IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

PRECISION CPAP, INC.; MEDICAL )
PLACE, INC.; PHASE III VANS, INC., )
d/b/a EAST MEDICAL EQUIPMENT AND )
SUPPLY; and MED-EX, )
                                            )
              **Plaintiffs,** )
                                              )
**vs.** )   **Civil Action No. 2:05-CV-1096-MHT-DRB**
                                              )
JACKSON HOSPITAL; MED-SOUTH, )   **ORAL ARGUMENT REQUESTED**
INC.; JMS HEALTH SERVICES, L.L.C., )
d/b/a JACKSON MED-SOUTH HOME )
HEALTH, L.L.C.; BAPTIST HEALTH, )
INC.; AMERICAN HOME PATIENT, INC.; )
BAPTIST VENTURES - AMERICAN )
HOME PATIENT, )
                                              )
              **Defendants.** )
_____ )

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      THE COMPLAINT IS SUBJECT TO DISMISSAL UNDER
        FED. R. CIV. P. 12(B)(1) FOR PLAINTIFFS' FAILURE
        TO ALLEGE INTERSTATE COMMERCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     PLAINTIFFS LACK ANTITRUST STANDING . . . . . . . . . . . . . . . . . . . . . . . . 7

III.    THE STATUTE OF LIMITATIONS HAS EXPIRED AS
        TO ALL PLAINTIFFS' CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE
        SHERMAN ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.      Plaintiffs Fail to Define an Economically Viable
                Relevant Product Market or Geographic Market . . . . . . . . . . . . . . . . . . 12

                1.      Plaintiffs' Claims Are Deficient for Failure
                        to Define a Product Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                2.      Plaintiffs Fail to Define a Relevant Geographic
                        Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      Plaintiffs Fail to Allege Facts Regarding the Existence
                of a Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.      Plaintiffs Fail to Allege Facts That Constitute An
                Unreasonable Restraint of Trade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        D.      Plaintiffs Fail to State a Claim for "Coercive Reciprocity" . . . . . . . . . . . 21

        E.      Plaintiffs Fail to State a Claim for "Concerted Refusal
                to Deal" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        F.      Plaintiffs' Section 2 Claims Should Be Dismissed
                Because the Antitrust Laws Do Not Require Defendants
                To Cooperate with Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        G.      Plaintiffs Fail to State a Claim for Monopolization or
                Attempted Monopolization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

361533-1

ii

V.    PLAINTIFFS FAIL TO STATE A CLAIM FOR INJUNCTIVE
      RELIEF ..................................................... 30

VI.   PLAINTIFFS' STATE LAW CLAIM IS SUBJECT TO
      DISMISSAL UNDER FED. R. CIV. 12(B)(1) FOR LACK
      OF SUPPLEMENTAL JURISDICTION ........................... 30

VII.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER ALABAMA ANTITRUST
      LAW ....................................................... 31

REQUEST FOR ORAL ARGUMENT ......................................... 32

CONCLUSION ....................................................... 32

CERTIFICATE OF SERVICE ............................................ 34

361533-1

## TABLE OF AUTHORITIES

**CASES**:

*Abbott Lab. v. Durrett*, 746 So. 2d 316 (Ala. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Advanced Health-Care v. Giles Mem. Hosp.*, 846 F. Supp. 488 (W.D. Va. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15, 29

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) . . . . . . . . . . . 3, 24-26

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8

*Austin v. Blue Cross & Blue Shield*, 903 F.2d 1385 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . 8

*Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342 (11th Cir. 1997) . . . . . . . . . . . . . . 31

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) . . . . . . . . . . . . . . . . . . . . . 7

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986) . . . . . . . . . . . . . . . . . . . 7, 29-30

*Carpet Group Inter'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp.2d 249 (D.N.J. 2003) 28

*Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . 16

*Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 994 F. Supp. 133 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Copperweld v. Independence Tube Corp.*, 467 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . 23, 28

*Covad Communications Co. v. BellSouth Corp.*, 374 F.3d 1044 (11th Cir. 2004) . . . . . . . 26-27

*Delaware Health Care, Inc. v. MCD Holding Co.*, 957 F. Supp. 535 (D. Del. 1997), *aff'd without opinion*, 141 F.3d 1153 (3rd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554 (8th Cir. 1998) . . . . . . . . . . . 14

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) . . . . . . . . . . . 28-29

*F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) . . . . . . . . . . . . . . . . . . . . . . . 12-13

*General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir.1987) . . . . . . . . . . . . . 13

*Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hosp. Bldg. Co. v. Rex Hosp. Trustees*, 425 U.S. 738 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*JES Properties, Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15-16, 17, 20

*Key Enters. of Delaware v. Venice Hosp.*, 703 F. Supp. 1513 (M.D. Fla. 1989), *reversed*, 919 F.2d 1550 (11th Cir. 1990), *reversal vacated*, 979 F.2d 806 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 23

*Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266 (5th Cir. 1979) . . . . . . . . . . 4, 18

*Levine v. Cent. Florida Medical Affiliates, Inc.*, 72 F.3d 1538 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13, 20, 24, 28, 29, 30

*McCluney v. Zap Professional Photography, Inc.*, 663 So. 2d 922 (Ala. 1995) . . . . . . . . . . . 31

*McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232 (1980) . . . . . . . . . . . . . . . . . . . 6

*Norman Tobacco & Candy Co. v. Gillette Safety Razor Co.*, 197 F. Supp. 333 (N.D. Ala. 1960), *aff'd*, 295 F.2d 362 (5th Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

*Norton Tire Co. v. Tire Kingdom Co.*, 858 F.2d 1533 (11th Cir. 1988) . . . . . . . . . . . . . . . . . 28

*Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Shahawy v. Harrison*, 778 F.2d 636 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Spanish Broadcasting Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4, 8, 20-21

*Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419 (5th Cir. 1978) . . . . . . . . . . . . . . . . . 12-13, 22

*Standard Oil Co. v. United States*, 221 U.S. 1, 58-64 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Florida*, 999 F.2d 503 (11th Cir. 1993) 7

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) . . . . . . . . . . . . . . . . . . . . . . 14-15

*Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991) . . . . . . . . . . . . . . 12-13, 14

*Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991) . . . . . . . . . . . . . . 7, 8-9, 30

*United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986 (11th Cir. 1993) . . . . . . . 13, 17, 20, 29

*United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86 (1975) . . . . . . . . . . . . . . . . . . 3

*United States v. Colgate & Co.*, 250 U.S. 300 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . 28, 32

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) . . . . . . . . . . . . . . . . . . . . 14

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 30

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) . . 24-27

*White v. Padgett*, 475 F.2d 79 (5th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Zenith Radio Corp v. Hazeltine Research*, 401 U.S. 321 (1971) . . . . . . . . . . . . . . . . . . 7-8, 11

## STATUTES AND RULES:

Sherman Act,
  Section One, 15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  Section Two, 15 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

15 U.S.C. § 15b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Clayton Act, Section 16, 15 U.S.C. § 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 31

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31

Ala. Code § 6-2-38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Alabama Antitrust Act, Ala. Code § 6-5-60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Fed. R. Civ. P. 12(B)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7, 30-31

361533-1

Fed. R. Civ. P. 12(B)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


**<u>TREATISES AND OTHER AUTHORITY</u>**:

Areeda & Hovenkamp, *Antitrust Law*, ¶ 335.1 (Supp. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 8

Areeda, Solow and Hovenkamp, *Antitrust Law*, ¶403 (2002) . . . . . . . . . . . . . . . . . . . . . . . 28

*Medicare Online Supplier Directory*, www.medicare.gov/Supplier/Home.asp . . . . . . . . . . . 17

