# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| PRECISION CPAP, INC.; | ) | |
| MEDICAL PLACE, INC.; PHASE III | ) | |
| VANS, INC., d/b/a EAST MEDICAL | ) | |
| EQUIPMENT AND SUPPLY; and | | ) |
| MED-EX, | ) | |
| | ) | |
|        Plaintiffs. | ) | Civil Action No: |
| | ) | 2:05-CV-1096-MHT-DRB |
| | ) | |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| JACKSON HOSPITAL; MED-SOUTH, | ) | |
| INC.; JMS HEALTH SERVICES, L.L.C. | ) | |
| d/b/a JACKSON MED-SOUTH HOME | ) | |
| HEALTH, L.L.C.; BAPTIST HEALTH, | ) | |
|  INC.; AMERICAN HOME PATIENT, | ) | |
| INC; BAPTIST VENTURES - | ) | |
| AMERICAN HOME PATIENT; | ) | |
| | ) | |
|        Defendants. | ) | |

## OPPOSITION TO MOTION TO DISMISS

## I. INTRODUCTION

### A.  Facts Alleged in Complaint

This is an antitrust case in which the basic allegations are Jackson Hospital and Baptist Hospital combined with MedSouth, Inc. and American Homepatient respectively, to operate durable medical equipment ("DME") businesses.  The joint venture DME businesses are Jackson-MedSouth HME, L.L.C. ("Jackson-MedSouth"), and Baptist Ventures-American Homepatient ("Baptist/American DME") (Complaint, ¶¶ 9-12).

The operative allegations of the Complaint are that Jackson Hospital entered into a joint venture with Med-South, Inc., a DME company, and Baptist Hospital entered into a joint venture with Baptist Ventures American Homepatient to form Jackson-MedSouth and Baptist/American DME.  The joint venture DME companies are sometimes referred to herein as "captive DME Companies."

Durable medical equipment is the provision of medical devices needed to care in the homes of patients, largely after discharge from the hospital (First Amended Complaint, "FAC", ¶ 3).[1]  The equipment is usually leased, but sometimes sold and includes such items as wheelchairs, hospital beds, oxygen, walkers, respiratory therapeutic devices and services, and other durable medical devices (FAC, ¶ 3).  A large portion of DME business comes from patients who have been recently discharged from a hospital. The market actors are aware of this district and large portion of the business, and treat that subset of business in a particular fashion by focusing marketing efforts on hospital patients and staff in an attempt to gain the business (FAC, ¶ 17).

One particular way this market was treated was that, before the entry into the market of the captive DME companies, Plaintiffs and other DME companies worked with hospital case workers and staff in assisting patients with their DME needs (FAC, ¶ 19).  Also, if hospital patients did not have a preference for DME services, the patients were referred by hospital staff to the various DME providers in the market area of a rotational system (FAC, ¶ 20).

The market, defined as the market for the rental and sale of durable medical equipment to patient discharged from Jackson Hospital, Baptist Medical Center, and Baptist Medical Center East

---

[1] Without conceding any of the points raised by Defendants in their Motion to Dismiss, for clarity's sake, and to avoid any confusion as to what is being alleged in the case, Plaintiffs file herewith a First Amended Complaint. References herein will be made to that Complaint.

in Montgomery and Prattville, Alabama (FAC, ¶ 17), or alternatively as the market for the rental and sale of durable medical equipment in Montgomery and Prattville, Alabama. (FAC, ¶ 18), changed dramatically in the lates 1990's (FAC, ¶ 22). In the late 1990's, the captive DME joint ventures were established. FAC, ¶ 22). Part and parcel of the joint venture agreements was an agreement that the hospitals would restrict access to hospital patients, and instruct hospital staff to refer or funnel all DME referrals to the captive DME companies (FAC, ¶ 24). The economic incentive for this behavior and agreement is obvious. The captive DME companies got an exclusive market, and the hospitals enjoyed a financial stake in the profitability of their joint ventures who had exclusive access to the market (FAC, ¶25). In this way, the captive DME companies were able to expand their business, not by greater efficiency or business acumen, but by combining with the hospitals to foreclose competition in the market for durable medical equipment needed by patients discharged from the hospitals (FAC, ¶¶ 24-31). It is this combination and monopolization that had lead to the filing of this action.

## B. Defendants Have Conveniently Failed to Mention Case Law Directly On Point.

Defendants have filed a thirty (30) page brief urging dismissal of this action. Defendants have cited numerous authorities from within and without the 11th Circuit in their papers. However, conspicuously absent from their brief is any mention of *Advanced Health Care Services, Inc. v. Radford Community Hospital*, 910 F.2d 139 (4th Cir. 1990); *M&M Medical Supply Svcs., Inc. v. Pleasant Valley Hospital*, 981 F.2d 160 (4th Cir. 1993), and the 11th Circuit case *Key Enterprises of Delaware, Inc. v. Venice Hospital*, 919 F.2d 1550, vacated 979 F.2d 806 (11th Cir. 1990).[2] The facts

_____

[2] Plaintiff's counsel is aware that the 11th Circuit panel decision in *Key Enterprises* was vacated. However, the opinion was vacated only under the most peculiar circumstances. In *Key Enterprises*, a DME company brought an antitrust action against a hospital and its captive DME company on antitrust

3

in these cases mirror the facts alleged in the present action.  In all of these cases, DME companies filed antitrust actions against hospitals and the  DME companies.  The allegations in the cases were that the captive DME received the majority of its business from the hospitals at issue, and that the joint venture DME received a monopolists percentage of all DME referrals from the hospital.  These are the same allegations that are made in the case at bar.

## II.  ARGUMENT

### A.  Legal Standard

Defendants have brought a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  Of course, the standard for such a motion is that all factual inferences to be drawn from the complaint are made in favor of plaintiffs, and the complaint should only be dismissed if it appears beyond a doubt that the pleader can assert no set of facts which would entitle it to relief.  *St. Joseph's Hosp. Corp. v. Hosp. Corp. of Am.*, 795 F.2d 948, 953 (11th Cir. 1986).  The Defendants' burden in this case is particularly high where "dismissals are particularly disfavored in fact-intensive antitrust cases." *Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communication, Inc.*, 376 F.2d 1065, 1070 (11th Cir. 2004), citing *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 944-45 (11th Cir. 1983).  Lastly, Defendants make several arguments concerning the relevant product market in this case.  "The definition of the relevant market is a question nearly dependent upon the special characteristics of the industry involved." *National*

---

grounds.  The case was tried, resulting in a substantial verdict for the plaintiff.  The district court granted the defendant's motion for summary judgment notwithstanding the verdict.  *Key Enterprises v. Venice Hosp.*, 703 F. Supp. 1513 (M. D. Fla. 1989).  The 11th Circuit reversed the ruling and reinstated the jury verdict.  The defendants filed a petition for *en banc* rehearing, which was granted.  However, in the interim, the case was settled, and request was made to vacate the panel decision.  The 11th Circuit ultimately vacated the panel decision because the settlement mooted the case.  This case is cited herein as persuasive authority for how the 11th Circuit has viewed many of the same issues raised in this action.

