## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| PRECISION CPAP, INC.; MEDICAL PLACE, INC.; PHASE III VANS, INC., d/b/a EAST MEDICAL EQUIPMENT AND SUPPLY; and MED-EX, | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| vs. | ) ) | Civil Action No. 2:05-CV-1096-MHT-DRB |
| JACKSON HOSPITAL; MED-SOUTH, INC.; JMS HEALTH SERVICES, L.L.C., d/b/a JACKSON MED-SOUTH HOME HEALTH, L.L.C.; BAPTIST HEALTH, INC.; AMERICAN HOME PATIENT, INC.; BAPTIST VENTURES - AMERICAN HOME PATIENT, | ) ) ) ) ) ) ) ) ) | ORAL ARGUMENT REQUESTED |
| **Defendants.** | ) ) | |
| _____ | ) | |

## MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      PLAINTIFFS CANNOT COMBINE COMPETITORS' MARKET
        SHARE TO SHOW MARKET OR MONOPOLY POWER. . . . . . . . . . . . . . . . 7

II.     PLAINTIFFS LACK ANTITRUST STANDING. . . . . . . . . . . . . . . . . . . . . . . 14

III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE
        SHERMAN ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        A.      Plaintiffs Fail to Define an Economically Viable
                Relevant Market. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                1.      There is No Submarket for Patients
                        of Defendant Hospitals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                2.      Plaintiffs' Relevant Product Market
                        Allegations are Insufficient to State a
                        Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        B.      Plaintiffs Fail to Allege Sufficient Facts Regarding
                the Existence of a Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        C.      Plaintiffs Fail to Allege Facts That Constitute An
                Unreasonable Restraint of Trade. . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        D.      Plaintiffs Fail to State a Claim For "Coercive
                Reciprocity." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        E.      Plaintiffs Fail to State a Claim For "Concerted
                Refusal to Deal." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

F.    Plaintiffs' Section 2 Claims Should Be Dismissed Because  the Antitrust Laws Do Not Require Defendants to Cooperate with Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . 39

G.    Plaintiffs Fail to State a Claim for Monopolization or Attempted Monopolization. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

H.    Plaintiffs Fail to State Claim Under the Essential Facilities Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR INJUNCTIVE RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

V.    PLAINTIFFS' STATE LAW CLAIM IS SUBJECT TO DISMISSAL UNDER FED. R. CIV. P. 12(B)(1) FOR LACK OF SUPPLEMENTAL JURISDICTION.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

VI.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER ALABAMA ANTITRUST ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

# TABLE OF AUTHORITIES

CASES

*Abbott Laboratories v. Durrett*,
746 So. 2d 316 (Ala. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*Advanced Health Care Servs., Inc. v. Radford Cmty. Hospital*,
910 F.2d 139 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 17, 29

*Advanced Health-Care v. Giles Mem. Hosp.*,
846 F. Supp. 488 (W.D. Va. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Ansell, Inc. v. Schmid Labs., Inc.*,
757 F. Supp. 467 (D.N.J. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Aquatherm Indus., Inc. v. Florida Power & Light Co.*,
145 F.3d 1258 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 40, 41, 42

*Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 15, 19

*Association of Independent Television Stations, Inc. v. College Football Ass'n*,
637 F. Supp. 1289 (W.D. Okla. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Austin v. Blue Cross & Blue Shield*,
903 F.2d 1385 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Baggett v. First Nat'l Bank of Gainesville*,
117 F.3d 1342 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19, 24, 25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Business Electronics Corp. v. Sharp Electronics Corp.*,
485 U.S. 717 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Cargill, Inc. v. Monfort, Inc.*,
479 U.S. 104 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 47

*Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*,
256 F. Supp.2d 249 (D.N.J. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Columbia Broadcasting Sys., Inc. v. Federal Trade Comm'n*,
414 F.2d 974 (7th Cir. 1969), *cert. denied*, 397 U.S. 907 (1970) . . . . . . . . . . . . . . . . . . . . . . . . 27

*Construction Aggregate Trans., Inc. v. Florida Rock Indus., Inc.*,
710 F.2d 752 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.*,
994 F. Supp. 133 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 29

*Copperweld v. Independence Tube Corp.*,
467 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 43

*Covad Communications Co. v. BellSouth Corp.*,
374 F.3d 1044 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*Delaware Health Care, Inc. v. MCD Holding Co.*,
957 F. Supp. 535, 538 (D. Del. 1997),
*aff'd without opinion*, 141 F.3d 1153 (3rd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Federal Trade Comm'n v. Cardinal Health, Inc.*,
1998 WL 433784 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Federal Trade Comm'n v. Staples*,
970 F. Supp. 1066 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 27

*General Cigar Holdings, Inc. v. Altadis, S.A.*,
205 F. Supp. 2d 1335 (S.D. Fla. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*General Indus. Corp. v. Hartz Mountain Corp.*,
810 F.2d 795 (8th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

iv

*Greyhound Computer Corp, Inc. v. International Bus. Machs. Corp.*,
559 F.2d 488 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040 (1978) . . . . . . . . . . . . . . . . . . . . . . . . 27

*Heatransfer Corp. v. Volkswagenwerk, A.G.*,
553 F.2d 964 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Henry v. Chloride, Inc.*, 809 F.2d 1334 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*JES Properties, Inc. v. USA Equestrian, Inc.*,
253 F. Supp. 2d 1273 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 32, 34

*Key Enterprises of Delaware, Inc. v. Venice Hospital*,
919 F.2d 1550, *vacated* 979 F.2d 806 (11th Cir. 1990)
("*Venice Hospital I*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9, 10, 18, 19, 38

*Key Enterprises of Delaware, Inc. v. Venice Hospital*,
979 F.2d 806 (11th Cir. 1992) ("*Venice Hospital II*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Key Enterprises of Delaware, Inc. v. Venice Hospital*,
9 F.3d 893 (11th Cir. 1993) ("*Venice Hospital III*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
359 U.S. 207 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Larry R. George Sales Co. v. Cool Attic Corp.*,
587 F.2d 266 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 33

*Levine v. Central Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 31, 34, 38, 39, 43

*M&M Med. Supply Servs., Inc. v. Pleasant Valley Hospital*,
981 F.2d 160 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 12, 13, 17, 29

*MCI Communications v. A.T. & T.*,
708 F.2d 1081 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*McCluney v. Zap Professional Photography, Inc.*,
663 So. 2d 922 (Ala. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Morris Communications Corp. v. PGA Tour, Inc.*,
364 F.3d 1288 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Northwest Title & Escrow Corp. v. Edina Realty, Inc.*,
1993 WL 593995 (D. Minn. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Norton Tire Co. v. Tire Kingdom Co.*,
858 F.2d 1533 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*,
797 F.2d 370 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

*Park Avenue Radiology Assocs., P.C. v. Methodist Health Sys., Inc.*,
198 F.3d 246, 1999 WL 1045098 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Pepsico, Inc. v. Coca-Cola Co.*,
1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

*Quality Foods de Centro America, S.A. v. Latin Am. Agribus. Dev. Corp., S.A.*,
711 F.2d 989 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Redmond v. Missouri Western State College*,
1988 WL 142119 (W.D. Mo. Nov. 2, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*,
376 F.3d 1065 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16, 17, 34, 35

*Spartan Grain & Mill Co. v. Ayers*,
581 F.2d 419 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Standard Oil Co. v. United States*,
221 U.S. 1 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Storer Cable Communications, Inc. v. City of Montgomery*,
826 F. Supp. 1338 (M.D. Ala. 1993), *vacated* 866 F. Supp. 1376 (M.D. Ala. 1993) . . . . . . 24, 28

*Sun Dun, Inc. v. Coca-Cola Co.*,
740 F. Supp. 381 (D. Md. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Supermarket of Marlinton, Inc. v. Valley Rich Dairy*,
161 F.3d 3, 1998 WL 610648 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*T. Harris Young & Assocs., Inc. v. Marquette Electronics, Inc.*,
931 F.2d 816 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*The Imaging Center, Inc. v. Western Maryland Health Systems, Inc.,*
158 Fed. Appx. 413 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Thompson v. Metro. Multi-List, Inc.,*
934 F.2d 1566 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 31

*Todorov v. DCH Healthcare Auth.,*
921 F.2d 1438 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18, 19, 20, 21

*United Mine Workers v. Gibbs,*
383 U.S. 715 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Citizens & Southern Nat'l Bank,*
422 U.S. 86 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Colgate & Co.,*
250 U.S. 300 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Ellis,*
419 F.3d 1189 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Grinnell Corp.,*
384 U.S. 563 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 49

*United States v. Sigma Int'l, Inc.,*
300 F.3d 1278 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Syufy Enters.,*
903 F.2d 659 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,*
7 F.3d 986 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 32, 34

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,*
540 U.S. 398 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 39, 40, 41, 42, 43

*Williamson v. Sacred Heart Hospital of Pensacola,*
1993 WL 543002 (N.D. Fla. May 28, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Zenith Radio Corp. v. Hazeltine Research,*
395 U.S. 100 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## STATUTES AND RULES

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *in passim*

15 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *in passim*

15 U.S.C. § 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

28 U.S.C. § 1367(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Ala. Code § 6-5-60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

11th Cir. R. 35-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

11th Cir. R. 35-9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## OTHER AUTHORITY

Areeda & Hovenkamp, *Antitrust Law*, ¶ 335.1, 261 (Supp. 1987) . . . . . . . . . . . . . . . . . . . . . . . 15

Areeda, Solow and Hovenkamp, *Antitrust Law*, ¶403 at 7 (2002) . . . . . . . . . . . . . . . . . . . . 10, 43

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| PRECISION CPAP, INC.; MEDICAL )<br>PLACE, INC.; PHASE III VANS, INC., )<br>d/b/a EAST MEDICAL EQUIPMENT AND )<br>SUPPLY; and MED-EX, )<br> )<br>        **Plaintiffs,** )<br> )<br>**vs.** )<br> )<br>JACKSON HOSPITAL; MED-SOUTH, )<br>INC.; JMS HEALTH SERVICES, L.L.C., )<br>d/b/a JACKSON MED-SOUTH HOME )<br>HEALTH, L.L.C.; BAPTIST HEALTH, )<br>INC.; AMERICAN HOME PATIENT, INC.; )<br>BAPTIST VENTURES - AMERICAN )<br>HOME PATIENT, )<br> )<br>        **Defendants.** )<br>_____ ) | **Civil Action No. 2:05-CV-1096-MHT-DRB**<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

COME NOW Defendants, by and through their respective counsel, and in support of their

Motion to Dismiss First Amended Complaint filed this date, and submit the following memorandum

of law:

**INTRODUCTION**

Despite a second chance to plead their case, and with full benefit of Defendants' criticisms

of their original Complaint, Plaintiffs have failed again, in their First Amended Complaint ("FAC"),

to submit a complaint that can survive a motion to dismiss. Plaintiffs still lack antitrust standing and

1

have still failed to state a claim upon which relief can be granted. In fact, the absence of antitrust standing and the inadequacy of Plaintiffs' allegations is even clearer now than before.

## FACTUAL ALLEGATIONS

As in their original Complaint, Plaintiffs, suppliers of various types of durable medical equipment ("DME"), allege that, until about seven years ago, they obtained referrals of certain patients being discharged from Jackson Hospital ("Jackson") and the Montgomery and Prattville hospitals owned by Baptist Health, Inc. ("Baptist") because Jackson and Baptist assigned patients who needed DME, but had expressed no preference, to DME suppliers, including Plaintiffs, on a rotational basis.  FAC ¶¶ 20, 21.  Plaintiffs further allege that in the late 1990's when Defendants JMS Health Services, L.L.C. ("JMS") and Baptist Ventures - American Home Patient ("Baptist-AHP") became competitors of Plaintiffs, Jackson and Baptist stopped assigning patients to Plaintiffs, causing financial losses to Plaintiffs. FAC ¶¶ 22, 24, 26, 32.

Significantly, Plaintiffs do not allege that Jackson and Baptist, or their respective DME companies, have any relationship with one another or that they entered into any agreement at issue in this case. While they allege that Jackson and Baptist together have "control over the market for acute care hospital services . . . such that it rises to monopoly power," FAC ¶ 13, and that the "hospital defendants have exclusive control of a substantial share of hospital services," FAC ¶ 36, Plaintiffs do not allege that either hospital alone has monopoly power, market power, or "control of a substantial share," of any market.  While they claim that a "great deal" or "a large portion" of DME business comes from patients recently discharged from hospitals,  FAC ¶¶16, 17, Plaintiffs do not allege what portion of DME business comes from patients at Jackson or Baptist, or that the portion attributable to either hospital is economically significant.