361533-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| PRECISION CPAP, INC.; MEDICAL PLACE, INC.; PHASE III VANS, INC., d/b/a EAST MEDICAL EQUIPMENT AND SUPPLY; and MED-EX, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>JACKSON HOSPITAL; MED-SOUTH, INC.; JMS HEALTH SERVICES, L.L.C., d/b/a JACKSON MED-SOUTH HOME HEALTH, L.L.C.; BAPTIST HEALTH, INC.; AMERICAN HOME PATIENT, INC.; BAPTIST VENTURES - AMERICAN HOME PATIENT, )<br><br>Defendants. ) | Civil Action No. 2:05-CV-1096-MHT-DRB<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

COME NOW Defendants, by and through their respective counsel, and in support of their Motion to Dismiss filed this date, submit the following memorandum of law:

**INTRODUCTION**

Plaintiffs, suppliers of various types of durable medical equipment ("DME"), allege that in the past they obtained referrals of certain patients being discharged from Jackson Hospital ("Jackson") and the Montgomery and Prattville hospitals owned by Baptist Health, Inc. ("Baptist") because Jackson and Baptist assigned patients who needed DME but had expressed no preference to DME suppliers, including Plaintiffs, on a rotational basis. Complaint ¶¶ 15, 16. Plaintiffs further allege that in the late 1990's when Defendants JMS Health Services, L.L.C. ("JMS") and Baptist

Ventures - American Home Patient ("Baptist-AHP") became competitors of Plaintiffs, Jackson and Baptist stopped assigning patients to Plaintiffs, causing financial losses to Plaintiffs. Complaint ¶¶ 21, 27. On these facts, Plaintiffs bring various antitrust claims against Defendants, and ask that this Court require Baptist and Jackson to reinstate the claimed rotational assignment of patients that allegedly benefitted Plaintiffs before JMS and Baptist-AHP became their competitors. *See, e.g.,* Complaint at 10. In other words, Plaintiffs allege that Defendants are their competitors, but ask that the Court require Defendants to refer customers to Plaintiffs.

Significantly, Plaintiffs concede that patients at the Defendant hospitals have (and have always had) the freedom to choose any DME supplier they wish, including Plaintiffs. Complaint ¶¶ 16, 22. Indeed, there is no allegation that any Defendant has ever failed to honor a patient's choice of DME supplier. Plaintiffs simply decry the fact that they are not automatically *assigned* customers by the Defendant hospitals when a patient makes no independent selection, implying that this somehow prevents them from marketing to and serving consumers in and around Montgomery and Prattville.

Plaintiffs' claims should be dismissed for many reasons. Most of the inadequacies and problems with Plaintiffs' Complaint follow directly from the fact that Plaintiffs' claims are at complete odds with the very laws Plaintiffs seek to invoke. As the United States Supreme Court recently held:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing – a role for which they are ill-suited. Moreover, compelling negotiations between competitors may facilitate the supreme evil of antitrust:

2

collusion.  Thus, as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004)

(quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).

"The central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion – that is, by competing successfully rather than by arranging treaties with its competitors.'" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600 (1985) (quoting *United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86, 116 (1975)).  Plaintiffs' Complaint seeks to hold Defendants liable for competing with Plaintiffs – the very thing the antitrust laws are intended to protect - and seeks a forced customer-sharing arrangement among competitors - one of the things the antitrust laws are intended to prevent.  To allow Plaintiffs' claims would be to ignore the most basic tenet of antitrust jurisprudence:  that the antitrust laws were enacted for the "protection of competition, not competitors."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).

## ARGUMENT

The Supreme Court has held that, in assessing a motion to dismiss an antitrust claim, district courts should not "assume that the [plaintiff] can prove facts that it has not alleged or that defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).  "Moreover, even in our liberal pleading regime, antitrust plaintiffs must allege facts in support of each element of an antitrust violation . . . ."  *Spanish Broadcasting Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1077 (11th Cir. 2004).

"While great detail is unnecessary, a Sherman Act complaint must allege facts from which it can be determined as a matter of law that by reason of intent, tendency, or inherent nature of the contemplated acts, the conspiracy alleged was calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce." *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 274 (5th Cir. 1979).[1] "An antitrust complaint must comprehend a so-called *prima facie* case, and enough data must be pleaded so that each element of the alleged antitrust violation can be properly identified. Conclusory allegations that defendant violated the antitrust laws and plaintiff was injured thereby will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief." *Spanish Broadcasting*, 376 F.3d at 1077-78 (quoting *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 995 (11th Cir. 1983)).

Plaintiffs' Complaint in this case alleges six different claims. Two counts allege violations of Section 1 of the Sherman Act (Counts I and II); three counts allege violations of Section 2 of the Sherman Act (Counts III, V, and VI), and one count alleges a violation of the Alabama Antitrust Law (Count VIII). The complaint includes no Count IV or VII. Substantively, Plaintiffs' Complaint fails to allege a viable cause of action under the antitrust laws for numerous, fundamental reasons. As already noted, Plaintiffs are not seeking to further the goal of preserving competition, but are instead asking this Court to require cooperation among competitors. Moreover, this Court lacks subject matter jurisdiction because none of the allegations in Plaintiffs' Complaint implicate interstate commerce. Additionally, Plaintiffs lack antitrust standing, and their claims are barred by

---

[1] Decisions of the Fifth Circuit prior to October 1, 1981, are binding on the Eleventh Circuit Court of Appeals and district courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

applicable statutes of limitation.  Although the complaint should be dismissed for any one of these reasons alone, there are additional deficiencies.  Plaintiffs have not, and cannot, adequately plead many required elements of antitrust claims, such as injury to competition, a conspiracy or improper agreement among the Defendants, the existence of a monopoly or any intent to monopolize. Plaintiffs even fail to identify viable product or geographic markets applicable to the facts alleged in the complaint.   Plaintiffs' Complaint must be dismissed

## I.    THE COMPLAINT IS SUBJECT TO DISMISSAL UNDER FED. R. CIV. P. 12(B)(1) FOR PLAINTIFFS' FAILURE TO ALLEGE INTERSTATE COMMERCE.

Plaintiffs' Complaint, which purports to raise claims under the federal antitrust laws, makes no mention of interstate commerce, an element that is not only necessary to state a claim, but also to invoke this Court's jurisdiction.  "[P]leading Sherman Act jurisdiction requires allegations that defendant's business activities have a substantial impact on interstate commerce."  *Shahawy v. Harrison*, 778 F.2d 636, 641 (11th Cir. 1986).  For this reason alone, the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

The Complaint alleges only that the Plaintiffs are Alabama corporations in the DME business in Montgomery, Alabama, Complaint ¶¶ 3-6, and that they "provide home health care services and home health care equipment to patients in Montgomery and Prattville, Alabama."  Complaint ¶ 14. Plaintiffs allege that Defendants either own or are DME businesses in Alabama.  Complaint ¶¶ 7-12.

There is no allegation that any transaction at issue occurs anywhere but in the State of Alabama, and no allegation that patients to whom Plaintiffs seek to lease DME are residents of any state other than Alabama.  Indeed, Plaintiffs specifically limit their allegations to include only patients of Jackson and Baptist, and allege that the "two defendants are the source of primary hospital services for the majority of residents in the Montgomery, Alabama area."  Complaint ¶ 13.

Plaintiffs further allege that "Plaintiffs compete in the DME business in and around Montgomery, Alabama." Complaint ¶ 14.