*Bancard Corp. v. Visa, U.S.A.*, 779, F.2d 592, 604 (11ᵗʰ Cir. 1986), quoting *Salmeyer v. Coca Cola Co.*, 515 F.2d 835, 839 (5ᵗʰ Cir. 1975).  As a question of fact, a motion to dismiss on the issue rarely appropriate.

### B.  The Requisite Effect On Interstate Commerce Has Been Alleged

The Complaint states that Plaintiffs are engaged in the DME business, which " is the provision of medical devices needed for care in the homes of patient after discharge from the hospital.  The equipment is usually leased and includes items such as hospital beds, walkers, wheelchairs, oxygen, and other durable medical devices . . . respiratory therapeutic services." (FAC, ¶ 3).  The FAC states that much of the equipment purchased for leasing is purchased from out of state suppliers, and insurance and government payments are made for the equipment from out of state (FAC, ¶3).  The Complaint also outlines that Medicare pays for some of the equipment.  (FAC, ¶ 31).

The FAC[3] makes explicit that which is implicit in the original Complaint–that fewer referrals

_____

[3]Because the original Complaint alleges that payments are received from Medicare, and because a reasonable inference from the allegations contained in the Complaint is that goods come from out of state to be leased in the DME market described in the Complaint, Plaintiff contends no amendment of the Complaint is necessary.  However, in order to make this analysis simpler and clearer, Plaintiff has filed a First Amended Complaint, stating more fully the effects of Defendants' activities on interstate commerce.  This amendment is due to be allowed, and considered in response to Defendants' Motion.

> [W]here it appears a more carefully drafted complaint might state a
> claim upon which relief can be granted, we have held that a district court
> should give a plaintiff an opportunity to amend his complaint instead of
> dismissing it."  See also *Allison v. McGhan Medical Corp.*, 184 F.3d
> 1300, 1308 (11ᵗʰ Cir. 1999).  Unless a substantial reason exists to deny
> such a motion to amend, it should be freely granted.  See *Thomas v.*
> *Town of Davie*, 847 F.2d 771, 773 (11ᵗʰ Cir. 1988).

*Moore v. Liberty National Ins. Co.*, 108 F. Supp. 1266, 1272 (N.D. Ala. 2000).  In the event more particularized allegations are necessary, this Court ought to allow the First Amended Complaint to provide that particularity.

to the DME providers means that they will make fewer orders for equipment from out of state markets, and will have fewer reimbursement from out of state insurers, or government payors, which are interstate transactions.

In *Shahawy v. Harrison*, 778 F.2d 636, (11th Cir. 1985), a physician claimed that he was denied access to a local hospital to perform a certain medical procedures, and that such a denial was a Sherman Act violation. The Court held a showing that the physician treated a substantial number of patients from out of state, and that he received reimbursement payments from out of state, and purchased medicines and supplies from out state satisfied the judicial requirement of a Sherman Act claim. Similarly, the First Amended Complaint alleges an effect on Plaintiffs' purchase of goods from out of state, and receipt of reimbursements from out state.

Defendants' argument is that interstate commerce is not implicated because, "There is no allegation that any transaction at issues occurs anywhere but in the State of Alabama." (Def's. Memorandum, p. 5). Where the alleged restraint occurs is not the test. The Untied States Supreme Court has held that "wholly local business restraints can produce the effects condemned by the Sherman Act." Not only can wholly local business create antitrust jurisdiction, but the conduct complained of does not need to be "purposefully directed" toward interstate commerce. *Hospital Building Co. v. Trustees of Rex Hospital*, 96 S. Ct. 1848, 1852 (1976).

The jurisdictional requirement of the Sherman Act may be satisfied if the activities complained of are either "in commerce" or have an "effect on commerce." *McLain v. Real Estate Bd. of New Orleans*, 100 S. Ct. 502, 509 (1980). The degree to which the conduct must "affect commerce" to trigger jurisdiction is not great. The *Hospital Bldg. Co. v. Trustees of Rex Hospital,*, 96 S. Ct. 848 (1976), Court noted *Unites States v. Employing Plasterers Assoc.*, 74 S. Ct. 432

6

(1954), a case in which a Sherman Act claim was brought by plasterers concerning parties they claimed restrained competition among Chicago plastering contractors. The defendants argued that the matter concerned only local commerce. The Court held that antitrust jurisdiction exists if the allegations, if proved, would show that the conspiracy resulted in "unreasonable burdens on the free and uninterrupted flow of plastering materials into Illinois. "We did not demand allegations, either expressed or implied, that the conspiracy threaten the demise of out-of-state businesses or that the conspiracy affect market price." *Id.* Similarly, if the allegations in the present case are proven, it would interrupt the flow of DME equipment into Alabama. Simply put, there is no question that, if the allegations are true, the flow of interstate goods that Plaintiffs deal in will be affected. As such, jurisdiction exists.

### C. Plaintiffs Have Standing

The question of standing was litigated in *Key Enterprises*. In that case, the defendants made the same argument raised by Defendants herein that absent a showing that price would be affected, no standing exists. The Court rejected the argument, stating:

> As we discussed above, the channeling of patient choice is sufficient to show injury to consumers. The antitrust laws do not require the consumer to suffer some form of monetary damage before a defendant's anticompetitive conduct is actionable. *See Aspen Skiing*, 105 S.Ct. At 2859-60 (consumers injured by not having easy access to all four mountains. *See also Association of General Contractors of Cal. V. California St. Council of Carpenters*, 459 U. S. 519, 103 S.Ct. 897, 903 74 L.Ed.2d 723 (1983). ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect."). Injury to competition may be shown even though injury to the consumer is practically nonexistent. *Cf. Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973) (electric utility that dominates transmission of power in most

7

of it service area may not use that "dominance to foreclose potential entrants into the retail area from obtaining electric power from outside sources of supply"); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986) ("The antitrust laws are concerned with the competitive *process*, and their application does not depend in each particular case upon the ultimate demonstrable consumer effect.") (emphasis added).

* * *

Thus, a court must consider the effect on competition and not simply the effect of on the ultimate consumer. In the DME industry, because of the regulated nature of Medicare and Medicaid reimbursements, the primary means of competition is quality and service. The defendants here have knowingly and purposefully set in place a scheme which insulates the unknowing patient from learning of these nuances. Competition has been injured because there is no effective means by which competing DME vendors can reach those patients who require DME when they are discharged from the hospital. The Supreme Court has aptly stated:

A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare. . . . Absent some countervailing procompetitive virtue-such as, for example, the creation of efficiencies in the operation of a market or provision of goods and services, such an agreement *limiting consumer choice by limiting the "ordinary give and take of the market place," cannot be sustained.* . . . *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986).

*Key Enterprises*, 919 F.2d at 1559-60. Plaintiffs' counsel cannot articulate the law on this standard any more eloquently than the 11th Circuit has.