2

Plaintiffs complain of being excluded from the defendant hospitals and/or denied access to the defendant hospitals' patients for the past seven or more years, and claim that, until they were excluded, they focused their marketing efforts on hospital patients and staff, "particularly targeting staff who will ultimately arrange DME services." FAC ¶¶ 16, 17, 19, 22. They recognize that Jackson and Baptist have financial stakes in JMS and Baptist-AHP, respectively, FAC ¶ 23, but complain that Jackson and Baptist do not assign patients to Plaintiffs or allow Plaintiffs to market themselves on the hospitals' premises.  FAC ¶ 24, 26.

Plaintiffs allege that the defendant hospitals inform their patients that their respective DME companies "can meet their needs," FAC ¶ 24, but significantly concede that patients at the defendant hospitals have (and have always had) the freedom to choose any DME supplier they wish, including Plaintiffs. FAC ¶¶ 27.   Indeed, there is no allegation that any Defendant has ever failed to honor a patient's choice of DME supplier. Plaintiffs simply decry the fact that they are not automatically *assigned* customers by the defendant hospitals when a patient makes no independent selection, implying that this somehow prevents them from marketing to and serving consumers in and around Montgomery and Prattville.

Indeed, Plaintiffs do not claim to have been excluded in any way from the DME market in and around Montgomery, the market in which they claim to compete.  FAC ¶ 3, 5, 6, 15. They claim only to have been "excluded from the hospitals," FAC ¶ 16, "denied access to hospital patients," FAC ¶ 19, "denied access to the market for [DME] sales and rentals to patients discharged from the hospitals," FAC ¶ 24, "exclud[ed from] the market for hospital patients discharged from the hospitals," FAC ¶ 26, "foreclose[]d . . . from competing in the market for the provision of [DME] to discharged patients leaving Baptist Health and Jackson hospital facilities," FAC ¶ 28, "rebuke[d]

3

in their attempt to market within the hospitals," FAC ¶ 29, and "forclos[ed from competing] for the business of discharged hospital patients from Baptist Medical Center, Baptist Medical Center East, and Jackson Hospital." FAC ¶ 30.

On these facts, Plaintiffs bring various antitrust claims against Defendants, and ask that this Court require Baptist and Jackson to reinstate the claimed rotational assignment of patients that allegedly benefitted Plaintiffs before JMS and Baptist-AHP became their competitors.[1]  In other words, Plaintiffs allege that Defendants are their competitors, but ask that the Court require Defendants to refer customers to Plaintiffs.

Plaintiffs' claims should be dismissed for many reasons. Almost all of the inadequacies and problems with Plaintiffs' original Complaint remain in the FAC, and follow directly from the fact that Plaintiffs' claims are at complete odds with the very laws Plaintiffs seek to invoke.  As the United States Supreme Court recently held:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers.  Compelling firms to share the source

---

[1] Plaintiffs argued in Plaintiffs' Opposition to Motion to Dismiss ("Plfs. Opp.") (Dkt. 22), that "the FAC does not seek a return to the rotational system." Plfs. Opp. at 24 n.7. Yet, the FAC refers to the rotational assignment system numerous times, and specifically alleges that Plaintiffs' "coercive reciprocity" claim (Count I) is based on the Defendant hospitals' allocation of assignments only to their captive DME providers." FAC ¶¶ 20, 21, 24, 26, 35. Plaintiffs claim that "[t]he Complaint simply seeks a stop to the exclusionary practices outlined in the FAC, and any assignment done by the hospital, out of necessity due to lack of choice, to be done on a nondiscriminatory and nonpreferential basis." Plfs. Opp. at 24 n.7 (citing FAC ¶¶ 39, 44, 51, 60, 67). Yet, all of the paragraphs cited by Plaintiffs, and others, request specifically that the Court enter a judgment "ordering Defendants to assign discharged patients to the respective home health care agencies in the area on a nondiscriminatory and nonpreferential basis." FAC ¶¶ 39(c), 44(c), 51(c), 60(c), 67(c), 73(c), 81(c). It is not limited to instances when the assignment is "out of necessity due to lack of choice," whatever that means, and certainly appears to request a rotational assignment system. As Plaintiffs have admitted that they do not seek to have a rotational assignment system put in place, Plfs. Opp. at 24 n.7, then these paragraphs of the FAC should be stricken.

of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.  Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing – a role for which they are ill-suited.  Moreover, compelling negotiations between competitors may facilitate the supreme evil of antitrust: collusion.  Thus, as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004)

(quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).

"The central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion – that is, by competing successfully rather than by arranging treaties with its competitors.'" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600 (1985) (quoting *United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86, 116 (1975)).  Plaintiffs' FAC seeks to hold Defendants liable for competing with Plaintiffs – the very thing the antitrust laws are intended to protect - and seeks a forced customer-sharing arrangement among competitors - one of the things the antitrust laws are intended to prevent.  To allow Plaintiffs' claims would be to ignore the most basic tenet of antitrust jurisprudence:  that the antitrust laws were enacted for the "protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).

## ARGUMENT

The Supreme Court has held that, in assessing a motion to dismiss an antitrust claim, district courts should not "assume that the [plaintiff] can prove facts that it has not alleged or that defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors*

*of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983). "Moreover, even in our liberal pleading regime, antitrust plaintiffs must allege facts in support of each element of an antitrust violation . . . ." *Spanish Broadcasting Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1077 (11th Cir. 2004).

"While great detail is unnecessary, a Sherman Act complaint must allege facts from which it can be determined as a matter of law that by reason of intent, tendency, or inherent nature of the contemplated acts, the conspiracy alleged was calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce." *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 274 (5th Cir. 1979).[2] "An antitrust complaint must comprehend a so-called *prima facie* case, and enough data must be pleaded so that each element of the alleged antitrust violation can be properly identified. Conclusory allegations that defendant violated the antitrust laws and plaintiff was injured thereby will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief." *Spanish Broadcasting*, 376 F.3d at 1077-78 (quoting *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 995 (11th Cir. 1983)).

Plaintiffs' FAC alleges seven different claims. Two counts allege violations of Section 1 of the Sherman Act (Counts I and II); four counts allege violations of Section 2 of the Sherman Act (Counts III, IV, V, and VI), and one count alleges a violation of the Alabama Antitrust Law (Count VII). Substantively, Plaintiffs' FAC fails to allege a viable cause of action under the antitrust laws for numerous, fundamental reasons. As already noted, Plaintiffs are not seeking to further the goal

---

[2] Decisions of the Fifth Circuit prior to October 1, 1981, are binding on the Eleventh Circuit Court of Appeals and district courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

of preserving competition, but are instead asking this Court to require cooperation among competitors. In addition, they impermissibly combine competing defendants' market share to allege that defendants have any market or monopoly power in any market.  Moreover, Plaintiffs lack antitrust standing.

Although the complaint should be dismissed for any one of these reasons alone, there are additional deficiencies.  Plaintiffs have not, and cannot, adequately plead many required elements of antitrust claims, such as injury to competition, a conspiracy or improper agreement among the Defendants, the existence of a monopoly or any intent to monopolize.  Plaintiffs have attempted to identify a viable relevant market, but again have failed to allege facts regarding activities in that market that state a claim under the antitrust laws.

Plaintiffs' FAC should be dismissed. Given Plaintiffs' inability to remedy the deficiencies of the original Complaint that were clearly outlined in Defendants' Motion to Dismiss, leave to further amend should be denied as futile.

## I.    PLAINTIFFS CANNOT COMBINE COMPETITORS' MARKET SHARE TO SHOW MARKET OR MONOPOLY POWER.

In opposing dismissal of their original Complaint, Plaintiffs relied primarily on three cases, all decided over a decade ago, with facts Plaintiffs claim "mirror the facts alleged in the present action." Plfs. Opp. at 3-4 (citing *Advanced Health Care Services, Inc. v. Radford Community Hospital*, 910 F.2d 139 (4th Cir. 1990); *M&M Medical Supply Services, Inc. v. Pleasant Valley Hospital*, 981 F.2d 160 (4th Cir. 1993); *Key Enterprises of Delaware, Inc. v. Venice Hospital*, 919 F.2d 1550, *vacated* 979 F.2d 806 (11th Cir. 1990) ("*Venice Hospital I*"[3])).

_____

[3] Although all three cases are distinguishable on numerous grounds, Plaintiffs cannot rely on *Venice Hospital I* for an additional reason. The decision was vacated by the Eleventh Circuit

One crucial difference Plaintiffs fail to appreciate is that, in each of the three DME cases, the plaintiff DME companies alleged that a single hospital so dominated the market for hospital services in a single geographic market, that the single hospital's affiliated DME company could monopolize or otherwise unreasonably restrain trade in the entire DME market for that geographic region. *See Advanced Health Care*, 910 F.2d at 142, 144-45, 147 (consolidated appeal from three separate actions, in each of which plaintiff alleged that each hospital had a monopoly position for the acute care market in a single geographic market such that a DME with which the hospital had an exclusive agreement could monopolize the DME market in a single geographic market); *M&M Medical*, 981 F.2d at 162, 163-64 (plaintiff alleged that the one and only hospital in the relevant geographic market had sufficient monopoly power that its affiliated DME could threaten competition in the relevant DME market for the relevant geographic market); *Venice Hospital I*, 919 F.2d at 1553 (single hospital had monopoly power for acute care in the relevant geographic market, such that the hospitals' affiliated DME could threaten monopolization in the DME market for that geographic

---

upon the Court's granting of defendants' petition for rehearing *en banc*, and no mandate ever issued. *See Key Enterprises of Delaware, Inc. v. Venice Hospital*, 979 F.2d 806 (11th Cir. 1992) ("*Venice Hospital II*"); 11th Cir. R. 35-9 ("Unless otherwise provided, the effect of granting a rehearing en banc is to vacate the panel opinion and to stay the mandate."). The court later clarified that it should have dismissed the appeal, instead of granting rehearing *en banc*, because it learned that the parties to the appeal had reached a settlement of all claims. *Key Enterprises of Delaware, Inc. v. Venice Hospital*, 9 F.3d 893, 896-97 (11th Cir. 1993) ("*Venice Hospital III*"). The court further held that, because the decision was vacated and no mandate ever issued in *Venice Hospital I*, the panel's decision was never effective and has no precedential force. *Venice Hospital III*, 9 F.3d at 899-900. "[V]acated opinions 'are officially gone. They have no legal effect whatever. They are void. [They have no] remaining force and cannot be considered to express the view of this Court.'" *United States v. Ellis*, 419 F.3d 1189, 1192 (11th Cir. 2005) (quoting *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002)). *See also The Imaging Center, Inc. v. Western Maryland Health Systems, Inc.*, 158 Fed. Appx. 413, 419 n. 3 (4th Cir. 2005) (copy attached hereto as Exhibit A) (refusing to consider *Venice Hospital I* because it "is of no precedential authority even in its own circuit").

market).

Plaintiffs here, on the other hand, have not alleged that either Jackson or Baptist alone has monopoly power in any relevant market, or that either Affiliated DME can alone obtain monopoly power or otherwise unreasonably restrain trade in any relevant market. Nor could they. If two or more competitors compete in the same market, they are not capable of monopolizing that market. *See Northwest Title & Escrow Corp. v. Edina Realty, Inc.*, 1993 WL 593995, at *3 (D. Minn. 1993) (attached hereto as Exhibit B) (holding that if "different parties acting individually are succeeding in the market, there is certainly no 'dangerous probability' of one of them achieving monopoly power, and they are not united to form a single monopolistic force"); *Sun Dun, Inc. v. Coca-Cola Co.*, 740 F. Supp. 381, 392-93 (D. Md. 1990) (holding that competitors in the same market are not capable of monopolizing that market); *Association of Independent Television Stations, Inc. v. College Football Ass'n*, 637 F. Supp. 1289 (W.D. Okla. 1986) (dismissing action where plaintiff accused two football associations of monopolization of the same geographical and product markets and there was no allegation of concerted action by the two associations).