Plaintiffs' Complaint is clearly limited to local, intrastate activity. To satisfy the interstate commerce requirement and invoke Sherman Act jurisdiction under such circumstances, Plaintiffs must allege facts sufficient to show a *substantial effect* on interstate commerce. *See McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 242 (1980). The United States Supreme Court held in *McLain* that, to establish federal jurisdiction, Plaintiffs must show that the "activities which allegedly have been infected by [an antitrust] conspiracy . . . 'as a matter of practical economics'. . . have a not insubstantial effect on the interstate commerce involved." *Id*. at 246 (quoting *Hosp. Bldg. Co. v. Rex Hosp. Trustees*, 425 U.S. 738, 745 (1976)). "[J]urisdiction may not be invoked under [the Sherman Act] unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce. To establish jurisdiction a plaintiff must allege the critical relationship in the pleadings . . . ." *Id*. at 242 (citing *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 202 (1974)).

Plaintiffs have not alleged that any aspect of interstate commerce is involved in this case, much less alleged any facts to show the critical relationship between the activities at issue and their substantial effect on interstate commerce. They have therefore failed to invoke federal jurisdiction under the Sherman Act, the only basis on which they claim this Court has jurisdiction. Complaint ¶ 1. "[T]he mere assertion that the district court had federal jurisdiction pursuant to 28 U.S.C. § 1331, without alleging facts necessary to support a federal question, fails to give the district court subject matter jurisdiction." *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Florida*, 999

F.2d 503, 507 (11th Cir. 1993). Therefore, the complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

## II.     PLAINTIFFS LACK ANTITRUST STANDING.

Plaintiffs' Complaint is also subject to dismissal for Plaintiffs' lack of antitrust standing. "[A]ntitrust standing is not simply a search for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991) (citing *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)). "Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust law." *Id.* (citing *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 110 n.5 (1986)). The Court must "evaluate the plaintiffs' harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* at 1449 (citing *Associated Gen.*, 459 U.S. at 535).

To establish antitrust standing, Plaintiffs must satisfy a two-pronged test: (1) Plaintiffs must have suffered an "antitrust injury," and (2) Plaintiffs must be efficient enforcers of the antitrust laws. *Id.* at 1449. To establish antitrust injury, Plaintiffs must show that they have suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The Supreme Court has held that "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969))." In other words, an antitrust plaintiff must "show that his own injury coincides with the public detriment tending to result from the alleged

7

violation . . . increas[ing] the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition." *Austin v. Blue Cross & Blue Shield*, 903 F.2d 1385, 1389-90 (11th Cir. 1990) (quoting Areeda & Hovenkamp, *Antitrust Law*, ¶ 335.1, 261 (Supp. 1987)).

Plaintiffs make vague allegations that the "monopolistic practices of Defendants. . . . will lead to higher prices . . . [and] eventually erode the services offered by the companies," Complaint ¶ 26, but such vague allegations do not suffice in the Eleventh Circuit to allege injury to competition. *See Spanish Broadcasting Sys.*, 376 F.3d at 1079 (antitrust complaint dismissed for failure to state a claim). Plaintiffs' failure to allege "that prices have actually risen or that the quantity of [the relevant product] has actually decreased," is a failure to allege "actual harm to competition." *Id.* Indeed, Plaintiffs here are unable to allege that prices have actually risen or that service actually eroded due to conduct that Plaintiffs claim started at least six (6) years ago in the "the late 1990's." Complaint ¶ 18.

The second prong of the antitrust standing test is satisfied only if Plaintiffs are the proper plaintiffs to bring the antitrust claim. It is not sufficient merely to allege a "causal connection between the plaintiffs' harm and an antitrust violation and that the defendants intended to cause that harm." *Todorov*, 921 F.2d at 1451. Such allegations would merely make the claim one "'literally encompassed by the Clayton Act,'" *id.* (quoting *Associated Gen.*, 459 U.S. at 537), but would not satisfy the second prong of the test.

In *Todorov*, a doctor sued a hospital and group of radiologists for the hospital's refusal to allow him privileges to administer and interpret CT scans. He claimed that the hospital's practice of allowing only its staff radiologists to administer and interpret CT scans made it necessary for his patients to incur the expense of an additional doctor, a radiologist at the hospital. He claimed that

8

the hospital and radiologists were guilty of violations of Sections 1 and 2 of the Sherman Act for denying him access to conduct CT scans and sought damages and privileges at the hospital. *Todorov*, 921 F.2d at 1444-45.

Affirming dismissal of the doctor's claims, the Eleventh Circuit held that Dr. Todorov lacked antitrust standing because he did not seek to protect competition, but merely sought to be a participant in what he claimed was a monopoly. *Id.* at 1454. The Supreme Court has long held that the antitrust laws were enacted for the "protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). Dr. Todorov's injury was not the type the antitrust laws address. He was "simply seeking to increase his profits, like any competitor," *Todorov*, 921 F.2d at 1455, and seeking to share in what he claimed were monopolistic profits. *Id.* at 1453-54.

The relief that Dr. Todorov sought demonstrated that he was not an efficient plaintiff to bring an antitrust claim. The court explained:

> Dr. Todorov is simply looking to increase his profits, like any competitor. As such, Dr. Todorov is a particularly poor representative of the patients; indeed, his interests in this case are so at odds with the patients' interests that it is unlikely that he would have standing under article III of the Constitution to present their claims. Dr. Todorov is thus no champion for the cause of consumers.

*Id.* at 1454-1455.

Plaintiffs' allegations are no different than Dr. Todorov's. Plaintiffs claim that they are not being allowed to participate in a DME market for patients at Baptist and Jackson, but what they seek is a return to an alleged rotational assignment process that would ensure them some business from Baptist and Jackson patients. Their allegations, if true, foreclose the possibility that Plaintiffs' success would promote competition. Assigning patients to Plaintiffs on a rotational basis would serve no competitive purpose. Indeed, if Plaintiffs know they will get some business through

9

rotation no matter what they do, then they have no incentive to compete. They could set their price on non-regulated sales and pay no attention to service, and still know that they would have their place in the rotation.

Plaintiffs' allegations and requested relief make clear that they are not attempting to protect competition, but to increase their profits without having to compete. Because their Complaint demonstrates that Plaintiffs would not be "efficient enforcers of the antitrust laws," they are not the proper plaintiffs to bring such claims. Plaintiffs' failure to allege an antitrust injury coupled with their failure to establish that they are proper plaintiffs require the dismissal of the Plaintiffs' Complaint for lack of antitrust standing.

## III.    THE STATUTE OF LIMITATIONS HAS EXPIRED AS TO ALL PLAINTIFFS' CLAIMS.

Although Defendants recognize that the statute of limitations is an affirmative defense, "the complaint is subject to dismissal under [Fed. R. Civ. P. 12(b)(6)], for failure to state a claim upon which relief can be granted when the affirmative defense clearly appears on the face of the complaint." *White v. Padgett*, 475 F.2d 79, 82 (5th Cir. 1973). Plaintiffs allege that the injury they suffer was caused when the Defendant hospitals ceased the rotational assignment of those patients in need of DME who had expressed no preferences and allege that the cessation occurred upon the creation of JMS and Baptist-AHP in "the late 1990's." Complaint ¶¶ 18, 21. Federal antitrust actions, however, must be brought "within four years after the cause accrues." 15 U.S.C. § 15b. Antitrust actions under Alabama law have a two-year statute of limitations, and a refusal-to-deal action accrues when the Defendant first refuses to deal with the plaintiff. *Norman Tobacco & Candy Co. v. Gillette Safety Razor Co.*, 197 F. Supp. 333, 335-36 (N.D. Ala. 1960), *aff'd,* 295 F.2d 362 (5th

Cir. 1961) (applying Alabama's one-year, now two-year statute of limitations under Ala. Code § 6-2-38, applicable to torts to antitrust claim).

"[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Zenith Radio Corp v. Hazeltine Research*, 401 U.S. 321, 339 (1971). Here, Plaintiffs allege that Defendants' improper practices occurred upon the formation of the hospital-affiliated DME companies in the "late 1990's." By Plaintiffs' own allegation, these events occurred more than four years ago, and certainly more than two years ago. Therefore, the fact that the statute of limitations has expired is apparent from the face of the Complaint, and Plaintiffs' claims should be dismissed.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SHERMAN ACT.