In addition to the *Key Enterprises* opinion, citing Supreme Court precedent holding that injury to a market driven by service levels, not necessarily price is to be protected, and injury thereto, constitutes antitrust injury, and hence standing, the Court in *M&M Medical Supplies*, specifically referencing *Advanced Health Care* stated, "In a case that also charges hospital-DME monopolization, we recently held that if the plaintiff can prove that the DME now provided to

patients in the relevant areas is inferior in quality and/or more expensive than [the plaintiffs], it will have shown harm to competitors, short-term sacrifices by the hospitals, and adverse affects on merits competition that injure DME consumers, all as a result of the hospital's entry into the DME markets." *M&M Medical Supplies*, 981 F.2d at 166. The same allegations have been made here. The FAC states that "a lack of competition will eventually, and has already begun to, erode the services offered by the companies, and the quality of goods offered." (FAC, ¶ 31). Similarly, this case is due to go forward.

### D.  The Statue of Limitations Is No Bar To These Claims

The claim in the case is that the activities excluding Plaintiffs from the market began in the late 1990's, and continue today. Because the effects of the original agreement, and the course of action to exclude competition continues, and because these anticompetitive practices continue, the statute of limitations has no effect on the claims.

Antitrust claims must generally be brought within four (4) years after the events creating the cause of action occurred. However, that period may be extended if an action is commenced within four (4) years of:  "(1) an overt act in furtherance of the antitrust conspiracy; or (2) an antitrust by its very nature constitutes a 'continuing antitrust violation.'" *Morton's Market, Inc. v. Gustafsons Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 91 S. Ct. 795 (1971).

> An act constitutes a "continuing violation," if it injures the plaintiff over a period of time. Even though the illegal act occurs at a specific point in time, if it inflicts "continuing and accumulating

harm" on a plaintiff, an antitrust violation occurs each time the plaintiff is injured by the act. *Hanover Shoe, Inc. v. Unites Shoe Machinery Corp.*, 392 U.S. 481, 502 n.15, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). For example, when sellers conspire to fix the price of a product, each time a customer purchases that product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues. *Klehr v. A. O. Smith Corp.,* 521 U. S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). As a cause of action accrues with each sale, the statute of limitations begins to run anew.

*Morton's Market*, 198 F.3d at 828.

The FAC alleges that these offending activities began when the captive DMEs were established in the late 1990's (FAC, ¶ 22). The FAC, however, goes on to state that the conduct of excluding Plaintiffs from the market continues. The FAC, and the original Complaint specifically allege a July 7, 2003 memo from hospital staff wherein hospital employees were told, absent special circumstances to send CPAP referrals only to the captive DMEs (FAC, ¶ 27). The FAC goes on to allege that these exclusionary acts continue, stating, "The contracts, combinations and /or

conspiracies among the Defendants seriously threatening irreparable harm in that all present competitors of Defendants will be driven out of business thereby creating an absolute and permanent monopoly for Defendants in the DME market." (FAC, ¶¶ 39, 44, 51, 60, 67).

Because of the continuing nature of the violations, Plaintiffs have requested injunctive relief. There is no question that the practices continue to harm plaintiffs. Because "an antitrust violation occurs each time the plaintiff is injured by the act", *Id.*, and because the Complaint alleges that the damages from the exclusionary practices continue, the statute of limitations does not bar the claims.

### E.  A Proper Product Market Has Been Defined

> **1.  A Submarket Alleging A Market Defined In Part By A Specific And Recognized Particular Chain Of Distribution Has Been Properly Alleged.**

The relevant product market or submarket in this case is the market for the rental and sale of durable medical equipment to patients discharged from Jackson Hospital, Baptist Medical Center, and Baptist Medical Center East in Montgomery and Prattville, Alabama.[4]  The broad market, alternatively plead in this case, is the market for the rental of durable medical equipment in Montgomery and Prattville, Alabama.  While a relevant product market, defined in terms of product and geography is "the area of effective competition," *Brown Shoe Co. v. United States*, 82 S.Ct. 1502, 1523, (1962), the law is that within a broad market , "there may also exist well-defined submarkets which, in themselves, constitute markets for antitrust purposes." *Storer Cable*

---

[4] Rule 8 of the Federal Rules of Civil Procedure, of course allows the pleading of alternative theories of relief.  There is no special antitrust pleading rule.  *Twonbly v. Bell Atlantic Corp.*, 425 F.3d 999, 108 (2nd Cir. 2005) ("We have consistently rejected the argument, put forward by successive generations of lawyers representing clients defending against civil antitrust claims that antitrust Complaints merit a more rigorous pleading standard . . . it is quite clear that the federal rules contain no special exceptions for antitrust cases.).  Under this standard, like in any case, alternative or multiple legal theories may be put forward in response to a dispositive motion in antitrust cases.  *Creative Copier Svcs. v. Xerox Corp.*, 344 F. Supp. 2d 858, 868 (D. Conn. 2004).

*Communications, Inc., v. City of Montgomery*, 826 F. Supp. 1338, 1350 (M. D. Ala. 1993), vacated 866 F. Supp. 1376 (1993),[5] citing *Brown Shoe, supra; T. Harris Young & Associates, Inc. v. Marquette Electric*, 931 F.2d 816, 824 (11th Cir. 1991).

Defendants argue that a proper market definition consists of only two components–product and geography. However, defining a relevant submarket is in no way limited to those two factors. The Untied States Supreme Court has stated the following:

> The boundaries of so-called "submarkets" may be established by reference to such "practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, and distinct prices, sensitivity to price changes, and specialized vendors. *Id.; see F.T.C. v. Cardinal Health, Inc.*, Nos. Civ. A. 98-595, Civ. A. 98-596, 1998 WL 433784, at *12 (D.D.C. July 31, 1998); *F.T.C. v. Staples, Inc.* 970 F. Supp. 1066, 1075 (D.D.C. 1997).
>
> * * *
>
> Ultimately, a "submarket" definition turns on the same inquiry as a "market" definition–"whether the products in a proposed submarket are reasonably interchangeable in use or production with products in the broader market." ABA Antitrust Section Antitrust Law Developments 521 (4th ed. 1997). At bottom, then, "the same proof market also shows (or fails . . . to show) the existence of a product submarket." *H. J., Inc. v. International Tel. & Tel. Corp.*, 867 F.2d 1531, 1540 (8th Cir. 1989); *AD/SAT v. Associated Press*, 920 F. Supp. 1287, 1296 n. 6 (S.D.N.Y. 1996) (observing that "[t]he required analysis does not change whether a particular product market is deemed a market or a "submarket" term draws no meaningful distinction and restricting itself to use of the term "market").

*Brown* Shoe, 82 S. Ct. at 1524. This Court in *Storer Cable Communications*, quoted the above-

---

[5] Plaintiff is aware that this Court's opinion in *Storer Cable Communications*, was vacated pursuant to a joint request by the parties after settlement of the action. However, the holdings and reasoning of the Court is that the case is instructive, and accurately states the law.

referenced passage from *Brown Shoe*.