A similar attempt was summarily rejected in *Williamson v. Sacred Heart Hospital of Pensacola*, 1993 WL 543002 (N.D. Fla. May 28, 1993) (attached hereto as Exhibit C), where the plaintiff, relying on *Venice Hospital I*, claimed that Sacred Heart hospital's ability to control access to hospital services gave it a competitive advantage in the relevant lending and financial market. Rejecting the plaintiffs' reliance on *Venice Hospital I*, the court held: "Unlike the defendant in *Venice Hospital [I]*, Sacred Heart has no unreasonable ability to control access to hospital services. It is undisputed that Sacred Heart and its two main competitors, Baptist and West Florida Regional Hospital . . ., compete neck and neck within the greater Pensacola area." *Sacred Heart*, 1993 WL

543002 at *42.[4]  Similarly, Jackson, Baptist and other hospitals in the Montgomery and Prattville area compete vigorously for business.  Neither Jackson nor Baptist can alone control access to hospital services in the area, and neither of the Affiliated DMEs can alone monopolize or unreasonably restrain trade in the DME market for the area.[5]

As Defendants argued in Defendants' Memorandum in Support of Motion to Dismiss ("Defs. Brf. I") (Dkt. 14): "A 'monopoly exists when *one firm* controls all or the bulk of a product's output, and no other firm can enter the market or expand output at comparable costs.'  Areeda, Solow and Hovenkamp, *Antitrust Law*, ¶403 at 7 (2002) (emphasis in original)." Defs. Brf. I at 28. Not only have Plaintiffs added nothing in their FAC to address this critical issue, they have now clarified that there is absolutely no relationship or agreement crossing between the two groups of Defendants.

Defendants complained that Plaintiffs provided no factual allegations in the original Complaint from which to determine what, if any, relationship they claimed to exist between the members of the two groups of Defendants. Defs. Brf. I at 18-19. Defendants' specifically argued:

> There is no factual allegation from which one could surmise that Jackson, Med-South, and JMS, on the one hand, and Baptist, AHP, and Baptist-AHP, on the other, had any knowledge whatsoever of the others' activities. . . .  Jackson and Baptist are

---

[4] The *Sacred Heart* court's decision was released before the Eleventh Circuit clarified that its decision in *Venice Hospital I* had been vacated pending *en banc* review. *See Venice Hospital III*, 9 F.3d 893 (11th Cir. 1993) (opinion released Dec. 1, 1993).

[5] *See also Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 994 F. Supp. 133, 140-41 (E.D.N.Y. 1998) (rejecting argument that other courts had accepted relevant markets consisting of DME referrals "stemming from a single hospital"). Plaintiffs claimed in their Opposition to Motion to Dismiss that Defendants overstated the holding of *Continental*, pointing out that a single hospital could have market or monopoly power in its market if foreclosure from referrals from that single hospital constituted foreclosure from the DME market. Plfs. Opp. at 16 n.6. The fact remains that Plaintiffs have not sued a single hospital that has such power. They have sued two hospitals without claiming that either has such power.

10

unaffiliated competitors. Given the vagueness of the Complaint, one cannot determine if Plaintiffs claim that Jackson and Baptist conspired with one another, or that either conspired with the other's DME company; in any case, no facts are alleged to support either idea. Instead, the Complaint contains specific allegations that indicate a *lack* of concerted activity; Plaintiffs allege that Baptist employees only refer patients to Baptist-AHP, while Jackson employees only refer patients to JMS.

Defs. Brf. I at 19 (citing Complaint ¶¶ 22, 24).

In response, Plaintiffs added no allegations to their FAC on this issue, and instead clarified in their Opposition to Motion to Dismiss that Defendants were correct in assuming that there was no relationship alleged between members of the two groups. In the first two paragraphs of their response to Defendants' Motion to Dismiss, Plaintiffs explain:

> This is an antitrust case in which the basic allegations are Jackson Hospital and Baptist Hospital combined with MedSouth, Inc. and American Homepatient respectively, to operate durable medical equipment ("DME") businesses. The joint venture DME businesses are Jackson-MedSouth HME, L.L.C. ("Jackson-MedSouth"), and Baptist Ventures-American Homepatient ("Baptist/American DME") (Complaint, ¶¶ 9-12).
>
> The operative allegations of the Complaint are that Jackson Hospital entered into a joint venture with Med-South, Inc., a DME company, and Baptist Hospital entered into a joint venture with Baptist Ventures American Homepatient to form Jackson-MedSouth and Baptist/American DME. The joint venture DME companies are sometimes referred to herein as "captive DME Companies."

Plfs. Opp. at 1-2.

Plaintiffs have also clarified that the conspiracy claims in the FAC are based on alleged conspiracies between each hospital and its respective affiliated DME company. Plfs. Opp. at 24. Specifically, Plaintiffs assert that their FAC pleads "facts from which one could infer that the defendant hospitals have conspired with the defendant captive DME companies to exclude Plaintiffs from the patients that represent a significant portion of the DME market . . . ." *Id.* at 25. *See also* FAC ¶ 24 (referencing "joint venture agreements between the hospitals and their captive DME

11

companies").

Plaintiffs' claims are, therefore, clearly against two distinct, unaffiliated groups of Defendants:

| **Jackson/Med-South Group** | | **Baptist/AHP Group** |
|---|---|---|
| Jackson Hospital<br>Med-South, Inc.<br>Jackson Med-South ("JMS")<br>("Affiliated DME") | and | Baptist Health<br>American Home Patient<br>Baptist-AHP<br>("Affiliated DME") |

While there are numerous reasons discussed herein to dismiss Plaintiffs' FAC for failure to state a claim, Plaintiffs' insistence on combining these two unaffiliated groups of competitive Defendants together is the death knell for their claims.

For instance, in *M&M Medical*, where the plaintiff DME company accused the defendant hospital and the DME company it owned (the affiliated or "captive" DME company, as Plaintiffs here would call it) of monopolization, attempted monopolization and monopoly leveraging, *M&M Medical*, 981 F.2d at 162,[6] the court made clear that the plaintiff there prevailed only because it could show that the hospital and affiliated DME company had monopoly power and/or a dangerous probability of obtaining monopoly power in the relevant market, which was assumed to be the DME market in Mason County, Virginia. *Id.* at 164-166. Plaintiffs here do not and cannot allege that either affiliated DME company has or can obtain monopoly power in the only plausibly defined

---

[6] Plaintiffs cannot rely on *M&M Medical* to support their conspiracy claims. No conspiracy claims under sections 1 or 2 were brought in that case.

relevant market in the FAC – the DME market for Montgomery and Prattville.[7] Plaintiffs therefore cannot, under any set of facts, prove a monopolization or attempted monopolization claim.

Plaintiffs' attempt to combine the undefined market shares of Jackson and Baptist to show monopoly power in an acute care hospital services market, so that Plaintiffs can then claim use of that power to gain competitive advantage in a DME market, is similarly without precedent and unsupportable. Even if Plaintiffs had alleged that one of the defendant hospitals had monopoly power in the acute case hospital services market in Montgomery and Prattville, and that the hospital had used that power to gain a competitive advantage in the DME market for Montgomery and Prattville, Plaintiffs' claims would amount to no more than a monopoly leveraging claim, which even the Fourth Circuit in *M&M Medical* did not recognize as a cognizable claim. *Id*. at 168-69. The Eleventh Circuit similarly has not recognized such a claim under the Sherman Act. *See, e.g., General Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1351-53 (S.D. Fla. 2002) (noting that Eleventh Circuit has not recognized monopoly leveraging as a valid theory of antitrust liability, and that theory has been called into serious doubt).

Similarly, Plaintiffs cannot combine Defendants' market shares to state a claim for conspiracy, either under section 1 or 2 of the Sherman Act. Plaintiffs have made clear that their conspiracy claims allege concerted action only between each defendant hospital and its affiliated DME company.  Plfs. Opp. at 24, 25; FAC ¶ 24. Therefore, even if Plaintiffs' narrower relevant market for DME sales and rentals to patients discharged from Jackson and Baptist hospitals was plausible, which it is not, there is no allegation that Jackson and JMS, or Baptist and Baptist-AHP,

---

[7] Defendants certainly do not concede that this is the appropriate relevant market for this case, but merely assume on motion to dismiss that the allegation as to the alternative relevant market alleged in Plaintiffs' FAC can be proved. FAC ¶ 18.

entered into any conspiracy that "produced adverse, anticompetitive effects" within that market, the first necessary element of a claim under § 1. *See, e.g., JES Properties, Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1280 (M.D. Fla. 2003). The alleged agreement between Jackson and JMS could only conceivably impact DME sales and rentals to patients discharged from Jackson, and the alleged agreement between Baptist and Baptist-AHP could only conceivably impact DME sales and rentals to patients discharged from Baptist. Indeed, Plaintiffs insist that each hospital influenced patients to use only that hospital's affiliated DME provider. FAC ¶ 27.

Plaintiffs' conspiracy to monopolize claim under § 2 must also fail because there is no allegation that Jackson and JMS, or Baptist and Baptist-AHP, entered into concerted action "with the specific intent of achieving a monopoly" in the discharged patient market. *Aquatherm Indus., Inc. v. Florida Power & Light Co.*, 145 F.3d 1258 (11th Cir. 1998). Indeed, it would be impossible for Jackson and JMS to monopolize a market that included patients discharged from Baptist, and impossible for Baptist and Baptist-AHP to monopolize a market that include patients discharged from Jackson, if each hospital insists, as Plaintiffs allege, that its patients be influenced to use only its affiliated DME.

While there are numerous other reasons discussed herein that the FAC should be dismissed, Plaintiffs' insistence on combining defendants to show market or monopoly power in any market, or to allege anticompetitive effects in any market, eviscerates all Plaintiffs' claims. There is simply no claim in the FAC that can survive.

## II.     PLAINTIFFS LACK ANTITRUST STANDING.

Plaintiffs' FAC is also subject to dismissal because Plaintiffs cannot, despite a second attempt, plead facts that establish their antitrust standing. "[A]ntitrust standing is not simply a search

for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991) (citing *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)). "Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust law." *Id*. (citing *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 110 n.5 (1986)). The Court must "evaluate the plaintiffs' harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id*. at 1449 (citing *Associated Gen.*, 459 U.S. at 535).

To establish antitrust standing, Plaintiffs must satisfy a two-pronged test: (1) Plaintiffs must have suffered an "antitrust injury," and (2) Plaintiffs must be efficient enforcers of the antitrust laws. *Id*. at 1449. To establish antitrust injury, Plaintiffs must show that they have suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The Supreme Court has held that "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" *Id*. (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969)). In other words, an antitrust plaintiff must "'show that his own injury coincides with the public detriment tending to result from the alleged violation . . . increas[ing] the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.'" *Austin v. Blue Cross & Blue Shield*, 903 F.2d 1385, 1389-90 (11th Cir. 1990) (quoting Areeda & Hovenkamp, *Antitrust Law*, ¶ 335.1, 261 (Supp. 1987)).

Plaintiffs' FAC still fails to allege sufficient facts to show that Plaintiffs' injury is of the type

the antitrust laws were intended to prevent, i.e., injury to competition. Plaintiffs' original Complaint made the vague allegation that, "[i]n cases where the DME services are not covered by Medicare, the monopolistic practices of Defendants has [sic] foreclosed competition, and will lead to higher prices." Complaint ¶ 26. This vague allegation is unchanged in the FAC, FAC ¶ 31, and therefore still does not suffice in the Eleventh Circuit to allege injury to competition "[in] cases where the DME services are not covered by Medicare." FAC ¶ 31; *see Spanish Broadcasting Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1079 (11th Cir. 2004) (holding that failure to allege "that prices have actually risen or that the quantity of [the relevant product] has actually decreased" is a failure to allege "actual harm to competition"). Indeed, Plaintiffs are still unable to allege that prices have actually risen due to conduct that Plaintiffs claim started at least seven (7) years ago in "the late 1990's." FAC ¶ 22. Plaintiffs have therefore failed to establish antitrust injury arising out DME services that are not covered by Medicare.

Plaintiffs also claimed in their original Complaint that, "[i]n the case where Medicare pays for the equipment, a lack of competition will eventually erode the services offered by the companies." Complaint ¶ 26. In the FAC, Plaintiffs have added that such services and "the quality of goods offered" has "already begun to erode," and that such services "will continue to erode." FAC ¶ 31. Yet, these allegations are still clearly insufficient. Indeed, they are much more vague than the allegations held insufficient as a matter of law to allege injury to competition in *Spanish Broadcasting Systems*, in which the Eleventh Circuit held:

> In addition, the complaint contains several vague statements about the potential general consequences of hypothetical monopolization of the Spanish-language radio market: it "ultimately results in supra-competitive prices for advertisements and reduces the number of Spanish stations available." A reduction in the number of stations, in turn, "reduces the inventory of available advertisements and hinders the

> advertisers' ability to target Hispanics of different origins." Finally, this situation "ultimately results in higher prices for the advertisers' products," "will likely deteriorate programming quality," and "affect the viability of artists in the marketplace."
>
> Unfortunately, SBS offers no specific factual allegations to support the likelihood of any of this happening. Rather, SBS merely assumes, conclusorily, a pernicious monopoly capable of limiting output and raising prices and then proceeds to describe the other evils that might flow from this monopoly. We hold that these conclusory allegations, unsupported by specific factual allegations, do not state a claim for relief under the antitrust laws. Because SBS, even in the proposed Second Amended Complaint, offered only conclusory allegations of harm to competition, we cannot say that the district court abused its discretion in denying the motion for reconsideration and the implicit motion for leave to amend the complaint.