Plaintiffs' Complaint alleges violations of either Section 1 or 2 of the Sherman Act in Counts I, II, III, V, and VI. Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies in restraint of trade, while Section 2 of the Act prohibits unilateral monopolization and attempted monopolization, as well as conspiracies to monopolize.[2]

Each of the antitrust counts in the Plaintiffs' Complaint fails for several reasons. The failure to identify viable product and geographic markets and to allege anticompetitive effect is fatal to *all* of the federal antitrust claims. Counts I, II and VI must be dismissed because the Complaint does

---

[2] Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2.

not allege facts sufficient to establish a conspiracy.  In addition, the Count I claim fails because there

is no allegation in the Complaint that either hospital is a buyer of anything, or that any third party

has recommended JMS or Baptist-AHP as a result of any reciprocal agreement.  Plaintiffs' Section

2 claims (Counts III, V, and VI) are further subject to dismissal because the Complaint does not

allege that Defendants, or more importantly that any single Defendant, had a monopoly in any

geographic market, or that there was a dangerous probability of a Defendant acquiring monopoly

power in any relevant market.

> **A.**    **Plaintiffs Fail to Define an Economically Viable Relevant Product Market or Geographic Market.**

Plaintiffs' failure to define a relevant market on which their claims are based is fatal to all

of their claims.  "On a very simplistic level, antitrust law is concerned with abuses of power by

private actors in the marketplace.  Therefore, before we can reach the larger question of whether [a

Defendant] violated any of the antitrust laws, we must confront the threshold problem of defining

the relevant market."  *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991).

Under the rule-of-reason[3] and in all claims alleging violations of Section 2, an antitrust plaintiff must

---

[3] Defendants acknowledge that Plaintiffs have made claims they label as "coercive reciprocity," Complaint ¶¶ 28-34, and "concerted refusal to deal," Complaint ¶¶ 35-39, which under some circumstances (not present here) receive *per se* treatment by the courts.  However, claims of the type raised in this case must be analyzed under the rule-of-reason, which requires proof of anticompetitive effect in a relevant product and geographic market.  Conduct that is alleged to constitute a coercive reciprocity agreement receives *per se* treatment only if a Defendant has "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product... ."  *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 425 (5th Cir. 1978).  Similarly, the notion that Plaintiffs' claim of concerted refusal to deal warrants *per se* treatment is undercut by *Levine v. Cent. Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1549-50 (11th Cir. 1996) (noting Supreme Court's recognition that "the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor") (citing *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986)).  As

define both a product market and a geographic market to satisfy the relevant market requirement, and the anti-competitive effect alleged must occur in that relevant market.  *Id.*; *see also Levine v. Cent. Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1555 (11ᵗʰ Cir. 1996).  Plaintiffs' Complaint fails to define an economically rational relevant product market or geographic market.

### 1.    Plaintiffs' Claims Are Deficient for Failure to Define a Product Market.

The Complaint fails to allege the relevant product market alleged to be at issue.  Defining a relevant product market is primarily "a process of describing those groups of producers which, because of the similarity of their products, have the ability--actual or potential--to take significant amounts of business away from each other." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11ᵗʰ Cir. 1993) (citing *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8ᵗʰ Cir.1987)).

Throughout the Complaint, Plaintiffs make various allegations about competition and exclusion in "the [DME] leasing market," and the "DME market." See, e.g., Complaint ¶¶ 33, 34, 37, 39, 42, 44, 49, 58.  Plaintiffs never attempt to distinguish these two product markets, and they acknowledge that Plaintiff Precision CPAP "is not a 'full-line' DME provider, but specializes in the provision or [sic] respiratory therapeutic services."  Complaint ¶ 2.  Plaintiffs also create confusion regarding purported product market definition by their repeated request, in prayers for relief, that the Court order Defendants "to assign discharged patients to the respective *home health care agencies* in the area...".  Complaint at 10, 11, 13, 15, 17 19 (emphasis added).  Suffice it to say, the Complaint does not allow Defendants to know whether Plaintiffs are concerned with the "DME

discussed in Sections IV-D & IV-E, *infra,* Plaintiffs have not alleged any facts to bring them within the *per se* framework for either claim.

13

market," the "DME leasing market," the "home health care" market or some subset thereof. Plaintiffs' failures to define a single product market and to allege any facts describing the characteristics of that market are fatal to the Complaint.

### 2.    Plaintiffs Fail to Define a Relevant Geographic Market.

The more striking deficiency in Plaintiffs' claims is the failure in the Complaint to define a viable geographical market. Plaintiffs make no attempt whatsoever to define a geographic market for Counts I, II or III. Lacking any definition of a geographic market, these claims are obviously legally insufficient.

In Counts V and VI, Plaintiffs attempt to define the geographic market as "patents [sic] that are discharged from the Defendant hospitals." Complaint ¶¶ 50, 59. No matter what the scope of the geographic market, it certainly cannot be defined simply by reference to the patients of a particular hospital. The concept of a geographic market is "essentially an economic concept in which the courts should examine 'supplier-customer relations.'" *Thompson*, 934 F.2d at 1573 (quoting *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 357 (1963)). A geographic market "includes the geographic area in which consumers can practically seek alternative sources of the product, and it can be defined as [the] market area in which [the] seller operates." *JES Properties, Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1282 (M.D. Fla. 2003) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) and *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998)).

Defendants are not aware of any antitrust case in which a court accepted a geographic market defined as "patients from a particular hospital," and have identified several decisions that *rejected* such a proposed definition. *See, e.g., Advanced Health-Care Svcs. v. Giles Mem. Hosp.*, 846 F.

14

Supp. 488, 494 n. 10 (W.D. Va. 1994) (granting summary judgment for defendants after rejecting plaintiff's market share statistics since "the proper geographic market for this analysis is Giles County, not Giles Memorial Hospital").[4]

By Plaintiffs' own definition, DME is used by consumers outside of a hospital setting. Complaint ¶ 3 ("the one business is the provision of medical devices needed for care in the homes of patients after discharge from the hospital"). Consumers do business with DME suppliers and other home health care providers not only through hospital referrals, but through referrals from doctor's offices, nursing homes, and home health agencies. Consumers also find and do business with DME suppliers on their own, by virtue of referrals from friends and direct marketing. *See Key Enters. of Delaware v. Venice Hosp.*, 703 F. Supp. 1513, 1518 (M.D. Fla. 1989), *reversed*, 919 F.2d 1550 (11th Cir. 1990), *reversal vacated*, 979 F.2d 806 (11th Cir. 1992) (noting that DME suppliers rent and sell their products, and receive customers from many sources, including self-selection or "street walk-ins," referrals from hospitals, nursing homes and intermediate care facilities, home health agencies, physicians and physical therapists)[5]. There is no justification for a departure from the established practice of defining a geographic market by looking to "the geographic area in which

_____

[4] *See also Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 994 F. Supp. 133, 140-41 (E.D.N.Y. 1998) (rejecting argument that other courts had accepted relevant markets consisting of DME referrals "stemming from a single hospital").