Defendants essentially argue that, as a matter of law, a market cannot be limited to sales through a single group of distributors. This is incorrect. Numerous courts have defined produce markets by reference to a channel of distribution. *See e. g. , Cardinal Health*, 1998 WL 433784, at *13 (holding that wholesale distribution of pharmaceutical products to customers who demanded such distribution was a relevant market, even though products so delivered were identical to those delivered through other modes of distribution); *Staples* 970 F. Supp. at 1080 (holding that sales of consumable office supplies through office supply superstores constituted relevant market , even though the office supplies sold in those outlets were physically identical to those sold elsewhere; relying on "compelling pricing evidence" which demonstrated that customers of office superstores did not turn to non-superstore outlets when faced with price increases in the superstore market); *Columbia Broadcasting Sys., Inc. v. FTC*, 414 F.2d 974, 978-79 (7th Cir. 1969), *cert. denied*, 397 U.S. 907, 90 S. Ct. 903, 25 L.Ed.2d 88 (1970) (phonograph records sold through record clubs comprised relevant market even though records delivered by clubs were identical to those sold in record stores and other outlets); *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1343 (8th Cir. 1987) (sales of automobile batteries through route salespersons distinct from sales of such batteries through retail stores even though "the batteries sold by route salespersons are not different in character, creation or use from those sold from a warehouse or store"); *Ansell Inc. v. Schmid Lab., Inc.* 757 F.Supp[. 467, 471-75 (D.N.J.. 1991) (holding that sales of condoms "to retail distributors does constitute an 'economically significant submarket'" even though manufacturers "may sell their products through a number of different channels of distribution"). This submarket defined in terms of durable medical equipment leased to patients discharged from the hospital is nothing but a definition of sales through

a particular distribution channel.  As such, it is a validly defined market.

The point was expressly made in *Greyhound Computer Corp., Inc. v. International Business Mach. Corp.*, 559 F.2d 488, 494 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S. Ct. 782, 54 L.Ed.2d 790 (1978), where IBM argued that leasing general purpose computers did not constitute a submarket "economically distinct from others in which such computers are made available to users", such as sales, time-sharing and contracting with service bureaus.  *Id.* at 494.  In upholding the jury's finding that leasing of computers constituted a separate submarket, the Court noted:

> No rule of law or economic principle bars application of Section 2 of the Sherman Act to one of several alternative means of distributing a product.  The statute prohibits monopolization of 'any part' of interstate or foreign commerce.  Accordingly, the Sherman Act and other antitrust statutes have been applied to protect competition in one of alternate channels of distribution.

*Id.*

### 2. **The Product Is Adequately Identified**

The FAC in this case lays out the product at issue (durable medical equipment, defined as "medical devices needed for car in the homes of patients after discharge from the hospital . . . such as hospital beds, walkers, wheelchairs, oxygen . . . respiratory therapeutic services") (FAC, ¶ 3).  Defendants' primary concern as to the relevant product is that "the Complaint does not allow Defendants to know whether Plaintiffs are concerned with the 'DME market' the 'DME leasing market' or the 'home health care' market or some subset thereof."  (Defendants' Memorandum, pp. 13-14).  As stated above, the product is defined as "durable medical equipment."  That term is defined in paragraph 3 of the FAC as "medical devices needed for care in the home of patients after discharge from the hospital." (FAC, ¶ 3). Not only is the product defined, but examples are given –"hospital beds, walkers, wheelchairs, oxygen, and other durable medical devices . . . [including]

respiratory therapeutic services." *Id.* This general description of the items is all that is done in *M&M Medical Supplies*, *Advanced Health-Care*, and *Key Enterprises*. In those cases, durable medical equipment has no more specific definition. The definition in this case goes beyond that which is acceptable.

**F.  The Geographic Component of the Product Market Has Been Properly Plead**

      **1.  The Geographic Component Is Specific.**

The FAC lays out that "Defendant Baptist Health and Jackson Hospital operate hospital facilities in Montgomery and Prattville, Alabama. These two defendants are the course of primary hospital services for the majority of residents in the Montgomery, Alabama area." (FAC, ¶ 13). The Complaint goes on to state the following:

> Plaintiffs provide home health care services and home health care equipment to patients in Montgomery and Prattville, Alabama. Plaintiffs compete in the DME business in an around Montgomery, Alabama. In particular, Plaintiffs compete in the market to provide patients discharged from Jackson Hospital and Baptist Health's hospital facilities with their DME needs.

(FAC, ¶ 14). It seems clear to Plaintiffs that the geographic market is clearly defined in either of the alternatively plead markets as Montgomery and Prattville, Alabama. Both the submarket plead, and the alternatively plead broader market are clear that the geographic scope of the market in this case is Montgomery and Prattville, Alabama. The alternatively broader formulation of the relevant market is virtually identical to the definition of the relevant market in *Advanced Health-Care Services, Inc.* In that case, the market was simply defined as "The DME markets in the areas surrounding Twin County and Giles Memorial." *Advanced Health-Care*, 910 F.2d at 145. The relevant product market in *M&M Medical Supplies* was defined as "Mason County, West Virginia",

*M&M Medical Supplies*, 981 F.2d at 164. The *Key Enterprises* case defined the relevant product and market as follows: "This case concerns the rental and sale of durable medical equipment (DME) to home users in the Venice, Florida area. DME includes such things as portable devices, hospital beds, oxygen equipment, wheelchairs and walkers." *Key Enterprises*, 919 F.2d at 1552. All of these definitions, which are very similar, if not functionally equivalent to the product market definition in the present case, were found to be sufficient.

### 2. **The Market Is Defined Such That Monopoly Power Is Present.**

"The relevant product market is the 'part of trade or commerce' that the defendant is allegedly attempting to monopolize." *Lockheed Martin Corp. v. Boeing Company*, 314 F. Supp.2d 1198, 1224 (M.D. Fla. 2004), citing, 15 U.S.C. §2 and *United States v. Grinnell Corp.*, 86 S. Ct. 1698 (1966). The boundaries of the case are determined by the boundaries of market. All purchasers and suppliers within those boundaries make up the market for the product unless there is evidence that the market is narrower because of other considerations." *Id.* The FAC clearly alleges that in the submarket Defendants have a virtual lock on the business by excluding Plaintiffs and other DME providers. Defendants' assertion that DME rentals come form other sources is simply irrelevant in a market defined by the distribution network which is patient referrals generated from hospital discharges.[6]

---

[6] Defendants cite *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 994 F. Supp. 133 (E. D. N.Y 1998) for the proposition that courts had rejected market definitions in DME cases stemming from a single hospital. The is not what the case says. In fact, the *Continental Orthopedic* case says that "Upon review of the other two cases [*Advanced Health-Care* and *M&M Medical Supplies*], the Court finds that each case demonstrates that a single hospital **could** be found to have market or monopoly power in its market and therefore, foreclosure of the plaintiff from the portion of durable medical equipment market represented by referrals from that single hospital constituted a substantial foreclosure form the market of all durable medical equipment purchasers." *Continental Orthopedic Appliances*, 904 F. Supp. at 141. Similarly, *Delaware Health Care, Inc. v. Med*

The market alternatively defined is the market for DME rentals in Montgomery and Prattville, Alabama. Defendants may assert that this definition is inadequate because of a glut of suppliers, or because consumers are not limited to suppliers within the geographical boundaries defined. However, "The definition of the relevant market is essentially a factual question." *U. S. Anchor Mfg. v. Rule Industries, Inc.*, 7 F.3d 986, 994 (11th Cir. 1993). Because of the fact intensive nature of market definition, "Dismissals are exceedingly disfavored in antitrust cases because of their fact-intensive nature." *Lockheed Martin*, 314 F. Supp. 2d at 1225, citing *Covad Communications Co. v. BellSouth Corp.*, 799 F.3d 1272, 1279 (11th Cir. 2002).