*Spanish Broadcasting*, 376 F.3d at 1079.

Plaintiffs' claims should be dismissed for lack of antitrust injury alone. The FAC simply does not come close to passing muster under *Spanish Broadcasting* or any other applicable precedent. In their Opposition to Motion to Dismiss, Plaintiffs relied exclusively on the three DME cases discussed earlier. Again, Plaintiffs' reliance is misplaced.

Two of the cases, *M&M Medical* and *Advanced Health-Care*, are from the Fourth Circuit, which applied a much different and easier test for showing antitrust injury than required in the Eleventh Circuit. Despite Plaintiffs' assertion to the contrary, Plfs. Opp. at 8-9, the issue of antitrust injury was not addressed in *M&M Medical*. However, antitrust injury was addressed in *Advanced Health-Care*, in which the Fourth Circuit held, contrary to Eleventh Circuit precedent, that "allegations that [plaintiff] lost income as a direct result of defendants' anti-competitive actions and monopolization of the relevant DME markets . . . states a causal antitrust injury with sufficient specificity to survive a motion to dismiss." *Advanced Health-Care*, 910 F.2d at 149. This is simply not the test for antitrust injury in the Eleventh Circuit.

17

Even the Fourth Circuit has recognized that its antitrust injury test is a search for "injury in fact," while acknowledging that, "[o]n several occasions, the Supreme Court has declined to 'equate injury in fact with antitrust injury . . . [for] not every loss stemming from a[n] [antitrust] violation counts as antitrust injury." *Supermarket of Marlinton, Inc. v. Valley Rich Dairy*, 161 F.3d 3, 1998 WL 610648, at *2, *2 n. 17 (4th Cir. 1998) (attached hereto as Exhibit D). The Eleventh Circuit, on the other hand, has specifically held that "antitrust standing is not simply a search for an injury in fact . . . ." *Todorov*, 921 F.2d at 1448. Fourth Circuit precedent related to antitrust injury is therefore inapposite.

In their Opposition to Motion to Dismiss regarding antitrust standing, Plaintiffs primarily relied on *Venice Hospital I*, which is, as already discussed, an absolutely void opinion with no precedential value. What is clear from the procedural history of *Venice Hospital* is that a majority of the Eleventh Circuit judges in active service voted affirmatively to hear the appeal in *Venice Hospital I en banc*. "A petition for en banc consideration . . . is an extraordinary procedure intended to bring to the attention of the entire court a precedent-setting error of exceptional importance in an appeal or other proceeding, and, with specific reference to a petition for en banc consideration upon rehearing, *is intended to bring to the attention of the entire court a panel opinion that is allegedly in direct conflict with precedent of the Supreme Court or of this circuit*." 11th Cir. R. 35-3 (emphasis added). In other words, a majority of active judges in the Eleventh Circuit believed that the panel's opinion in *Venice Hospital I* may have been in conflict with Supreme Court and/or Eleventh Circuit precedent.

One problematic issue may have been the panel's treatment of antitrust standing, on which Plaintiffs primarily relied in their Opposition to Motion to Dismiss. *See* Plfs. Opp. at 7-8 (quoting

*Venice Hospital I*, 919 F.2d at 1559-60).  In the year after the panel opinion in *Venice Hospital I* was written, the Eleventh Circuit decided *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991), in which it held, unlike the Fourth Circuit or the panel in *Venice Hospital I*, that antitrust standing requires more than antitrust injury. *Id.* at 1451. To show antitrust injury alone would merely make the claim one "'literally encompassed by the Clayton Act,'" *id.* (quoting *Associated Gen.*, 459 U.S. at 537), but would not satisfy the second prong of the test – that the Plaintiffs be efficient enforcers of the antitrust laws. *Id.* at 1449.

In *Todorov*, a doctor sued a hospital and group of radiologists for the hospital's refusal to allow him privileges to administer and interpret CT scans.  He claimed the hospital's practice of allowing only its staff radiologists to administer and interpret CT scans made it necessary for his patients to incur the expense of an additional doctor, a radiologist at the hospital.  He claimed the hospital and radiologists were guilty of violations of §§ 1 and 2 of the Sherman Act for denying him access to conduct CT scans and sought damages and privileges at the hospital. *Id.* at 1444-45.

Affirming dismissal of the doctor's claims, the Eleventh Circuit held that Dr. Todorov lacked antitrust standing because he did not seek to protect competition, but merely sought to be a participant in what he claimed was a monopoly.  *Id.* at 1454.  The Supreme Court has long held that the antitrust laws were enacted for the "protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).  Dr. Todorov's injury was not the type the antitrust laws address.  He was "simply seeking to increase his profits, like any competitor," *Todorov*, 921 F.2d 1455, and seeking to share in what he claimed were monopolistic profits.  *Id.* at 1453-54.

The relief that Dr. Todorov sought demonstrated that he was not an efficient plaintiff to bring an antitrust claim.  The court explained:

19

Dr. Todorov is simply looking to increase his profits, like any competitor. As such, Dr. Todorov is a particularly poor representative of the patients; indeed, his interests in this case are so at odds with the patients' interests that it is unlikely that he would have standing under article III of the Constitution to present their claims. Dr. Todorov is thus no champion for the cause of consumers.

*Id.* at 1454-1455.

Plaintiffs' allegations are no different than Dr. Todorov's. Plaintiffs claim that they are not being allowed access to a hospital where patients with whom they seek to do business are hospitalized. They seek to compete more easily in the DME market by having easier access to potential customers while those potential customers are patients at Baptist and Jackson. They do not claim that they have no other way of competing. They simply claim that, before they were competing with the Affiliated DMEs, competition was easier because they were "assigned on a rotational basis . . . to arrange for that patient's home health care needs." FAC ¶ 6. They complain because the alleged rotational assignment of patients to them was discontinued. FAC ¶ 20, 21, 24, 26. While they claim that prices for DME may one day increase, or that the quality of services or goods may one day erode, FAC ¶ 21, they do not seek to protect consumers or competition. They simply seek to "increase [their] profits, like any competitor." *Todorov*, 921 F.2d at 1455. Therefore, even if Plaintiffs had antitrust injury, and even if an antitrust violation had occurred, Plaintiffs would not have antitrust standing because they are not efficient enforcers of the antitrust laws.

The Eleventh Circuit is not alone in recognizing that claimed harm to consumers will not suffice to satisfy antitrust standing. In *Park Avenue Radiology Associates, P.C. v. Methodist Health Systems, Inc.*, 198 F.3d 246, 1999 WL 1045098 (6th Cir. 1999) (attached hereto as Exhibit E), plaintiffs, doctors that provided outpatient radiological services, sued a hospital and the hospital's exclusive radiological group, claiming that doctors with staff privileges at the hospital had stopped

20

referring patients to the plaintiffs after the hospital, the defendant doctors, and a preferred provider organization ("PPO") entered into an agreement that required that the defendant doctors refer patients only to the hospital's exclusive radiological group. *Id.* at *1. They alleged several violations of the antitrust laws, which were all dismissed for lack of antitrust standing.

The Sixth Circuit affirmed, holding that the alleged harm to consumers due to an increase in price or decrease in quality of the services plaintiffs offered, did not suffice to give the plaintiffs antitrust standing. Specifically, the court held that if, as plaintiffs alleged, the price of services in would increase or the quality of services would decline due to the alleged antitrust violations, patients in the market would, on their own accord or at the urging of their insurer, seek a less expensive or higher quality service in the market. *Id.* at *3. The court also held that, "[a]lthough Plaintiffs may ultimately suffer from a loss of patients and profits, their lost profits are derivative of the alleged harm inflicted on [consumers and their insurers], the harm is not sufficiently causally related to the violation, and their damages are speculative in that the number of lost referrals is not easy to measure." *Id.* at *6. Finally, the court, citing *Todorov*, held that the plaintiffs were not efficient enforcers of the antitrust laws in such a case, and that the consumers or their insurers were the more directly harmed by the alleged violations. *Id.* at *6-7.

Plaintiffs' claims here are indistinguishable from the claims made in *Todorov* or *Park Avenue*. Plaintiffs' allegations and requested relief make clear that they are not attempting to protect competition, but to increase their profits without having to compete. The FAC demonstrates that Plaintiffs have not suffered antitrust injury and would not be efficient enforcers of the antitrust laws for the violations they allege. As in *Todorov* and *Park Avenue*, their claims should be dismissed for lack of antitrust standing.

21

III.    **PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SHERMAN ACT.**

Plaintiffs' FAC alleges violations of either Section 1 or 2 of the Sherman Act in Counts I through VI. Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies in restraint of trade, while Section 2 of the Act prohibits unilateral monopolization and attempted monopolization, as well as conspiracies to monopolize.[8]

Each of the Sherman Act claims in the Plaintiffs' FAC fails for several reasons, in addition to the reasons discussed in Section I, *supra*, regarding Plaintiffs' combination of Defendants' market shares in their allegations. Among other things, Plaintiffs continue in their failure to identify a viable relevant market in the context of their claims, which is fatal to *all* of the antitrust claims.

A.    **Plaintiffs Fail to Define an Economically Viable Relevant Market.**

Plaintiffs' failure to define a relevant market on which their claims are based requires dismissal of their FAC. "On a very simplistic level, antitrust law is concerned with abuses of power by private actors in the marketplace. Therefore, before we can reach the larger question of whether [a Defendant] violated any of the antitrust laws, we must confront the threshold problem of defining the relevant market." *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991). Under the rule-of-reason,[9] and in all claims alleging violations of Section 2, an antitrust plaintiff

---

[8] Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2.

[9] Contrary to Plaintiffs' assertions, Plfs. Opp. at 22-24, 26-27, their § 1 claims are not subject to *per se* treatment. *See Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 735-36 (1988) ("vertical restraint is not illegal per se unless it includes some agreement on

must define both a product market and a geographic market to satisfy the relevant market requirement, and the anti-competitive effect alleged must occur in that relevant market. *Id*.; *see also Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1555 (11th Cir. 1996). Plaintiffs' FAC fails to define an economically rational relevant market,[10] much less set forth how any anti-competitive effect occurred in a viable relevant market.

The FAC fails to define a relevant product market applicable to Plaintiffs' claims. Defining a relevant product market is primarily "a process of describing those groups of producers which, because of the similarity of their products, have the ability – actual or potential – to take significant amounts of business away from each other." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993) (citing *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir.1987)). In response to Defendants' argument that the original Complaint did not allow Defendants to know whether Plaintiffs were concerned with the "DME market" or the "DME leasing market," Plaintiffs asserted only that they had defined what DME was, i.e., defined the product. Plfs. Opp. at 14-15. The product *market*, however, still remains inadequately defined in the context of Plaintiffs' other allegations, making all their claims deficient and subject to dismissal.

### 1.    There is No Submarket for Patients of Defendant Hospitals.

Plaintiffs, in their Opposition to Motion to Dismiss, criticized Defendants for not recognizing

---

price or price levels"). *See also* Sections 3(D) & 3(E), *infra*.

[10] In their Opposition to Motion Dismiss, Plaintiffs eventually concede that "[i]t seems clear to Plaintiffs that the geographic market is clearly defined in either of the alternatively plead markets as Montgomery and Prattville, Alabama." Plfs. Opp. at 15. Defendants disagree that the geographic market is so clearly defined in the FAC, but based on Plaintiffs' concession, will assume that the relevant geographic market for purposes of a motion to dismiss is Montgomery and Prattville, Alabama.

the existence of antitrust "submarkets," and claimed that "defining a relevant submarket is in no way limited to [product and geography]." Plfs. Opp. at 12. Defendants do recognize that antitrust "submarkets" exist, but defining a relevant submarket requires the exact same analysis as defining a relevant market.  In fact, the case quoted at length by Plaintiffs' Opposition to Motion to Dismiss regarding submarkets says just that. "Ultimately, a 'submarket' definition turns on the same inquiry as a 'market' definition . . . . At bottom, then, 'the same proof which establishes the existence of a relevant product market also shows (or fails . . . to show) the existence of a product submarket.'" *Pepsico, Inc. v. Coca-Cola Co.*, 1998 WL 547088, at *5 (S.D.N.Y. Aug. 27, 1998) (attached hereto as Exhibit F).