[5] *See also Delaware Health Care, Inc. v. MCD Holding Co.*, 957 F. Supp. 535, 538 (D. Del. 1997), aff'd without opinion, 141 F.3d 1153 (3rd Cir. 1998) (noting that home health care providers often rely on referrals and that "such referrals come from hospitals, physicians, insurance companies, health maintenance organizations ("HMO's"), nursing homes, state contracts and other patients").

consumers can practically seek alternative sources of the product." *JES Properties*, 253 F. Supp. 2d at 1282.[6]

Here, the proper contours of any geographic market must be at least as large as the area in and around Montgomery and Prattville, and as discussed below may be significantly larger. Plaintiffs state in their Complaint that they "compete in and around Montgomery," and that they "provide home health care services and home health care equipment to patients in Montgomery and Prattville." Complaint ¶ 14. The only logical explanation for including both Jackson and Baptist in Plaintiffs' Complaint is the proximity of these hospitals to each other and to Plaintiffs, yet this only underscores the defects in the "patients discharged from each separate hospital" market definition that Plaintiffs appear to propose. Given the parties' proximity, it is clear that patients at any of the hospitals, like all consumers in and around Montgomery and Prattville, live in a geographic area where they "can practically seek alternative sources of the product" from a multitude of DME suppliers.[7]

---

[6] A great deal of antitrust litigation has focused on physicians' staff privileges at hospitals. Since, unlike DME sales and service, much medical care can only take place in a hospital setting, a physician's access to a hospital is, if anything, *more* important than a DME supplier's access to a hospital. Yet courts in staff privileges cases have also roundly rejected attempts by plaintiffs to define a geographic market as consisting of a particular hospital. *See Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 480 n. 5 (7th Cir. 1987) (plaintiff was "slicing the geographic market much too thin" in limiting market to one hospital), *cert. denied*, 488 U.S. 852 (1988); *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 877 (3rd Cir. 1995) (citing decisions by the 3rd, 4th, 5th, 7th and 8th Circuits as showing that "every court that has addressed this issue has held or suggested that, absent an allegation that the hospital is the only one serving a particular area or offers a unique set of services, a physician [denied staffing privileges] may not limit the relevant geographic market to a single hospital").

[7] In fact, as of January 2006, there were a total of 95 Medicare-enrolled DME suppliers listed in Medicare's online supplier directory located within a 25-mile radius of Montgomery. *See* www.medicare.gov/Supplier/Home.asp.

Further, Plaintiffs provide no factual basis on which to assume that the geographic market is even limited to the area in and around Montgomery and Prattville. They allege that Defendant Med-South, Inc. is in the DME business in the "State of Alabama," and place no limitations on Defendant American Home Patient, Inc.'s geographical scope of business. If consumers in and around Montgomery and Prattville can obtain DME from vendors in Birmingham or Mobile, then the geographic market includes those areas as well. Plaintiffs' proposed geographic market fails as a matter of law. Because the failure to define a proper product market and a relevant geographic market is fatal to all of the Plaintiffs' claims, the Complaint should be dismissed.

**B. Plaintiffs Fail to Allege Facts Regarding the Existence of a Conspiracy.**

For the claims in Counts I, II, and VI to survive, the Complaint must adequately allege (1) the existence of concerted action between two or more Defendants (2) that unreasonably restrains competition. *See U.S. Anchor Mfg.*, 7 F.3d at 1001-1002 ("a section 1 claim and a section 2 conspiracy to monopolize require the same threshold showing -- the existence of an agreement to restrain trade."). To be sure, Plaintiffs repeatedly assert or imply in a conclusory manner that their claims are based on concerted action, yet Plaintiffs fail to allege any facts to support the element of concerted action.

A complaint cannot survive a motion to dismiss with only conclusory allegations of a conspiracy. In *JES Properties*, a district court dismissed a complaint that alleged "[a]ll of the Defendants acted as a part of a common scheme to violate the antitrust laws which have an adverse effect on competition." 253 F. Supp. 2d at 1280. The court noted that "[t]he Complaint [did] not state with any degree of specificity the Defendants' alleged concerted conspiratorial conduct nor how the [alleged conspiratorial conduct] relate[d] to Plaintiffs' section 1 claim." *Id*. Further, the

17

complaint did not allege "that Defendants were conscious of each other's conduct nor that this awareness was an element in their decision-making process." *Id.* Finding that there were no facts to support an inference that there were concerted activities among the defendants with respect to the alleged antitrust activity, the district court dismissed the complaint. *Id.* at 1280, 1283.

Plaintiffs' Complaint here suffers from the same fatal flaw. The only references in the Complaint to a conspiracy or other concerted activity are:

¶ 23  ". . . Defendants have combined, contracted and/or conspired to create a monopoly . . ."

¶ 30  "The contracts, combinations and/or conspiracies by and among Defendants whereby Defendant hospitals allocate the assignment of patients . . . to their captive DME providers constitutes [sic] a coercive reciprocity agreement . . ."

¶ 34  "The contracts, combinations and/or conspiracies among the Defendants seriously threatening [sic] irreparable harm . . . ."

¶ 37  "The contracts, combinations and/or conspiracies by and among Defendants whereby Defendants have agreed or otherwise acted in concert to the exclusion of all other competitors . . . constitutes a concerted refusal to deal . . . ."

¶ 60  "Defendants have contracted, combined and conspired in a series of unlawful and wrongful activities and communications with the specific intent to acquire or maintain for Defendants monopoly power . . . ."

These allegations are nothing more than conclusions that there was a conspiracy, and are therefore insufficient to state a claim for conspiracy or improper concerted action under the Sherman Act. *See Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979) ("A general allegation of conspiracy . . . without a statement of the facts constituting the conspiracy, is a mere allegation of a legal conclusion and is inadequate of itself to state a cause of action.").

Nowhere in the Complaint can one find any factual allegation explaining what Defendants supposedly agreed to do (or even stating that they actually did anything together) that relates to

Plaintiffs' claims.  Moreover, Plaintiffs make the bald claim that "Defendants" conspired, but give no indication of with whom they are alleged to have conspired.  There is no factual allegation from which one could surmise that Jackson, Med-South, and JMS, on the one hand, and Baptist, AHP, and Baptist-AHP, on the other, had any knowledge whatsoever of the others' activities.  There is certainly no allegation that their supposed activity -- ceasing use of the rotational assignment process -- was the result of any agreement between the two groups, or between any members of the two groups.  Plaintiffs allege only that Jackson and Baptist "ceased the rotational assignment." Complaint ¶ 21.

Jackson and Baptist are unaffiliated competitors.  Given the vagueness of the Complaint, one cannot determine if Plaintiffs claim that Jackson and Baptist conspired with one another, or that either conspired with the other's DME company; in any case, no facts are alleged to support either idea.  Instead, the Complaint contains specific allegations that indicate a *lack* of concerted activity; Plaintiffs allege that Baptist employees only refer patients to Baptist-AHP, while Jackson employees only refer patients to JMS.  Complaint ¶¶ 22, 24.  There is simply no factual allegation that Jackson, Med-South, or JMS conspired with Baptist, AHP, or Baptist-AHP, and no allegation from which such an inference could be drawn.  With regard to federal antitrust claims alleging concerted action, the plaintiff has the burden of disproving the possibility that the defendants acted independently or legitimately.  *U.S. Anchor Mfg.*, 7 F.3d at 1002.  Plaintiffs' Complaint contains no allegations that could meet this burden.  Plaintiffs' failure to allege facts regarding the existence of a conspiracy renders Counts I, II, and VI of their Complaint legally insufficient.

**C.    Plaintiffs Fail to Allege Facts That Constitute An Unreasonable Restraint of Trade.**

Even if Plaintiffs had alleged some agreement among any of the Defendants, they have failed to allege an unreasonable restraint of trade.  "[N]ot every agreement that restrains competition will violate the Sherman Act.  The Supreme Court long ago determined that Section 1 prohibits only those agreements that *unreasonably* restrain competition." *Levine*, 72 F.3d at 1545 (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 58-64 (1911)) (emphasis in original).  In a Section 1 claim, Plaintiffs "must allege that defendants' conduct had an impact upon competition... and that the alleged restraint on trade was unreasonably calculated to prejudice public interest." *JES Properties*, 253 F. Supp. 2d at 1281.  Proof of "anticompetitive effect" in the relevant market is similarly a requirement in a Section 2 claim. *Spanish Broadcasting Sys.*, 376 F.3d at 1077.