Defendants argue somehow that the market in this case is ill defined because consumers use DMEs outsides of a hospital setting (Brief, p. 15). While not exactly clear, this appears to be an argument that, because there is a market of DME customers outside of the hospital referrals, the hospitals do not process sufficient power within the DME rental market to affect a monopoly.

In order to make out a monopolization claim, a plaintiff must establish: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as consequence of superior product, business acumen, or historic accident." *U. S. v. Grinnell Corp.*, 384 U. S. 563, 570-71 (1966). The element of monopoly power "is the power to control prices in or exclude competition from the relevant market." *Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004). The allegations of the Complaint are that a significant portion of the DME market in Montgomery

---

*Holding Co.*, 957 F. Supp. 5325, 538 (D. Del. 1997) aff'd without opinion, 141 F.3d 1153 (3d Cir. 1998) does not help Defendants on this point. The Court did not reject a market definition with a suppler (hospital) component, it merely held that the plaintiffs "just has not put enough information into the record to support its geographic market definition." *Delaware Health Care, Inc.*, 957 F. Supp at 546.

and Prattville, Alabama emanates from the hospitals.  If Defendants are able to effectively exclude plaintiffs from the market, they will be able to control prices and the level of service they have to provide to keep market share in the DME market.  The question is not, as posed in Defendants' Brief at p. 16–whether DME customers "can practically seek alternative sources of the product form a multitude of suppliers."  The question is whether hospitals and their captive DMEs can and do control such a portion of the DME market that they have the ability to foreclose competition or effectively set prices because competition has been foreclosed for a significant portion of the market.

The relevant question, in terms of whether a proper geographic market has been plead,  is not the number of providers from which a consumer may choose, but whether a party possesses sufficient market share, i.e., monopoly power,  to control prices or exclude competition.  "Market power is the measure of a firm's ability to raise prices above competitive levels without losing profits from decreased sales."  *Service Trends, Inc. v. Siemens Medical Systems, Inc.*, 870 F. Supp. 1042, 1052, n.4 (N. D. Ga. 1994).  *Grinnell, supra* at 1704 (The existence of monopoly power can be inferred from a firm's dominant share of the market).

In this case, Plaintiffs have alleged that Defendants' market share is above that threshold in Montgomery and Prattville, Alabama such hat it can control service levels and  prices (FAC, ¶ 24).  "The existence of monopoly power can be inferred from a firm's dominant share of the market."  *Id.*  It has been alleged that Defendants share of the DME leasing market in Montgomery and Prattville, Alabama is such that it can control prices and service levels without a drop in usage or sales (FAC, ¶ 24).  While this obviously will be a disputed fact, it is not ripe for determination at the motion to dismiss stage.

### 3.  <u>Defendants Are Liable Under the Essential Facilities Doctrine.</u>

Count VI of the FAC states a cause of action pursuant to Section 2 of the Sherman Act under the essential facilities doctrine. The allegations are that the hospitals use their monopoly power over the provision of acute core hospital services to further a monopoly through their joint venture in the retail of DME to discharged patients (FAC, ¶ 30). Such use of monopoly power, either alone or in concert, creates liability under the essential facilities doctrine.

The essential facilities doctrine requires a plaintiff to prove: (1) control of the essential facility by a monopolization; (2) a competitor's inability practicably or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competition; and (4) the feasibility of providing the facility to competitors. *MCI Communications v. A.T. & T*, 708 F.2d 1081 (7th Cir. 1132-33), citing *Otter Tail Power Co. v. U.S.*, 93 S. Ct. 1022 (1973). The doctrine "imposes upon firm controlling an essential facility–that is, a facility that cannot reasonably be duplicated and to which access is necessary if one wishes to compete –the obligation to make that facility available to competitors on nondiscriminatory terms." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir. 1986).

These elements are exact in the present case as they were in *Advanced Health-Care Services, Inc.*. In that case, the Court stated the following:

> Here, the plaintiff alleges that the defendants' market power over the provision of acute care hospital services is being used to further a monopoly in the retail of DME to discharged patients. AHCS contends that all DME dealers were equally able to market their services to patients, physicians, and discharge personnel before the hospitals entered into exclusive contracts with Medserv. The plaintiffs alleges that now the hospitals will not give it access to their patients. This has resulted in AHCS's inability to compete in the DME market and has ultimately given Medserv complete control over the price and quality of DME services in the areas surrounding Twin County and Giles. AHCS argues that access to patients is an

essential facility that cannot be duplicated and that the hospitals could feasiblyu return to their prior practice of providing this facility to AHCS and other DME providers.

These allegations on their face address all of the elements of a claim under the essential facilities doctrine established buy *MCI* and the relevant Supreme Court precedent.

* * *

As noted above, AHCS has alleged that Twin City and Giles, who control access to the alleged essential facility, now have a financial stake in the sale of DME by Medserv to their discharged patients. Whether this connection alone is enough to make the hospitals competitors of AHCS and whether access to hospital patients is actually an essential facility to entry into the relevant market are factual issues that cannot be resolved on a motion to dismiss. *Compare Fishman v. Estate of Wirtz*, 807 F.2d 520, 539-40 (7th Cir. 1986) (upholding liability under the essential facilities doctrine where the owner of a stadium in competition with the plaintiff to purchase basketball team refused to lease the stadium to the other bidder), *with Ferguson v. Greater Pocatello Chamber of Commerce*, 848 F.2d 976, 983 (9th cir. 1988) (no liability under essential facilities doctrine because minidome owner was not a competitor of prospective trade show producer).

Therefore, we reverse the district court's refusal to allow amendment of the plaintiff's complaint in the Twin County and Giles cases to add claims for denial of access to an essential facility.

*Advanced Health Care*, 960 F.2d at 150-51. Just as the facts in *Advanced Health Care* presented a

fact question, they present a fact question in the case at bar as to Count VII of the Complaint.

### 4. **In Addition To Proper Market Definition, Proper Claims For The Remaining Elements Of Plaintiffs Monopolization Claims Have Been Plead.**

As stated above, after the relevant market is established, a § 2 monopolization claim requires

the showing of monopoly power in that market, and willful acquisition or maintenance of that owe

as approval to legitimate business growth.  *U. S. Grinnell Corp., Supra*.  To establish a claim for

attempted monopolization, a showing of: (1) an intent to bring about a monopoly; and (2) a dangerous possibility of success must be plead. *Norton Tire Co. V. Tire Kingdom*, 858 F. 2d 1533, 1535 (11ᵗʰ Cir. 1988). As argued above, it clear that whether a party has sufficient monopoly power, defined in terms of market share, is a question of fact. Defendants, however, argues at pp. 28-29 of their Brief that the pleadings are deficient because a proper distinction between unilateral and concerted activity has been not been made.