Plaintiffs attempt to redefine the relevant product market as the "submarket" for "rental and sale of [DME] to patients discharged from" the defendant hospitals. Plfs. Opp. at 11-14. Plaintiffs have also added allegations in the FAC that Plaintiffs "focused their marketing efforts on hospital patients and hospital staff," FAC ¶ 16, that "the market of hospital patients with DME needs is recognized by the industry as a separate economic entity," and that "market actors are aware of this submarket of business." FAC ¶ 17. This does not an antitrust "submarket" make.

In support of their submarket argument, Plaintiffs asserted in their Opposition to Motion to Dismiss that they were quoting from the United States Supreme Court opinion in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502 (1962), and that this Court had also quoted the language in its opinion in *Storer Cable Communications, Inc. v. City of Montgomery*, 826 F. Supp. 1338 (M.D. Ala. 1993), *vacated* 866 F. Supp. 1376 (M.D. Ala. 1993). Plfs. Opp. at 12-13.  They are incorrect on both counts. The quote is from the Southern District of New York's opinion in *Pepsico*, and the last internal citation that would have made the quote complete is to "[*Federal Trade Comm'n*

24

*v. Staples*, 970 F. Supp. 1066, 1080 n.11 (D.D.C. 1997)] (noting that use of the term 'submarket' may be confusing and observing that '[w]hatever term is used – market, submarket, relevant product market – the analysis is the same')." *Pepsico*, 1998 WL 547088, at *5.[11] What "product market" analysis requires is an examination of reasonable substitutes. *See Brown Shoe Co.*, 370 U.S. at 325 ("reasonable interchangability of use or the cross-elasticity of demand between the product itself and substitutes for it" constitute the outer boundaries of a product market for antitrust purposes). Under the proper analysis, the submarket proposed by Plaintiffs is simply not plausible.

Plaintiffs fail to mention that the court in *Pepsico* allowed "sales of fountain-dispensed soft drinks distributed through independent foodservice distributors," as opposed to all sales of fountain-dispense soft drinks, because the plaintiff "expressly allege[d] that there are no viable substitutes to fountain-dispensed soft drinks distributed through independent foodservice distributors." *Pepsico*, 1998 WL 547088, at *8. There is no allegation here that, from the consumer's point of view, there are no viable substitutes to the rental or sale of DME in the hospital setting. In fact, Plaintiffs' entire case is based on their allegation that they are the substitute.

This case is much more akin to *Redmond v. Missouri Western State College*, 1988 WL 142119 (W.D. Mo. Nov. 2, 1988) (attached hereto as Exhibit G), which the *Pepsico* court distinguished. In *Redmond*, a college-textbook bookstore alleged that a college-owned bookstore's practice of offering book vouchers to scholarship students, redeemable only at its bookstore, constituted monopolization in the market for sales of books to those students. *Redmond*, 1988 WL 142119, at *1. In rejecting such a limited product market definition, the *Redmond* court held:

_____

[11] In fact, almost all of Plaintiffs' argument regarding submarkets is a direct quote from *Pepsico*, although not identified as such. *Compare* Plfs. Opp. at 13-14 *with Pepsico*, 1998 WL 547088, at *7-8.

> An attempt to define the relevant market in terms of a certain class of prospective purchasers runs contrary to the classic tests used in a monopolization case. . . . Classes of prospective purchasers are not separated, and it seems unprecedented to allow a claim that a defendant has monopolized a class of customers as distinguished from a product or service. . . . Only "classes of things" can be monopolized, . . . not certain groups of customers.

*Id.* at *2.

Although they cited to the case, Plfs. Opp. at 12, Plaintiffs' argument ignores *T. Harris Young & Assocs., Inc. v. Marquette Electronics, Inc.*, 931 F.2d 816 (11th Cir. 1991), which was also distinguished by *Pepsico*, 1998 WL 547088, at *8-9. In *T. Harris Young*, the Eleventh Circuit specifically held that a plaintiff who concentrated efforts to sell EKG recording paper to 200+ bed hospitals did not thereby create an antitrust "submarket." *Id.* at 825. It did not matter that sales of EKG paper to 200+ bed hospitals accounted for 80% of all sales. *Id.* at 820. Nor did it matter that plaintiff had concentrated its sales efforts in that segment of the market. *Id.* at 825 n.17.

"While a relevant product market can be limited to a portion of customers, such a limitation must be based on a distinction in the *product* sold to those customers. If, for example, a product is specially designed for a certain group of purchasers and the suppliers concentrate their efforts almost exclusively on those purchasers, as in *Heatransfer [Corp. v. Volkswagenwerk, A.G.*], 553 F.2d 964 [(5th Cir. 1977)], the product dimension may be limited to the sale of that product to those purchasers." *T. Harris Young*, 931 F.2d at 824 (emphasis in original). In *Heatransfer*, the product was a "submarket" of air conditioner sales, limited to air conditioners sold in Volkswagens, because "the companies selling air conditioners for those cars concentrated almost exclusively on those cars because of the distinct engineering problems associated with the Volkswagen imports." *T. Harris Young*, 931 F.2d at 825 n.16. "EKG recording paper is not designed for 200+ bed hospitals; rather,

there is no difference in the paper sold to those hospitals from that sold to smaller hospitals, clinics, and doctors' offices." *Id.* at 825 n.17.[12]

The fatal flaw in Plaintiffs' proposed submarket is simple: no matter how large a segment of their DME business was derived from in-hospital marketing, they have not alleged anything that justifies viewing DME (or the consumers who use it) differently based on whether a consumer was

_____

[12] Cases upon which Plaintiffs rely from outside the Eleventh Circuit involving different channels of distribution, are clearly distinguishable for many reasons. In *Federal Trade Comm'n v. Cardinal Health, Inc.*, 1998 WL 433784 (D.D.C. 1998) (attached hereto as Exhibit H), the court was reviewing a proposed merger of two drug wholesalers, and the relevant product market for drug distribution was limited to the submarket for wholesale distribution because the wholesaler's customers could not duplicate the services wholesalers could provide. To compare *Cardinal Health* to this case would require finding that there is no way to obtain DME unless you are a patient in Baptist or Jackson hospital. In *Federal Trade Comm'n v. Staples*, 970 F. Supp. 1066 (D.D.C. 1997), the court, in the context of reviewing a proposed acquisition of Office Depot by Staples, limited the relevant office supply product market to the "office supply superstore" product market for a variety of reasons, including the level at which the superstores competed with one another, as opposed to smaller office supply retailers. *Id.* at 1079. As the Plaintiffs allege that they compete with the DME companies affiliated with the hospitals, such a scenario is inapposite here. In *Columbia Broadcasting Sys., Inc. v. Federal Trade Comm'n*, 414 F.2d 974 (7th Cir. 1969), *cert. denied*, 397 U.S. 907 (1970), yet another non-Sherman Act case, the court limited the product market to record club sales, as opposed to all retail sales of records, because it was reviewing the extent to which exclusive licensing agreements kept other record clubs from forming. *Id.* at 981. As Plaintiffs do not complain here that the hospitals' affiliated DMEs companies prevent other hospital-affiliated DME companies from forming, the case is clearly inapposite. Plaintiffs here simply seek easier avenues of competition with the hospital-affiliated DMS companies. In *Henry v. Chloride, Inc.*, 809 F.2d 1334 (8th Cir. 1987), another non-Sherman Act case, the court held that services provided by route salesmen of batteries to a unique type of customer, small service station owners in need of such services, limited the relevant market to route sales of batteries. *Id.* There is no similar allegation here that the hospital-affiliated DME companies provide services that other DME providers cannot. In fact, the allegations are to the contrary. In *Ansell, Inc. v. Schmid Labs., Inc.*, 757 F. Supp. 467 (D.N.J. 1991), the court, in holding that retail sales of condoms constituted a relevant product submarket of all condom sales, relied on a number of factors, including that the products sold at retail had different packaging characteristics than those sold at wholesale, *id.* at 473-74, an allegation not made here. Finally, in *Greyhound Computer Corp, Inc. v. International Business Machs. Corp.*, 559 F.2d 488 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040 (1978), a relevant product market for leasing computers was recognized because of the varied needs of customers seeking to lease, not purchase computers. *Id.* at 494-95. No such allegations are made in the FAC.

recently discharged from the hospital or not. It is not alleged that DME is specially designed to be sold to people in the hospital. Nor is it alleged that DME used by individuals recently discharged from the hospital is significantly different from DME used by individuals who were not recently discharged. Nor is it alleged that consumers who were recently discharged from the hospital use DME in a way that is significantly different from consumers who were not recently discharged.

By Plaintiffs' own definition, DME is used by consumers outside of a hospital setting. FAC ¶ 3 ("the one business is the provision of medical devices needed for care in the homes of patients after discharge from the hospital"). Consumers do business with DME suppliers and other home health care providers not only through hospital referrals, but through referrals from doctor's offices, nursing homes, and home health agencies. FAC ¶¶ 36, 37. Consumers also find and do business with DME suppliers on their own, by virtue of referrals from friends and direct marketing. *See, e.g., Delaware Health Care, Inc. v. MCD Holding Co.*, 957 F. Supp. 535, 538 (D. Del. 1997), *aff'd without opinion*, 141 F.3d 1153 (3rd Cir. 1998) (noting that home health care providers often rely on referrals and that "such referrals come from hospitals, physicians, insurance companies, health maintenance organizations ("HMO's"), nursing homes, state contracts and other patients").

In *Storer Cable Communications, Inc. v. City of Montgomery*, 826 F. Supp. 1338 (M.D. Ala. 1993), *vacated* 866 F. Supp. 1376 (M.D. Ala. 1993), on which Plaintiffs rely for their "submarket" argument, this Court denied a motion to dismiss because the plaintiffs had alleged that, based on the structure of the cable industry, there could be submarkets for various types of programming, i.e., Sunday night NFL games, within the broader cable programming market. *Id.* at 1355. Plaintiffs make no similar allegations here. In fact, similar allegations in this case would involve whether various types of DME (e.g., wheelchairs) could be a "submarket" of the DME market. *Storer* is therefore not

helpful to Plaintiffs. There is no antitrust submarket here.[13]

### 2. Plaintiffs' Relevant Product Market Allegations are Insufficient to State a Claim.

Plaintiffs continue in the FAC to make various allegations about competition and exclusion in "the [DME] leasing market," the "DME market," and other alleged product markets. Because Defendants have already pointed out the supposed discrepancies and Plaintiffs have amended their complaint, Defendants will assume that the differences in Plaintiffs' usage of product market definitions are intentional.

Plaintiffs have added general allegations that "the relevant product market in this case is the market for rental and sale of [DME]." FAC ¶¶ 17,18. Count I, the Section 1 "coercive reciprocity" claim, contains no additional definition of the relevant product market, and claims injury and exclusion only from the "[DME] leasing market." FAC ¶ 38. Count I asserts that a "monopoly for Defendants [will be created] in the DME market," FAC ¶ 39, but seeks only to have Defendants enjoined from excluding competitors in the "[DME] leasing market." FAC ¶ 39(a).

In Count II, the Section 1 "concerted refusal to deal" claim, there is no specific definition of

---

[13] Similarly, there was no submarket recognized in any of the DME cases upon which Plaintiffs rely. As the court in *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 994 F. Supp. 133 (E.D.N.Y. 1998), explained, both *Advanced Health-Care Services, Inc. v. Radford Community Hospital*, 910 F.2d 139 (4th Cir. 1990), and *M&M Medical Supply Services, Inc. v. Pleasant Valley Hospital*, 981 F.2d 160 (4th Cir. 1993), involved hospitals that had such monopoly power that foreclosure from referrals to their patients could essentially constitute foreclosure from the entire DME product market for the relevant geographic area. *Continental*, 994 F. Supp. at 141. (The court refused to consider *Venice Hospital I*, recognizing that it had been vacated. *Id.*) There were no submarkets in those cases. Therefore, the *Continental* court recognized the crucial difference between a hospital's patients representing a large *share* of a DME market, and a hospital's patients actually *being* the market. The court specifically held that a product market limited by reference to the defendant's customers (or patients) would not be "an economically viable product market." *Id.*

the relevant product market, so it will be assumed that the applicable market is "rental and sale of [DME]," as provided in the general allegations of the FAC. FAC ¶¶ 17, 18. Yet, Plaintiffs assert that Defendants have excluded competitors and that the defendant hospitals have refused to deal with Plaintiffs only in the "[DME] leasing market." FAC ¶ 42. As in Count I, Plaintiffs again allege a threatened monopoly in the "DME sales and rental market," but seek to enjoin their exclusion from the "[DME] leasing market." FAC ¶¶ 44, 44(a).