In *Spanish Broadcasting*, the plaintiff offered conclusory allegations that "Defendants' exploitation of their dominance of those markets has caused injury to competition by limiting alternatives available to advertisers, performers and the listening audience," and "[defendants'] conduct has and will continue to affect prices for advertisements, the quality of programming, and the prices for advertisers' products." *Id.* at 1078-79.  The Eleventh Circuit found that "neither statement claims that prices have actually risen or that the quantity of available Spanish-language advertising time has actually decreased," and therefore neither statement alleged "actual harm to competition." *Id.* at 1079.

Ultimately, the Court dismissed the plaintiff's complaint, reasoning:

[Plaintiff] offers no specific factual allegations to support the likelihood of any of this happening.  Rather, [plaintiff] merely assumes, conclusorily, a pernicious monopoly capable of limiting output and raising prices and then proceeds to describe the other evils that might flow from this monopoly.  We hold that these conclusory

20

allegations, unsupported by specific factual allegations, do not state a claim for relief under the antitrust laws.

*Id.*

In this case, Plaintiffs' allegations are even weaker. Plaintiffs allege that Defendants' practices have been on-going since "the late 1990's," but the Plaintiffs remain in business (in one case through a successor). Plaintiffs never even allege generally that prices have increased or that service has suffered. Instead, the Complaint repeatedly speaks in a conclusory fashion about what *may* happen in the future. For example, Plaintiffs allege that the Defendants' activities "will lead to higher prices" and "will eventually erode the services offered." Complaint ¶ 26. Plaintiffs cannot state a claim by generally alleging that they "will be driven out of business." Complaint ¶ 39. Plaintiffs' failure to allege facts regarding injury to competition mandates dismissal of all of Plaintiffs' claims.

### D.    Plaintiffs Fail to State a Claim For "Coercive Reciprocity."

In addition to the general defects in all Plaintiffs' conspiracy claims, each count suffers from its own specific deficiencies. In Count I, Plaintiffs claim that "the hospital defendants," Jackson and Baptist, "have exclusive control of a substantial share of patient referrals and, accordingly, have the power to otherwise unduly influence the patients, doctors, nursing homes or home health care agents' selection or recommendation of durable medical equipment vendors." Complaint ¶ 31. Plaintiffs further claim that the hospital Defendants "unlawfully exercise said power to coerce, pressure or otherwise unduly influence" the selection or recommendation of the "captive DME companies,"[8] Complaint ¶ 32, as they describe JMS and Baptist-AHP, Complaint ¶ 19. Plaintiffs

---

[8] Plaintiffs only claim that the "hospital defendants" have the power to influence others. Complaint ¶ 31. Furthermore, they do not seek to "deal" with any of the DME supplier defendants. From this it follows that any claims based on coercion or refusal to deal could not

claim that these allegations constitute a "coercive reciprocity agreement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." Complaint ¶ 30.

"In reciprocal dealings a buyer with economic power forces a seller to buy something from it to sell its goods." *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 425 (5th Cir. 1978). Plaintiffs claim that the alleged "contracts, combinations and/or conspiracies" that constituted a "coercive reciprocity agreement" were "by and among Defendants." Yet, Plaintiffs do not allege that any Defendant had economic power in any relevant market. Plaintiffs simply allege that the "Defendant hospitals" have "exclusive control of a substantial share of patient referrals," and therefore allegedly have some power to influence the selection of DME vendors. Complaint ¶ 30. Even if these allegations sufficiently defined a proper market, which they do not, there is no allegation in Count I that any Defendant has market power in any market. Without market power, a defendant cannot be guilty of coercing anyone to do anything in violation of Section 1.

There is also no factual allegation that either of the Defendant hospitals were buyers of anything, much less that they forced any seller "to buy something from it to sell its goods." Plaintiffs simply allege that unspecified "contracts, combinations and/or conspiracies" resulted in the Defendant hospitals allocating the assignment of patients to their "captive DME providers." Complaint ¶ 30.

Plaintiffs' decision to assert a "coercive reciprocity agreement" claim appears inexplicable. With respect to Jackson, Plaintiffs concede that Jackson patients may choose a DME company other than JMS, but that Jackson prefers the recommendation of JMS by Jackson staff "when possible."

---

extend to the DME supplier Defendants. These are merely additional grounds upon which to dismiss Counts I and II against JMS, Med-South, Baptist-AHP and AHP.

Complaint ¶ 22. With respect to one of Baptist's hospitals, Plaintiffs claim only that *hospital personnel* have said they "have an 'obligation' to refer patients only to [Baptist-AHP]," Complaint ¶ 24, but any claim of a coercive reciprocity agreement (or other conspiracy) between a hospital and its employees fails as a matter of law because an agreement between a company and its employees cannot constitute a violation of Section 1. *See Copperweld v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984). For this reason, even if Plaintiffs can, as they allege, produce evidence that each hospital urges its staff to use an affiliated DME provider for referrals (and discourages staff referrals to a competitor except when requested by a patient), such allegations do not create a claim under the Sherman Act.

Plaintiffs additionally allege in their Complaint that, prior to the formation of JMS and Baptist-AHP, Jackson and Baptist assigned patients to DME providers on a rotational basis, and Plaintiffs were able to market themselves to be in the rotation. Complaint ¶¶ 15-16. They allege that after the formation of JMS and Baptist-AHP, the purported rotational assignment ceased. Complaint ¶ 21. There is no factual allegation that any third party has recommended JMS or Baptist-AHP as a result of any reciprocal agreement.

Plaintiffs are free to market to persons who may one day be patients at Jackson or Baptist, i.e., patients whose discharge is not imminent, and to convince them to choose one of Plaintiffs' companies for their DME needs. *See Key Enters. of Delaware v. Venice Hospital*, 703 F. Supp. 1513, 1518 (M.D. Fla. 1989), *reversed*, 919 F.2d 1550 (11th Cir. 1990), *reversal vacated*, 979 F.2d 806 (11th Cir. 1992) (finding that plaintiffs had other competitive options in the DME market, and noting that they could compete for consumers coming from other sources, "including street walk-ins,

nursing homes, physical therapists and physicians"). Plaintiffs are free to compete, but they do not seek to compete. Plaintiffs just want to be placed in a rotation that promises them business.

### E.   Plaintiffs Fail to State a Claim For "Concerted Refusal to Deal."

A claim of concerted refusal to deal of the type raised in Count II requires proof of anticompetitive effect in a relevant product and geographic market. *See Levine v. Centr. Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1549-50 (11th Cir. 1996) (presumption in Section 1 cases is that rule-of-reason applies). The Eleventh Circuit held in *Levine* that the rule of reason was appropriate where a doctor alleged that his exclusion from a preferred provider list amounted to a concerted refusal to deal, since the plaintiff had made no showing that the defendants had market power. *Id.* at 1550. Similarly, here Plaintiffs have not alleged market power in any relevant market. The failure to allege market power forecloses *per se* treatment, and results in the need to allege facts supporting a conspiracy with anticompetitive effect in a relevant product and geographic market. Given the failure to allege those facts (discussed *supra*), Plaintiffs' concerted refusal to deal claim must be dismissed.

### F.   Plaintiffs' Section 2 Claims Should Be Dismissed Because the Antitrust Laws Do Not Require Defendants to Cooperate with Plaintiffs.

Plaintiffs' Section 2 claims (Counts III, V and VI) fall under a category the Supreme Court has labeled as "refusal to cooperate with a rival." *Trinko*, 540 U.S. at 408. In *Trinko* it was alleged that Verizon had violated Section 2 by denying competitors adequate access to its established telecommunications network, so as to limit competitors' entry into the market. In holding that the Second Circuit had erred in reinstating a complaint dismissed by the district court, the Supreme Court held that "Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents." *Id.* at 410.