Defendants argue that Counts III and V of the Complaint (§ 2 monopolization and attempted monopolization) should be dismissed because they allege collective action by Defendants, as opposed to unilateral action by a defendant. This argument is related by the very case Defendants cites, *Copperweld Corp. v. Independence Tube Corp*., 104 S. Ct. 2731, 2740 (1984). The *Copperweld* case states:

> Section 2 of the Sherman Act provides in pertinent part:
>
> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several state, or with foreign nations, shall be deemed guilty of a felony.
>
> By making a conspiracy to monopolize unlawful, §2 does reach both concerted and unilateral behavior. The point remains, however, that purely unilateral conduct is illegal only under §2 and not under §1. Monopoly without conspiracy is unlawful under §2, but restraint of trade without a conspiracy or combination is not unlawful under §1.

*Copperweld*, 104 S. Ct. at 2740. Citing the plain language of the statue, the *Copperweld* decision directly contradicts Defendants' proposition that the §2 claims made in Counts III and V may only be made based upon unilateral action. The plain language of the statute creates liability for both unilateral and concerted actions, and *Copperweld* echos this language. Counts III and V of the

Complaints (Counts III and IV of the FAC) allege conduct by "Defendants" meaning both in concert, and unilaterally, as allowed under §2, have violated §2 of the Sherman Act. Defendants' argument on this point simply misunderstands the statute.

Lastly in this section of their Brief, at p. 29, Defendants argue that Plaintiffs have not properly plead a dangerous probability of success as to monopoly because Plaintiffs have not alleged that Defendants either possess or are close to possessing monopoly power within the relevant market. The FAC clearly alleges just that. Paragraph 24 of the FAC alleges that Defendants, through their conspiracy, have pushed the market share of the captive DMEs to such a level that they can cut services or raise prices without fear of a corresponding drop in sales (FAC, ¶ 24). As stated above, market share is the principal measure of monopoly power. The test of monopoly power, the ability to raise prices/lower service without economic reprisal, *Levine v. Cent. Fla. Medical Affiliates, Inc.*, 72 F.3d 1538 (11th Cir. 1996) is exactly what is plead in paragraph 24 of the FAC. Whether that threshold can actually be met will undoubtedly be a factual contention in the case, but it is not the subject of determination on a motion to dismiss.

### G.  Plaintiffs' Claims Of Coercive Reciprocity Create Per Se Liability

Without regard to establishing the requisite market share in the relevant product market, Defendants concede that conduct constituting coercive reciprocity is a *per se* violation of antitrust law if a Defendant has sufficient economic power with respect to the tying (hospital) product appreciably restrain free competition  in the  tied product (durable medical equipment). (Memorandum, p. 12); *Spartan Grain and Mill Co. v. Ayers.*, 581 F.2d 419, 425 (5th Cir. 1978). Once a plaintiff has established a *prima facie* case of a *per se* violation, no specific snowing of anti-competitive effect is necessary. *Betaseed, Inc. v. V and I, Inc.*, 681 F.2d 1203, 1216 (9th Cir. 1982).

Coercive reciprocity refers to the practice of using economic leverage in one market to coercively secure competitive advantage in another. *Id.* The use of monopoly power, however lawfully acquired, to foreclose competition, is unlawful. *U. S. v. Griffith*, 68 S. Ct. 941, 945 (1948). In the present case, there is no question that Jackson and Baptist hospitals have monopoly power over hospital services. An allegation that the hospitals have used those powers to foreclose competition in the DME market has been made. It is alleged in the Complaint that the hospital defendants have exclusive control over acute care hospital services and, accordingly, have the power to unduly influence . . . selection or recommendation of durable medical equipment vendors (FAC, ¶ 13, 36). In this way, Defendants have used their monopoly power in the market of hospital services to gain a competitive advantage in the DME market. This exact claim was the subject of a large section of the *Key Enterprises*, opinion, in which the Court opined, "Since we find that the arrangement between defendants and the home health agencies has sufficient elements of a reciprocal arrangement, we analyze the evidence VCA presented to support its claim under the law governing such arrangements. *Key Enterprises*, 919 F.2d at 1562.

The question becomes whether the acts alleged in the Complaint are sufficiently "coercive" to qualify for *per se* treatment. The Complaint alleges that hospital staff was directed to refer all hospital patients needing sleep lab services to Jackson-MedSouth (FAC, ¶¶ 26-30). Moreover, as to Baptist, Plaintiffs have been told that they have an "obligation" to refer patients only to Baptist/American Homepatient DME (FAC, ¶29). In either case, such activity rises to the level needed to prevail on a coercive reciprocity claim even when it is far less than "bludgeoning or coercion". *Federal Trade Commission v. Consolidated Foods Corp.*, 85 S. Ct. 1220, 1222 (1965). The *Key Enterprise* Court noted that the term "coercion" is a proxy for "leverage", and that,

"Leverage is loosely defined as a supplier's power to induce his customer for one product to buy a second product from him that would not otherwise be purchased solely on the merit of that second product." *Id.* citing 5 P. Areeda & Turner, *Antitrust Law* § 1134a, p. 202 (1980). In this case, as in *Key Enterprises*, the arrangement at the outset of the joint venture whereby trade in the durable medical equipment market is monopolized as part of this joint venture arrangement is a reciprocal agreement restraining trade prohibited by all of the Sherman Act.

## H. A Conspiracy Is Alleged

The allegations of a conspiracy between the hospitals and their captive DMEs are far greater than generalized allegations. The Complaint alleges that prior to the entry of the captive DMEs into the marketplace, Plaintiff DME providers were able to market themselves to hospital staff and patients whose discharge was imminent." (FAC, ¶19). The FAC completes what is implicit in the above-referenced statement, that "Plaintiffs are now denied access to hospital patients by hospital policy." (FAC, ¶ 19). The FAC goes on to state specific hospital policies regarding referrals to outside DME providers in paragraphs 21-30.[7]

Of course, "Even a successful antitrust plaintiff will seldom be able to offer direct evidence of a conspiracy and such evidence is not a requirement." *General Chemicals, Inc. v. Exxon Chemical Co.*, 625 F.2d 1231, 1233 (5th Cir. 1980). A plaintiff must only convince the Court that it is reasonable to infer the existence of a conspiracy from the facts shown. *Id.* In this case, the following facts are plead:

---

[7] Contrary to Defendants' argument, the FAC does not seek a return to a rotational system. The Complaint simply seeks a stop to the exclusionary practices outlined in the FAC, and any assignment done by the hospital, out of necessity due to lack of choice, to be done on a nondiscriminatory and nonpreferential basis (FAC, ¶¶ 39, 44, 51, 60, 67).

- Prior to the 1990's, plaintiffs were able to market their products in the defendant hospitals (FAC, ¶19).

- Prior to that time, patients who had no preference were assigned a DME provider on a rotational basis. (FAC, ¶¶ 20-21).

- Baptist and Jackson hospital entered into business agreement wherein they became significant shareholders in DME businesses. (FAC, ¶¶ 11, 12, 24).

- There is direct evidence of directives from the hospital not to refer patients to other DMEs, and to refer all patients to captive DMEs. (FAC, ¶¶ 27, 29).

- Plaintiffs' referrals have almost vanished. (FAC, ¶ 32).

- Plaintiffs are no longer allowed to market to the hospitals (FAC, ¶ 24).