In Count III, the Section 2 monopolization claim, the relevant product market is defined as "the sale and rental of [DME]," FAC ¶ 47, and Plaintiffs allege that Defendants have engaged in willful conduct to establish and maintain monopoly power in the "[DME] market." FAC ¶ 48. Yet, Plaintiffs claim that the defendant hospitals and affiliated DME companies possess monopoly power only in the "[DME] leasing market," FAC ¶ 49, and claim to have suffered injury by being foreclosed from doing business only in the "[DME] leasing market." FAC ¶ 50.

In Count IV, the Section 2 attempted monopolization claim, the relevant product market is defined as "the sale and rental of [DME]," FAC ¶¶ 54, 55, but Plaintiffs assert that Defendants had the specific intent to acquire monopoly power only in the "[DME] leasing market." FAC ¶¶ 56, 57. Plaintiffs claim that they have been injured by foreclosure from "said market." FAC ¶ 59, that irreparable harm is threatened in "the market described above," that a monopoly is threatened in the "[DME] leasing market," FAC ¶ 60, and that they seek to enjoin their exclusion from the "[DME] leasing market." FAC ¶ 60(a).

In Count V, the Section 2 conspiracy to monopolize claim, the relevant product market is defined as "the sale and rental of [DME]." FAC ¶¶ 63, 64. Yet, Plaintiffs claim that Defendants have conspired with the intent to acquire monopoly power only in the "[DME] leasing market," FAC ¶

30

65, and that Plaintiffs' injuries arise only from being foreclosed from the "[DME] leasing market." FAC ¶ 66.

In Count VI, the new Section 2 "essential facilities" conspiracy to monopolize claim, Plaintiffs do not define a relevant market, so it will be assumed that the applicable market is "rental and sale of [DME]," as provided in the general allegations. FAC ¶¶ 17, 18. Plaintiffs claim that they have been excluded from the defendant hospitals in an attempt to monopolize "the retail [DME] market," FAC ¶ 72, but seek to enjoin only their exclusion from the "[DME] leasing market." FAC ¶ 73(a).

Finally, in Count VII, the state law antitrust claim, Plaintiffs allege that the relevant product market is "the health service and [DME] leasing market," FAC ¶ 76, but allege that Defendants have monopoly power only in the "[DME] leasing market." FAC ¶ 79. Plaintiffs allege that their injury arises from exclusion from the "[DME] leasing market," FAC ¶ 81, and seek to enjoin their exclusion from that market. FAC ¶ 81(a).

In sum, no count in the FAC alleges a relevant product market in which the alleged anti-competitive effects have occurred. All Plaintiffs' claims therefore fail.[14]  *Thompson*, 934 F.2d at 1572; *Levine*, 72 F.3d at 1555.

**B.   Plaintiffs Fail to Allege Sufficient Facts Regarding the Existence of a Conspiracy**.

For the claims in Counts I, II, and VI to survive, the FAC must adequately allege (1) the

---

[14] In addition, Plaintiffs' FAC still acknowledges that Plaintiff Precision CPAP "is not a 'full-line' DME provider, but specializes in the provision or [sic] respiratory therapeutic services." FAC ¶ 3. Therefore, Precision CPAP does not compete in DME market or the DME leasing market, as DME is defined by the Plaintiffs to include "hospital beds, walkers, wheelchairs, oxygen, and other durable medical equipment." FAC ¶ 3. Precision CPAP cannot be injured from foreclosure from a market in which it does not compete. Its claims are due to be dismissed on this additional basis, as well.

31

existence of concerted action between two or more Defendants (2) that unreasonably restrains competition in the relevant market. *See U.S. Anchor Mfg.*, 7 F.3d at 1001-1002 ("a section 1 claim and a section 2 conspiracy to monopolize require the same threshold showing -- the existence of an agreement to restrain trade."). To be sure, Plaintiffs, as they did in their original Complaint, repeatedly imply or assert in a conclusory manner that their claims are based on concerted action, without alleging any facts to support the element of concerted action.

A complaint cannot survive a motion to dismiss with only conclusory allegations of a conspiracy. In *JES Properties*, a district court dismissed a complaint that alleged "[a]ll of the Defendants acted as a part of a common scheme to violate the antitrust laws which have an adverse effect on competition." 253 F. Supp. 2d at 1280. The court noted that "[t]he Complaint [did] not state with any degree of specificity the Defendants' alleged concerted conspiratorial conduct nor how the [alleged conspiratorial conduct] relate[d] to Plaintiffs' section 1 claim." *Id.* Further, the complaint did not allege "that Defendants were conscious of each other's conduct nor that this awareness was an element in their decision-making process." *Id.* Finding that there were no facts to support an inference that there were concerted activities among the defendants with respect to the alleged antitrust activity, the district court dismissed the complaint. *Id.* at 1280, 1283.

Plaintiffs' FAC suffers from the same fatal flaw as its original Complaint. The only references in the Complaint to a conspiracy or other concerted activity are:

¶ 28    "Defendants have combined, contracted and/or conspired to create a monopoly . . ."

¶ 30    "The contracts, combinations and/or conspiracies by and among Defendants whereby Defendant hospitals allocate the assignment of patients . . . to their captive DME providers and restrict access to hospital patients and staff . . . is a coercive reciprocity agreement . . ."

32

¶ 39    "The contracts, combinations and/or conspiracies among the Defendants seriously threatening [sic] irreparable harm . . . ."

¶ 42    "The contracts, combinations and/or conspiracies by and among Defendants whereby Defendants have agreed or otherwise acted in concert to the exclusion of all other competitors . . . constitutes a concerted refusal to deal . . . . More specifically, the hospitals have refused to deal with Plaintiff in providing access to the above-referenced market."

¶ 65    "Defendants have contracted, combined and conspired in a series of unlawful and wrongful activities and communications with the specific intent to acquire or maintain for Defendants monopoly power . . . ."

These allegations are nothing more than conclusions that there was a conspiracy, and are therefore insufficient to state a claim for conspiracy or improper concerted action under the Sherman Act. *See Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979) ("A general allegation of conspiracy . . . without a statement of the facts constituting the conspiracy, is a mere allegation of a legal conclusion and is inadequate of itself to state a cause of action.").

Plaintiffs have added one allegation in the FAC regarding an agreement. "Part and parcel of the joint venture agreements between the hospitals and their captive DME companies referenced above was that the hospitals and their captive DME companies would combine to restrict . . . access to the market for [DME] sales and rentals to patients discharged from the hospital's [sic] . . . ." FAC ¶ 24. The FAC and Plaintiffs' Opposition to Motion to Dismiss clarify therefore that no agreement of any kind is alleged between Med-South or AHP and any other defendant. *See* Plfs. Opp. at 24.[15] Plaintiffs allege only that the hospitals and their affiliated DME companies, JMS and Baptist-AHP, entered into an agreement.

Clarifying what claims are not made is all ¶ 24 does, however. Otherwise, it simply alleges

---

[15] On this basis, Counts I and II against Med-South and AHP should be dismissed.

that an agreement was made to restrict access to a market that does not exist. There is no "market for [DME] sales and rentals to patients discharged from the hospitals." As there is no allegation that any defendants conspired to restrict access in the relevant market, there is no conspiracy claim alleged.

In addition, with regard to federal antitrust claims alleging concerted action, the plaintiff has the burden of disproving the possibility that the defendants acted independently or legitimately. *U.S. Anchor Mfg.*, 7 F.3d at 1002. Plaintiffs' FAC, like their original Complaint, contains no allegations that could meet this burden. Plaintiffs' failure to allege facts regarding the existence of an actionable conspiracy renders Counts I, II, and VI of their FAC legally insufficient.

### C.    Plaintiffs Fail to Allege Facts That Constitute An Unreasonable Restraint of Trade.

Even if Plaintiffs had alleged some agreement among any of the Defendants, they have failed to allege an unreasonable restraint of trade.  "[N]ot every agreement that restrains competition will violate the Sherman Act.  The Supreme Court long ago determined that Section 1 prohibits only those agreements that *unreasonably* restrain competition." *Levine*, 72 F.3d at 1545 (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 58-64 (1911)) (emphasis in original).  In a Section 1 claim, Plaintiffs "must allege that defendants' conduct had an impact upon competition... and that the alleged restraint on trade was unreasonably calculated to prejudice public interest." *JES Properties*, 253 F. Supp. 2d at 1281.  Proof of "anticompetitive effect" in the relevant market is similarly a requirement in a Section 2 claim.  *Spanish Broadcasting Sys.*, 376 F.3d at 1077.

In *Spanish Broadcasting*, the plaintiff offered conclusory allegations that "Defendants' exploitation of their dominance of those markets has caused injury to competition by limiting

alternatives available to advertisers, performers and the listening audience," and "[defendants']
conduct has and will continue to affect prices for advertisements, the quality of programming, and
the prices for advertisers' products." *Id.* at 1078-79. The Eleventh Circuit found that "neither
statement claims that prices have actually risen or that the quantity of available Spanish-language
advertising time has actually decreased," and therefore neither statement alleged "actual harm to
competition." *Id.* at 1079.

> Ultimately, the Court dismissed the plaintiff's complaint, reasoning:

> [Plaintiff] offers no specific factual allegations to support the likelihood of any of this
> happening. Rather, [plaintiff] merely assumes, conclusorily, a pernicious monopoly
> capable of limiting output and raising prices and then proceeds to describe the other
> evils that might flow from this monopoly. We hold that these conclusory allegations,
> unsupported by specific factual allegations, do not state a claim for relief under the
> antitrust laws.

*Id.*

In this case, Plaintiffs' allegations are even weaker. Plaintiffs allege that Defendants'
practices have been on-going since "the late 1990's," but the Plaintiffs remain in business (in one
case through a successor). Plaintiffs do not allege that prices have increased. They allege only that,
with respect to non-Medicare-reimbursed DME services, prices *will* increase. FAC ¶ 31. They allege
that, with respect to Medicare-reimbursed DME services, services and quality of goods have begun
to erode. FAC ¶ 31. As discussed in Section II, *infra*, in the context of antitrust injury, such
conclusory statements are not sufficient allege unreasonable restraint of trade. Plaintiffs' failure to
allege facts regarding injury to competition mandates dismissal of all of Plaintiffs' claims.

### D.    Plaintiffs Fail to State a Claim For "Coercive Reciprocity."

In addition to the general defects in all Plaintiffs' conspiracy claims, each count suffers from
its own specific deficiencies. In Count I, Plaintiffs claim that "the hospital defendants," Jackson and

Baptist, "have exclusive control of a substantial share of hospital services and, accordingly, have the power to otherwise unduly influence the patients, doctors, nursing homes or home health care agents' selection or recommendation of durable medical equipment vendors." FAC ¶ 36. Plaintiffs further claim that the hospital Defendants "unlawfully exercise said power to coerce, pressure or otherwise unduly influence" the selection or recommendation of the "captive DME companies,"[16] FAC ¶ 37, as they describe JMS and Baptist-AHP, FAC ¶ 23. Plaintiffs claim that these allegations constitute a "coercive reciprocity agreement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." FAC ¶ 35.

"In reciprocal dealings a buyer with economic power forces a seller to buy something from it to sell its goods." *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 425 (5th Cir. 1978). Plaintiffs claim that the alleged "contracts, combinations and/or conspiracies" that constituted a "coercive reciprocity agreement" were "by and among Defendants." Yet, despite Defendants' argument in support of dismissing the original Complaint, that these allegations were insufficient, Plaintiffs still do not allege that any Defendant had economic power in any relevant market. Plaintiffs simply allege that the "Defendant hospitals" have "exclusive control of a substantial share of hospital services," and therefore allegedly have some power to influence the selection of DME vendors. FAC ¶ 36. Even if these allegations sufficiently defined a proper market, which they do not, there is no

---

[16] Plaintiffs only claim that the "hospital defendants" have the power to influence others. Complaint ¶ 31. Furthermore, Plaintiffs do not seek to "deal" with any of the DME supplier defendants. From this it follows that any claims based on coercion or refusal to deal could not extend to the DME supplier Defendants. These are merely additional grounds upon which to dismiss Counts I and II against JMS, Med-South, Baptist-AHP and AHP.

allegation in Count I that any Defendant has market power in any market.[17]  Without market power, a defendant cannot be guilty of coercing anyone to do anything in violation of Section 1. Also, for this reason, Plaintiffs' claim is not subject to *per se* treatment. *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 425 (5th Cir. 1978).