24

In so holding, the Court discussed its previous decision in *Aspen Skiing Co.*, 472 U.S. 585 (1985), in which the Court held that the defendant, who owned three of the four mountain areas in Aspen, could be held liable for failing to cooperate with the plaintiff, who owned the fourth mountain area, in the issuance of joint, all-area ski tickets. The defendant had cooperated with its competitor in the past in issuing joint tickets, but, in an alleged attempt to drive the plaintiff company out of business, had refused to continue issuing joint tickets, and had refused requests by the plaintiff to purchase tickets for defendants' mountains, even at retail price, so that the plaintiff could still provide all-area ski tickets to its customers. The *Aspen Skiing* Court upheld a jury verdict in favor of the plaintiff, "reasoning that '[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor.'" *Trinko*, 540 U.S. at 409 (quoting *Aspen Skiing*, 472 U.S. at 608).

In *Trinko*, the plaintiff claimed that *Aspen Skiing* required that dismissal of its complaint be reversed, but the Court disagreed. It held that, unlike the plaintiff in *Aspen Skiing*, the plaintiff in *Trinko* had not alleged that the defendant had turned down a proposal to sell its own product at retail price to plaintiff, and had not alleged that the defendant had previously voluntarily engaged in a course of conduct with its rivals. Therefore, the Court held, "the defendant's prior conduct sheds no light upon the motivation of its refusal to deal . . . ." *Id.* The Court explained: "The unilateral termination [in *Aspen Skiing*] of a voluntary (*and thus presumably profitable*) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end. Similarly, the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Id.* (citing *Aspen Skiing*, 472 U.S. at 608, 610-11) (emphasis in

original).  The Court added that "*Aspen Skiing* is at or near the outer boundary of § 2 liability," *id.*, and reversed and remanded the case for dismissal of the complaint for failure to state a claim.  *Id.* at 416.

Similarly, in *Covad Communications Co. v. BellSouth Corp.*, 374 F.3d 1044 (11th Cir. 2004), the Eleventh Circuit recognized that *Aspen Skiing* represented a very limited exception to the rule that companies are not required to assist their competitors in the market.  In *Covad*, an Internet service provider ("ISP") brought Section 2 claims against BellSouth, claiming that BellSouth, who also competed as an ISP, did not allow the plaintiff adequate access to BellSouth's telephone lines, which were necessary for the plaintiff to compete as an ISP.  *Id.* at 1046.

The Eleventh Circuit held that *Trinko* required dismissal of the complaint for failure to state a claim because the plaintiff had not alleged any of the conduct necessary to bring a case within *Aspen*'s very limited exception:  (1) that the defendant had refused to sell otherwise publicly marketed services to the plaintiff, even at retail prices; and (2) had ceased a voluntary course of dealing with its competitor.  The Court of Appeals in *Covad* stated that "*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under *Aspen*."  *Id.* at 1049.

As in *Trinko* and *Covad*, Plaintiffs here do not allege facts that would bring them within *Aspen*'s narrow exception, and have therefore failed to state a claim under Section 2.  First, there is no allegation that Defendants have refused to sell any of their products to Plaintiffs, or that Plaintiffs have asked to purchase them.  Second, there is no allegation that Defendants ceased a voluntary arrangement with their competitors, particularly one that was "presumably profitable" to Defendants.  *Trinko*, 540 U.S. at 409.  While Plaintiffs allege that Jackson and Baptist ceased to use

26

a rotational assignment procedure for patients needing DME, they make clear that any cessation

occurred when JMS and Baptist-AHP, respectively, were created.  Complaint ¶ 21.  They do not

allege that Defendants participated in a voluntary course of dealing with their competitors.

Once Jackson and Baptist became owners of JMS and Baptist-AHP, they stopped referring

patients to competitors of JMS and Baptist-AHP.  In other words, once each became a competitor

of the Plaintiffs, Jackson and Baptist acted as competitors.  Defendants Med-South, AHP, JMS and

Baptist-AHP have always been competitors of Plaintiffs, and were never involved in any course of

dealing, voluntary or otherwise, with Plaintiffs, and therefore could not have discontinued a course

of dealing.

As in *Trinko* and *Covad,* Plaintiffs' claim that Defendants have not adequately assisted

Plaintiffs in their business "is not a recognized claim under [the Supreme Court's] existing refusal-

to-deal precedent," *Trinko*, 540 U.S. at 410, and their Section 2 claims should be dismissed for

failure to state a claim.  A variety of additional reasons require that Plaintiffs' Section 2 claims be

dismissed.

### G.    Plaintiffs Fail to State a Claim for Monopolization or Attempted Monopolization.

Plaintiffs claim in Count III that Defendants are guilty of violating Section 2 of the Sherman

Act for establishing and maintaining a monopoly.  "The offense of monopoly under § 2 of the

Sherman Act has two elements:  (1) the possession of monopoly power in the relevant market and

(2) the willful acquisition or maintenance of that power as distinguished from growth or

development as a consequence of a superior product, business acumen, or historic accident." *United

States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

27

Plaintiffs raise in Count V a claim for attempted monopolization. "To establish a violation of section 2 for attempted monopolization, 'a plaintiff must show (1) an intent to bring about a monopoly and (2) a dangerous probability of success.' " *Levine*, 72 F.3d at 1555 (quoting *Norton Tire Co. v. Tire Kingdom Co.*, 858 F.2d 1533, 1535 (11th Cir. 1988)).

The Sherman Act makes a 'basic distinction between concerted and independent action." *Copperweld*, 467 U.S. at 767. The monopolization and attempted monopolization provisions of Section 2 govern conduct by a single firm; Section 2 reaches concerted activity only through its "conspiracy to monopolize." *See id.* at 768, n.13. A "monopoly exists when *one firm* controls all or the bulk of a product's output, and no other firm can enter the market or expand output at comparable costs." Areeda, Solow and Hovenkamp, *Antitrust Law*, ¶403 at 7 (2002) (emphasis in original).

Counts III and V of Plaintiffs' Complaint should be dismissed because, instead of alleging unilateral action by one of the Defendants, these counts allege collective action by the *Defendants*. Complaint, ¶¶ 43, 51 ( "Defendants have engaged in a series of unlawful and wrongful activities and communications designed and succeeding to wilfully establish and maintain Defendants as a monopoly power."). Because Counts III and V contain no allegation that any single Defendant has a monopoly or any probability of attaining one, but instead refer to collective action of *Defendants*, they fail to state a claim and must be dismissed. *See Carpet Group Inter'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp.2d 249, 283-84 (D.N.J. 2003) (to sustain claims of monopolization and attempted monopolization, Plaintiffs must prove the required elements against an individual defendant).

Further, Plaintiffs fail to allege the second element of an attempted monopolization claim at all. To allege that Defendants had a dangerous probability of success, Plaintiffs must allege that Defendants either possess or are close to possessing monopoly power in the relevant market. *Levine*, 72 F.3d at 1556. Instead, Plaintiffs have alleged only that Defendants possess "sufficient *market power* in the relevant market." Complaint ¶ 53. "Monopoly power under § 2 requires, of course, something greater than market power under § 1." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992). "Monopoly power is 'the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market.'" *Levine*, 72 F.3d at 1555 (quoting *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993)). To allege that Defendants possessed "sufficient market power," therefore, fails to state a claim for attempted monopolization under Section 2.