These are certainly facts from which one could infer that the defendant hospitals have conspired with the defendant captive DME companies to exclude Plaintiffs from the patients that represent a significant portion of the DME market so that the hospital, who has significant stake in the profitability of the Captive DME companies and the captive DME companies, can profit. The Complaint alleges that "Defendants have engaged in a pattern of communications and actions foreclosing competition within the relevant market area." (FAC, ¶ 30). Indeed, the FAC alleges the agreement made part and parcel of the Joint Venture Agreement; that for the benefit of the hospitals and captive DME companies, Plaintiffs and other DME companies would be excluded (FAC, ¶ 24). This is a conspiracy.

### I.  Plaintiffs Have Properly Alleged An Unreasonable Restraint of Trade

Plaintiffs have made claims under Section 1 of the Sherman Act that the activities of Defendants have restrained trade, and under Section 2, for monopolization, and attempted

monopolization. The claims require similar allegations. A Section 1 Sherman Act claim must allege that the conduct of the defendant unreasonably restrains competition, *NCAA v. Board of Regents of University of Oklahoma*, 104 S. Ct. 2948, and a Section 2 claim requires a showing of anti-competitive affects in the relevant market, *American Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1579 (11th Cir. 1985). Both of these showings have been made in this case.

### 1. __The Requisite Pleading Of A *Per Se* Unreasonable Restraint For A Section 1 Claim__ Has Been Made.

The Complaint states that Defendants have: (1) excluded them from the hospitals, thus preventing plaintiffs from marketing to soon-to-be discharged hospital patients (FAC, ¶¶ 24, 30); and have directed or assigned patients to the captive DMEs (FAC, ¶¶ 26-29). The FAC alleges that the above-referenced exclusionary conduct "will eventually and has already began to, erode the services offered by the companies and the quality of goods offered. Because there is no competition, the services offered to consumers of durable medical equipment will continue to erode (FAC, ¶ 31). The FAC goes on to state that, as a result of the practices complained of, Plaintiffs have suffered a loss of revenues. (FAC,¶32).

The law is that "certain agreements, including concerted refusals to deal . . . have generally long been held to be *per se* unreasonable and always illegal." *Orval Sheppard Real Estate Co., Inc. v. Valinda Freed & Associates*, 608 F. Supp. 354, 358 (M.D. Ala. 1985), citing *United States v. General Motors Corp.*, 86 S. Ct. 1321, 1330-31 (1966). The allegations are clearly stated that the hospitals and their captive DME companies have entered into agreements whereby the hospital will only refer to the captive DME companies those patients requiring DME services. This is the very definition of a concerted refusal to deal, which is *per se* an unreasonable restraint of trade. *Id.*

26

The type of concerted refusal to deal found to be *per se* an unreasonable restraint of trade in *U. S. v. General Motors Corp.*, *supra*, is the functional equivalent of what is occurring in this case. In the *General Motors* case, there was an agreement between General Motors and auto dealerships that no auto dealership would sell automobiles to "discount houses" which were automobile sales lots that operated independent of nay dealership agreement, and offered several different makes of automobiles. The Court found that an agreement between a supplier and its retailers not to deal with a group of other automobile sellers was an agreed upon or "concerted" refusal to deal, and was thus *per se* an unreasonable restraint of trade. The same sort of an agreement has been plead in this case. In this case, it has been plead that the hospitals have agreed with their DME companies that they will not do any business, i.e., refer any patients, for the purpose of obtaining durable medical equipment. This is a concerted refusal to deal with a distributor of durable medical equipment, which is part and parcel of the agreement establishing the captive DMEs, and is *per se* unreasonable.

## 2. The Restraint Of Trade Is Unreasonable If The Rule of Reason Standard Is Applied.

Not only is the agreement by the hospitals with their captive DMEs that they will not deal with Plaintiffs *per se* unreasonable, but an application of the rule of reason, also used to show an unreasonable restraint of trade, shows the product to unreasonably restrain competition. *Boczar v. Manatee Hospitals and Health Systems, Inc.*, 131 F. Supp. 1042, 1046 (M. D. Fla. 1990) (Two different methods of analysis are used to determine whether conduct is an unreasonable restraint of trade: the rule of reason and the *per se* rule).

Under the rule of reason, it is necessary to plead that "the alleged restraint of trade tends or is reasonably calculated to prejudice the public." *Larry R. George Sales Co. v. Cool Attic Corp.*, 587

27

F.2d 266, 273 (5th Cir. 1979), cited by *Boczar*, *supra*.  The test has been alternatively formulated as a requirement that the plaintiff "must allege that defendants conduct had an impact upon competition in his particular . . . profession, and not just upon his business."  *Boczar*, *supra*, quoting *Feldman v. Jackson Memorial Hospital*, 571 F. Supp. 1000, 1008 (S. D. Fla. 1983), aff'd 752 F.2d 647 (11th Cir. 1983).  The necessary facts have been plead in this case. It has been alleged that the conspiracy between the defendant hospitals are their captive DME companies has injured the public in that prices will rise, and the level of service and quality of goods had will decrease without competition among DME companies.  Defendants have argued no legitimate business reason, i.e., efficiency, for excluding Plaintiffs from the market.  As such, Plaintiffs have carried their burden to show that the combination and agreement between the defendant hospitals and their captive DME companies are an unreasonable restraint of trade.

**J.   Defendants' Argument That The Section 2 Claims Are To Be Dismissed Because Defendants Are Not Required to Cooperate With Plaintiffs Is Misplaced.**

Defendants argue that Plaintiffs' Section 2 claims are due to be dismissed because, in essence, they amount to a claim that Defendants are required to cooperate with Plaintiffs, and the law requires no such cooperation amongst competitors.  This argument mischaracterizes Plaintiffs' claim, and distorts the holding of the cases establishing liability for exclusionary practices undertaken by firms possessing monopoly power in the relevant market.

To prevail on a monopolization claim, a plaintiff must show (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury.  *United States v. Grinnell Corp.*, 86 S. Ct. 1698, 1702-04 (1966).  There is no question that exclusion from the market has been alleged. The FAC alleges that there was and is an agreement in place between the hospitals and the captive DMEs to limit access to customers

discharged from the hospital who need DME services, and who might otherwise be served by Plaintiffs. (FAC, ¶¶ 24, 26, 30).

Defendants argue that this agreement to exclude competitors from marketing to hospital patients is a legal exclusionary practice. After all, Defendants argue, a business should not be required to assist a competitor. Nowhere do Defendants cite the proper legal standard for distinguishing legal exclusions (unwillingness to cooperate) from improper or predator exclusion giving rise to a monopolization claim. "The key to distinguishing legal exclusion from improper, or predatory exclusion is whether the exclusion was based on superior efficiency." *Advanced Health Care Services*, 9109 F.2d at 147, citing *Aspen Skiing*, 105 S. Ct. 2857-58 ("Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended.").