There is also no factual allegation that either of the Defendant hospitals were buyers of anything, much less that they forced any seller "to buy something from it to sell its goods." Plaintiffs simply allege that unspecified "contracts, combinations and/or conspiracies" resulted in the Defendant hospitals allocating the assignment of patients to their "captive DME providers." FAC ¶ 38.

Plaintiffs' decision to assert a "coercive reciprocity agreement" claim appears inexplicable. With respect to Jackson, Plaintiffs concede that Jackson patients may choose a DME company other than JMS, but that Jackson prefers the recommendation of JMS by Jackson staff "when possible." FAC ¶ 27. With respect to one of Baptist's hospitals, Plaintiffs claim only that *hospital personnel* have said they "have an 'obligation' to refer patients only to [Baptist-AHP]," FAC ¶ 29, but any claim of a coercive reciprocity agreement (or other conspiracy) between a hospital and its employees fails as a matter of law because an agreement between a company and its employees cannot constitute a violation of Section 1. *See Copperweld v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984). For this reason, even if Plaintiffs can, as they allege, produce evidence that each hospital

---

[17] Plaintiffs argued in their Opposition to Motion to Dismiss that "there is no question that Jackson and Baptist hospitals have monopoly power over hospital services." Plfs. Opp. at 23. This is utterly false. First, neither Jackson nor Baptist have monopoly power over any market at issue in this case. To the extent Plaintiffs' claim of power over "hospital services" equates with power in some unspecified geographic region for a "market for acute care hospital services," as alleged in the FAC, ¶ 13, clearly neither has monopoly power. They vigorously compete with one another for business.

urges its staff to use an affiliated DME provider for referrals (and discourages staff referrals to a competitor except when requested by a patient), such allegations do not create a claim under the Sherman Act.[18]

Plaintiffs additionally allege in their FAC that, prior to the formation of JMS and Baptist-AHP, Jackson and Baptist assigned patients to DME providers on a rotational basis, and Plaintiffs were able to market themselves to be in the rotation. FAC ¶¶ 19-20. They allege that after the formation of JMS and Baptist-AHP, the purported rotational assignment ceased. FAC ¶¶ 24, 27. There is no factual allegation that any third party has recommended JMS or Baptist-AHP as a result of any reciprocal agreement.

Plaintiffs are free to market to persons who may one day be patients at Jackson or Baptist, and to convince them to choose one of Plaintiffs' companies for their DME needs, so Plaintiffs are free to compete. Yet, Plaintiffs do not seek to compete, but rather to be placed in a rotation that promises them business.

### E.    Plaintiffs Fail to State a Claim For "Concerted Refusal to Deal."

A claim of concerted refusal to deal of the type raised in Count II requires proof of anticompetitive effect in a relevant product and geographic market. *See Levine v. Centr. Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1549-50 (11th Cir. 1996) (presumption in Section 1 cases is that rule-of-reason applies). The Eleventh Circuit held in *Levine* that the rule of reason was appropriate where a doctor alleged that his exclusion from a preferred provider list amounted to a

---

[18] Plaintiffs again rely on the void opinion in *Venice Hospital I* to support their coercive reciprocity claim. Plfs. Opp. 22-24. They ignore, however, that the persons allegedly coerced by the hospital in *Venice Hospital I*, and who agreed to recommend the defendant hospital's DME company in exchange, were home health care nurses who were not employees of the defendant hospital. *Venice Hospital I*, 919 F.2d at 1553.

concerted refusal to deal, since the plaintiff had made no showing that the defendants had market power. *Id*. at 1550. Similarly, here Plaintiffs have not alleged market power in any relevant market. The failure to allege market power forecloses *per se* treatment, and results in the need to allege facts supporting a conspiracy with anticompetitive effect in a relevant product and geographic market. Given the failure to allege those facts (discussed *supra*), Plaintiffs' concerted refusal to deal claim must be dismissed.

Furthermore, as discussed above, to the extent that Plaintiffs allege any concerted action, it is an alleged concert of action between a hospital and its affiliate DME company. Concerted refusal to deal "essentially is an agreement among two or more parties *that each will engage in an individual refusal to deal* with a particular customer or customers." *Construction Aggregate Transp, Inc. v. Florida Rock Indus., Inc.*, 710 F.2d 752, 773 (11th Cir. 1983) (emphasis added). The claim is also commonly called a "group boycott," (*See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959)) and as the plain language of either phrase implies, the claim involves multiple actors *at the same market level* agreeing not to deal with a firm. Plaintiffs do not allege any horizontal agreement, but instead allege only vertical conspiracies. Because these allegations cannot support a claim for concerted refusal to deal, Count II must be dismissed.

**F.    Plaintiffs' Section 2 Claims Should Be Dismissed Because  the Antitrust Laws Do Not Require Defendants to Cooperate with Plaintiffs.**

Despite Plaintiffs' arguments to the contrary in their Opposition to Motion to Dismiss (again relying on the inapposite DME cases from the Fourth Circuit), Plaintiffs' Section 2 claims (Counts III through VI) fall into a category the Supreme Court has labeled as "refusal to cooperate with a rival." *Trinko*, 540 U.S. at 408. In *Trinko* it was alleged that Verizon had violated Section 2 by

denying competitors adequate access to its established telecommunications network, so as to limit competitors' entry into the market. In holding that the Second Circuit had erred in reinstating a complaint dismissed by the district court, the Supreme Court held that "Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents." *Id*. at 410.

In so holding, the Court discussed its previous decision in *Aspen Skiing Co.*, 472 U.S. 585 (1985), in which the Court held that the defendant, who owned three of the four mountain areas in Aspen, could be held liable for failing to cooperate with the plaintiff, who owned the fourth mountain area, in the issuance of joint, all-area ski tickets. The defendant had cooperated with its competitor in the past in issuing joint tickets, but, in an alleged attempt to drive the plaintiff company out of business, had refused to continue issuing joint tickets, and had refused requests by the plaintiff to purchase tickets for defendants' mountains, even at retail price, so that the plaintiff could still provide all-area ski tickets to its customers. The *Aspen Skiing* Court upheld a jury verdict in favor of the plaintiff, "reasoning that '[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor.'" *Trinko*, 540 U.S. at 409 (quoting *Aspen Skiing*, 472 U.S. at 608).

In *Trinko*, the plaintiff claimed that *Aspen Skiing* required that dismissal of its complaint be reversed, but the Court disagreed. It held that, unlike the plaintiff in *Aspen Skiing*, the plaintiff in *Trinko* had not alleged that the defendant had turned down a proposal to sell its own product at retail price to plaintiff, and had not alleged that the defendant had previously voluntarily engaged in a course of conduct with its rivals. Therefore, the Court held, "the defendant's prior conduct sheds

40

no light upon the motivation of its refusal to deal . . . ." *Trinko*, 540 U.S. at 409. The Court explained: "The unilateral termination [in *Aspen Skiing*] of a voluntary (*and thus presumably profitable*) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end. Similarly, the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Id.* (citing *Aspen Skiing*, 472 U.S. at 608, 610-11) (emphasis in original). The Court added that "*Aspen Skiing* is at or near the outer boundary of § 2 liability," *id.*, and reversed and remanded the case for dismissal of the complaint for failure to state a claim. *Id.* at 416.

Similarly, in *Covad Communications Co. v. BellSouth Corp.*, 374 F.3d 1044 (11th Cir. 2004), the Eleventh Circuit recognized that *Aspen Skiing* represented a very limited exception to the rule that companies are not required to assist their competitors in the market. In *Covad*, an Internet service provider ("ISP") brought Section 2 claims against BellSouth, claiming that BellSouth, who also competed as an ISP, did not allow the plaintiff adequate access to BellSouth's telephone lines, which were necessary for the plaintiff to compete as an ISP. *Id.* at 1046.

The Eleventh Circuit held that *Trinko* required dismissal of the *Covad* complaint for failure to state a claim because the plaintiff had not alleged any of the conduct necessary to bring a case within *Aspen*'s very limited exception: (1) that the defendant had refused to sell otherwise publicly marketed services to the plaintiff, even at retail prices; and (2) had ceased a voluntary course of dealing with its competitor. The Court of Appeals in *Covad* stated that "*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-

deal claim under *Aspen*." *Id.* at 1049.[19]

As in *Trinko* and *Covad*, Plaintiffs here do not allege facts that would bring them within *Aspen*'s narrow exception, and have therefore failed to state a claim under Section 2.  First, there is no allegation that Defendants have refused to sell any of their products to Plaintiffs, or that Plaintiffs have asked to purchase them.  Second, there is no allegation that Defendants ceased a voluntary arrangement with their competitors, particularly one that was "presumably profitable" to Defendants. *Trinko*, 540 U.S. at 409.  While Plaintiffs allege that Jackson and Baptist ceased to use a rotational assignment procedure for patients needing DME, they make clear that any cessation occurred when JMS and Baptist-AHP, respectively, were created.  FAC ¶ 26.  They do not allege that Defendants participated in a voluntary course of dealing with their competitors.

Once Jackson and Baptist became owners of JMS and Baptist-AHP, they stopped referring patients to competitors of JMS and Baptist-AHP.  In other words, once each became a competitor of the Plaintiffs, Jackson and Baptist acted as competitors.  Defendants Med-South, AHP, JMS and Baptist-AHP have always been competitors of Plaintiffs, and were never involved in any course of dealing, voluntary or otherwise, with Plaintiffs, and therefore could not have discontinued a course of dealing.

As in *Trinko* and *Covad,* Plaintiffs' claim that Defendants have not adequately assisted Plaintiffs in their business "is not a recognized claim under [the Supreme Court's] existing refusal-

---

[19]  At an earlier stage in the *Covad* case, the court stressed several distinctions between the case and *Aspen Skiing*: "In this case, there was no preexisting business arrangement that [the defendant] once thought to be mutually beneficial.  Moreover, [the plaintiff] cannot possibly claim that the obligation it seeks to impose with the antitrust laws -- forced sharing -- serves [the defendant's] interests. Its decision not to share is perfectly legitimate competition on the merits." *Covad Communications Co. v. BellSouth Corp.*, 314 F.3d 1282, 1288 (11th Cir. 2002).  The distinctions made by the *Covad* court apply equally in this case.

to-deal precedent," *Trinko*, 540 U.S. at 410, and their Section 2 claims should be dismissed for failure to state a claim.  A variety of additional reasons require that Plaintiffs' Section 2 claims be dismissed.

###  G.    Plaintiffs Fail to State a Claim for Monopolization or Attempted Monopolization.

Plaintiffs claim in Count III that Defendants are guilty of violating Section 2 of the Sherman Act for establishing and maintaining a monopoly.  "The offense of monopoly under § 2 of the Sherman Act has two elements:  (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

Plaintiffs raise in Count IV a claim for attempted monopolization.  "To establish a violation of section 2 for attempted monopolization, 'a plaintiff must show (1) an intent to bring about a monopoly and (2) a dangerous probability of success.' " *Levine*, 72 F.3d at 1555 (quoting *Norton Tire Co. v. Tire Kingdom Co.*, 858 F.2d 1533, 1535 (11th Cir. 1988)).

The Sherman Act makes a 'basic distinction between concerted and independent action." *Copperweld*, 467 U.S. at  767.  The monopolization and attempted monopolization provisions of Section 2 govern conduct by a single firm; Section 2 reaches concerted activity only through its "conspiracy to monopolize." *See id.* at 768, n.13.  A "monopoly exists when *one firm* controls all or the bulk of a product's output, and no other firm can enter the market or expand output at comparable costs."  Areeda, Solow and Hovenkamp, *Antitrust Law*, ¶403 at 7 (2002) (emphasis in original).