Because Plaintiffs have failed to define a relevant market, have failed to allege improper action by a single entity, and have failed to allege that Defendants possessed or were close to possessing monopoly power in a relevant geographic market, Counts III and V (like the conspiracy claims in Counts I, II and VI of the Complaint) should be dismissed.[9]

_____

[9] As to the general plausibility of a claim for monopolization of a DME market, one court noted that "The DME market is characterized by low barriers to entry, which makes exercise of monopoly power nearly impossible, as any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods for less." *See Advanced Health-Care v. Giles Mem. Hosp.*, 846 F. Supp. 488, 494 n. 11 (W.D. Va. 1994) (citing *United States v. Syufy Enters.*, 903 F.2d 659, 664-65 (9th Cir. 1990)).

V.     **PLAINTIFFS FAIL TO STATE A CLAIM FOR INJUNCTIVE RELIEF**.

Throughout their Complaint, Plaintiffs seek relief under Section 16 of the Clayton Act, which provides: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ." 15 U.S.C. § 26. As previously discussed, Plaintiffs have no antitrust standing. They therefore have no standing to bring a claim for injunctive relief. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 112 (1986); *Todorov*, 921 F.2d at 1454. Moreover, Plaintiffs have failed to alleged a violation of either Section 1 or Section 2 of the Sherman Act, so their claims for injunctive relief necessarily fail. *See, e.g., Cargill*, 479 U.S. at 112 ("It would be anomalous, we think, to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred."). As a practical matter, it is difficult to imagine how injunctive relief in 2006 would prevent any alleged threatened harm, when Plaintiffs admit that the alleged conduct – the cessation of including Plaintiffs in a rotation for patient assignments – occurred in "the late 1990's." Complaint ¶ 18. Plaintiffs do not seek to enjoin any action, but rather ask the Court to require that the Defendants take affirmative action to assist them in their business. As previously noted, the antitrust laws do not require such cooperation. Plaintiffs fail to state a claim for injunctive relief under Section 16 of the Clayton Act. All claims for injunctive relief should be dismissed.

VI.    **PLAINTIFFS' STATE LAW CLAIM IS SUBJECT TO DISMISSAL UNDER FED. R. CIV. P. 12(B)(1) FOR LACK OF SUPPLEMENTAL JURISDICTION**.

Plaintiffs' Complaint contains no allegation as to how this Court has jurisdiction over Plaintiffs' state law claim found in Count VIII. Plaintiffs claim that the Court's jurisdiction is

invoked only by 28 U.S.C. § 1331, Complaint ¶ 1, but § 1331 is, of course, limited to federal question jurisdiction.

Even if Plaintiffs had pled supplemental jurisdiction under 28 U.S.C. § 1367, Plaintiffs cannot invoke the Court's jurisdiction over their state law claim because § 1367 only applies in a "civil action of which the district courts have original jurisdiction . . . ." 28 U.S.C. § 1367(a). As discussed in Section I, *supra*, Plaintiffs' failure to allege the necessary impact on interstate commerce prevents this Court from having subject matter jurisdiction. There is therefore no basis on which to exercise supplemental jurisdiction. *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir. 1997).

Even if the Court had jurisdiction over Plaintiffs' federal claims and could exercise supplemental jurisdiction over the state claim, the Court has discretion to decline jurisdiction upon dismissal of all the federal claims, 28 U.S.C. § 1367(c)(3), and should do so. The United States Supreme Court and the Eleventh Circuit have held that, where federal claims are dismissed before trial, dismissal of state law claims is "strongly encouraged." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); see also *Baggett*, 117 F.3d at 1353.

## VII.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER ALABAMA ANTITRUST ACT.

Count VIII of the Complaint claims a violation of Ala. Code § 6-5-60, which provides:

> Any person, firm, or corporation injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of $500 and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly and may commence the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly.

*Id.* Alabama's antitrust law applies only to activities that are solely intrastate in nature, like those alleged in Plaintiffs' Complaint. *Abbott Lab. v. Durrett*, 746 So. 2d 316, 339 (Ala. 1999).

In reviewing antitrust actions brought under § 6-5-60, courts apply standards from the Sherman Act. In fact, "[t]he federal law relating to monopolization governs Alabama antitrust actions." *McCluney v. Zap Professional Photography, Inc.*, 663 So. 2d 922, 926 (Ala. 1995). Therefore, Count VIII should be dismissed for all the reasons stated above for dismissing Plaintiffs' Section 2 monopolization claim. The same deficiencies exist, including lack of antitrust standing, and the lack of a viable relevant market definition, particularly a geographic market.

In addition, Plaintiffs allege in Count VIII that the relevant product market is "the health service and [DME] leasing market." Complaint ¶ 65. Yet, plaintiffs claim that Defendants' monopoly power exists only in the DME leasing market. Complaint ¶ 68. Plaintiffs again fail to state a claim for monopolization. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (holding that monopoly power in the relevant market is necessary element of monopolization claim). Count VIII should therefore be dismissed.

### REQUEST FOR ORAL ARGUMENT

Given the number of issues raised by the allegations in the Complaint, Defendants believe that oral argument on this motion would be beneficial and ask the Court to conduct such a hearing.

### CONCLUSION

For the reasons stated herein, Defendants respectfully request the Court to dismiss with prejudice Plaintiffs' Complaint, and to grant Defendants such other relief as may be appropriate.

Respectfully submitted this the 31st day of January, 2006.

s/ James E. Williams
James E. Williams / ASB-9283-W84J
One of the Attorneys for Defendants
**Baptist Health, American Home Patient, Inc.**
**and Baptist Ventures-American Home Patient**
Melton, Espy & Williams, PC
301 Adams Avenue
Montgomery, AL 36104
Telephone:    (334) 263-6621
Facsimile:    (334) 269-9515
jwilliams@mewlegal.com


s/ Glenn B. Rose
Glenn B. Rose (TN Bar 010598)
One of the Attorneys for Defendants
**American Home Patient, Inc.**
**and Baptist Ventures-American Home Patient**
Harwell Howard Hyne Gabbert & Manner, PC
315 Deaderick Street, Suite 1800
Nashville, TN 37238
Telephone:    (615) 256-0500
Facsimile:    (615) 251-1059
gbr@h3gm.com


s/ Dennis R. Bailey
Dennis R. Bailey / ASB-4845-I71D
One of the Attorneys for Defendants
**Jackson Hospital; JMS Health Services, L.L.C.**
**dba Jackson Med-South Home Health L.L.C.**
Rushton, Stakely, Johnston & Garrett, P.A.
184 Commerce Street
Montgomery, AL 36104
Telephone:    (334) 206-3100
Facsimile:    (334) 262-6277
drb@rsjg.com

s/ Mike Carlson
Mike Carlson / ASB-5825-A62W
One of the Attorneys for Defendants
**JMS Health Services, L.L.C. dba Jackson Med-South Home Health L.L.C. and Med-South, Inc.**
William Carlson & Associates, P.C.
Post Office Box 660955
Birmingham, AL 35266
Telephone:    (205) 823-1842
Facsimile:    (205) 823-8242
wtcpilot@bellsouth.net

## CERTIFICATE OF SERVICE

I hereby certify that on this the 31st day of January, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice of such filing to the following:

*Attorney for Plaintiffs*:
Brian M. Clark
Wiggins, Childs, Quinn & Pantazis
The Kress Building
301 19th Street North
Birmingham, AL 35203
bclark@wcqp.com

I also served a copy of the foregoing by first-class mail on:

Dwayne L. Brown, Esq.
5926 Carmichael Road
Suite C
Montgomery, AL 36123-0205
dbrown@dbrownatty.com

s/ Glenn B. Rose
Glenn B. Rose (TN Bar 010598)
One of the Attorneys for Defendants
**American Home Patient, Inc.
and Baptist Ventures-American Home Patient**
Harwell Howard Hyne Gabbert & Manner, PC
315 Deaderick Street, Suite 1800
Nashville, TN 37238
Telephone:    (615) 256-0500
Facsimile:    (615) 251-1059
gbr@h3gm.com

34