In this case, Defendants point to no increased efficiency as the result of excluding Plaintiffs. Indeed, even if such were proposed by Defendants, whether the practice actually was one aimed at increasing efficiency, or whether the claim of increased efficiency is merely pretext is a fact question. The *Advanced Health Care Services* Court, a cases brought by a DME provider against a hospital and its captive DME company for excluding it form the market, the Court held that such an argument cannot support dismissal. The Court held as follows:

> If a refusal to deal with an individual competitor can give rise to antitrust liability in an appropriate case, it stands to reason that an agreement to exclude such a competitor could create liability as well. Therefore, the question in this case is not whether the defendants have a duty to advertise on behalf of or refer patients to the plaintiff; rather, it is whether the purposeful exclusion of this competitor from gaining access to the hospital's patients constitutes the type of circumstances that can give rise to antitrust liability. *See Oahu Gas Serv. v. Pacific Resources, Inc.,* 838 /f,2d 360m 368 (9th Cir.) (a monopolist in some instances has "affirmative duties" under antitrust laws to aid its competitors), *cert. denied.* 488 U.S. 8709, 109 S. Ct. 180, 102

L.Ed.2d 149 (1988). Like the plaintiffs in *Aspen Skiing*, AHCS deserves an opportunity to develop a factual record that "support an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." 472. U.S. at 610, 105 S. Ct. at 2861.

*Advanced Health Care*, 910 F.3d at 148-149.

Not only are the facts plead in this case indistinguishable from those in the *Advanced Health Care* case (and in the *M&M Medical Supplies* and *Key Enterprises* case), but the legal theory put forth as grounds for recovery is squarely within accepted antitrust law. The *Aspen Skiing Company* case relied heavily upon *Lorain Journal Co. v United States*, 72 S. Ct. 181 (1951). The Court in *Aspen Skiing* stated that, "In *Lorain Journal Co.*, we squarely held that this right was not unqualified." *Aspen Skiing*, 105 S. Ct. at 2857. In *Lorain Journal Co.*, the question was whether a small town's only local newspaper cold refuse to accept advertising from customers that also advertised on a new radio station in the town. "The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases." In holding that such a right is not absolute, the court held that, "The right claim by the publisher is neither absolute nor exempt from regulation. Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act." *Id.* Similarly, where Defendants' refusal to allow Plaintiffs access to a market is done with an intent to monopolize the DME market, it is subject to regulation and prohibition by the Sherman Act.

Not only is the claim in the mainstream, but one of the key factors relied upon in *Aspen Skiing*, and commented upon by *Trinko*, cited by Defendants, and *Covad Communications*, also quoted by Defendants, is present in the case at bar. In *Aspen Skiing*, the Court cited as a factor in determining the exclusionary practice to be predatory as opposed to benign or legal that, "The

30

nonprofit elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." *Aspen Skiing*, 105 S. Ct. at 2858. Defendants argue that *Trinko* and *Covad Communications Co. v. Bellsouth Corp.*, 374 F.3d 1044 (11th Cir. 2004) now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal to deal claims under *Aspen. Covad*, 374 F.3d at 1049.

Whether this is the law or not, Plaintiffs have alleged just that. In paragraph 26 of the FAC, Plaintiffs allege that the hospitals unilaterally ceased the rotational assignment of patients for durable medical equipment that had existed prior to the entry into the market of the captive DME companies. In *Trinko*, the Court relied upon the absence of an earlier course of dealing , stating, "Here, therefore, the defendants' prior conduct sheds no light upon the notification of its refusal to deed upon whether its regulatory lapses were prompted not be competitive zeal but by anti-competitive malice." *Id.* In the present case, there was a prior history of rotational assignment in order to best serve the hospital's patients that rotational assignment in order to best serve the hospital's patients. That rotational practice ended upon entry into the market of captive DMEs. It certainly can be inferred that the ceasing of this practice occurred as the result of Defendants' wishes to exclude competition, rather than to compete with Plaintiffs.

### K.  Plaintiffs Has Stated A Claim For Injunctive Relief.

Defendants argue that Plaintiffs are not entitled to injunctive relief on the simple assertion that they have not stated any claim for relief under either the Sherman Act or the Clayton Act. Plaintiffs have refuted each argument made by Defendants as to whether they have stated a claim, and have shown that they are entitled to relief under the antitrust statutes.

Plaintiffs have alleged that the conduct giving rise to liability is ongoing, and that the ongoing

31

actions threaten serious and irreparable harm in the alleged market.  Defendants do no dispute that injunctive relief  is available to a successful antitrust claimant, such as provided for by the statutes themselves, 15 U.S.C. § 26 ("Any person, from, corporation, or association shall be entitled to sue for and have injunctive relief . . . against certain loss or violation of  the antitrust laws").  Because the Plaintiffs have alleged continuing  violation and continuing loss or threat of loss, the claims for injunctive relief are properly plead.

   **L.  Plaintiffs State Law Claims Are Proper And This Court Properly Has Jurisdiction Over   Them.**

   Defendants make no real argument concerning Plaintiffs claims for a violation of the Alabama Antitrust Act.  Plaintiffs merely state that federal law regarding monopolization governs Alabama Antitrust  actions.  *McCluney v. Zap Professional Photography, Inc.*, 663 So.2d 982, 926 (Ala. 1995).  Because Plaintiffs have stated claims under the Federal Antitrust Acts, they have stated claims under the Alabama Antitrust Act.  Similarly, this Court has jurisdiction over the state law claims under its supplemental jurisdiction, 28 U.S.C. §1367.  Where a federal court has proper jurisdiction over the case either on diversity of subject matter grounds, the Court has jurisdiction "over all other claims that are so related to claims in the action within such that they form part of the same case or controversy under Article 3 of the United States Constitution." 28 U.S.C. § 1367(a). Where a federal court has original jurisdiction over some claims in the case, the Court also has jurisdiction over state law claims so related to federal claim that the two claims "derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 86 S. Ct. 1130, 1138 (1966).  There is no question that the same facts giving rise to liability under the federal antitrust laws also give rise to liability under the  Alabama Antitrust Act.  As such, federal jurisdiction

attaches.

### III.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is due to be denied in its entirety.

Respectfully,


s/Brian M. Clark
Brian M. Clark (ASB-5319-R78B)
*Attorney for Plaintiffs*



**OF COUNSEL:**

WIGGINS, CHILDS, QUINN
 & PANTAZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile:   (205) 254-1500
Email address: bclark@wcqp.com

**OF COUNSEL:**

DWAYNE L. BROWN
5926 Carmichael Road, Suite C
Montgomery, Alabama 36123-02058
Email address: dbrown@dbrownatty.com



### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing via CMF Electronic Filing System and/or by U. S. Mail, properly addressed and postage prepaid upon the following:

James E. Williams, Esq.
Melton, Espy & Williams, P.C.
301 Adams Avenue
Montgomery, Alabama 36104

Glenn B. Rose, Esq.
Harwell, Howard, Hyne, Gabbert
 & Manner, P.C.
315 Deaderick Street, Suite 1800
Nashville, Tennessee 37238

Dennis R. Bailey
Ruston, Stakely, Johnston
 & Garrett, P.A.
184 Commerce Street
Montgomery, Alabama 36104

Mike Carlson
William Carlson & Associates, P.C.
Post Office Box 660955
Birmingham, Alabama 35266

Done this 3rd day of March, 2006.


                                        s/Brian M. Clark
                                        Of Counsel