Counts III and IV of Plaintiffs' Complaint should be dismissed because, instead of alleging unilateral action by one of the Defendants, these counts allege collective action by the *Defendants*. Complaint, ¶¶ 48, 56 ( "Defendants have engaged in a series of unlawful and wrongful activities and communications designed and succeeding to wilfully establish and maintain Defendants as a monopoly power."). Because Counts III and IV contain no allegation that any single Defendant has a monopoly or any probability of attaining one in any relevant market, but instead refer to collective action of *Defendants*, they fail to state a claim and must be dismissed. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp.2d 249, 283-84 (D.N.J. 2003) (to sustain claims of monopolization and attempted monopolization, Plaintiffs must prove the required elements against an individual defendant).[20]

Because Plaintiffs have failed to define a relevant market in which any alleged anticompetitive conduct occurred, have failed to allege improper action by a single entity, and have failed to allege anticompetitive conduct at all, Counts III and IV (like the conspiracy claims in Counts I, II and VI of the FAC) should be dismissed.[21]

---

[20] Defendants recognize that Plaintiffs dispute this legal requirement, Plfs. Opp. at 21-22, but Plaintiffs simply fail to recognize that the three different claims falling under Section Two have different essential ingredients, and that collective action is necessary element of a "conspiracy to monopolize" claim, but that *unilateral* action and *individual* market power (or monopoly power) are necessary elements of a monopolization of attempted monopolization claim.

[21] As to the general plausibility of a claim for monopolization of a DME market, one court noted that "The DME market is characterized by low barriers to entry, which makes exercise of monopoly power nearly impossible, as any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods for less." *See Advanced Health-Care v. Giles Mem. Hosp.*, 846 F. Supp. 488, 494 n. 11 (W.D. Va. 1994) (citing *United States v. Syufy Enters.*, 903 F.2d 659, 664-65 (9th Cir. 1990)).

**H.      Plaintiffs Fail to State Claim Under the Essential Facilities Doctrine**.

A new claim in the FAC is Count VI for alleged violation of Section 2 under the essential facilities doctrine. Again, Plaintiffs have failed to state a claim.

As Plaintiffs recognized in their Opposition to Motion to Dismiss, "[t]he essential facilities doctrine requires a plaintiff to prove: (1) control of the essential facility by a monopolization [sic]; (2) a competitor's inability practicably or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competition [sic]; and (4) the feasibility of providing the facility to competitors." Plfs. Opp. at 19 (citing *MCI Communications v. A.T. & T.*, 708 F.2d 1081, 1132-33 (7th Cir. 1983)). Plaintiffs cannot cross the threshold of this claim because, as discussed with respect to their other monopolization claims, there is no allegation that any defendant has a monopoly.

Plaintiffs again allege that Jackson and Baptist together have a monopoly, but say nothing as to whether either of them alone does. The essential facilities doctrine claim should therefore be dismissed.

Moreover, "[u]nder the essential facility test, a company that has exclusive control over a facility essential to effective competition may not deny potential competitors access to that facility on reasonable terms and conditions if to do so would create or maintain monopoly power in the relevant market." *Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004). Therefore, the facility must be essential to competition in the relevant market, and there must be no access to the relevant market otherwise. The relevant market in this case is alleged to be the sale and rental of DME in Montgomery and Prattville, Alabama. Refusing the Plaintiffs access to market themselves on the defendant hospitals' premises is not refusing them access to the relevant market.

In a context similar to this case, in *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995), an HMO alleged that it had been denied access to a physician-owned clinic, and claimed that the clinic was an essential facility in which it must be allowed access to compete with the clinic's "captive" HMO. The Seventh Circuit held that, because the clinic did not monopolize 100% of any market, it could not be deemed "essential" to competition." *Id.* at 1413.

The Seventh Circuit also rejected use of the essential facilities doctrine in *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986), where Western Union controlled telex service and also sold telex terminals. When Western Union decided to open its telex service lines and to phase out of the telex terminal market, Olympia entered the telex terminal market, but relied on Western Union's salesmen to refer it customers. When Western Union decided that it's phase-out was going too slowly, it instructed its salesmen to promote only Western Union telex terminals and not to refer customers to competitors like Olympia.  Olympia sued, claiming among other things, that Western Union's salesmen were a kind of "essential facility" on which Olympia had relied for business.  *Id.* at 372-73.

The Seventh Circuit, rejecting the use of the essential facilities doctrine to require the defendant to assist its competitor explained:

> Although some customers of Western Union may not have known about alternative vendors, nothing prevented those vendors from acquainting the customers with their existence. Virtually by definition, a consumer will not know of the existence of a brand-new firm; but this point is not usually understood to imply a duty in existing firms to tell their customers about the new firm, even if the existing firms have monopoly power. Brand-new firms are expected to make their own way in the market, by advertising or other means of promotion. . . . Olympia had no right under antitrust law to take a free ride on its competitor's sales force. You cannot conscript your competitor's salesmen to sell your product even if the competitor has monopoly

> power and you are a struggling new entrant. Advertising a competitor's products free
> of charge is not a form of cooperation commonly found in competitive markets; it is
> the antithesis of competition.

*Id.* at 377-78. Plaintiffs' essential facilities claim fares no better here.

Plaintiffs decided to depend on referrals from the hospitals for part, if not most of their

business, but that does not make the hospitals, either together or separately, an essential facility.

Plaintiffs simply cannot state an antitrust claim, under the essential facilities doctrine or any other,

by alleging that their competitors should refer them customers. Count VI, like all of Plaintiffs'

claims, should be dismissed.

## IV. PLAINTIFFS FAIL TO STATE A CLAIM FOR INJUNCTIVE RELIEF.

Throughout their FAC, Plaintiffs seek relief under Section 16 of the Clayton Act, which

provides: "Any person, firm, corporation, or association shall be entitled to sue for and have

injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ." 15

U.S.C. § 26. As previously discussed, Plaintiffs have no antitrust standing. They therefore have no

standing to bring a claim for injunctive relief. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S.

104, 112 (1986); *Todorov*, 921 F.2d at 1454. Moreover, Plaintiffs have failed to allege a violation

of either Section 1 or Section 2 of the Sherman Act, so their claims for injunctive relief necessarily

fail. *See, e.g., Cargill*, 479 U.S. at 112 ("It would be anomalous, we think, to read the Clayton Act

to authorize a private plaintiff to secure an injunction against a threatened injury for which he would

not be entitled to compensation if the injury actually occurred."). As a practical matter, it is difficult

to imagine how injunctive relief in 2006 would prevent any alleged threatened harm, when Plaintiffs

admit that the alleged conduct – the cessation of including Plaintiffs in a rotation for patient

assignments – occurred in "the late 1990's." FAC ¶ 22. Plaintiffs do not seek to enjoin any illegal

action, but rather ask the Court to require that the Defendants take affirmative action to assist them in their business. As previously noted, the antitrust laws do not require such cooperation. Plaintiffs fail to state a claim for injunctive relief under Section 16 of the Clayton Act. All claims for injunctive relief should be dismissed.

## V.   PLAINTIFFS' STATE LAW CLAIM IS SUBJECT TO DISMISSAL UNDER FED. R. CIV. P. 12(B)(1) FOR LACK OF SUPPLEMENTAL JURISDICTION.

Plaintiffs' FAC contains no allegation as to how this Court has jurisdiction over Plaintiffs' state law claim found in Count VII. Plaintiffs claim that the Court's jurisdiction is invoked only by 28 U.S.C. § 1331, FAC ¶ 1, but § 1331 is, of course, limited to federal question jurisdiction.

The Court has discretion to decline jurisdiction upon dismissal of all the federal claims, 28 U.S.C. § 1367(c)(3), and should do so. The United States Supreme Court and the Eleventh Circuit have held that, where federal claims are dismissed before trial, dismissal of state law claims is "strongly encouraged." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); see also *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997).

## VI.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER ALABAMA ANTITRUST ACT.

Count VII of the Complaint claims a violation of Ala. Code § 6-5-60, which provides:

> Any person, firm, or corporation injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of $500 and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly and may commence the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly.

*Id*. Alabama's antitrust law applies only to activities that are solely intrastate in nature. *Abbott Laboratories v. Durrett*, 746 So. 2d 316, 339 (Ala. 1999). Plaintiffs have alleged in the FAC that

48

"Plaintiffs purchase equipment for leasing out of state, insurance payments are made for the equipment from out of state, and government payment for equipment is made from out of state." FAC ¶ 1. They further allege that "[m]uch of the equipment is purchased for leasing is purchased from out of state suppliers, and insurance and government payments are made for the equipment from out of state." FAC ¶ 3. In arguing that interstate commerce was substantially impacted so as to invoke this Court's subject matter jurisdiction under the Sherman Act, Plaintiffs further asserted in their Opposition to Motion to Dismiss that, "if the allegations in the present case are proven, it would interrupt the flow of DME equipment into Alabama." Plfs. Opp. at 7.  In so claiming, Plaintiffs have also shown that their claims cannot arise under the Alabama antitrust statute, the scope of which is limited to transactions in intrastate commerce. *Abbott Labs.,* 746 So. 2d at 339.

Even if Plaintiffs' state law claim was not nullified by their insistence that this action involves transactions in interstate commerce, in reviewing antitrust actions brought under § 6-5-60, courts apply standards from the Sherman Act. In fact, "[t]he federal law relating to monopolization governs Alabama antitrust actions." *McCluney v. Zap Professional Photography, Inc.*, 663 So. 2d 922, 926 (Ala. 1995). Therefore, Count VII should be dismissed for all the reasons stated above for dismissing Plaintiffs' Section 2 monopolization claim. The same deficiencies exist, including lack of antitrust standing, lack of a viable relevant market definition, and lack of allegations of monopoly power in any relevant market.

In addition, Plaintiffs allege in Count VII that the relevant product market is "the health service and [DME] leasing market." FAC ¶ 76. Yet, plaintiffs claim that Defendants' monopoly power exists only in the DME leasing market. FAC ¶ 78. Plaintiffs again fail to state a claim for monopolization. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (holding that

monopoly power in the relevant market is necessary element of monopolization claim).

For all these reasons, Count VII should be dismissed.

## CONCLUSION

For the reasons stated herein, Defendants respectfully request the Court to dismiss with prejudice Plaintiffs' First Amended Complaint, and to grant Defendants such other relief as may be appropriate.

Respectfully submitted this the 24th day of March, 2006.

s/ James E. Williams (with permission)
James E. Williams / ASB-9283-W84J
One of the Attorneys for Defendants
**Baptist Health, American Home Patient, Inc.**
**and Baptist Ventures-American Home Patient**
Melton, Espy & Williams, PC
301 Adams Avenue
Montgomery, AL 36104
Telephone:    (334) 263-6621
Facsimile:    (334) 269-9515
jwilliams@mewlegal.com

s/ Glenn B. Rose
Glenn B. Rose (TN Bar 010598)
One of the Attorneys for Defendants
**American Home Patient, Inc.**
**and Baptist Ventures-American Home Patient**
Harwell Howard Hyne Gabbert & Manner, PC
315 Deaderick Street, Suite 1800
Nashville, TN 37238
Telephone:    (615) 256-0500
Facsimile:    (615) 251-1059
gbr@h3gm.com

s/ Dennis R. Bailey (with permission)
Dennis R. Bailey / ASB-4845-I71D
One of the Attorneys for Defendants
**Jackson Hospital; JMS Health Services, L.L.C.
dba Jackson Med-South Home Health L.L.C.**
Rushton, Stakely, Johnston & Garrett, P.A.
184 Commerce Street
Montgomery, AL 36104
Telephone:     (334) 206-3100
Facsimile:     (334) 262-6277
drb@rsjg.com


s/ Mike Carlson (with permission)
Mike Carlson / ASB-5825-A62W
One of the Attorneys for Defendants
**JMS Health Services, L.L.C. dba Jackson Med-
South Home Health L.L.C. and Med-South, Inc.**
William Carlson & Associates, P.C.
Post Office Box 660955
Birmingham, AL 35266
Telephone:     (205) 823-1842
Facsimile:     (205) 823-8242
wtcpilot@bellsouth.net

51

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 24th day of March, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice of such filing to the following:

*Attorney for Plaintiffs*:
Brian M. Clark
Wiggins, Childs, Quinn & Pantazis
The Kress Building
301 19th Street North
Birmingham, AL 35203
bclark@wcqp.com

I also served a copy of the foregoing by first-class mail on:

Dwayne L. Brown, Esq.
5926 Carmichael Road
Suite C
Montgomery, AL 36123-0205
dbrown@dbrownatty.com

s/ James E. Williams (with permission)
James E. Williams / ASB-9283-W84J
One of the Attorneys for Defendants
**Baptist Health, American Home Patient, Inc.**
**and Baptist Ventures-American Home Patient**
Melton, Espy & Williams, PC
301 Adams Avenue
Montgomery, AL 36104
Telephone:    (334) 263-6621
Facsimile:    (334) 269-9515
jwilliams@mewlegal.com