

H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Pensacola Division.
Angel Yuh WILLIAMSON, M.D., and Pensacola
Diagnostic Center & Breast Clinic, P.A. Plaintiffs,
v.
SACRED HEART HOSPITAL OF PENSACOLA;
Baptist Hospital, Inc.; Pensacola Radiology
Consultants, P.A.; Albert A. Post, M.D.; Keith T.
Shearlock, M.D.; and Health First Network, Inc.,
Defendants.
**No. 89-30084-RV.**

May 28, 1993.

ORDER

VINSON, District Judge.
**\*1** Defendants Sacred Heart Hospital of Pensacola
("Sacred Heart"), Baptist Hospital, Inc. ("Baptist"),
Health First Network, Inc., and Keith T. Shearlock,
M.D. all have moved for reconsideration of this
court's order of December 27, 1991, denying their
several motions for summary judgment. (doc. 332).
Upon consideration of the motions and the
memoranda of the parties, the evidence in the record,
and the argument of counsel at the hearing held in
this matter, I have concluded that further
amplification of the factual record is necessary, and
that, in turn, requires a number of revisions in the
legal analysis set out in my earlier order.
Accordingly, these motions are GRANTED and my
order of December 27, 1991, is vacated and set aside,
and this order is substituted therefor. Except as
noted, the material facts are not in dispute.

I. BACKGROUND

A. DR. WILLIAMSON AND PENSACOLA
DIAGNOSTIC CENTER & BREAST CLINIC

Plaintiff Angel Yuh Williamson, M.D. is a board
certified radiologist. In May 1984, Dr. Williamson
formed, and has been the sole owner of, plaintiff
Pensacola Diagnostic Center & Breast Clinic, P.A.
("Pensacola Diagnostic"). Pensacola Diagnostic is
an outpatient radiology clinic located in Pensacola,

Florida. While it provides general radiological
services, it specializes in the area of comprehensive
breast care. [FN1] In particular, Pensacola Diagnostic
places special emphasis on the detection and
diagnosis of breast cancer.

In 1984, Pensacola Diagnostic was unique. In the
traditional approach to breast care, a patient would
see a primary care physician such as a family
practitioner or an obstetrician/gynecologist. The
primary care physician then would refer the patient to
a radiologist for a mammogram. The patient would
go to the hospital with which the radiologist was
affiliated, and a radiology technician would perform
the mammogram. The radiologist would read and
interpret the mammogram and send a written report
to the primary care physician for consultation
regarding any further action.

In contrast, Dr. Williamson, through her clinic, does
not utilize the hospital radiology departments and
emphasizes patient consultation and education.
Normally, Dr. Williamson's patients are referred to
her by their primary care physician. [FN2] Dr.
Williamson then consults with the patient, performs
the mammogram or other diagnostic procedures at
her clinic, interprets the results there, and discusses
them with the patient. She then makes a written
report to the primary care physician.

When the results of a particular diagnostic test reveal
the need for further treatment or hospitalization, it is
still the referring primary care physician or a surgeon
who provides the treatment or admits the patient to
the hospital. Thus, even though Dr. Williamson was
on the staff of the University Hospital in Pensacola
from shortly after arriving here in 1983, she never
admitted a patient to that hospital. It is now closed.
Similarly, between the time she obtained courtesy
privileges at defendant Baptist Hospital in 1988, and
the taking of her deposition in October 1989, Dr.
Williamson visited only three patients there. During
these visits, she consulted with the patients and their
families by giving them medical advice, but did not
prescribe treatments or make entries on their hospital
charts. [FN3]

**\*2** Since it began operations in 1984, Pensacola
Diagnostic has enjoyed continuous growth. Dr.
Williamson opened Pensacola Diagnostic by herself
with three employees. As of October 1989, there

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

were nine full-time employees. As of early 1991, Pensacola Diagnostic maintained approximately 10,000 to 11,000 patient files. The work load at her clinic is such that, for the last several years, Dr. Williamson has been exploring the possibility of adding another radiologist to her practice.

Dr. Williamson and Pensacola Diagnostic have also enjoyed a steady increase in income. Clinic revenue has increased every year, growing from $187,881.00 in the fiscal year ending April 30, 1985, to $670,996.27 for the first eleven months of the fiscal year ending April 30, 1990. During the same period, Williamson's annual salary and benefits package increased in value from $45,139.00 to over $250,000.00.

### B. DR. WILLIAMSON'S ATTEMPTS TO GAIN PRIVILEGES AT SACRED HEART AND BAPTIST.

#### 1. *The 1984 Applications*

(a) Sacred Heart, Pensacola Radiology Associates and Albert A. Post, M.D.

In November 1984, shortly after opening Pensacola Diagnostic, Dr. Williamson sought staff privileges in the Departments of Radiology at defendant Sacred Heart Hospital of Pensacola ("Sacred Heart") and at defendant Baptist Hospital, Inc. ("Baptist"). Defendant Sacred Heart is a non-profit corporation engaged in the business of providing full service health care in the Pensacola, Florida, area. [FN4] At the time Dr. Williamson submitted her application, Sacred Heart had an exclusive contract with defendant Pensacola Radiology Consultants, P.A. ("PRC") for the provision of radiological services at the hospital. [FN5] Defendant Albert A. Post, M.D. is PRC's founder and president, and is also the chairman of Sacred Heart's Department of Radiology.

Section 7.1 of Sacred Heart's "Credentialling Procedures Manual of the Bylaws, Rules and Regulations of the Medical and Dental Staff" sets out an "exclusivity policy" that specifically provides for this type of contract. According to the bylaws, certain hospital facilities and services, including radiology, are designated to be used on an exclusive basis in accordance with contracts between the hospital and qualified practitioners. Applications for initial appointment or for clinical privileges related to those hospital facilities and services under exclusive contract cannot be accepted for processing unless they are submitted in accordance with an existing or proposed contract with the hospital.

Upon receiving Dr. Williamson's application, Sacred Heart's medical director, John Whitcomb, M.D., consulted with Dr. Post. During their discussion, Dr. Post stated that, in his view, the exclusive contract with PRC prohibited Dr. Williamson from practicing radiology at Sacred Heart. Therefore, he questioned whether the hospital could grant the requested privileges. [FN6] There was some further discussion as to what services Dr. Williamson sought to render, and Dr. Post noted that the hospital routinely granted courtesy rights to non-staff physicians who merely wanted to view films or to visit and consult with their patients.

**\*3** What exactly happened to Dr. Williamson's application at this point is unclear. Dr. Whitcomb admits having made no immediate effort to process it through regular channels. [FN7] At the same time, S. Randall Hobgood, M.D., another of PRC's partners, admits having questioned the propriety of granting Dr. Williamson's request for privileges in the face of the exclusive contract with PRC. In addition, there also is evidence that, during a conversation with David Allen Cross, M.D., a local surgeon, Dr. Post questioned the quality of Dr. Williamson's equipment, as well as her competency as a radiologist.

It is undisputed that Dr. Williamson frequently telephoned Dr. Whitcomb's office concerning her application. In particular, on February 8, 1985, Dr. Whitcomb's administrative secretary, Carol Beem, telephoned Dr. Williamson's office and told her secretary that Dr. Whitcomb and Dr. Post had discussed her application, and had concluded that she would not need privileges.

Dr. Williamson claims to have understood Ms. Beem's remarks to mean that Drs. Whitcomb and Post had decided that she did not need privileges "in order to properly care for her patients," and therefore, that her application was no longer being considered for approval. Dr. Williamson felt that such patient care decisions were hers alone to make. [FN8] Of course, Sacred Heart contends that Ms. Beem merely explained Dr. Post's conclusion that, because of the standard courtesies extended to non-staff physicians, Dr. Williamson would not need privileges "to visit patients or to view the results of tests." [FN9]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 3
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

On February 12, 1985, Dr. Whitcomb followed up this phone conversation with a letter in which he advised Dr. Williamson that the Executive Committee had discussed "what kind of privileges could be offered to [her] since we do have a closed contract situation for radiology." He then informed her that the Committee had concluded that she would not need privileges to visit her patients or to see the results of their tests. Dr. Whitcomb also offered to continue processing Dr. Williamson's application, stating that, if accepted, she would be afforded staff membership rights without radiology procedure or interpretation privileges.

Dr. Whitcomb's letter is the only evidence that the Executive Committee actually met and discussed Dr. Williamson's application. [FN10] In any event, on February 13, 1985, Dr. Williamson requested that Sacred Heart continue processing her application for staff membership. Subsequently, Dr. Williamson received several requests from Carol Beem for additional information regarding her education and references.

On April 4, 1985, Dr. Whitcomb again wrote Dr. Williamson and stated that he had begun the procedure of verifying her license and other qualifications, but that, contrary to his letter of February 12, he could not process her application for staff membership only. He explained that the Credentialling Procedures Manual required that each application for appointment to the medical staff contain a request for specific clinical privileges. Since the exclusive contract with PRC prevented Sacred Heart from granting privileges in the Department of Radiology, it could not process Dr. Williamson's associated request for appointment to the medical staff.

**\*4** On April 15, 1985, Dr. Williamson wrote back to Dr. Whitcomb and explained that she did not wish to work in the radiology department, and that she only wanted to be able to admit her clinic patients and attend to their general care. [FN11] This letter also alludes to several telephone conversations with Dr. Whitcomb's office during which Dr. Williamson allegedly explained the precise nature of the services she wanted to perform at the hospital.

On April 17, 1985, Dr. Williamson met with the Credentials Committee to discuss her unique request. Once again, she stated that she did not want to practice diagnostic radiology, but only wanted to be able to provide continuing care to her clinic patients. She explained that the provision of such care required

that she have the privilege of admitting patients as the attending physician, that she be able both to consult with them during their stay, and to order clinical tests and patient care.

The Credentials Committee considered her request, but determined that the exclusive contract with PRC prevented them from recommending approval of her application for membership in the Department of Radiology as a radiologist. [FN12] Instead, the Committee, along with Dr. Whitcomb, suggested that Dr. Williamson apply for staff membership and Level I privileges in either the Department of Family Practice or the Department of Internal Medicine. Dr. Williamson agreed to amend her application, and the committee provided her with a copy of the Bylaws, Rules and Regulations of the Medical and Dental Staff setting out the staff membership and privilege eligibility requirements for all the medical departments at the hospital. They also provided her with copies of proposed amendments to the Rules and Regulations of the Departments of Medicine and Family Practice then under consideration by the hospital. Because Dr. Williamson later withdrew her application for privileges in the Department of Family Practice, it is not at issue in this case. Therefore, I will refer only to her application for privileges in the Department of Internal Medicine.

The bylaws in effect at the time Dr. Williamson submitted her original application provided for four categories of privileges in the Department of Internal Medicine. Category I privileges allowed the physician to "render emergency care and care of the most preliminary nature. Further management must then be provided by an appropriately qualified physician." To be eligible for such privileges, the physician had to have completed one year of post-graduate clinical training.

In the fall of 1984, shortly before Dr. Williamson submitted her application, the Department of Internal Medicine began the process of amending its departmental Rules and Regulations. [FN13] The proposed rule changes would create a three-tiered system of privileges wherein "Level I" privileges would require the least amount of medical expertise, and "Level III" privileges would require the most expertise. [FN14]

**\*5** From as early as October 23, 1984, the proposed rules defined "Level I" privileges to permit the physician "to treat mild, uncomplicated illnesses or disorders. Should the patient's medical condition progress to an acute or unstable phase, consultation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 4
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

by a member of the Department with Level III privileges is required." The proposed eligibility requirements for "Level I" privileges added the words "in a medically oriented specialty" to the existing requirements. Thus, as proposed, the rules included the phrase: "To be eligible for Level I privileges, the physician must provide evidence of satisfactorily completing one year of approved postgraduate clinical training *in a medically oriented specialty.*" [FN15]

On March 11, 1985, the Bylaws Committee approved the Department of Internal Medicine's proposed rule changes and passed them on to the Medical Executive Committee. On March 26, 1985, several weeks before Dr. Williamson's April 17 meeting with the Credentials Committee, the Medical Executive Committee approved these amendments without change. In the version of the proposed rule that the general staff considered at its regular meeting of May 28, 1985, the words "primary care" appeared before the words "medically oriented specialty." Thus, the proposed rule then read:

To be eligible for Level I privileges, the physician must provide evidence of satisfactorily completing one year of approved post-graduate clinical training in a *primary care* medically oriented specialty. (emphasis added)

This addition is not reflected in the minutes of any committee meeting. [FN16] Nevertheless, the general staff approved the amendment as presented and passed it on to the Board of Directors for their approval.

The change is significant insofar as it concerns Dr. Williamson's pending application. After finishing medical school, Dr. Williamson completed a one year residency in nuclear medicine. It is undisputed that nuclear medicine has been recognized by the AMA since 1971 as a "medically oriented" specialty. However, it is not a "*primary care* medically oriented" specialty. [FN17]

At the Board of Directors meeting on July 19, 1985, Dr. Whitcomb presented the revised Rules and Regulations for the Department of Internal Medicine and, in the words of the Board's minutes, "highlighted the levels of privileges, eligibility requirements, and supervision requirements." The Board then adopted the proposed rules without change.

On July 17, 1985, two days before Board approval of the revised eligibility requirements, Dr. Whitcomb

sent a memo to the Credentials Committee in which he stated that Dr. Webb, the Chairman of the Department of Internal Medicine, had reviewed Dr. Williamson's credentials and concluded that she failed to meet the minimum requirements for the granting of Level I privileges within his department. Accordingly, Dr. Webb recommended that Dr. Williamson's applications for medical staff membership and privileges be denied. In accordance with Dr. Webb's evaluation of her medical qualifications, the Credentials Committee concluded at its July 17 meeting that Dr. Williamson did not qualify for privileges in the Department of Internal Medicine.

**\*6** In lieu of recommending the outright rejection of her application, the Credentials Committee voted to request the Department of Radiology to consider accepting Dr. Williamson in the Department of Radiology "Courtesy Staff, with consultant privileges." The committee defined consultant privileges as "being available for consultation [with] other physicians or patients, to permit patient interaction within the hospital, but without the privilege to give official readings of x-rays or radiological procedures and without the privilege to write orders."

This recommendation notwithstanding, the Executive Committee of the Medical and Dental Staff determined at its July 23, 1985, meeting that the exclusive contract with PRC precluded the hospital from offering any type of privileges in the Department of Radiology. The Executive Committee also determined that Dr. Williamson's lack of clinical experience precluded granting privileges in the Department of Internal Medicine. Accordingly, the committee voted to recommend to the Board of Directors that it deny Dr. Williamson's applications.

As the Chairman of the Department of Radiology, Dr. Post did serve on the Executive Committee, and was present at this meeting. However, Dr. Post claims to have abstained from making any comments about Dr. Williamson, and there is no evidence to the contrary. Neither Dr. Post nor any other physician associated with PRC otherwise played any role in the processing of Dr. Williamson's application. [FN18] One member of the Executive Committee did vote against a negative recommendation, but this physician is not identified.

Under the "Fair Hearing Plan" of the Medical Staff By-laws, a physician who receives an adverse

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

recommendation from the Executive Committee is entitled to an opportunity to show, by clear and convincing evidence, that the adverse recommendation was arbitrary, capricious, or unreasonable. On July 30, 1985, Dr. Williamson requested a hearing on the Executive Committee's adverse recommendation. A hearing was set for September 17, 1985, but was postponed at Dr. Williamson's request. The Executive Committee then rescheduled the hearing for November 5, 1985, but Dr. Williamson again requested that it be postponed. On November 25, 1985, Dr. Whitcomb wrote Dr. Williamson to ask that she submit a tentative date for rescheduling the hearing. Dr. Williamson did not respond, and there was no further discussion of her application for approximately two and one-half years. Thus, the application was considered to be abandoned.

(b) Baptist Hospital

Defendant Baptist Hospital, Inc. ("Baptist") also is a non-profit corporation engaged in the business of providing full service health care in the Pensacola, Florida, area. [FN19] Dr. Williamson's concurrent attempt to attain privileges at Baptist is similar to her efforts at Sacred Heart.

Pursuant to an oral agreement, Radiology Associates of Pensacola ("Radiology Associates") had been providing radiology services at Baptist from the time the hospital opened in 1951. The specifics of this agreement were very vague. At the time Dr. Williamson submitted her application, some of the physicians practicing with Radiology Associates did not even realize that the contract was exclusive. Similarly, over the years several exceptions had been made, most notably for perinatologists performing fetal ultrasound, and neurologists performing CT scans. [FN20]

*7 In the summer of 1984-well before plaintiff submitted her application for privileges-Baptist's Board of Directors directed the hospital administration to reduce the Radiology Associates contract to writing. Discussions regarding the written contract continued through the winter, and the contract was executed on June 28, 1985.

In the meantime, Dr. Williamson contacted Baptist in November 1984, and requested an application for medical staff membership and privileges in the Department of Radiology. On December 7, 1984, John N. Robbins, Baptist's administrator, responded

with a letter explaining that the hospital was then negotiating a written contract with Radiology Associates for the provision of radiology services. Robbins informed Dr. Williamson that, in view of these negotiations, Baptist would be unable to consider an application for privileges in radiology from a physician who was not affiliated with Radiology Associates.

In April, Dr. Williamson contacted Baptist and, as with Sacred Heart, explained that she did not wish to practice diagnostic radiology. She informed Baptist that she only desired privileges sufficient to allow her to admit patients, and to provide continuing care to those patients she had treated at her clinic, but who had been admitted to Baptist by other physicians. In a letter to Thomas B. Williams, M.D., the president of Baptist's medical staff, dated May 6, 1985, Dr. Williamson reiterated her desire and stated that she had discussed the matter with Radiology Associates and had made it quite clear to them that she had no intention of practicing radiology at Baptist. [FN21] Subsequently, on May 13, 1985, Baptist forwarded an application and a copy of the hospital bylaws and rules and regulations to Dr. Williamson.

Dr. Williamson submitted her application on or about May 28, 1985. On June 4, 1985, the Executive Committee met, and although there is no evidence that Radiology Consultants objected to Dr. Williamson's application, it concluded that, although she was qualified for privileges in diagnostic radiology, the exclusive contract then being negotiated would preclude her from practicing her specialty at Baptist. The minutes of the Committee's meeting reveal that it recognized that Dr. Williamson did not want to practice radiology. However, after much discussion, it was agreed "that the Medical Staff Bylaws do not appear to provide for granting privileges such as she is requesting, since it appears that with her training she would be eligible only for privileges in radiology and the Executive Committee does not perceive a need to amend the bylaws to change this."

Nevertheless, hospital policy required the Committee to consider the issue of privileges separately from the issue of the exclusive contract. [FN22] In other words, the exclusive contract with Radiology Associates would not prevent Dr. Williamson from obtaining privileges at Baptist merely because she was a radiologist. If she could show that she otherwise qualified *under the bylaws* for privileges in an area not covered by the exclusive contract, the Committee would recommend approval of her application.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 6
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Accordingly, by letter dated July 8, 1985, Dr. Williams explained the Executive Committee's dilemma

**\*8** From information submitted, it would appear that under our bylaws your qualifications if acceptable would be only in the specialty of Diagnostic Radiology. Further, as you have been advised, you will not be able to practice Diagnostic Radiology in Baptist Hospital because of the exclusive contract the hospital has with Radiology Associates of Pensacola.

With these constraints, there is almost nothing that you can do at Baptist Hospital with your present qualifications. Therefore, it appears to us that membership on our Medical staff would be of no benefit to you. *If you disagree with this conclusion, please advise us specifically and in detail what it is that you wish to do at Baptist Hospital that is allowed under the Rules and Regulations applicable to Diagnostic Radiology and not precluded by the exclusive contract which we have with Radiology Associates of Pensacola. We will hold your application pending our receiving your reply to this correspondence. If it can be determined that there is any meaningful practice in Diagnostic Radiology open to you at Baptist Hospital, we will be happy to proceed with processing your application.*

Dr. Williamson claims that, because she felt that she already had provided the requested information, she interpreted Dr. Williams' letter as a denial of her application. At this point, Dr. Williamson also abandoned her application to Baptist for approximately two and one-half years.

### 2. Dr. Williamson's First Application For Membership in Health First

While her applications were being processed at Sacred Heart and Baptist in 1984 and 1985, Dr. Williamson also was seeking membership in defendant Health First Network, Inc. ("Health First"). Health First is an "independent physician's association", and it is the sole authorized provider of health care for members of a health maintenance organization ("HMO") known as Health Options of Pensacola ("HOP"). HOP is jointly and equally owned by Health First; Blue Cross/Blue Shield of Florida; Gulf Coast Diversified, Inc., an affiliate of defendant Sacred Heart; and BCI Enterprises, Inc., an affiliate of defendant Baptist.

As originally drafted, Health First's bylaws provided that, at a minimum, a physician applying for membership
(2) shall have been granted permanent admitting or clinical privileges or other major privileges, without supervision, by at least one Participating Hospital, and shall not have had any such privileges suspended, revoked, or otherwise terminated at any hospital anywhere. [FN23]

The bylaws defined "Participating Hospital" as a "participating provider that is a hospital." At the time the bylaws were drafted in early 1985, the only participating hospitals were Sacred Heart and Baptist. Later, Gulf Breeze Hospital became a participating hospital.

Shortly after HOP became operational on August 1, 1985, it decided to expand its operation to areas outside Pensacola. Accordingly, in late 1985, HOP added several outlying hospitals to the organization. At the same time, it requested that Health First correspondingly admit physician providers from these areas. To encourage physician participation outside of the Pensacola area, Health First waived the requirement that all members buy an $8500.00 share of stock in the Health First corporation.

**\*9** Health First also amended its credentialing criteria to permit physicians who practiced primarily in the outlying areas to qualify for membership in Health First, and hence HOP, by obtaining privileges at an outlying participating hospital. At the same time, Health First retained the requirement that physicians practicing primarily in Pensacola obtain privileges at a hospital affiliated by ownership or control with the hospital owners of HOP. At the time, the only such hospitals were Baptist, Sacred Heart, Gulf Breeze Hospital and Jay Hospital. [FN24]

Dr. Williamson initially inquired into membership in Health First by telephone on May 20, 1985. At that time she spoke to Health First's president, defendant Keith T. Shearlock, M.D. [FN25] Dr. Shearlock explained that, in order to become a member of Health First, its bylaws required that physicians practicing in the greater Pensacola, Florida, area first obtain staff membership and associated privileges without supervision at Sacred Heart or Baptist. Since Dr. Williamson did not have privileges at either hospital, Dr. Shearlock told her that she would not be eligible for membership.

In response, Dr. Williamson wrote to Health First's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 7
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Medical Director, Paul T. Baroco, M.D., requesting a waiver of the privileges requirement. In her letter, which was dated September 30, 1985, Dr. Williamson set out her qualifications, and explained that because of the exclusive contracts at Baptist and Sacred Heart, she was not eligible for radiology privileges. She also offered to discount her fees in exchange for a waiver.

Dr. Baroco passed this letter on to Dr. Shearlock, who responded by letter on February 9, 1986. In this letter, Dr. Shearlock simply stated that "one must have major staff privileges at either Baptist or Sacred Heart Hospital to be eligible as a physician provider. It is my understanding that you have not achieved that status and therefore there is no opportunity to offer you a contract as a physician provider."

Dr. Shearlock rejected Dr. Williamson's inquiry without supplying her with an application or discussing her request with the Health First Board of Directors (which also functions as the credentialling committee). Dr. Shearlock stated that, as Health First's president and only administrative employee, he felt it was within his purview to screen applications in order to determine whether the applicant met the threshold requirements for membership. Since it was clear that Dr. Williamson did not have the appropriate privileges, Dr. Shearlock stated that he felt it unnecessary and wasteful to continue processing her application.

### 3. Dr. Williamson's Negotiations With PRC

While her various applications were pending, and even after they had been rejected, Dr. Williamson was attempting to negotiate an employment contract with PRC. At this same time, Sacred Heart was laying the groundwork for the creation of its own women's health care clinic. During the preliminary planning stages, and in conjunction with the Williamson/PRC negotiations, there was some discussion of Sacred Heart buying Dr. Williamson's equipment and making her the radiologist for the proposed clinic.

**\*10** In the context of the parties' negotiations, it is clear that Dr. Williamson viewed joining PRC and operating the proposed Sacred Heart clinic as akin to a corporate merger. Consistent with this view, Dr. Williamson envisioned joining PRC as a shareholder and combining her assets, i.e. her clinical expertise, equipment and substantial client files, with those of PRC to form a single entity.

In contrast, PRC wanted Dr. Williamson to join the group as an employee, with the possibility of shareholder status in two years. In mid-August 1986, PRC in fact offered Dr. Williamson such a proposed contract in writing. However, by her own admission, Dr. Williamson was not interested in doing "hospital radiology." In particular, she did not want to be "on call" at night or on weekends. Apparently, PRC was willing to accommodate Dr. Williamson's scheduling request in exchange for a 25% decrease in salary, but Dr. Williamson rejected this arrangement.

The proposed contract also contained a non-compete clause forbidding her to practice medicine in Escambia and Santa Rosa Counties for two years if she should separate from the group. Finally, it contained a termination clause that would have allowed PRC to terminate Dr. Williamson without cause upon 90-days' notice. Dr. Williamson had severe misgivings about the inclusion of these clauses. PRC, however, refused to change them, as they are commonly utilized. As a result, negotiations broke down, and on October 3, 1986, PRC withdrew its offer. [FN26]

The withdrawal of PRC's offer also eliminated the possibility of Dr. Williamson playing a part in the operation of Sacred Heart's proposed women's center. After discussions with PRC, the Ad Hoc Committee on the Women's Center had determined as early as January of 1986 that the creation of its own women's center and a formal relationship with Pensacola Diagnostic were mutually exclusive alternatives. [FN27]

After the negotiations between PRC and Dr. Williamson ended, Sacred Heart completed its plans for a free-standing women's center on the Sacred Heart grounds. In March of 1987, the Ann L. Baroco Center for Women's Health ("Ann Baroco Center") opened its doors. Located adjacent to Sacred Heart, the Center offers a broad range of services, including mammography, fetal ultrasound, and localization of breast lesions through the use of a Kopan's needle and wire. From the beginning, its planners had envisioned the Center as a self-supporting addition to the network of clinic based health care facilities that Sacred Heart was developing through its affiliate, Gulf Coast Diversified, Inc. It also was anticipated that the Center would be both the source and the beneficiary of referrals to and from Sacred Heart physicians and programs. In short, Sacred Heart was now in direct competition with Dr. Williamson and Pensacola

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 8
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Diagnostic.

### 4. Dr. Williamson's Second Application to Health First

On May 18, 1987, approximately two months after the Ann Baroco Center opened, Dr. Williamson contacted Dr. Baroco's office and renewed her request for a Health First membership. At that time, it was again explained to her that she did not have the requisite privileges. Nevertheless, Health First sent her an application. Dr. Williamson returned the completed application on June 5, 1987.

**\*11** Although it was clear that Dr. Williamson did not meet the hospital privileges requirement, several Health First members (most notably Dr. Irvin) spoke to Dr. Shearlock and Dr. Baroco on her behalf. These recommendations notwithstanding, Health First denied Dr. Williamson's application. Although Health First's Board of Directors did not meet to consider the application until June 16, 1987, Dr. Shearlock wrote Dr. Williamson on June 11, and once again told her that, without privileges at either Baptist or Sacred Heart, she was not eligible for membership. Health First's Board of Directors later confirmed Dr. Shearlock's actions by rejecting Dr. Williamson's application.

Between August and September 1987, Dr. Williamson obtained privileges at two of HOP's outlying participating hospitals (Abernathy Hospital in Flomaton, Alabama, and at Greenlawn Hospital in Atmore, Alabama). When Dr. Williamson notified Dr. Shearlock of her newly acquired privileges, she may have assumed that she would then be eligible for Health First membership. However, it is undisputed that Dr. Williamson practices primarily within HOP's "central" service area, i.e. within the greater Pensacola area. Her privileges at these "outlying" hospitals notwithstanding, the bylaws still required her to obtain privileges at either Sacred Heart or Baptist. Since Dr. Williamson still had not obtained these privileges, Dr. Shearlock again rejected her request for membership.

### 5. Dr. Williamson's 1987 Applications for Privileges

#### (a) Sacred Heart.

In December 1987, several months after she had been denied membership in Health First, Dr. Williamson

contacted both Sacred Heart and Baptist and requested that they reconsider her applications for privileges. Because of the time lapse, Sacred Heart requested that Dr. Williamson update her application. Accordingly, on January 22, 1988, Dr. Williamson submitted an application requesting privileges in the Department of Family Practice. Subsequently, on March 8, 1988, she requested that she also be considered for privileges in the Department of Internal Medicine.

On March 11, 1988, Dr. Williamson met with the Credentials Committee and the Chairman of the Department of Internal Medicine. She explained her qualifications for Level I privileges, and, after describing her education and residency in nuclear medicine, she argued that her unique specialty qualified as a "primary care, medically oriented specialty" within the meaning of the Department of Internal Medicine Rules and Regulations provisions describing the eligibility criteria for Level I privileges.

She also argued that her eight years' experience in the primary care of breast cancer patients was at least the functional equivalent of "one year of approved post graduate clinical training in a primary care medically oriented specialty." Finally, Dr. Williamson pointed out that she satisfied the "experienced physician" exception to the requirements for Level II privileges.

**\*12** Dr. Williamson again stated that she did not wish to practice radiology at Sacred Heart. She explained that many of her patients were frustrated by the fact that when surgery was indicated, she could not admit them to Sacred Heart, but instead had to turn them over to the care of another physician. She only desired to be able to admit those patients as the attending physician, consult with the appropriate surgeon, introduce her patients to the consultants, explain the procedures, write orders, and supervise the overall care of her patients.

The Credentials Committee concluded that Dr. Williamson had not completed the required one-year residency in a "primary care medically oriented" specialty as required by the bylaws. At its meeting on March 22, 1988, the Executive Committee accepted the Credentials Committee's recommendation that Dr. Williamson's application be denied.

At Dr. Williamson's request, a hearing committee convened on April 27, 1988, to determine whether the rejection was arbitrary, capricious, or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unreasonable. Present at the hearing were the committee members, counsel for Sacred Heart, Dr. Williamson and her counsel, representatives from the Departments of Radiology, Family Practice, Internal Medicine, and Obstetrics/Gynecology. As the Department of Radiology's representative, Dr. Hobgood of PRC attended the hearing as an observer. There is no evidence that he otherwise participated in the proceedings.

At the beginning of the hearing, Dr. Williamson voluntarily withdrew her application for membership and privileges in the Department of Family Practice. She then admitted that she had not completed a year of post-graduate clinical training in a "*primary care* medically oriented specialty" as required by the Rules and Regulations of the Department of Internal Medicine. However, she was prepared to present evidence showing that she was uniquely qualified by experience in a heretofore unrecognized sub-specialty of internal medicine that she described as comprehensive breast care.

Although the credentialling criteria for the Department of Internal Medicine does not allow for waiver of their requirements by a showing of practical expertise, Dr. Williamson took the position that Section 4.6 of the Sacred Heart Bylaws allowed the Board of Directors of the hospital to waive eligibility requirements where such waiver would serve the best interests of patient care.[FN28] Thus, she sought to create a record establishing her unique qualifications in the area of breast care.

The Hearing Committee determined that the only issue was whether her rejection had been arbitrary, capricious, or unreasonable, which narrowed down to whether Dr. Williamson satisfied the requirements for Level I privileges as set out in the Rules and Regulations of the Department of Internal Medicine, i.e. whether she had completed one year of post-graduate clinical training. Therefore, the parties concluded that it was unnecessary, if not improper, for Dr. Williamson to present evidence unrelated to this narrow issue. In short, having admitted that she did not meet the literal requirements for Level I privileges, the Hearing Committee determined that its job was at an end.

**\*13** Subsequently, Dr. Williamson wrote to Jay Hardman, the Hospital Administrator and representative of the Board of Directors, asking that the Board take up the issue of her request for a Section 4.6 exemption. At the same time, Dr. Williamson exercised her right under the Fair

Hearing Plan to request appellate review of the Hearing Committee's adverse decision.

At the Appellate Review Committee hearing on August 24, 1988, Dr. Williamson argued that the Hearing Committee erroneously had excluded evidence that her experience in the care and treatment of breast disease patients qualified her for privileges in the Department of Internal Medicine. Dr. Williamson further argued that the bylaws are primarily concerned with maintaining the quality of patient care, and therefore, that they should be interpreted broadly to allow her to show that her qualifications are at least equivalent to those she would have obtained in a one-year primary care residency.

The Appellate Review Committee nevertheless determined that the Hearing Committee properly had excluded the evidence of Dr. Williamson's equivalent training in her subspecialty. The Committee pointed out that the bylaws do not recognize breast care as a subspecialty within the Department of Internal Medicine, and concluded that neither it, nor the Hearing Committee, were authorized to amend the by-laws to create a new subspecialty or to waive the one-year residency requirement for Level I privileges in the Department of Internal Medicine. According to the Appellate Committee, these issue were solely within the purview of the Board of Directors. The Committee then affirmed the adverse recommendations of both the Hearing Committee and the Executive Committee, and recommended that Dr. Williamson's application for staff membership and privileges in the Department of Internal Medicine be denied.

On September 23, 1988, the Board of Directors reviewed the Appellate Review Committee's decision and recommendation, and adopted a resolution finding that the exclusion of the evidence relating to Dr. Williamson's medical expertise in the area of breast care was proper. The Board then denied her application for staff membership and privileges in the Department of Internal Medicine.

In another resolution adopted at the same time, the Board denied Dr. Williamson's request for a Section 4.6 waiver. The Board specifically concluded that there was no compelling reason to waive the eligibility requirements established by the Department of Internal Medicine, and that such a waiver would not serve the best interests of patient care.

Not Reported in F.Supp.                                                                                    Page 10
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

(b) Baptist Hospital.

Dr. Williamson's second attempt to obtain privileges at Baptist proved much more fruitful than her attempts at Sacred Heart. In December 1987, Dr. Williamson wrote to Administrator John Robbins requesting that he reconsider her application. At this time, Dr. Williamson also requested information regarding privileges in the Department of Internal Medicine and the Department of Family Practice.

**\*14** Robbins responded by letter dated January 12, 1988, in which he advised Dr. Williamson that, in order to qualify for privileges in the Department of Radiology, the Baptist Bylaws required the physician to spend at least 30 percent of her diagnostic radiology time in the Baptist Radiological Department. Inasmuch as the exclusive contract with Radiology Associates precluded her from practicing radiology at Baptist, it would be impossible for Dr. Williamson to meet this requirement. Nevertheless, Robbins again invited Dr. Williamson to detail what she wished to accomplish through membership on the Baptist medical staff.

By letter dated February 25, 1988, Dr. Williamson again explained that she had no desire to use her staff privileges to practice radiology, and that she only wished to admit patients and to provide follow-up care to patients she already had treated at her clinic. Dr. Williamson also discussed her qualifications in the fields of internal medicine and family practice. Finally, Dr. Williamson argued that, under the Baptist Bylaws, her medical staff privileges at University Hospital made her eligible for courtesy staff privileges at Baptist. Accordingly, she requested that Baptist also consider her application as one for courtesy staff privileges.

Baptist continued to process Dr. Williamson's application, and sometime in May 1988, the radiology department met and determined that she satisfied the minimum standards for privileges in diagnostic radiology at Baptist Hospital. Several telephone conversations then ensued between Dr. Williamson and Michael Fry, M.D., the Chief of Baptist's Department of Internal Medicine, during which the two physicians discussed Dr. Williamson's application for privileges in the Departments of Family Practice and Internal Medicine. The parties were able to work out an accommodation, and, in a letter dated July 27, 1988, Dr. Williamson agreed to withdraw her applications for privileges in those

departments if Baptist would grant her application for courtesy privileges in the Department of Radiology.

On August 2, 1988, both the Credentials and Executive Committees recommended approval of Dr. Williamson's application for appointment to the courtesy medical staff with major privileges under supervision in diagnostic radiology. Subsequently, on August 23, 1988, the Board of Directors of Baptist Hospital approved her appointment.

As Baptist made clear during the processing of her application, Dr. Williamson's ability to practice radiology at Baptist would be circumscribed by its exclusive contract with Radiology Associates. However, plaintiff does not contend that the privileges granted to her were insufficient for her purposes. Further, Dr. Williamson expressed no objection to the bylaws requirement that her privileges be "under supervision" for the first two years of her membership on the Baptist medical staff.

As of the filing of her complaint in this case, Dr. Williamson had not attempted to admit any patients to Baptist. She has visited with patients on three separate occasions. According to Dr. Williamson, she did not review their medical records or make any entries on their charts. However, she did "consult" with these patients and their families on matters concerning the continuing care and treatment of their respective breast diseases.

### 6. *Dr. Williamson's Renewed Attempt to Gain Membership in Health First*

**\*15** On August 10, 1988, Dr. Williamson informed Health First that she had obtained courtesy staff privileges under supervision at Baptist, and requested that her application for membership be processed. In again denying her application, Dr. Shearlock pointed out that the credentialling criteria of the Health First Bylaws require *unsupervised* privileges at either Baptist or Sacred Heart.

### 7. *Dr. Williamson's Request For A Change In Privileges*

Initially, Dr. Williamson expressed no outward signs of dissatisfaction with her privileges at Baptist. However, after she was rejected for membership in Health First, Dr. Williamson wrote to Al Stubblefield (Robbins' replacement as administrator) on January 9, 1989, requesting that her privileges be changed from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

"under supervision" to "unsupervised".

In her letter, Dr. Williamson emphasizes that her request was prompted by Health First's rejection. Furthermore, Dr. Williamson stated in her deposition that her current privileges were sufficient to meet the needs of her patients, and that she sought reclassification only to gain entrance into Health First.

Stubblefield responded on January 26, 1989, by pointing out that the bylaws, which Dr. Williamson had signed upon accepting her privileges, required that all initial appointments to both the associate and courtesy medical staff be provisional, i.e. "under supervision", for a period of two years before regular membership is granted. In addition, he reminded Dr. Williamson that the bylaws also required her to spend at least 30% of her practice in diagnostic radiology at Baptist before being eligible for regular privileges. Dr. Williamson met neither requirement. Hence, Stubblefield informed the plaintiff that Baptist could not change her privileges.

In a letter dated February 15, 1989, Dr. Williamson questioned Stubblefield's interpretation of the bylaws. Under Dr. Williamson's view, the thirty percent requirement would come into play if she sought promotion from the courtesy staff to the active staff, but would not bar her promotion from "provisional" (i.e. under supervision) courtesy staff to "regular" courtesy staff (i.e. not under supervision). Dr. Williamson reasoned that, because courtesy staff members are, by definition, physicians who "only occasionally attend patients" at Baptist Hospital, the imposition of the 30% practice requirement would defeat the purpose of having a courtesy staff.

Baptist rejected plaintiff's interpretation of its bylaws, and on March 16, 1989, Stubblefield wrote Dr. Williamson to inform her that both requirements applied to promotions from provisional courtesy to regular courtesy staff privileges. He also reminded Dr. Williamson that the hospital had warned her when she applied for privileges that the exclusive contract would make it impossible for her to meet the 30% practice requirement.

### B. THREATS TO "BLACKBALL" DR. WILLIAMSON

Before Dr. Williamson opened her clinic, she contends that she met with Sacred Heart administrator Jay Hardman. Over the course of the meeting, Dr. Williamson says that she explained the organization of the clinic as well as her goal in creating it. At the conclusion of the meeting, Dr. Williamson alleges that Hardman told her that if she opened her clinic, Sacred Heart would close her one way or another, and threatened to "blackball" her. It is plaintiff's contention that Sacred Heart attempted to make good on this threat in three ways. First, Sacred Heart attacked her referral base. Second, it pressured Pensacola Pathologists into firing her husband, Michael Williamson M.D. Finally, it refused to accept her "needle placement" patients. Sacred Heart strongly denies making any threats against Dr. Williamson and disputes her three alleged theories of implementation.

#### 1. *Attacks on Dr. Williamson's Referral Base*

**\*16** It is undisputed that referrals from other physicians are vital to the success of Dr. Williamson's practice. According to Dr. Williamson, both Sacred Heart and PRC attacked this referral base in two ways. First, they threatened or otherwise pressured several physicians into reducing the number of patients they referred to her. Second, plaintiff alleges that between 1986 and 1988 Sacred Heart entered into contractual arrangements of one kind or another with several physicians in her referral base. Dr. Williamson alleges that Sacred Heart used its contractual leverage to coerce these physicians into referring patients back to Sacred Heart.

*Dr. Murphy:* According to plaintiff, the most important physicians in her referral base were B.L. Stalnaker, M.D. and Eugene Murphy, M.D. Drs. Stalnaker and Murphy practiced together as obstetrician/gynecologists. On October 14, 1986, Dr. Murphy gave an interview to the FTC in which he stated that Sacred Heart was not happy that he referred patients to Dr. Williamson. He stated that in several meetings with Sacred Heart administrators, Jay Hardman and defendant Dr. Post tried to convince him to divert referrals to Sacred Heart. According to Murphy, Sacred Heart focused on loyalty to the hospital, rather than on quality of care. Murphy allegedly rebuffed Sacred Heart's entreaties, and stated that because he had an established practice that could be taken elsewhere, he had enough leverage to "resist that, the gentle arm twisting." [FN29]

*Dr. Stalnaker:* Similarly, Williamson states that in 1985, and again in 1986 or 1987, Dr. Murphy's partner, Dr. Stalnaker, told her that Hardman threatened to pull his group's perinatal care contract

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 12
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

unless he stopped referring patients to Dr. Williamson. Dr. Stalnaker also allegedly told Williamson that Hardman offered him kickbacks worth $300,000.00, as well as a reduction in his medical malpractice coverage requirement worth another $300,000.00, if he would refer his patients back to Sacred Heart. Finally, Dr. Williamson claims that Dr. Stalnaker told her that Hardman had threatened to call in the loans the hospital had made to various other practices if they continued to refer patients to Williamson.

Of course, all of Dr. Williamson's testimony concerning Dr. Stalnaker's statements to her is inadmissible hearsay. This leaves Dr. Stalnaker's own deposition testimony as the only credible evidence in the record regarding his dealings with Sacred Heart. Dr. Stalnaker flatly denies ever having told Dr. Williamson that Sacred Heart pressured him to divert referrals away from her clinic. He also denies having been offered kickbacks. In fact, Dr. Stalnaker stated that, unless a patient had a specific request, or was an in-patient at a hospital, he referred all his patients to Dr. Williamson.

The evidence on this point is hotly disputed, although it does not appear to be material. Defendants claim that, in 1985, Drs. Stalnaker and Murphy accounted for 354.5 referrals to Dr. Williamson. In 1986, the number of referrals from these two doctors increased to 409.5. [FN30] Dr. Williamson counters that defendants' figures fail to distinguish between new referrals and repeat visits from old referrals. Taking this factor into account, Dr. Williamson claims that new referrals from Drs. Stalnaker and Murphy dropped from approximately 450 in 1985, to 375 in 1986, and to fewer than 50 per year after 1987.

**\*17** In viewing these statistics, however, it must be remembered that Dr. Murphy became gravely ill in 1986 and died in December of that year. Subsequently, Dr. Stalnaker sold his practice to Drs. Horan and Turner, and took a position as Director of Sacred Heart's obstetrics/gynecology residency program. As a result, he reduced his private practice to two and one-half days a week in 1986, and to one and one-half days a week beginning in 1989. In 1987 Dr. Stalnaker referred 55 new patients to Dr. Williamson, and in the years 1988-1990 he referred 16, 13, and 17 new patients respectively. In short, the decrease in referrals seems to be fully explained by the circumstances.

*Dr. Horan and Dr. Turner:* In 1985 Drs. Murphy

and Stalnaker took in Charles A. Horan, M.D. as an associate. Subsequently, in 1986, they hired David Turner, M.D. After Dr. Murphy's death at the end of 1986, and pending his appointment as Director of Sacred Heart's OB/GYN residency program, Dr. Stalnaker agreed to sell his practice to Drs. Horan and Turner. Because they were young and had little or no collateral, Drs. Horan and Turner did not believe that they could get a bank loan for the purchase.

Consequently, Sacred Heart agreed to lend them the money. The loan agreement called for interest only payments during the first year, interest and principal payments in the second and third years, and a balloon payment in the third year with an option to renew. In addition, Sacred Heart did not require that the loan be fully collateralized. Both physicians stated that these terms were very advantageous.

According to the agreement, Sacred Heart made the loan as an inducement to Drs. Horan and Turner to maintain their practice in the Sacred Heart service area and to provide professional services to their patients at Sacred Heart. In addition, paragraph 3(b) of the agreement, under "covenants", also provides:
In consideration for the aforesaid inducements from Hospital to Corporation, Corporation agrees that its physician shareholders and employees shall utilize the in-patient and out-patient facilities operated by Hospital and its affiliated corporations for their patients, to the extent feasible, and unless patient choice dictates otherwise.

Drs. Horan and Turner stated that maintaining the viability of their practice was important to Sacred Heart since it stood to lose approximately 30% of its OB-GYN service if their practice collapsed.

According to Dr. Williamson, Drs. Horan and Turner told her that Sacred Heart threatened not to renew their note unless they referred their radiology patients to Sacred Heart. Once again, Dr. Williamson's statements concerning Drs. Horan and Turner are hearsay and do not appear to fall within any exception to the hearsay rule. Therefore, the only credible evidence in the record concerning the relationship between Sacred Heart and Drs. Horan and Turner are the statements of the doctors themselves. Both physicians deny that the referral covenant created a quid pro quo requiring them to refer patients to the hospital's radiology department, or that they were under any pressure to make such referrals. Dr. Horan also denies having made any statements to the contrary to Dr. Williamson.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                           Page 13
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

**\*18** According to Dr. Horan, he and Dr. Turner were free to refer their patients as they saw fit. In this regard, defendants have submitted statistics which show that during the years 1986, 1987, 1988, and 1989, these two doctors accounted for 81, 80, 106.5, and 187.5 breast referrals to Dr. Williamson. Plaintiff does not agree with these statistics. Furthermore, Dr. Turner states that they chose not to renew the note in 1989 when the balloon payment came due, and had no further agreement after 1989.

*Dr. Antonelli:* In August 1987, Sacred Heart loaned Emilio Antonelli, M.D. and Stricker Mays, M.D. $300,479.00 to buy the OB/GYN practice of Eddie M. Frazier, M.D. This agreement is very similar to that of Drs. Horan and Turner, except that the "utilization" clause reads:
In consideration of the aforesaid inducements from Hospital to Corporation, Antonelli and Mays agree that they shall utilize the inpatient and outpatient facilities operated by Hospital and its affiliated corporations for their patients, to the extent feasible, and in accordance with acceptable medical practice, and unless patient choice dictates otherwise.

According to Dr. Antonelli, Sacred Heart wanted to insert a more restrictive clause, but backed down after he refused.

In his deposition, Dr. Antonelli praised Dr. Williamson, and stated that, unless a patient requested otherwise, he always referred his patients to Dr. Williamson. There is absolutely no evidence that his relationship with Sacred Heart affected his referral patterns.

*Drs. Fowler and Willis:* Sacred Heart also loaned Louis B. Fowler, M.D. and Wayne Willis, M.D., partners in a family care practice, $50,000.00 to build a small pharmacy building on their office property. Drs. Fowler and Willis then leased the building back to Sacred Heart, which operated it as a pharmacy. During initial negotiations, Sacred Heart evidently asked them to refer their patients to the hospital. According to Drs. Fowler and Willis, they told Sacred Heart that they wouldn't have anything to do with such an arrangement, after which Sacred Heart "immediately" backed down. Subsequently, neither physician has received any pressure from Sacred Heart to refer patients to the hospital. Nor is there any evidence that their referral pattern vis-a-vis Dr. Williamson changed after they entered into the agreement with Sacred Heart.

In fact, Drs. Fowler and Willis subsequently entered into an arrangement whereby Dr. Williamson agreed to overread their x-rays on an "as needed" basis. Drs. Fowler and Willis previously had approached PRC at Sacred Heart with the same proposal. When Dr. Post of PRC insisted not only that his group read all films generated by the Fowler/Willis clinic, but also that PRC have supervisory control over their clinic's radiology department and employees, Drs. Fowler and Willis discontinued negotiations with PRC and reached the agreement with Dr. Williamson.

Shortly after this agreement was consummated, Sacred Heart's lease on the pharmacy expired, and they chose not to renew it. Plaintiff attempts to link her agreement with Drs. Fowler and Willis with Sacred Heart's abandonment of the pharmacy. However, Sacred Heart's representative in charge of the pharmacy, Richard Zeiler, as well as Drs. Fowler and Willis, denied any such linkage and stated in their depositions that the pharmacy was closed because it was not financially successful. Though it turned a small profit, the parties anticipated that sales would continue to fall off when a national drug store chain completed construction of a nearby store.

**\*19** *Dr. McMahon:* Dr. Williamson further alleges that Dr. McMahon-who is the Medical Director of the Sacred Heart Surgery Center, and the Chairman of the Department of Surgery-told her that, because he had to support the hospital, he could not work with her. As with Dr. Stalnaker, Dr. McMahon denies ever having made such a comment to plaintiff.

*Drs. Belk and Irvin:* Dr. Williamson also claims that William W. Belk, M.D. and E. Coy Irvin, Jr.,-partners in a family care practice-told her that Sacred Heart told them not to talk to her. According to Dr. Williamson, Drs. Belk and Irvin succumbed to the pressure from Sacred Heart, and stopped sending patients to her in 1987. In support of her argument, she points out that in 1986 and 1987 Drs. Belk and Irvin accounted for over 200 new referrals per year. However, after August 1987, when they entered into what Dr. Belk described as a "joint venture" with Sacred Heart to open a satellite office in Pace, Florida, their referrals decreased to 108 for 1988, and to 70 and 25 in 1989 and 1990, respectively. The precise nature of this "joint venture" is unclear, but it is undisputed that Sacred Heart rented the office and subleased it to Drs. Belk and Irvin. It is also undisputed that the contract contained no provisions relating to referrals.

Again, Dr. Williamson's statements are hearsay and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are not admissible to prove the truth of what Drs. Belk and Irvin told her. And, once again, Drs. Belk and Irvin, like Drs. Horan and Turner, deny being under any pressure to disassociate themselves from Dr. Williamson. Instead, they mention a number of factors that lead to a decrease in referrals to Dr. Williamson.

Prior to 1987, Drs. Belk and Irvin were located next door to Dr. Williamson, making her services very convenient. Sometime in 1987, they acquired x-ray equipment for their Pensacola office and started to do much of their own x-ray work. In addition, they moved their Pensacola office to a new Gulf Coast Medical Arts Center several miles away from Dr. Williamson's clinic. [FN31] This move placed Dr. Williamson's facilities and Sacred Heart's facilities equally distant from their offices. At the same time, Sacred Heart opened its own women's clinic, the Ann Baroco Center. Dr. Belk stated that as the Ann Baroco center became more established, patients began asking to go there. Finding no difference in the quality of care between Dr. Williamson and the Ann Baroco Center, Drs. Belk and Irvin respected these requests. [FN32]

Despite the fact that, after 1987, they performed their own simple x-ray procedures, defendants claim that referrals to Dr. Williamson from Drs. Belk and Irvin actually increased. They claim that plaintiff's records show that in 1987, Drs. Belk and Irvin accounted for 136.5 referrals to her clinic. [FN33] This number decreased in 1988 to 132 referrals, but increased again in 1989 for 157 referrals.

*Dr. Howard:* On December 13, 1984, Joseph D. Howard, M.D. entered into an agreement with Gulf Coast Diversified ("Gulf Coast"), an affiliate of Sacred Heart and co-owner of HOP, to operate a family care clinic. According to the agreement, Gulf Coast would provide the administrative support and Dr. Howard would provide the physician services. The agreement states that Dr. Howard is an independent contractor. The agreement also states that "[Gulf Coast] shall be notified of any referral of patients ... for medical services to any entity other than Sacred Heart Hospital of Pensacola." Finally, the agreement states that "[Dr. Howard] agrees to utilize specialty physicians who are members of the medical staff of Sacred Heart Hospital of Pensacola wherever practical to ensure continuity of patient care."

**\*20** There is no indication that Dr. Williamson ever had a referral relationship with Dr. Howard. Instead,

she alleges that Dr. Howard's referrals to Thomas Brown, M.D., another independent radiologist for whom Dr. Williamson worked when she first came to Pensacola, virtually ceased after Dr. Howard entered into the agreement with Sacred Heart.

In her affidavit, Mary Ellen Neal, Dr. Howard's head nurse at the time, stated that, when Sacred Heart established its relationship with Dr. Howard, she became an employee of Sacred Heart. She was supervised by a head nurse who came to the clinic from Sacred Heart Hospital, and who, in turn, reported to the Sacred Heart administration.

Ms. Neal states that prior to Dr. Howard's relationship with Sacred Heart, the majority of his referrals for out-patient radiological services went to Dr. Brown. Immediately after the relationship began, the supervising nurse told Ms. Neal that the clinic staff was to send all out-patient radiological referrals to Sacred Heart. She was told not to ask the patient where they wanted to go, but instead, to simply schedule the patient for Sacred Heart. Only if the patient objected were the staff to consider referring the patient to another facility. As a result, referrals to Dr. Brown virtually ceased. Of course, as previously noted, Dr. Brown is not a party to this case, and there is no evidence of any relationship between plaintiff and Dr. Howard that is relevant to this issue.

*Dr. Mixon:* On April 10, 1989, shortly after Dr. Williamson filed her complaint in this case, Fred S. Mixon, M.D. entered into an agreement to operate a family care clinic similar to that between Gulf Coast and Dr. Howard. As with Dr. Howard, Gulf Coast supplied administrative support, while Dr. Mixon provided physician services. Also like Dr. Howard, Dr. Mixon is an independent contractor. In addition, Dr. Mixon's agreement contains the same requirement that he utilize specialty physicians from Sacred Heart "wherever practical to ensure continuity of patient care." However, Dr. Mixon's agreement contains an additional restriction specifically requiring him to utilize radiology services provided by Sacred Heart unless Sacred Heart instructs him to use an outside radiologist. According to Dr. Brown, referrals from Dr. Mixon ceased after he entered into this agreement. As with Dr. Howard, the record reflects no relationship between Dr. Mixon and the plaintiff that is relevant to this issue.

*Dr. Cross:* Dr. Williamson has alleged that David Alan Cross, M.D., a local surgeon, intimated to her that he and others with whom he was familiar were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 15
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

under pressure from Sacred Heart to route their radiology referrals back to Sacred Heart. As with the other physicians alleged to have been under such pressure, Dr. Cross stated under oath that he was under no pressure, had not been threatened by Sacred Heart, knew of no other physicians subject to pressure or threats, knew of no direct attempts to interrupt Dr. Williamson's referral patterns and that he never communicated any information to the contrary to Dr. Williamson. Dr. Williamson's testimony again appears to be inadmissible hearsay.

**\*21** *Dr. Westafer:* Remarkably, Dr. Williamson next points to the contract between Anita S. Westafer, M.D. and Baptist Hospital. As with the contracts between Drs. Mixon and Howard and Sacred Heart, Baptist agreed to help equip and staff Dr. Westafer's office, in return for which Dr. Westafer agreed to provide the specified physician services. Dr. Williamson argues that after Dr. Westafer signed this contract in April of 1988, her referrals to Dr. Williamson decreased from approximately 70 new referrals on 1987 to 30 and 40 referrals in 1988 and 1989.

What plaintiff fails to mention is that Dr. Westafer's new referrals to Dr. Williamson had been dropping off steadily since 1985. In that year Dr. Westafer referred approximately 130 new patients. New referrals dropped to just under 100 in 1986, and to approximately 70 in 1987. In 1988, the year Dr. Westafer signed the contract with Baptist, her new referrals dropped to a low of approximately 30, but began to rise again to 40 in 1989, and to over 50 in 1990.

Moreover, Dr. Westafer's contract specifically states that she is not required to refer patients to Baptist. Quite to the contrary, the agreement provides:

*Admittance of Patients*

[Dr. Westafer] hereby acknowledges that the choice of services and the choice of service of suppliers that [Dr. Westafer] makes on behalf of its patients must be, and will be, made only with regard to the best interest of the patients themselves. Physician hereby specifically acknowledges, that the compensation that [Dr. Westafer] is to receive hereunder in no way requires, and is in no way contingent upon, the admission, recommendation, referral or any other form of arrangement by [Dr. Westafer] for utilization by patients or others of any item or service offered by the Hospital.

*Drs. French and Montgomery:* In October 1988, Baptist advanced Barbara French, M.D. and Paula Montgomery, M.D. working capital in the amount of $40,000.00 to open up their family care practice in Escambia County. Their loan agreement contained a clause identical to that quoted above from Dr. Westafer's contract. Plaintiff does not argue that Drs. French and Montgomery ever referred significant numbers of patients to her. Instead, she advances the novel theory that, but for their contractual relationship with Baptist, their referrals to her would have grown significantly.

In support of her contention, plaintiff compares the referral patter of Drs. French and Montgomery to that of Dr. Epps. Not a party to a contract with any hospital, Dr. Epps increased his new referrals to Dr. Williamson from 34 in 1987 to 325 in 1990.

Dr. Williamson also claims that members of the Sacred Heart Staff made disparaging remarks to others concerning the quality of her medical care and that of her clinic. Again, the only evidence supporting this allegation is the testimony of Dr. Williamson, which is inadmissible hearsay. And again, every physician that plaintiffs deposed denied ever having heard or made any of the disparaging remarks as claimed by the plaintiff, so the only material evidence of record fails to support plaintiff's claims.

### 2. *Alleged Threats to Michael Williamson*

**\*22** When the Williamsons moved to Pensacola, Dr. Williamson's husband, Michael Williamson, M.D., a pathologist, became a professional employee of Pensacola Pathologists. In 1985, after two years employment, Dr. Michael Williamson became a shareholder and director of the professional association. Throughout his employment with Pensacola Pathologists, the corporation held an exclusive contract with Sacred Heart for the provision of pathology services. Eighty percent of the corporation's income came from this contract.

Shortly after Dr. Angel Williamson began advertising her clinic in 1984, Jerrard H. Hilbert, M.D., Pensacola Pathologists' founder, called a meeting of the group. According to Dr. Michael Williamson, Dr. Hilbert told him in front of the other physicians that Sacred Heart was upset with the Pensacola Diagnostic's advertising. He also allegedly stated that the advertising could mean trouble for the group

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 16
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

and that trouble for the group would mean trouble for Michael Williamson.    Dr. Hilbert then allegedly requested Dr. Michael Williamson to ask his wife to tone down her advertising.

David P. Nicholson, M.D., another shareholder in Pensacola Pathologists, stated that, around the time Dr. Angel Williamson began advertising her clinic, he had conversations with Dr. Hilbert in which Dr. Hilbert expressed concern over the fact that plaintiff's advertising might have a negative impact on Pensacola Pathologists' relationship with Sacred Heart.    However, Dr. Nicholson stated that Dr. Michael Williamson was not present during these conversations, and that he had no knowledge of anyone from the group discussing the matter with Sacred Heart.

Dr. Michael Williamson further stated that, around the same time he commented on Pensacola Diagnostic's advertising, Dr. Hilbert told him that Sister Mary Carroll, a Sacred Heart administrator, had questioned him (Dr. Hilbert) about the quality of his (Dr. Michael Williamson's) work.    Dr. Michael Williamson stated that such questioning by the Sisters was very unusual, and that he took it to be a threatening gesture.

Dr. Hilbert denies ever having made any of these statements.    In addition, as discussed more fully below, these statements attributed to Dr. Hilbert are hearsay to the extent they are offered to show that Sacred Heart, in fact, threatened or pressured Pensacola Pathologists.

Dr. Angel Williamson also has testified to a number of conversations she allegedly had with Pensacola Pathologists shareholders concerning the effect of her practice on her husband's job.    She states that Dr. Hilbert and Dr. Nicholson, along with Everett S. Harvard, M.D. and Fenner McConnell, M.D. (the two remaining Pensacola Pathologists shareholders), told her that Sacred Heart was very angry about her advertising, that this meant trouble for Pensacola Pathologists, which meant trouble for Dr. Michael Williamson.

Dr. Angel Williamson also states that, during the time when she was negotiating with PRC and Sacred Heart for the purchase of her practice, Dr. McConnell told the Williamsons at dinner one night that Jay Hardman had tried very hard to make the corporation fire Dr. Michael Williamson.    He allegedly went on to state that things would be better for everyone if she reached an agreement with Sacred Heart.    Once

again, all of the Williamsons' statements concerning what Dr. McConnell and other members of Pensacola Pathologists said are inadmissible hearsay.

**\*23** According to Dr. McConnell, the Williamsons invited him and his wife to dinner at a local restaurant, where Dr. Angel Williamson told him that she was negotiating with Sacred Heart and PRC to join the radiology group.    Dr. McConnell states that he responded that he was happy because it would make his job easier.    He admitted that the controversy between Sacred Heart and Dr. Angel Williamson made him uncomfortable in the negotiation of his own contract with Sacred Heart. He denied that any threats, of any type, were made by Sacred Heart.

When Dr. McMahon and Jay Hardman visited Dr. Angel Williamson in December 1985 to tell her that Sacred Heart no longer would accept her needle placement patients, Hardman allegedly asked her how she would feel if her husband's group lost its contract.    Dr. Angel Williamson claims that she understood this to mean that if she fought the decision to ban her patients, Sacred Heart would have her husband fired.

Pensacola Pathologists' contract with Sacred Heart expired on December 31, 1988.    Although negotiations to renew the contract began as early as September 1988, the parties did not reach an agreement on a new contract until June 1989.    Until that time, Pensacola Pathologists continued to work without a contract.    According to Dr. Angel Williamson, Drs. Hilbert and McConnell told her husband that this delay was occasioned by Sacred Heart's displeasure over her competition with them. These statements are also inadmissible hearsay.

Dr. McConnell expressed his concern over this delay in a conversation with Dr. David Cross.    According to Dr. McConnell, he told Dr. Cross that he felt that, in general, Sacred Heart was putting undue pressure on hospital based physicians to accept increasingly more restrictive contract terms.    In particular, Dr. McConnell commented on the fact that Sacred Heart was pressuring his own group into accepting a 90-day termination clause that he felt was unfair to the physicians.    It also appears that Sacred Heart would not agree to an increase in the reimbursement rates for certain services.    Although Dr. McConnell denies that any of this pressure was connected to Sacred Heart's ongoing controversy with Dr. Angel Williamson, he did indicate that the group had decided to terminate its relationship with Dr. Michael

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 17
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Williamson.

Dr. Cross tells a different story. According to Dr. Cross, sometime in May 1989, he had gone to the pathology department to speak with Dr. McConnell. Their conversation turned to the subject of Pensacola Pathologists' negotiations to renew their contract. At this point, Dr. McConnell allegedly told Dr. Cross that his group had acquiesced to pressure from Sacred Heart to get rid of Dr. Michael Williamson, and that, as a result, they would be able to renew their contract.

Several weeks later, on June 14, 1989, Pensacola Pathologists and Sacred Heart completed negotiations on the pathology contract. On the same day, Drs. Hilbert and Harvard informed Dr. Michael Williamson that Pensacola Pathologists would terminate his employment as of November 30, 1989. On June 15, 1989, Sacred Heart signed the pathology contract. On June 22, 1989, the Board of Directors of Pensacola Pathologists formally voted to terminate Dr. Michael Williamson, as their professional agreement allowed. As a result, he lost his privileges to practice at Sacred Heart, and was forced to sell his shares in the corporation.

**\*24** Drs. Hilbert, Harvard and McConnell have denied that there was any connection between the renewal of the pathology contract and the termination of Dr. Michael Williamson. In addition, they point out that, at the same time Sacred Heart and Pensacola Pathologists completed their negotiations, Pensacola Pathologists also decided not to renew its contract with Roche Laboratories. During his time with the group, Dr. Michael Williamson had spent at least 50 percent of his time at Roche on behalf of the group. Thus, Pensacola Pathologists maintains that it simply had no further need for Dr. Michael Williamson's services.

Drs. Hilbert, Harvard, and McConnell also have stated that Sacred Heart never expressed any concern or complaints over Dr. Angel Williamson's advertising, and that the hospital never exerted any pressure on the group to fire Dr. Michael Williamson. In addition, each has stated that he never told Dr. Angel Williamson that the group was in danger of losing its contract because of its association with her husband. To the contrary, when the pathologists approached Sacred Heart with their concern that Dr. Michael Williamson's association with the group might influence the upcoming contract negotiations, Jay Hardman is alleged to have told Dr. McConnell that Dr. Michael Williamson would have to be judged

on his own merits.

### 3. *The Needle Placement Controversy*

Occasionally, Dr. Williamson's examination will reveal a lesion in the patient's breast which must be removed for analysis. Often these lesions are nonpalpable, and too small to be found easily by the surgeon. The accepted procedure in these circumstances is to insert a Kopan's needle containing a very thin hook-wire into the breast at the point of the suspected lesion. After properly positioning the needle so that it isolates the lesion, the radiologist removes the needle, leaving the hook-wire attached to, or very near, the lesion. The surgeon need only follow the wire to find the suspected lesion.

Once the suspected lesion is removed, the specimen is then transported to the radiologist and a pathologist for examination and testing. The pathologist dissects the specimen, after which the radiologist performs an x-ray on the dissection. The radiologist then compares this film to the original x-ray to ensure that the proper tissue has been removed. The specimen is then sent to a pathologist who determines whether the lesion is cancerous.

When a Sacred Heart radiologist initiates the needle placement procedure, each subsequent step is performed on the Hospital premises. The radiologist performs the mammogram, places the needle, and then escorts the patient to the Sacred Heart surgi-center. A Sacred Heart surgeon removes the specimen, which is then transported back to the radiology department. There, a pathologist dissects the specimen and examines it along with the radiologist. The radiologist then re-mammograms the specimen. The pathologist then takes the specimen back to the pathology department for further testing. In the meantime, the patient remains in the surgery area in case further specimens are needed.

**\*25** In the fall of 1985, shortly after Sacred Heart denied her first request for privileges, Dr. Williamson met with Drs. Hilbert, McConnell, Havard, and Nicholson of the Sacred Heart Pathology Department. They discussed the feasibility of Dr. Williamson performing the needle placement procedure at her clinic and then sending the patient to Sacred Heart for specimen removal and pathological examination. Dr. Williamson would identify the lesion, position the needle and localize the wire. A technician would then walk with the patient across

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Sacred Heart parking lot to the Sacred Heart surgi-center, where a surgeon would remove the specimen. [FN34]

Once removed, the specimen would be returned to Dr. Williamson's clinic for dissection and another x-ray.   After determining that the proper tissue had been removed, Dr. Williamson would send the specimen to the Sacred Heart pathology department for further testing.   While Dr. Williamson performed these procedures, the patient would remain on the operating table at the surgi-center.

The pathologists agreed that an arrangement could probably be worked out, and Dr. Williamson was permitted to follow this procedure with several patients.   No quality of care problems ever arose on these occasions.   Nevertheless, shortly after Dr. Williamson implemented this protocol, technicians at the surgi-center contacted the pathologists and questioned whether it was appropriate to send specimens off the Sacred Heart grounds.

At the same time, William R. Bell, M.D., a member of the pathology group not present at the meeting with Dr. Williamson, expressed a number of concerns related to quality assurance and legal liability.   First, Dr. Williamson's procedure did not allow for joint review of the biopsy specimen by the radiologist and the pathologist.    Second, the procedure involved dissection of the specimen by Dr. Williamson, who, as a radiologist, is not specifically trained in such procedures.    Third, the transportation of the specimen to Dr. Williamson's clinic would involve loss of control over the integrity of the specimen.   Fourth, delays in processing the specimen might lead to deterioration.   Finally, because she did not have staff privileges, Dr. Williamson was outside the Sacred Heart quality assurance mechanism.

Dr. Bell discussed his concerns with Dr. Hilbert, Dr. McMahon (the Medical Director of the Sacred Heart Surgical Center and the Chairman of the Department of Surgery), and Sacred Heart administrator Edward Lohmiller.   As a result, the administration called a meeting of the Medical Advisory Board.   The Board met on December 4, 1985.   After much discussion, it concluded that the breaks in the quality control chain not only threatened the integrity of the needle placement procedure, but also unnecessarily exposed the hospital to civil liability.   Although no one could demonstrate that Dr. Williamson's protocol resulted in a decrease or decline in the quality of care, and despite the fact that several of the physicians present apparently felt that there was no serious problem, the Advisory Board recommended both that the hospital not allow specimens removed at Sacred Heart to be transported outside the Sacred Heart complex, and that Sacred Heart not accept needle placement patients whose lesions had been localized in a physician's office outside the hospital.

**\*26** Several days later, Jay Hardman, Sacred Heart's administrator, and Dr. McMahon visited Dr. Williamson at her office and told her of the Advisory Board's decision.   However, it was not until April 1, 1987, that Surgical Center issued a written policy statement directing that all specimens removed from a patient's body be submitted directly to the pathology department.   This statement did not address the needle localization, and it was not until October 17, 1989, that Dr. Whitcomb wrote Dr. Williamson and made it clear that Sacred Heart would no longer accept patients with needle localizations for breast biopsy unless they were under the care of a Sacred Heart staff radiologist.

Despite its stated concern over the removal of specimens from the Sacred Heart campus, it is undisputed that the pathology department received thousands of samples, including breast biopsies, from places other than the Sacred Heart Surgical Center. In addition, it is undisputed that the pathology department routinely sends specimens to outside laboratories. [FN35]    Other doctors utilize couriers to send samples to Sacred Heart's pathologists.    Dr. Williamson argues that Sacred Heart's professed quality control concerns were illusory, and that her needle placement procedure posed no greater quality assurance concerns than Sacred Heart's procedure. Specifically, she contends that board certified radiologists are qualified to dissect breast biopsy specimens, and that the removal of the specimen to her clinic poses no greater risk than the use of any outside laboratory.

PLAINTIFFS' CLAIMS

Dr. Williamson and her clinic filed the complaint in this case on March 29, 1989.   Count I of the complaint alleges a conspiracy among Sacred Heart, PRC, and Dr. Post to restrain trade in violation of Section 1 of the Sherman Act [15 U.S.C. § 1] by making it impossible for independent radiologists to compete against them in the provision of radiology services.    Count II alleges a similar conspiracy between Baptist and Radiology Associates.    Count III alleges a conspiracy among all the defendants to restrain trade in violation of Section 1 of the Sherman

Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Act by excluding Dr. Angel Williamson from Health First, and thus from HOP and its patient base. Count IV alleges a pendant state law claim against Sacred Heart, PRC, and Dr. Post for tortious interference with present and prospective business relationships.

Defendants counter that there is no evidence of an antitrust conspiracy and that plaintiff Williamson has failed to show an antitrust injury. In addition, Sacred Heart, Baptist and Health First argue that their actions in denying Dr. Williamson's requests for privileges and staff membership are immune from antitrust liability under the Health Care Quality Improvement Act, [Title 42, United States Code, Sections 11101](), *et seq.* Finally, Sacred Heart, PRC and Dr. Post argue that there is no evidence that they improperly interfered with plaintiff's business relationships.

## II. ANALYSIS

### A. *Defendants' Joint Motion to Strike Expert Witnesses' Affidavits*

**\*27** Before taking up the substance of defendants' several motions for summary judgment, I first must address their joint motion to strike certain expert witnesses' affidavits submitted by plaintiff Williamson in support of her opposition to defendants' motions. (doc. 317). For the reasons set out below, that motion is GRANTED.

On May 26, 1989, I entered my standard scheduling order. To facilitate expert witness discovery pursuant, the order provided:
*Expert Witnesses.* The identification of expert witnesses and their opinions is commonly the source of most pre-trial delay. In order to expedite the discovery process, and in addition to the requirements of Rule 26(B)(4)(A), *each party shall submit to the opposing party at the earliest opportunity a list of all expert witnesses anticipated to testify at trial.* The list shall also included the address and area of expertise of each expert witness. A copy of each expert's written opinion with supporting facts and grounds, or a written summary thereof, shall be attached to the list. *Although no time deadline is set herein for the submission of this information, the parties are directed to do so sufficiently in advance of the discovery deadline set in paragraph (a) of this Order so depositions may be scheduled and taken before the discovery period ends.* Expert witnesses not timely identified as

required herein, or whose expert opinions have been significantly modified or changed after discovery has ended, will normally not be permitted to testify at trial. [FN36]() (emphasis added)

Before the discovery period closed on April 30, 1990, the defendants propounded interrogatories seeking the name of each person Dr. Williamson expected to call as an expert witness at trial in this matter. In connection with each expert, defendants also requested that Dr. Williamson identify (1) the subject matter on which each expert would testify, (2) the substance of the opinions to which each expert would testify, and (3) a summary of the facts upon which the opinions were based.

In her responses, which are dated January 26, 1990, April 13, 1990 and April 25, 1990, Dr. Williamson interposed a general objection to the interrogatories as a whole, stating that due to delays in discovery occasioned by defendants' failure to produce relevant documents, she had been unable to fully develop responses. Specifically with regard to the expert witness interrogatories, Dr. Williamson answered that she "has not yet determined which expert may be called as a witness at trial of this matter. When this determination is made, Williamson will respond to this interrogatory."

As early as March 7, 1990, plaintiff's attorney had written to defendants' attorneys explaining that plaintiff's experts would not be able to form their opinions until all discovery was complete. Therefore, he suggested that the parties agree to engage in expert discovery after the completion of fact discovery. Defendants refused to agree to extend discovery beyond the April 30, 1990, cut-off date.

**\*28** At the end of the discovery period, defendant Sacred Heart identified one expert. However, the expert's report was not produced until February 27, 1991, when Sacred Heart filed it as an exhibit to its motion for summary judgment. No other defendant has identified an expert. Plaintiff did not reveal any experts until April 1, 1991, almost a year after the discovery period had ended, when she incorporated their affidavits into her opposition to defendants' several motions for summary judgment.

Alleging a failure to comply with [Federal Rules of Civil Procedure 26(b)(4)]() and [26(e)](), and this court's Scheduling Order of May 26, 1989, setting the April 30, 1990, discovery deadline, defendants moved to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.　　　　　　　　　　　　　　　　　　　　　　　　Page 20
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

strike these affidavits, as well as the affidavits of several fact witnesses whom defendants claim plaintiff has not previously identified. In response, plaintiff claims that delays in the completion of discovery prevented her from identifying her experts until just before filing her response.

The plaintiff failed to comply with the Scheduling Order's clear requirements concerning expert witnesses. Therefore, the testimony of such witnesses must be disallowed, as the order expressly warns.

### B. *Summary Judgment Standard*

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id. See also Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

"The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case to which the nonmoving party has the burden of proof." *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Id.*

On summary judgment motion, the record and all inferences that can be drawn from it, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176, 177 (1962). Furthermore, the court must consider the entire record in the case, not just those pieces of evidence which have been singled out for attention by the

parties. *See Clinkscales v. Chevron USA, Inc.,* 831 F.2d 1565, 1570 (11th Cir.1987).

### C. *Health Care Quality Improvement Act*

**\*29** In their several motions for summary judgment, defendants argue that plaintiffs claims are barred by the Health Care Quality Improvement Act, Title 42, United States Code, Section 11101, *et seq.* ("HCQIA"). This statute creates antitrust immunity for a "professional review body" in connection with a "professional review action." 42 U.S.C. § 11111(a). Defendants correctly point out that Sacred Heart, Baptist, and Health First qualify as "professional review bodies," and that their decisions regarding privileges and membership qualify on their face as "professional review actions." [FN37] However, they also concede, as they must, that for immunity to attach under the HCQIA, the review action must have been taken "in the reasonable belief that the action was in the furtherance of quality care," and "in the reasonable belief that the action was warranted by the facts known after [a] reasonable effort to obtain the facts and after [providing] notice and hearing procedures." *Id.* at § 11112(a). The statute creates a rebuttable presumption that these requirements have been met. *Id.*

In this case, the major thrust of plaintiff's claims is that the defendants did not act in a reasonable belief that their actions furthered quality health care. As the evidence amply demonstrates, Dr. Williamson is a qualified professional whose services are well regarded by many of her peers. I agree with defendants that there is a substantial amount of evidence supporting the application of the HCQIA to the actions in question, but it cannot be resolved on summary judgment. Sufficient evidence exists to create a genuine issue of fact on the question of whether defendants acted reasonably in the furtherance of quality of care.

In addition, there is a question as to whether Dr. Williamson was afforded notice and a hearing within the meaning of the Act. I realize that there is no evidence suggesting that Dr. Williamson requested such a hearing, but the record is silent as to whether one was readily available. Furthermore, with regard to the hearings incident to Sacred Heart's denial of plaintiff's application, the evidence indicates that plaintiff was not given an opportunity to present evidence on quality of care issues or her expertise.

Therefore, defendants' several motions for summary

Not Reported in F.Supp.                                                                                        Page 21
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

judgment must be denied to the extent that they are based on the HCQIA. Further discussion of this issue is unnecessary in light of my conclusion, set out below, that plaintiff has failed to establish a genuine issue of material fact as to the existence of an antitrust conspiracy.

### D. *Conspiracy In Restraint Of Trade*

Section 1 of the Sherman Act, Title 15, United States Code, Section 1, provides:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations is declared to be illegal.

The threshold requirement of a conspiracy claim under this statute is existence of an agreement between two or more persons demonstrating a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1573 (11th Cir.1991) (*quoting American Tobacco Co. v. United States,* 328 U.S. 781, 810 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). *See also Bolt v. Halifax Hospital Medical Center,* 891 F.2d 810, 818-19 (11th Cir.1990).

**\*30** The courts recognize that it is the rare case in which the plaintiff can establish the existence of a conspiracy by showing an explicit agreement. Therefore, most conspiracies are inferred from the behavior of the alleged conspirators. *Seagood Trading,* 924 F.2d at 1573. However, the range of inferences that may be drawn from circumstantial evidence to prove an unlawful conspiracy is limited. *Id.* at 1574 (citations omitted).

To make out the conspiracy, and thus avoid summary judgment, the circumstantial evidence upon which the plaintiff relies must establish a non-legitimate motive for entering into such a conspiracy. *Seagood Trading, supra,* 924 F.2d at 1574; *Bolt, supra,* 891 F.2d at 819. In other words, the plaintiff must show that collective behavior is economically reasonable in that it accomplishes a goal that would economically inure to the defendants' benefit, and therefore reasonably exclude the possibility that defendants acted independently. *See Seagood Trading, supra,* 924 F.2d at 1574; *Bolt, supra,* 891 F.2d at 819 (citations omitted). To make this showing, the plaintiff must adduce evidence "that tends to exclude the possibility that the alleged co-conspirators acted independently and in a manner consistent with

rational business objectives." *Bolt, supra,* 891 F.2d at 819 (citations omitted). This means that conduct which is as consistent with permissible, unilateral activity as with an illegal conspiracy does not, standing alone, permit the inference of an antitrust conspiracy. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Seagood Trading, supra,* 924 F.2d at 1574.

The plaintiff need not show a specific intent to restrain trade or to build a monopoly, however. *Id.* at 819-20. "So long as the purported conspiracy has an anticompetitive effect, the plaintiff has made out a case under Section 1." *Id.* at 820. Therefore, in determining whether a conspiracy exists, if an economic motive is evident, the plaintiff need only show (1) a conscious commitment on the part of the alleged conspirators to adhere to an agreement that is (2) designed to achieve an objective prohibited by the statute. *Id.*

Once the plaintiff makes out a conspiracy, the court must decide whether the agreement had an adverse impact on competition. *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1570 (11th Cir.1991). Certain conspiracies are deemed to have such a pernicious effect on competition, that they are said to be illegal "per se". *Id. at 1567.* "[T]hat is, the conduct involved 'always or almost always tends to restrict competition and decrease output' " without any countervailing procompetitive benefits. *Id.* (quoting *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 427 U.S. 284, 289-90, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202, 208 (1985) (citation omitted)). The Supreme Court has made it clear that the "per se" label should be applied infrequently and with caution. *Id.* (citing *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808, 816 (1988)). Therefore, the presumption in Section 1 cases is that the "rule of reason" standard applies. *Id.* at 1567.

**\*31** The rule of reason asks whether, in the circumstances of a particular case, a restrictive practice imposes an unreasonable restraint on competition. *Seagood Trading Corp., supra* at 1569 (citations omitted). A restraint is "unreasonable" if it has an adverse impact on competition and cannot be justified as a procompetitive measure. *Id.* Thus, "[t]he rule of reason standard hinges the ultimate legality of a restraint on whether the plaintiff has demonstrated an anticompetitive effect which is not offset by a need to achieve a procompetitive benefit

Not Reported in F.Supp.                                                                                Page 22
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

or justification." *Id.* at 1569 (quoting from *Kesterbaum v. Falstaff Brewing Corp.,* 575 F.2d 564, 571 (5th Cir.1978).

In order to show an injury to competition using the rule of reason analysis, the plaintiff first must establish a "particularized or relevant market in which the defendant's actions unreasonably restrain trade." *L.A. Draper & Son v. Wheelabrator-Frye, Inc.,* 735 F.2d 414, 422 (11th Cir.1984). The relevant market is defined generally as the "area of effective competition." *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510, 535 (1962). The market must contain both a product dimension and a geographic dimension. *L.A. Draper, supra,* 735 F.2d at 423. The product dimension is "determined by the availability of substitutes to which consumers can turn in response to price increases and other existing or potential producer's ability to expand output." *Id.* The geographic dimension is "the area in which the product or its reasonably interchangeable substitutes are traded." *Id.*

Once a plaintiff has established the relevant market, the rule of reason analysis focuses on the defendants' power within the market. The meaning of market power in rule of reason cases has not been clearly explained or defined by the Supreme Court. However, I agree with Judge Posner's description of market power as the "power to raise price above the competitive level without losing so many sales that the price increase would be unprofitable." *Morrison v. Murray Biscuit Co.,* 797 F.2d 1430, 1435 (7th Cir.1986) (citations omitted).

As described above, Dr. Williamson alleges a swirl of conspiracies. First, she contends that Sacred Heart conspired with PRC, Dr. Post, and others to prevent her from competing for radiology patients. Next, she alleges a similar conspiracy among Baptist, Radiology Associates, and unnamed others for that same purpose. Finally, she asserts that there was a "community wide" conspiracy among all the defendants to prevent her from gaining membership in Health First, which effectively disqualified her from treating HOP subscribers, and thereby prevented her from competing for patients in need of radiology services.

Dr. Williamson's argument proceeds from the premise that rational economic actors in the defendants' positions would have accommodated her various requests for privileges. Their failure to do so, according to Dr. Williamson, is evidence that they

acted in a manner inconsistent with rational economic objectives, and hence conspired to drive her out of the market.

### 1. *PRC, Sacred Heart and Dr. Post Conspiracy*

**\*32** As previously noted, there is no direct evidence that PRC, Dr. Post, and Sacred Heart conspired to prevent Dr. Williamson from competing for radiology patients. Accordingly, the plaintiff relies entirely on circumstantial evidence of (a) defendants' failure to accommodate Dr. Williamson's requests for staff privileges, and (b) Sacred Heart's attempts to "blackball" Dr. Williamson.

(a) Denial of Staff Privileges. (i) *The Bolt Case:* In *Bolt v. Halifax Hospital Medical Center,* 891 F.2d 810 (11th Cir.1990), the Eleventh Circuit held that the denial or revocation of hospital privileges are presumed to be economically motivated, and are, therefore, evidence of an economic conspiracy between the defendant hospital and its staff. In such a case, the plaintiff need only show a conscious commitment to the agreement and that the agreement was designed to achieve an anticompetitive effect.

In *Bolt,* the plaintiff was granted probationary privileges at each of three hospitals. At the end of the probation period, one of the hospitals conditioned the plaintiff's reappointment to the active staff on his agreement to seek psychiatric counseling through the Impaired Physicians Program operated by the Florida Medical Association. Shortly thereafter, the remaining two hospitals denied reappointment.

In reversing a directed verdict in favor of the defendant hospitals, the Eleventh Circuit held that hospitals and doctors always have a "rational economic motive" sufficient for antitrust purposes when they deny or revoke a physician's privileges. *Id.* at 820. Relying solely on a simplified application of the inverse relationship between supply and demand and a law review article, and without citation to any legal authority, the court seems to presume that excluding a physician from practice in a hospital always allows the remaining doctors to charge a higher price. *Id.*

*Bolt,* however, is distinguishable from this case. It does not address the role of exclusive contracts in the staffing of hospital diagnostic facilities; nor does it deal with the role of HMO participation in the granting of privileges. In addition, *Bolt* presumed that the physician subject to denial of privileges was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 23
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

facially qualified under the hospital bylaws to practice medicine within the relevant department. In this case, there is no question that Dr. Williamson had the medical training necessary to qualify for privileges in the Department of Radiology. But there is no legal impropriety claimed or shown regarding Sacred Heart's exclusive contract with PRC, so it is undisputed that plaintiff is not entitled to have regular radiological privileges. Instead, Sacred Heart denied her amended and second applications for privileges in the Department of Internal Medicine on the ground that her medical training in radiology was insufficient under the bylaws to qualify her for privileges in the Department of Internal Medicine.

I realize that plaintiff is challenging Sacred Heart's reliance on the bylaws on the grounds that it was pretextual. Nevertheless, the fact that plaintiff's medical credentials have been questioned, along with the other factors mentioned above, makes application of the *Bolt* "economic motive" presumption to this case inappropriate. Accordingly, I must review all the evidence in the record to determine whether there is any genuine issue of material fact concerning the existence of an antitrust motive.

**\*33** (ii) *The Exclusive Contract:* Preliminarily, as noted above, Dr. Williamson does not, and cannot, challenge the exclusive contract between PRC and Sacred Heart on the grounds that, by itself, it establishes a violation of Section 1 of the Sherman Act. *Jefferson Parish Hospital v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). To the contrary, it is well established that such contracts are completely consistent with rational economic objectives. For example, the exclusive contracts in this case ensure that a radiologist will be available 24 hours a day, 365 days a year, thereby minimizing the risk of treatment delays. Dealing with a single radiology group also allows Sacred Heart to offer continuous, high quality care with a minimum of administrative effort. In this way, the exclusive contract "preserve[s] the efficiency of the department's operation and thus its ability to compete in the market place." *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1458 (11th Cir.1991).

Since the exclusive contract itself is facially pro-competitive, it follows that the denial of Dr. Williamson's initial application for privileges in the Department of Radiology on the grounds that it violated the contract also was a facially pro-competitive measure. Therefore, it is not circumstantial evidence of an antitrust conspiracy between PRC and Sacred Heart.

(iii) *Exclusive Contract as a Pretext:* According to plaintiff, her services were so desirable to both Sacred Heart and PRC that a rational economic actor in their position would have jumped at the chance to bring her on board. Faced with the exclusive contract and the apparent bylaws restrictions, rational business objectives should have compelled them to find a way to work around these obstacles. Accordingly, plaintiff contends that Sacred Heart invoked the exclusive contract as a pretext to delay, and later to deny, her initial application for privileges in radiology. Sacred Heart then used the contract as a pretext to trick her into requesting privileges in the Department of Internal Medicine.

Plaintiff correctly points out that both Dr. Post and Dr. Whitcomb admitted that the exclusive contract involved only the use of imaging modalities at the hospital. In addition, they acknowledged that the procedures Dr. Williamson wished to perform (i.e. admit patients, consult with them and the attending physician, do physical histories and medical exams, give medical advise, and review and make notations on patients' charts) were not radiology procedures within the meaning of the contract and did not require radiology privileges. In fact, any member of the staff could perform these procedures.

It is plaintiff's assessment that, under these circumstances, the economically rational decision would have been to give her privileges necessary to allow her to perform those patient care procedures not covered by the exclusive contract while imposing whatever limitations were required to protect those procedures reserved exclusively to PRC. She contends that the defendants' failure to accommodate her in this manner is not only evidence that their reliance on the contract was pretextual, but also that they conspired to drive her out of the outpatient radiology market. I cannot agree.

**\*34** Plaintiff's argument is fundamentally flawed in that it completely ignores the fact that Sacred Heart was committed to opening the Ann Baroco Center. Under its exclusive contract, PRC would be the beneficiary of the center's business. It is undisputed that plaintiff's clinic competed with Sacred Heart for outpatient radiology referrals and that plaintiff herself competed with the physicians of PRC. The opening of its own women's center would place Sacred Heart and PRC into even more direct competition with plaintiff.

In fact, the undisputed evidence establishes that,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 24
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

since Baptist then had no plans to open a women's center, Pensacola Diagnostic would be the Baroco Center's *primary* competitor.    The undisputed evidence in the record also indicates that Dr. Williamson was a very formidable competitor.    In two years she carved out a specialty that brought her substantial remuneration.    Before the Baroco Center opened, Pensacola Diagnostic's revenues were three times those of Sacred Heart for procedures and services encompassed by Dr. Williamson's specialty. As late as 1989, a full two years after opening the Baroco center, Dr. Williamson's revenues were still greater than those of Sacred Heart for the procedures encompassed by Dr. Williamson's specialty. Furthermore, Dr. Williamson's specialized practice grew rapidly:  between 1986 and 1989 the number of breast exams that she performed more than doubled from 2007 to 4421.

In light of plaintiff's position in the market, granting her any type of privileges while she still operated her own clinic would put Sacred Heart in the position of supporting its main competition.  Essentially, Sacred Heart would be competing with itself.    Faced with this possibility, it clearly had a rational, pro-competitive reason for acting independently to deny Dr. Williamson's request for privileges.

Dr. Williamson counters that if PRC and Sacred Heart were acting rationally, they would have tried to "neutralize" her by merging with her.    Accepting plaintiff's assertion that the relevant product and geographic markets at issue in this case are outpatient mammography in the greater Pensacola area, her argument for merging the only two significant competitors in that market would seem to have its own antitrust implications.

Putting this telling point aside, it is undisputed that PRC, with Sacred Heart's approval, did in fact enter into negotiations to hire Dr. Williamson.    As discussed above, the parties were not able to reach an agreement.    In particular, Dr. Williamson did not want to work nights, weekends, or holidays.    PRC was willing to accommodate her schedule in exchange for a reduction in salary, but Dr. Williamson rejected the proposed amount as too low.

Similarly, Dr. Williamson had justifiable misgivings about the interaction between the non-compete covenant and the termination clause.  Observing that, taken together, the two clauses could allow PRC to put her out of practice in Pensacola in as little as three months, Dr. Williamson asserts that these negotiations were not "genuine".    She characterizes

PRC's written offer as a "take it or leave it" proposition and characterizes the proposed contract as a "sham".    In addition, plaintiff contends that Dr. Post wanted her to change her style of practice.

**\*35** It is true that the termination clause and the non-compete clause could have harsh consequences.  But such clauses are commonly utilized by professional practices, and there is no evidence that they were specifically directed toward plaintiff.    Even if I accept plaintiff's contention, arguendo, that the proposed contract was a thinly disguised attempt to lure her into a professional trap, I cannot conclude that PRC's conduct was evidence of an antitrust conspiracy.

It is undisputed that PRC and Pensacola Diagnostic were direct competitors.    I also accept the fact that PRC rationally could have chosen to address this competition by merging with Pensacola Diagnostic or by hiring Dr. Williamson.    However, in her zeal to isolate economic irrationality, plaintiff appears to take the position that any action on the part of PRC and Sacred Heart short of a complete accommodation through a merger is circumstantial evidence of concerted action.    She ignores the fact that PRC just as rationally could have chosen to compete with her. Clearly, the proposed Baroco Center would be a more than ample foundation upon which to base such a choice.

PRC could choose to compete by offering superior service or a lower price.    Similarly, PRC rationally could choose to compete through its long term relationship with Sacred Heart.    If so, that is *not* evidence of an antitrust conspiracy unless the method itself is inconsistent with both independent action and rational business objectives, even if deemed to be unfair.    *L.A. Draper & Sons v. Wheelabrator-Frye, Inc., supra,* 735 F.2d 414, 421 (11th Cir.1984).  "The use of unfair means in substituting one competitor for another without more does not violate the antitrust laws." *Id.* (citations omitted).

In this case, it is perfectly rational for PRC to attempt to compete with the plaintiff.    After all, competition is what the antitrust laws are supposed to promote: Who says that competition is supposed to be fair, that we judge the behavior of the marketplace by the ethics of the courtroom?    Real competition is bruising rivalry, in which people go out of business under intense pressure. ... [C]ompetition is a gale of creative destruction.

*Fishman v. Estate of Wirtz,* 807 F.2d 520, 577 (7th

Case 2:05-cv-01096-MHT-TFM    Document 28-4    Filed 03/24/2006    Page 25 of 41

Not Reported in F.Supp.                                                                  Page 25
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Cir.1986) (Easterbrook, J., dissenting).

Moreover, there is no evidence that Sacred Heart influenced PRC's negotiating posture. Sacred Heart did encourage PRC to choose a female physician to service its new women's center. In fact, there is even evidence that it encouraged PRC to reach an agreement with Dr. Williamson, perhaps for the same reason. However, PRC conducted the negotiations through its own counsel, and there is no evidence that Sacred Heart had any control over, or participation in, PRC's ultimate choice. For these reasons, I must conclude that the conduct of both Sacred Heart and PRC in denying plaintiff's request for privileges, and in failing to come to a contractual agreement with her, are at least as consistent with rational, independent business conduct as with an antitrust conspiracy, as *Matsushita* requires on motions for summary judgment.

**\*36** In further support of her pretext argument, plaintiff points to so-called "accommodations" that Sacred Heart made for other physicians whose areas of specialty were covered by "exclusive" contracts. However, a brief examination of these "accommodations" reveals that they bear no resemblance to plaintiff's situation. For instance, the Department of Gastroenterology and the Department of Pulmonology are both subject to exclusive contracts. The exclusive contract applicable to the former specifically preserved the staff privileges of six gastroenterologists who were not parties to the contract.

The exclusive contract associated with the Department of Pulmonology provided that
the termination or cancellation of this agreement shall not affect the staff membership or clinical privileges of any physician employee of the group, except that such physician employee may not thereafter obtain or exercise any clinical privileges for which exclusive contractual arrangements have been made between the hospital and a third party.

Thus, the pulmonologists in question would retain their staff membership, as well as the privilege to perform any service not specifically named in the exclusive contract. Similarly, Sacred Heart's exclusive contract with Dr. Frank for the provision of neurological services states that exceptions may be made after consultation and joint approval of Dr. Frank and the hospital.

These contracts show only that the parties involved negotiated certain exceptions to their exclusive rights.

Whatever factors led to the inclusion of these terms are unknown, but make them clearly distinguishable from the plaintiff's circumstances. In addition, each contract was an independent event completely unrelated either to the PRC contract or to Dr. Williamson's applications for staff privileges. For these reasons, they cannot be evidence that the denial of plaintiff's request was anomalous, and therefore, pretextual. It is simply not reasonable to infer a conspiracy from the fact that these contracts are different from the PRC contract.

The case of independent radiologist Thomas Brown, M.D. presents a somewhat different situation. Between 1975 and 1980, Dr. Brown practiced with PRC at Sacred Heart, and consequently, had full privileges there. When he left PRC in 1981 to open his own radiology clinic, Sacred Heart permitted him to retain his privileges. No objection to this arrangement was raised until 1984, when Sacred Heart told Dr. Brown he would have to resign his membership or face revocation proceedings.

Sacred Heart claims that it did not realize that Dr. Brown had retained his privileges, and that when it discovered the error, it asked him to resign. Plaintiff contends that Sacred Heart forced Dr. Brown to resign only after it discovered that his having privileges allowed him to compete for Blue Cross/Blue Shield PRC patients. Which interpretation is more accurate is immaterial. The material fact is that when Dr. Williamson submitted her application for privileges, Dr. Brown's privileges had been revoked. Thus, Dr. Williamson and Dr. Brown received the same treatment. [FN38]

**\*37** Plaintiff's strongest argument involves the case of obstetrical ultrasound. Traditionally, this procedure was performed by radiologists. However, developments in the procedure and in the medical profession made it more common for obstetricians to perform it. In 1986, Sacred Heart determined that it was in its best interest to respond to these changes by hiring a perinatologist (a specialist in high-risk pregnancies) to perform obstetrical ultrasounds at the hospital. Initially, PRC objected to this arrangement on the basis of its exclusive contract. Nevertheless, Sacred Heart and PRC eventually reached an agreement to modify the exclusive contract to permit the perinatologist to perform obstetric ultrasounds.

Dr. Williamson argues that a similar transformation was occurring in the detection and treatment of breast cancer. Therefore, she contends that an accommodation along the lines of that made for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 26
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

perinatologists could have, and should have, been made for her. This brings us back to the core of plaintiff's argument, which is that Sacred Heart's failure to accommodate her practice was economically unsound and was antitrust conduct. Once again, this argument ignores the fact that Sacred Heart had a rational business reason, in the form of its own Ann Baroco Center, for refusing to accommodate plaintiff. Failure to make special exceptions to established policy in order to accommodate a competitor is not antitrust behavior.

(iv) *Unilateral Conduct and Causation:* Even if I were to accept plaintiff's evidence of pretext as true, such evidence, standing alone, would not be sufficient to show joint action in violation of the antitrust laws. *DeLong Equipment Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1514 (11th Cir.1989). Rather, evidence of pretext only serves to rebut an assertion of independent action on the part of the defendant. *Id.* In this case, however, plaintiff's argument overlooks the fact that the final authority to grant privileges or to waive bylaws requirements lies solely with Sacred Heart's Board of Directors. The Board of Directors also has the sole authority to negotiate contract modifications.

The Eleventh Circuit faced a similar set of facts in *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438 (11th Cir.1991). In that case, the plaintiff neurologist brought an antitrust claim against a hospital and its radiologists. The plaintiff had applied for privileges to perform CT scans in the hospital's radiology department. The radiologists, who had developed numerous protocols for this procedure, recommended that the application be denied. The hospital followed this recommendation, and the neurologist filed his antitrust claim.

The court held that even if the radiologists had conspired among themselves to deprive the neurologist of privileges, they could not have caused his application to be denied. *Id.* at 1459. Only the Board of Directors could deny the application. Therefore, such denial was a unilateral action on the part of the hospital. *Id.* As with all tort-like causes of action, the failure to show causation is fatal to a Section 1 claim. *Id.*

*38 To the extent that PRC was involved in the denial of plaintiff's request for privileges, its participation was limited to the comments that Drs. Post and Hobgood made in December of 1985, in opposition to Dr. Williamson's original application for privileges in the Department of Radiology. None

of PRC's physician employees sat on the Sacred Heart's Board, and none of them played any part in the drafting of the Department of Internal Medicine's credentialing criteria. Furthermore, with the exception of Dr. Post, who sat on the Executive Committee, none of the PRC physicians sat on any of the committees that reviewed plaintiff's application.

Plaintiff points out that all of the physicians sitting on the Credentials and Executive Committees considered Dr. Williamson a skilled practitioner, and many referred patients to her. Some were in favor of adding her to the staff, and they lobbied on her behalf with both the hospital and the Department of Radiology. Accepting plaintiff's interpretation of the facts as true, these physicians, though they personally wanted to see her on the staff, ultimately were constrained by the bylaws and were forced to recommend that her application be denied. Nevertheless, support for Dr. Williamson is evident from the occasions that the Credentials Committee, despite its adverse recommendation, continued to encourage the hospital to accommodate Dr. Williamson's practice. But, as in the *Todorov* case, the decision with regard to these matters constitutes *unilateral* action on the part of Sacred Heart, and does not implicate an antitrust conspiracy.

(b) Attempts to Blackball Dr. Williamson. The alleged attempts to "blackball" Dr. Williamson are much more difficult to analyze. These attempts fall into three main categories. First, there are the alleged attempts to attack Dr. Williamson's referral base through coercive reciprocal agreements with other physicians, as well as through the use of threats and pressure to force physicians to refer patients back to Sacred Heart. Second, there is the evidence relating to the needle placement controversy. Third, there is the alleged pressure on Pensacola Pathologists to fire Dr. Michael Williamson.

(i) *Attacks on Dr. Williamson's Referral Base:* Plaintiff's allegations of threats and pressure are based almost entirely on her own hearsay testimony describing what other physicians allegedly told her about what Sacred Heart administrators, in turn, told them.

Insofar as plaintiff offers her own testimony to prove that Sacred Heart, in fact, intimidated or coerced the named physicians, it is clearly inadmissible hearsay. Recognizing this fact, plaintiff argues that this testimony nevertheless is admissible as *circumstantial evidence* to show the state of mind of the declarant physicians. However, the plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 27
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

misunderstands the state of mind rule regarding what would otherwise be hearsay: it's the state of mind of the secondary declarant that must be affected without regard to the truth or falsity of the statement. In short, it does not apply to the declarant physicians. Even if it did, it does not assist plaintiff in establishing the existence of a conspiracy to blackball her. To the extent that the alleged statements may be circumstantial evidence of the physicians' states of mind, they would be admissible only for the purpose of inferring the conduct of the declarant physicians, *not* to infer conduct on the part of Sacred Heart. Therefore, plaintiff must establish the conspiracy through other admissible evidence.

**\*39** Plaintiff attempts to do this through proof of the circumstances surrounding the several contracts between Sacred Heart and the declarant physicians. Essentially, plaintiff argues that the contracts between Sacred Heart and Drs. Horan, Turner, Antonelli, Howard and Mixon were coercive reciprocal agreements requiring the physicians to refer patients back to Sacred Heart in exchange for much needed financial support.

As the Eleventh Circuit observed in *Key Enterprises of Delaware, Inc. v. Venice Hospital,* 919 F.2d 1550, 1561 (11th Cir.1990), "reciprocal dealing has received little attention in the courts; however, when the subject has arisen, courts have not hesitated to condemn the practice." Reciprocal dealing is conceptually similar to tying. *Id.* In a tying arrangement, a seller uses its power in the market for product A to coerce the buyer of product A to purchase product B. *Id.* However, "[a] reciprocal dealing arrangement exists when the two parties face each other as both buyer and seller." *Id.* (*citing Spartan Grain & Mill Co. v. Ayers,* 581 F.2d 419, 424 (5th Cir.1978).* The buyer of product A offers to buy from the other party, but only if that second party will buy product B from the first party. *Id.* The two cases are similar in that, in each case, one side of a transaction has special power in the market place ... [i]n reciprocal dealings, a buyer with economic power forces a seller to buy something from it." *Id.*

The difference between the two types of arrangements is that the strict standard of coercion applied to tying cases is not applicable to reciprocal dealing cases. *Id.* If the coercion necessary for *per se* treatment is not present, the court may analyze the case under the rule of reason. *Id.* Therefore, "where a plaintiff shows that one party has sufficient market power to unduly influence a second party to treat the first more favorably than the free market would

otherwise dictate, and the second party acts in conformity with the reciprocal arrangement, the plaintiff has proved the existence of an arrangement which unreasonably restrains trade." *Id.*

In *Venice Hospital, supra,* the Eleventh Circuit determined that it was appropriate to allow the jury to determine the existence of a coercive reciprocal agreement where the evidence showed that the defendant hospital entered into agreements with one or more home health care agencies whereby the home health care nurses would have access to patients prior to discharge in exchange for the nurses preferentially referring their patients to Medical Patient Aid Center ("MPAC"), a hospital owned company that supplied "durable medical equipment" ("DME") for home use. *Id.* 919 F.2d at 1561. At the time it entered into the agreement, the defendant hospital was the dominant hospital in the area. It controlled 76% of the available hospital beds, 80% of patient admissions, and 81% of the patient days in the relevant geographic market.

**\*40** The defendant hospital also was the source of at least 46% of the total market for durable medical equipment. In the two-year period beginning with the agreement between the MPAC and the home health care agencies, MPAC's total market share rose from 9.2% to 61%. A total of 64% of MPAC's business originated with a referral from a home health care nurse counseling patients at the defendant hospital. Thus, MPAC got a large part of the market simply by capturing a large percentage of the defendant hospital's referrals.

Under these facts, the court concluded that although the arrangement did not fit precisely the contours of the classical reciprocal agreement, it had sufficient representative elements to allow the issue to go to the jury. *Id.* at 1562. An important aspect of the court's decision is the factual showing of the hospital's monopoly power within the relevant geographic market-80% of the hospital patients and in excess of 46% of the "durable medical equipment" market.

Here, plaintiff contends that, similarly, Sacred Heart has entered into agreements with several physicians whereby Sacred Heart provides financial support to their practices in exchange for, or in expectation of, the physician's referral of patients back to Sacred Heart for outpatient services, including radiology services. [FN39] Defendants, of course, argue that these contracts contained nothing that constitutes an arrangement which unreasonably restrains trade.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 28
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
(Cite as: Not Reported in F.Supp.)

In the case of Drs. Horan, Turner, and Antonelli, the contracts with Sacred Heart contain language requiring them to utilize Sacred Heart's outpatient services "to the extent feasible, and unless patient choice dictates otherwise." FN40 In the case of Drs. Howard the so-called "utilization" clauses provides that "Gulf Coast Diversified (Sacred Heart's for-profit affiliate) shall be notified of any referral of patients ... for medical services to any entity other than Sacred Heart Hospital of Pensacola."     In addition, it provides that "[Dr. Howard] agrees to utilize specialty physicians who are members of the medical staff of Sacred Heart Hospital of Pensacola wherever practical to ensure continuity of patient care."    Dr. Mixon's contract contains the same utilization clause, but with the additional specific requirement that he utilize radiology services provided by Sacred Heart unless Sacred Heart instructs him to use an outside radiologist.

Factually, as previously noted Dr. Mixon and Dr. Howard had no history of any referrals to plaintiff, and there is nothing to tie their agreements to this case.     Dr. Antonelli said he always referred his patients requiring a radiologist to the plaintiff and that his agreement with Sacred Heart had no effect on referrals.    The statistics regarding Drs. Horan and Turner are basically inconclusive, but they each deny any pressure to move referrals from plaintiff to Sacred Heart.

Nevertheless, the question remains as to whether the potential restraint imposed by these agreements was unreasonable.     Plaintiff argues that the coercion involved was sufficient to allow application of the *per se* rule.  I cannot agree.

**\*41** A coercive reciprocal agreement, like a tying agreement, is unreasonable *per se* whenever one party has sufficient economic leverage in one market to gain an unfair advantage in another market.  *See Venice Hospital, supra, 919 F.2d at 1560-64; Betasee, Inc. v. U and I, Inc., 681 F.2d 1203, 1216-18 (9th Cir.1982); Spartan Grain & Mill Co. v. Ayers, 581 F.2d 419, 425-26 (5th Cir.1978).* In this case, the products exchanged are loans and financial credit on the one hand, and outpatient referrals of all types on the other hand.  There is no evidence in the record whatsoever relating to Sacred Heart's leverage in the lending or financial market.

The Supreme Court addressed this very issue in *United States Steel Corp. v. Fortner Enterprises, Inc., 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977)* ( "*Fortner II* ").    In that case, a subsidiary of U.S.

Steel offered 100% financing to Fortner for the purchase of prefabricated homes manufactured by U.S. Steel.    The financing was at particularly low rates, and on terms favorable to Fortner.    The financing was available, however, only on sales of homes from U.S. Steel to Fortner.    The homes themselves were more expensive than those of U.S. Steel's competitors.    The relationship between Fortner and U.S. Steel soured, and Fortner brought an antitrust action contending that the credit had been tied to the purchase of the homes in violation of Section 1 of the Sherman Act.

The only issue before the Supreme Court was whether Fortner had shown that U.S. Steel had economic power in the market for credit, not the market for prefabricated homes.    Ignoring several other arguments, including the size of U.S. Steel and the number of similar arrangements it had made, the Supreme Court determined that the question came down to one of uniqueness:

The most significant finding made by the District Court related to the unique character of the credit extended to Fortner.    This finding is particularly important because the unique character of the tying product has provided critical support for the finding of illegality in prior cases.

*Id.* at 619, 97 S.Ct. at 867, 51 L.Ed.2d at 89.  "In short, the question is whether the seller has some advantage not shared by his competitors in the market for [credit]."    *Id. at 620, 97 S.Ct. at 868, 51 L.Ed.2d at 89-90.*

The fact that the financing arrangement was unique, i.e. "without like or equal", did not mean that U.S. Steel possessed economic power.     The Court concluded that the evidence merely showed that the credit terms were unique because the seller was willing to accept a lesser profit, or to incur greater risk, than its competitors.    This kind of uniqueness did not give rise to an inference of economic power.  Without any evidence that U.S. Steel had some cost advantage over its competitors-or could offer a form of financing that was significantly differentiated from that which other lenders could offer if they so elected-the unique character of the financing did not support the conclusion that U.S. Steel had the kind of economic power that would sustain a finding of *per se* illegality.    *Id. at 621-22, 97 S.Ct. at 868, 51 L.Ed.2d at 90-91.*

**\*42** Assuming that the relevant geographic market in this case, *for this issue,* is the greater Pensacola area, there is no evidence in the record to support the

Not Reported in F.Supp.                                                                  Page 29
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

conclusion that Sacred Heart had some competitive advantage over other potential lenders. Common sense requires a contrary conclusion. The fact that the physicians in question felt that they could not get as good a deal at a bank, for example, is irrelevant to my inquiry under *Fortner II.    See also Spartan Grain, supra,* 581 F.2d at 425-27 (*citing Fortner II* ). Accordingly, I must conclude that application of a *per se* analysis to the reciprocal agreement alleged in this case is inappropriate.

In order to prevail in the absence of *per se* liability, plaintiff must show that Sacred Heart's conduct unreasonably restrained competition. *Jefferson Parish Hospital v. Hyde,* 466 U.S. 2, 29, 104 S.Ct. 1551, ----, 80 L.Ed.2d 2, 23 (1984); *Venice Hospital, supra,* 919 F.2d at 1562. In the absence of evidence of actual detrimental effects, the rule of reason dictates that the plaintiff define the relevant market (both its product and geographical boundaries), as well as demonstrate the defendant's market power. As discussed above, there is no evidence that Sacred Heart's power in the lending and financial market was sufficient to restrain trade within the greater Pensacola area.

In the alternative, even assuming, as plaintiff seems to argue, that the relevant product market is not access to credit, but access to hospital services, she has still failed to meet her burden. As discussed above, the Eleventh Circuit's decision in *Venice Hospital, supra,* 919 F.2d at 1550, was based, in large part, on the factual showing of the hospital's monopoly power within the relevant geographic market-80% of the hospital patients and in excess of 46% of the "durable medical equipment" market.

Unlike the defendant in *Venice Hospital,* Sacred Heart has no unreasonable ability to control access to hospital services. It is undisputed that Sacred Heart and its two main competitors, Baptist and West Florida Regional Hospital ("West Florida"), compete neck and neck within the greater Pensacola area. [FN41] The Navy Hospital and (at the relevant time) University Hospital were also competitors within the Pensacola market. There is nothing to indicate that Sacred Heart was able to exert any control over this market.

(ii) *The Needle Placement Controversy:* Next, plaintiff argues that banning her needle placement patients from its surgi-center is circumstantial evidence of an antitrust conspiracy.

Essentially, plaintiff argues that her needle placement

protocol, involving as it did, the placement of the needle at her clinic and then walking the patient across the parking lot to the surgi-center for removal, presented no greater risk to the patient or to the specimen once removed than did Sacred Heart's own protocol. Once again, plaintiff has overlooked the fact that she was in competition with Sacred Heart. As discussed above in greater detail, there is nothing in the antitrust law that mandates aid to a competitor.

**\*43** In addition, there is another, procompetitive reason for the advisory board's recommendation: Dr. Williamson is outside Sacred Heart's quality assurance mechanism. It is true that Sacred Heart routinely receives specimens from outside the hospital. However, when Sacred heart takes in specimens from physicians who are on its staff, it has the power to enforce compliance with its quality assurance protocol. Similarly, when Sacred Heart sends its own specimens to an outside lab, it has control over the choice of labs and may adjust its choices as quality concerns dictate. It also has control over its couriers and the means of transport.

Under plaintiff's proposed needle placement protocol, Sacred Heart has no such control. She is outside its review and, more importantly, its enforcement mechanisms. If legitimate questions arise or problems occur, Sacred Heart's only recourse would be to discontinue plaintiff's use of its surgery and lab facilities. After weighing the risks and benefits of plaintiff's proposal, this is precisely what it did. The fact that the decision may have made plaintiff's needle placement practice less desirable for plaintiff to use does not detract from the legitimacy or reasonableness of the decision. Nor does it create an inference of an antitrust conspiracy.

(iii) *Termination of Michael Williamson:* As with her allegations of intimidation, plaintiff's contention that Pensacola Pathologists terminated Michael Williamson under pressure from Sacred Heart is almost entirely based on plaintiff's own and her husband's hearsay testimony. That evidence cannot be considered for purposes of the pending motion.

The admissible evidence in the record is what the doctors themselves have testified: that they were under no pressure from Sacred Heart, and that their termination of Michael Williamson had nothing to do with the delay in the renewal of their contract. Therefore, this does not support the plaintiff's antitrust claim. Further, Dr. Michael Williamson is not a party to this action. Any claim he may have is in a separate case in state court.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 30
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

*(iv) Involvement of PRC and Dr. Post:* I must now assess the involvement of PRC and Dr. Post in all these activities. The evidence of PRC's and Dr. Post's attempts to intimidate physicians into using the Sacred Heart outpatient radiology facilities consists of Dr. Murphy's statement to the FTC. According to Dr. Murphy, Dr. Post attempted to persuade him to refer his patients to the Sacred Heart radiology department by appealing to his sense of loyalty to the hospital. Assuming that it occurred, this attempt to lobby Dr. Murphy can hardly be characterized as a threat. A threat implies the ability to harm. In this case, Dr. Post and PRC had no ability to harm Dr. Murphy's practice.

Similarly, there is no evidence that PRC or Dr. Post participated in the negotiation of the pathology contract, or of the allegedly coercive reciprocal agreements with Dr. Williamson's referring physicians. It is true that PRC stood to benefit from these arrangements, but so did all of Sacred Heart's other outpatient diagnostic facilities. Even if they knew about Sacred Heart's conduct, and hoped that it would succeed in diverting referrals back to the hospital, the fact that PRC and Dr. Post would benefit from Sacred Heart's allegedly improper actions is not evidence that they participated. More importantly, there is no evidence whatsoever, that PRC or Dr. Post was in position to influence Sacred Heart's lending and contract decisions.

**\*44** Finally, the participation of PRC and Dr. Post in the alleged scheme to ban Dr. Williamson's needle placement patients was limited to Dr. Post's role as an advisor to the Medical Advisory Board. The evidence shows that in this capacity he did nothing more than describe the needle placement process. He was not a member of the board, and had no vote in the matter. Similarly, no other physician employee or shareholder of PRC sat on the board. For these reasons, I must conclude that the evidence is insufficient to link either PRC or Dr. Post to a conspiracy to drive plaintiff out of business or to limit her ability to compete for radiology patients.

*(v) Summation:* In sum, there is no genuine issue of material fact in the record as to whether the defendants PRC, Sacred Heart, and Dr. Post conspired to violate Section 1 of the Sherman Act, and these defendants' motions for summary judgment are GRANTED.

### 2. Baptist and Radiology Associates Conspiracy

As with the Sacred Heart/PRC conspiracy, there is no direct evidence that Baptist and Radiology Associates conspired to prevent plaintiff from competing for radiology patients. Moreover, the plaintiff's circumstantial evidence relating to this conspiracy is quite limited.

Plaintiff's application for privileges at Baptist is distinguished not only by the fact that Radiology Associates interposed no objection, but also by the fact that Baptist eventually gave the plaintiff the privileges that she requested. Plaintiff argues that the process was delayed for three years. However, she ignores the fact that two and one-half years of that delay are attributable to her own lack of diligence. The events prior to February 25, 1988, are simply not relevant to plaintiff's claim against Baptist. There was no delay that can be attributable to anyone except the plaintiff.

Plaintiff next interposes the specious argument that Baptist did not give her all the privileges she requested. In other words, Baptist failed to accommodate plaintiff on her terms. She claims that this is evidence of an antitrust conspiracy. I do not agree.

Based on plaintiff's representations to the hospital, Baptist made the precise accommodation she had been seeking. Plaintiff requested privileges that would allow her to provide specific follow up care to the patients she saw at her clinic. Within five months of her renewal application in February 1988, Baptist granted plaintiff full courtesy privileges under supervision. It is undisputed that these privileges satisfied the professional needs plaintiff had expressed to Baptist, and that were known to it at the time.

Upon granting these privileges, Baptist explained that the interaction of the bylaws' practice requirement and the exclusive contract with Radiology Associates, plaintiff would not be eligible for unsupervised privileges. Baptist provided her with a copy of the bylaws, which she then signed, signifying her agreement to be bound by them in her dealings with the hospital. At the time plaintiff voiced no dissatisfaction with this arrangement.

**\*45** Plaintiff's dissatisfaction with the level of her privileges arose only after Health First continued to deny her request for membership. It was only then that she revealed her true purpose in seeking privileges; and it is only since filing her complaint

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 31
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

that plaintiff claims not to have received all the privileges for which she originally asked. Plaintiff will not now be heard to argue that Baptist's compliance with plaintiff's actual, written request is somehow evidence of an antitrust conspiracy.

Plaintiff next challenges the interaction between the exclusive contract with Radiology Associates and the bylaws practice requirement. Prior to June 1985, Baptist's contract with Radiology Associates was oral, and its terms were rather vaguely defined. In the summer of 1984, several months preceding plaintiff's first application for privileges, Baptist's Board of Directors ordered the administrative staff to negotiate a written contract.

Although the contract was not signed until June 28, 1985, Baptist represented to plaintiff that it was bound by its negotiations, and therefore could not process her application. When the hospital later reached an accommodation with plaintiff, it explained, as described above, that the contract, together with the bylaws practice requirement, would prevent it from granting her unsupervised privileges.

Plaintiff now attacks the exclusive contract on the grounds that the switch from a vaguely defined oral contract to a written contract "unnecessarily tied Baptist's hands." In other words, it prevented the hospital from accommodating plaintiff on her terms. The switch, according to plaintiff, was therefore economically irrational, and is evidence of an antitrust conspiracy.

This is essentially an attack on the economic validity of the exclusive contract, and I reject it out of hand. I already have discussed this issue in connection with the PRC contract, and it is settled law that the mere existence of an exclusive contract is not evidence of an antitrust conspiracy.

Plaintiff counters that Baptist decided to put its 35-year-old oral contract into writing precisely as she was applying for privileges, which implies an improper motive. However, the evidence is undisputed that negotiations on the written contract began several months before plaintiff submitted her application to any of the defendants in this case. Except for the actual coincidence of her application and the contract negotiations, there is absolutely nothing in the record to refute Baptist's evidence that the hospital was in the process of converting all their preexisting oral contracts into writing, and that the radiology contract was simply the next in line for conversion. Given that Baptist's explanation is consistent with permissible, unilateral business activity, I cannot conclude that the mere drafting of a contract at about the same time plaintiff submitted her application is evidence of anything.

Plaintiff also argues that, because the privileges requirement in the bylaws was not objectively necessary to assure quality medical care, Baptist's reliance on it to deny her unsupervised privileges is circumstantial evidence of an antitrust conspiracy between it and Radiology Associates. Again, this argument is, at best, specious. The bylaws existed long before plaintiff submitted her application. Nor is there any evidence that they were changed.

**\*46** Plaintiff argues that, because the requirement prevents her from obtaining unsupervised privileges, it is irrational. Obviously, that is not the test. No requirement can satisfy every applicant. The test is whether the requirement is objectively economically reasonable in light of Baptist's legitimate business objectives. The answer, of course, is yes.

Plaintiff argues in the alternative that while the privileges requirement may be objectively rational, Baptist acted irrationally by refusing to waive the requirement for plaintiff. In other words, plaintiff argues that Baptist's failure to modify the privileges requirement is pretextual.

My previous analysis of this argument in connection with the alleged conspiracy between Sacred Heart and PRC applies with equal force here, and needs no repeating. There is simply no material evidence of pretext. Suffice it to say that, even if Baptist's reliance on the privileges requirement was pretextual, such pretext would constitute unilateral action by Baptist. *Todorov v. DCH Healthcare Authority, supra, 921 F.2d 1438, 1459 (11th Cir.1991).* Therefore, it is not evidence of a conspiracy between Baptist and Radiology Associates.

The same may be said for the contracts between Baptist and Drs. Westafer, French, and Montgomery. The Baptist situation is even stronger than with Sacred Heart, because the Baptist contracts contain a clause specifically stating that the loan in no way obligates the physician to refer patients to Baptist, and that referrals are to be made according to the best medical interests of the patient. Additionally, there is absolutely no evidence that anyone from Baptist or Radiology Associates pressured Drs. Westafer, French, or Montgomery into diverting referrals away from plaintiff and to Baptist.

Not Reported in F.Supp.                                                                                    Page 32
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Nevertheless, plaintiff makes the astounding argument that the mere lack of growth in referrals from these physicians is evidence of a conspiracy. Plaintiff does not even contend that she ever had a referral base at Baptist, or with these doctors, which was eroded by Baptist's action. Rather, she points to the growth in referrals from Dr. Epps, a Baptist physician not encumbered by a loan agreement, and concludes that referrals from Drs. Westafer, French, and Montgomery *would have grown* if they had not been parties to the offending contracts.

This comparison is meaningless. As discussed earlier, the Supreme Court has expressly held that conduct that is as consistent with permissible, unilateral activity as with an illegal conspiracy does not, standing alone, permit the inference of an antitrust conspiracy. There are numerous rational explanations for the disparate growth in referrals from these four physicians. Location, patient preference, and physician preference are just a few that come to mind. Under the facts of this case, each of these explanations is just as likely as plaintiff's explanation-if not more so. Therefore, plaintiff's contrived speculation cannot support the inference of an antitrust conspiracy.

**\*47** Plaintiff herself argues that the possibility of increased referrals from her clinic provided an economic incentive for the hospital defendants to grant her requests for privileges. She does not explain why a similar, rational business-motivated exchange of benefits between Baptist and Drs. Westafer, French, and Montgomery should be subject to antitrust liability. In short, the mere referral of patients to a hospital that has loaned the referring physician money to open a practice is at least as consistent with legitimate unilateral activity as with illegal concerted activity.

I make one more observation regarding Baptist's relation with plaintiff. As with Sacred Heart, Baptist and plaintiff are direct competitors. Plaintiff's own statistics reveal that as of 1989, the market for services encompassed by plaintiff's specialty was split almost equally among Baptist; Sacred Heart (Ann Baroco Center), and Pensacola Diagnostic.[FN42] All appear to be competing with each other for patients. Thus, Baptist would have a rational economic motive to refrain from granting plaintiff's request for privileges.

Plaintiff has argued that Baptist (or Sacred Heart) would realize an economic gain from establishing a relationship with her because she often must refer patients to hospitals for surgery. Yet, it is undisputed that she has never admitted a patient to any hospital at which she has privileges. Since attaining privileges at Baptist, she has visited only three patients there. In only one of these cases was Dr. Williamson acting as the "primary care" physician. And, even then, it was the surgeon who admitted the patient. Similarly, at least half of plaintiff's patients are referred to her by traditional primary care physicians who, if further treatment was indicated, would dictate the choice of hospital. Regardless, it is undisputed that, as competitors, Baptist had no legal obligation to make special accommodations to aid the plaintiff.

In sum, Baptist's motion for summary judgment is GRANTED insofar as it pertains to the alleged conspiracy between Baptist, Radiology Associates, and unnamed others to prevent plaintiff from competing for radiology patients.

### 3. *The Community Conspiracy*

In Count III of her complaint, plaintiff alleges that there was a "community wide" conspiracy among all the defendants to prevent her from gaining membership in Health First. This effectively disqualified her from treating HOP subscribers, and thereby prevented her from competing for patients in need of radiology services. The evidence in support of this conspiracy consists of the parallel refusals of the defendants to accommodate plaintiff's practice. According to plaintiff, Health First's denial of her application for membership was economically irrational unless all the defendants "toed the line" by refusing to accommodate her.

The rule in this circuit is that evidence of conscious parallelism does not permit an inference of conspiracy unless the plaintiff establishes that each defendant engaging in the parallel action acted contrary to its economic self-interest. *Bolt v. Halifax Hospital Medical Center, supra*, 891 F.2d 810, 826 (11th Cir.1990). "Thus, the plaintiff must establish that each defendant would have acted unreasonably in a business sense if it had engaged in the challenged conduct unless that defendant had received assurances from the other defendants that they would take the same action." *Id.* at 826-27.

**\*48** I already have determined that the evidence in this case does not tend to exclude the possibility that both Sacred Heart and Baptist acted independently and in a manner consistent with rational business

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 33
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

objectives in denying plaintiff's applications for privileges. Accordingly, plaintiff's claim of conscious parallelism cannot support an inference of conspiracy.

It is important to note here that, aside from the parallel denials of staff privileges (or membership in the case of Health First), there is no evidence that the defendants conspired to deprive her of membership in Health First. It is true that the physicians serving on Health First's Board of Directors were affiliated in one way or another with either Baptist or Sacred Heart. However, the mere opportunity to conspire among antitrust defendants is insufficient to permit the inference of conspiracy. *Bolt, supra,* 891 F.2d at 827.

There are other factors at work in the marketplace. By their very nature, HMOs restrict competition. As described above, Health First's bylaws initially required applicants to have privileges at a "participating hospital". At the time, the only such hospitals were Sacred Heart and Baptist. Health First maintains that it adopted this "ready made" credentialling procedure to avoid the cost of hiring a staff to screen applicants, and there is no evidence to the contrary.

The efficiency of this arrangement notwithstanding, it is clear that it effectively forfeits control over the selection of both physician participants and practice formats to the participating hospitals. Sacred Heart and Baptist therefore had *de facto* control over Health First's membership. Obviously, physicians who are otherwise competent in their specialties may be excluded from the HOP patient pool simply because they do not have privileges at one of these two hospitals.

In late 1985, shortly after becoming operational, HOP decided to begin admitting hospitals located outside the Pensacola area. To accommodate physicians who practiced at these hospitals, Health First amended its bylaws to provide that physicians who practiced primarily outside the greater Pensacola area could become members of Health First by obtaining privileges at one of the outlying hospitals. At the same time it retained the requirement that physicians practicing primarily within Pensacola must have privileges at Baptist or Sacred Heart. [FN43]

It is clear that the amended bylaws allowed Sacred Heart and Baptist to retain effective control over Health First membership within the greater Pensacola area. In order to fully understand the nature of this control, one must look to the nature of the competition between doctor owned, for-profit hospitals and non-profit hospitals like Baptist and Sacred Heart within the greater Pensacola market.

As the record shows, Baptist and Sacred Heart compete neck and neck with the privately owned West Florida Regional Hospital. In 1984, the Medical Center Clinic at West Florida Regional created its own HMO. In order to compete, Baptist and Sacred Heart created HOP. Obviously, if Health First was to compete successfully, it could not open its membership to physicians associated with West Florida Regional, and vice versa. Viewed in this context, the procompetitive aspects of Health First's credentialling criteria become apparent.

**\*49** As can be seen, competition between HMOs creates something of a paradox. On one level, their restrictive practices promote competition. On another level, they have an obvious anticompetitive effect. Thus, the question becomes whether the procompetitive benefits offset the anticompetitive effect in the relevant product and geographic markets (the "rule of reason"). *Seagood Trading Corp. v. Jerrico, Inc., supra,* 924 F.2d 1555, 1569 (11th Cir.1991) (citations omitted); *Construction Aggregate Transport, Inc. v. Florida Rock Indus., Inc.,* 710 F.2d 752, 771-72 (11th Cir.1983). [FN44]

For the purposes of the rule of reason analysis, there does not appear to be any evidence that the relevant geographic market is other than the greater Pensacola area. This includes Pensacola proper, along with the surrounding cities of Cantonment, Gulf Breeze, and Milton. [FN45] Similarly, there is no real dispute over the definition of the product component of the relevant market. It is the use of outpatient diagnostic radiology in the detection and treatment of breast cancer. [FN46] In this case, consumers are generally limited in their choice of physicians by the type of insurance they carry.

Although HOP met with some measure of success, the health insurance market in the greater Pensacola area has been, and remains, highly fragmented. At the time Dr. Williamson filed her complaint, two HMOs, in addition to HOP, operated within the market. They were Medical Center Health Plan ("MCHP") and Metlife Healthcare Network of Florida ("Metlife") (formerly HMO America). At their peaks, which came around 1988, MCHP, Metlife, and HOP had enrollments of approximately 31,000, 7,000, and 23,000 respectively. From this peak, HOP membership gradually declined to

Not Reported in F.Supp.                                                                                                    Page 34
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

approximately 15,000.00 in June of 1989. Enrollment in the other two HMOs declined similarly. As of April 1990, HOP still had approximately 15,000 members, MCHP also had about 15,000 members, while Metlife had declined to roughly 3,000 members.

In addition to the three HMOs, there are at least eight other providers of group health insurance operating in the greater Pensacola area. These include Blue Cross/Blue Shield of Florida PPC, Met-Elect PPO, and American General PPO. All of these are preferred provider programs ("PPOs"). [FN47] There are also three government funded programs: Champus, Medicare, and Medicaid. Finally, there are commercial indemnity insurance companies that supply group health insurance; Aetna and Providence are the largest in the Pensacola area.

Together with the three HMOs, these entities service almost the entire group health insurance market in the greater Pensacola area. This market consists of over 300,000 people. Thus, while it controlled between 38% and 45% of the HMO market between 1988 and 1990, HOP controlled only between 5% and 8% of total group health insurance market. Obviously, these percentages would be much lower if the market were expanded to include all people treated by doctors.

**\*50** Although plaintiff has been excluded from HOP, she has been, and continues to be, a physician provider for Metlife, Blue Cross/Blue Shield PPC, MetElect PPO, American General PPO, Lawrence Health Care Administrative Services, Inc., Champus, and Medicare. Thus, it appears that a maximum of 8% of potential patients are excluded from choosing plaintiff's services. Under these circumstances, it would appear that the procompetitive benefit of allowing consumers the choice of an additional HMO outweighs the anticompetitive effect of the HMO structure.

In addition, it does not appear that HOP's presence has resulted in any detriment to competition in the relevant market. Plaintiff's own figures show that from the fiscal year ending April 30, 1985, to the fiscal year ending April 30, 1990, plaintiff's clinic receipts increased by over 300%, while her income increased in excess of 500%.

Plaintiff argues, of course, that these figures would have been even higher if defendants had not "prevented her from competing". The evidence clearly shows that plaintiff was a highly effective

competitor. The injuries she complains of are merely those that every competitor must endure. Given HOP's small share of the total group health insurance market, along with plaintiff's obvious penetration and successful competition in the market, I must conclude that HOP's restrictive membership does not impose an unreasonable restraint on trade in the relevant geographic and product markets.

In sum, I conclude that defendants' parallel denials of plaintiff's various applications for privileges and staff membership do not support the inference of an antitrust conspiracy among the defendants. Moreover, I conclude that Health First's restrictive admissions practices do not unreasonably restrain trade in the relevant market. Accordingly, Defendants' various motions for summary judgment are GRANTED as to Count III.

### E. *Tortious Interference*

Count IV of plaintiff's complaint alleges that defendants Sacred Heart, PRC, and Dr. Post intentionally and wrongfully interfered with existing and prospective business relationships which plaintiff had with patients at her clinic and with other doctors, and that they further interfered with prospective relationships plaintiff had with HOP patients. Baptist is not named in this count. This is a pendent state law claim.

Tortious interference with business relationships and tortious interference with contractual relations are "basically the same cause of action" under Florida law. *Smith v. Ocean State Bank,* 335 So.2d 641, 642 (Fla. 1st DCA 1976). "The only material difference appears to be that in one there is a contract and in the other there is only a business relationship." *Id.* In order to prove a tortious interference claim, the plaintiff must demonstrate: (1) the existence of a business or contractual relationship under which the plaintiff had legal rights; (2) an intentional and unjustified interference with the relationship; and (3) damage to the plaintiff as a result of the tortious interference with that relationship. *Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories,* 849 F.2d 1336, 1348-49 (11th Cir.1987) (applying Florida law); *Tamiami Trail Tours, Inc. v. Cotton,* 463 So.2d 1125, 1127 (Fla.1985). The relationship involved can be based on a business expectancy arising "even from an unenforceable agreement which would have been completed had the defendant net intervened." *Scussel v. Balter,* 386 So.2d 1227, 1228 (Fla. 3d DCA 1980), *citing United*

Not Reported in F.Supp.                                                                                                Page 35
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

*Yacht Brokers, Inc. v. Gillespie,* 377 So.2d 668 (Fla.1979).

**\*51** In order to be actionable, the interference must be direct; conduct that has only indirect consequences on the plaintiff will not support a claim for tortious interference. *See Lawler v. Eugene Wuesthoff Memorial Hospital Ass'n,* 497 So.2d 1261, 1263 (Fla. 5th DCA 1986); *Rosa v. Florida Coast Bank,* 484 So.2d 57 (Fla. 4th DCA 1986). For instance, in *Lawler, supra,* the plaintiff physician brought a claim for intentional interference with his doctor-doctor and doctor-patient relationships after the defendant hospital terminated staff privileges. The trial court dismissed the claim, and the appellate court affirmed, holding that the claimed interference was "only an indirect consequence of the termination of staff privileges." *Lawler,* 497 So.2d at 1263. In contrast, the court in *Scheller v. American Medical Int'l, Inc.,* 502 So.2d 1268 (Fla. 4th DCA), *cert. denied,* 513 So.2d 1060 (Fla.1987), held that a physician stated a valid claim for tortious interference where he alleged that the defendant hospital wrongfully denied him access to laboratories and billing information.

Closely related is the rule in Florida that no liability for tortious interference exists where the defendant acted to protect its own legitimate economic interests. *Genet Co. v. Anheuser-Busch, Inc.,* 498 So.2d 683, 684 (Fla. 3d DCA 1986). "So long as improper means are not employed, activities taken to safeguard or promote one's own financial and contractual interests are entirely non-actionable." *Ethyl Corp. v. Balter,* 386 So.2d 1220, 1224-25 (Fla. 3d DCA 1980) *review denied* 392 So.2d 1271 (Fla.), *cert. denied,* 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981).

### 1. Sacred Heart

Sacred Heart contends that it did not directly interfere with plaintiff's practice, but even if it did interfere directly, it did so for legitimate business reasons. I agree. Sacred Heart correctly points out that, in Florida, no tortious liability interference exists where the defendant acted to protect its own legitimate economic interests. Insofar as plaintiff's claim relates to the needle placement controversy, I already have determined that Sacred Heart's conduct was consistent with the maintenance of quality care, and was in the best interests of its patients. Any effect on plaintiff's practice, therefore, was incidental. Further, there seems to be no reason in the record to

require Sacred Heart to change its policy in order to accommodate the plaintiff as a competitor.

The same is true for the contractual agreements between Sacred Heart and various physicians. As previously discussed, the record does not support the plaintiff's allegations regarding referrals. Even assuming that these contracts in fact lead to a decrease in referrals from these doctors, there is nothing to support plaintiff's contention that the interference was intentional. Each contract promoted Sacred Heart's legitimate business interests, and each physician gained a concomitant business benefit. Any decrease in referrals was incidental, and therefore, not actionable. For these reasons, Sacred Heart's motion for summary judgment on Count IV is GRANTED.

### 2. PRC and Dr. Post

**\*52** The only evidence supporting plaintiff's tortious interference claim against Dr. Post and PRC is the fact that Dr. Post tried to convince Dr. Murphy to refer his patients to Sacred Heart's radiology department by appealing to Dr. Murphy's sense of loyalty to the hospital. This conduct simply is not tortious. Competitors have a right to attract patronage by lobbying potential customers for their business. That is the essence of competition. Such conduct becomes actionable only when the competitor uses improper means. *See, e.g., Ad-Vantage Telephone, supra,* 849 F.2d at 1348-49 (defendant contacted customers of plaintiff, improperly imposing additional burdens on them if they continued to deal with plaintiff); *Manufacturing Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037 (11th Cir.1982) (defendant contacted customers and employees of plaintiff with false information, which constituted direct interference); *Insurance Field Servs., Inc. v. White & White Inspection & Audit Servs., Inc.,* 384 So.2d 303 (Fla. 5th DCA 1980) (direct tortious interference found where defendants contacted plaintiff's customers to solicit their business in a wrongful manner).

In this case there is no evidence that Dr. Post did anything but talk to Dr. Murphy. There is also no evidence that PRC or Dr. Post had any ability to affect Dr. Murphy's practice. Finally, Dr. Murphy himself testified that Dr. Post's efforts were unsuccessful and that he continued to refer patients to plaintiff. Accordingly, the motion of Dr. Post and PRC for summary judgment on plaintiff's tortious interference claim is GRANTED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 36
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

3. Dismissal of State Law Claims

In the alternative, I also conclude that the state law claims against these defendants should be, and are DISMISSED, without prejudice, in the absence of any viable federal claims and as a matter of comity. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218, 228 (1966).

III. CONCLUSION

In sum, I conclude that, after a thorough review of the voluminous evidentiary record, there are no genuine issues of material fact remaining in this case and that the defendants are entitled to summary judgment on all claims. The defendants' motions are GRANTED, and the Clerk shall enter judgment in their favor and against the plaintiff on all claims, together with taxable costs.

FN1. Since Dr. Williamson is the sole owner of Pensacola Diagnostic, I will frequently refer to both as "the plaintiff" for brevity purposes. As a practical matter, their interests are identical.

FN2. Defendants claim that plaintiff's patient logs show that, from 1984 and 1989, only 7% to 15% of Pensacola Diagnostic's business consisted of "self-referrals", i.e. patients who come directly to plaintiff for breast care. In such case, plaintiff would perform diagnostic functions, and then would refer the patient to a physician or surgeon if further care was necessary. Plaintiff claims that self-referrals accounted for approximately half of her business.

FN3. At least one of these patients was a "self-referral" for whom Dr. Williamson was acting as the "primary care" physician. Accordingly, she referred the patient to a surgeon who then admitted the patient to Baptist. Since receiving her privileges at Baptist, Dr. Williamson has not attempted to admit any patients there. Nor has she ever admitted any patient to any hospital where she has privileges.

FN4. Pensacola and the bordering communities of Cantonment, Gulf Breeze and Milton account for 82% of Sacred Heart's patients.

FN5. Defendant Albert A. Post, M.D. is a radiologist and a shareholder in PRC. He also is chairman of Sacred Heart's radiology department. Dr. Post's partners in PRC, S. Randall Hobgood, M.D., William R. Balchunas, M.D., and Anthony J. DeRaimo, M.D., all were originally named as defendants in plaintiff's complaint. They all have been dismissed with prejudice by stipulation of the plaintiffs. (Doc. 284).

FN6. S. Randall Hobgood, M.D., another of PRC's physician partners, expressed similar concerns to Dr. Whitcomb.

FN7. Indeed, given the wording of the bylaws, it is doubtful whether Dr. Whitcomb had authority to process the application.

FN8. PRC and Dr. Post correctly point out that Dr. Williamson's description of her conversation with Ms. Beem is inadmissible hearsay as to them. However, PRC and Dr. Post have based their motion in part on the deposition testimony of Dr. Whitcomb in which he admits both that his office was in contact with Dr. Williamson during this time period, and that Ms. Beem did have a conversation with Dr. Williamson, the substance of which was substantially as alleged by plaintiffs. Thus, I reiterate that the fact of the phone call and the essentials of its content are not in dispute as to either Sacred Heart or PRC and Dr. Post. The *only* dispute over the conversation relates to interpretation of Ms. Beem's statement that Dr. Williamson "did not need privileges". Oddly, Dr. Williamson has submitted an excerpt of Ms. Beem's deposition testimony, in which she confirms Sacred Heart's interpretation of the conversation, i.e. Ms. Beem told Dr. Williamson she would not need privileges because the radiology department would extend her the courtesy of visiting her patients and viewing their films.

FN9. In the original order, I determined that this conversation was hearsay. However, upon further reflection, it appears to be an adopted admission under Federal Rule of Evidence 801(d)(2)(B), and if so, not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 37
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

hearsay.

FN10. Though Sacred Heart has attached to its motion for summary judgment the minutes of other Executive Committee meetings in which plaintiff's application was discussed, the minutes of this meeting are absent.

FN11. Dr. Williamson claims that, at this time, independent radiologist Thomas Brown, M.D. had privileges at Sacred Heart even though he was not then a member of PRC. Sacred Heart points out, however, that, at one time, Dr. Brown was associated with PRC. After he severed this relationship, Dr. Brown did remain a member of the Sacred Heart staff, but was not permitted to furnish radiology services or exercise clinical privileges. Dr. Brown resigned from the staff in December 1985, and has not had staff privileges since then.

FN12. Only the Board of Directors can grant staff membership and privileges. Under the normal procedure, an application for medical staff privileges is reviewed first by the Credentials Committee. After examining the applicants qualifications and receiving input from the relevant medical department, the Credentials Committee makes findings as to the applicant's qualifications and recommends either approval or denial. It then passes the application on to the Executive Committee of the Medical and Dental Staff for review. After making its own recommendation, the Executive Committee passes the application on to the Board of Directors of Sacred Heart Hospital for final action.

FN13. In addition to matters of general concern, the Bylaws of the Medical and Dental Staff of Sacred Heart Hospital contain the Rules and Regulations for each medical department within the hospital. The delineation of privileges for a particular department is listed within the "Rules and Regulations" pertaining to that department. Subject to the approval of the Bylaws Committee, the Executive Committee, the General Staff and the Board of Directors, each department has the power to adopt its own Rules and Regulations.

FN14. Amending the bylaws to incorporate the rules changes was a four-step process. First, the department changing its rules drafts a proposed rule. The Bylaws Committee then reviews the proposed rule and makes any changes it deems appropriate. Next the proposed rule goes before the Executive Committee for input from the administration. If the Executive Committee makes any changes, the proposed rule goes back to the department for review, and the process starts over. Once the Executive Committee approves the rule, the general staff votes on it. Finally, if the general staff approves the change, it is submitted to the Board of Directors for final approval and incorporation into the bylaws.

FN15. Both definitions appeared in the minutes of an October 23, 1984, Department of Internal Medicine monthly meeting and remained unchanged throughout the amendment process.

FN16. This wording does appear in a copy of the bylaws plaintiff has submitted in support of her opposition to defendants' original motions for summary judgment. (*See* App. III to plaintiff's opposition at p. 213-14). This copy is dated March 1985. Another copy of the bylaws bearing the same date, and also submitted by the plaintiff, does not include the words "primary care" before "medically oriented specialty". (*See Id.* at 158-59).

FN17. Dr. Williamson also had completed a three year residency in diagnostic radiology. During that residency, she rotated through the different sections of diagnostic radiology including angiography and interventional radiology. During these rotations, Dr. Williamson visited patients prior to performing the necessary procedures, and discussed with them the procedures and the associated risks. She issued premedication orders and post procedure orders on these patients including antiocoagulant or other medications required for the procedures. Most of the patients with whom Dr. Williamson dealt during her residency were referred to radiology for specific procedures by the admitting physician. However, in those cases where patients were admitted to the hospital by the radiology staff, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 38
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

residents participated in taking medical histories and administering physical exams.

FN18. None of the radiologists sits on the Credentials Committee.

FN19. Pensacola and the bordering communities of Cantonment, Gulf Breeze, and Milton account for 88.88% of Baptist's patients.

FN20. As described more fully below, at one time radiologists performed fetal ultrasound. Gradually, responsibility for performing the procedure shifted to obstetricians and perinatologists. This is now the standard practice.

FN21. In their depositions, Wiley Howard Cooper, M.D. and William R. Bender, M.D., both of whom are principals in Radiology Associates, stated that the P.A. had no objection to Dr. Williamson obtaining staff membership at Baptist as long as she did not practice diagnostic radiology at the hospital. According to Drs. Cooper and Bender, both John Robbins, Baptist's chief administrator, and Spencer Mitchum, the hospital's attorney, told the physicians of Radiology Associates that the hospital considered the issue of medical staff membership separate from the issue of privileges.

FN22. In her memorandum, plaintiff consistently mischaracterizes the nature of this policy, relying on a statement by counsel for Baptist at the deposition of Wiley Howard Cooper, M.D. to the effect that the Board of Directors had adopted a policy of keeping the issue of privileges separate from the issue of exclusive contracts. Plaintiff argues that Baptist had a policy that would have allowed the Executive Committee to grant limited privileges in the Department of Radiology so long as she promised not to practice diagnostic radiology at the hospital.
The plain language of plaintiff's own evidence belies this interpretation. First, the Medical Staff Bylaws make no provisions for such partial privileges. Second, the minutes of the June 4 Executive Committee meeting clearly show that it was willing to grant Dr. Williamson privileges in a manner that was consistent with both the

Bylaws and the exclusive contract. As discussed in the text, it subsequently wrote her a letter inviting her to explain her qualifications in an area not covered by the exclusive contract.

FN23. The remaining included minimum credentialling criteria required that applicants:
(1) shall at all times be licensed to practice allopathic or osteopathic medicine within the State of Florida;

(3) shall not have been denied membership in the American Medical Association or any state or county medical association or society;
(4) shall at all times be and have been in compliance with the Current Opinions of the Judicial Council of the American Medical Association;
(5) shall have made no act or omission which tends to disrupt the operation of the business of [Health First] or any Physician Provider;
(6) shall at all times maintain professional malpractice liability insurance satisfactory to the Board; and,
(7) shall be in compliance with all provisions of these Medical Staff Bylaws, the Bylaws of [Health First], any applicable Physician Provider Agreement, and any other rules, regulations, policies and procedures of the Staff or [Health First].

FN24. The new credentialling criteria provided that an applicant
(2) shall have been granted or shall be actively seeking or making progress toward obtaining, permanent admitting or clinical privileges or other major privileges, without supervision, by at least one Participating Hospital (*which must be an affiliated hospital if the Applicant practices primarily within the central portion of the service area*), and shall not have had any such privileges suspended, revoked, or otherwise terminated at any hospital anywhere ...
A "participating hospital" still was defined as a "Participating Provider that is a hospital," and included the newly recruited hospitals. However, "Affiliated Hospital" means
Sacred Heart Hospital or Baptist Hospital of Pensacola, Florida, or any other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 39
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Participating Hospital ... directly or indirectly associated by ownership or control with Gulf Coast Diversified, Inc. or Mobile Diagnostics, Inc., which are the two hospital related Florida corporations that are stockholders in Health Options of Pensacola, Inc.

"Central portion of the service area" is not defined in the bylaws, but it is undisputed that the term refers to the greater Pensacola area, including Escambia, Santa Rosa, Okaloosa Counties, along with parts of Walton County, Florida.

FN25. Defendant Keith Shearlock, M.D. is a nephrologist (a kidney specialist). It is undisputed that Dr. Shearlock does not compete with Dr. Williamson, and that, as a nephrologist, he would not refer patients to a radiologist such as Dr. Williamson.

FN26. Plaintiff's clinic operated on a regular "9 to 5" type business schedule, and Dr. Williamson did not work nights or weekends. In addition, plaintiff's own figures show that association with PRC would have resulted in a decrease in her income.

FN27. Obviously, if Sacred Heart had pursued both options, it would have ended up competing with itself.

FN28. Section 4.6 of Bylaws, Rules and Regulations of the Medical and Dental Staff of Sacred Heart Hospital provide: "The Board [of Directors] may waive any qualification when in its discretion such waiver will serve the best interests of patient care in the hospital."

FN29. Defendants argue that Dr. Murphy's statements before the FTC are inadmissible hearsay. Actually, Dr. Murphy's statements may include hearsay within hearsay: The FTC testimony involves not only Dr. Murphy's own statements, but also Hardman's statements to Dr. Murphy. In the case of double hearsay, both levels of hearsay must fall within exception to the hearsay rule, or the entire statement is inadmissible. Dr. Murphy is now deceased. Plaintiff seems to be contending that these statements are within one of the exceptions to the hearsay rule, but that cannot be

determined at this point.

FN30. These figures were complied by Sacred Heart from Dr. Williamson's patient logs. Instances where two physicians names were listed as referral sources have been counted as half referrals to each doctor.

FN31. Gulf Coast Medical Arts Center is a group of several practices that pooled their resources to build an office complex. Sacred Heart is not associated with Gulf Coast Medical Arts Center.

FN32. Drs. Belk and Irvin do not contend that there was any problem with Dr. Williamson's quality of care.

FN33. As discussed above, defendants' numbers do not differentiate between new referrals and repeat visits by old referrals.

FN34. Dr. Williamson's clinic is adjacent to the Sacred Heart Hospital grounds, and is no farther from the surgi-center, which is free-standing, than the Sacred Heart radiology department.

FN35. As a matter of standard procedure, specimens entering or leaving the Pathology Department are transported by courier. However, on occasion, a patient or a doctor may bring a sample directly to the department for analysis. Sacred Heart employed its own couriers to transport specimens between different locations within the Sacred Heart complex.

FN36. Federal Rule of Civil Procedure 26(b)(4) provides:
(4) *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)((1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 40
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

grounds for each opinion.

FN37. Not all of the actions alleged to have been taken by the defendants necessarily qualify as "professional review actions." For example, the alleged actions taken to divert referrals from plaintiff to defendants do not so qualify. Thus, even if the HCQIA acted to bar liability for the denial of privileges, antitrust liability in theory still could exist with respect to such non-qualifying activities.

FN38. Of course, plaintiffs argue that the treatment itself was evidence of a conspiracy. I address this issue below. Right now I am only dealing with plaintiff's argument that her treatment was anomalous, and therefore, evidence of pretext. The evidence shows that, with respect to Dr. Brown, it was not.

FN39. I note that plaintiff never uses the term "coercive reciprocal agreement" in her pleadings or opposition to defendants' several motions.

FN40. The wording of Dr. Antonelli's contract is slightly different, and reads "to the extent feasible, and in accordance with acceptable medical practice, and unless patient choice dictates otherwise."

FN41. Although it is not a part of the record, the affidavit of plaintiff's own expert establishes, by way of comparison, that Sacred Heart has only 28.3% of patient days, while Baptist and West Florida have 29.8% and 31.4%, respectively. Similarly, Sacred Heart has only 21.6% of the available beds, while Baptist and West Florida have 28.9% and 30.4%. Finally, Sacred Heart has 35.8% of the admissions, while Baptist and West Florida have 24.6% and 27.6%, respectively.

FN42. These figures in the record are based on revenues from procedures encompassed by plaintiff's specialty and were compiled by plaintiff's expert. The data omits figures for the privately-owned West Florida Regional Medical Center, an H.C.A. hospital, which is the major competitor of both Sacred Heart and Baptist, as well as the two other Pensacola hospitals, Navy and (at that time)

University.

FN43. Plaintiff's claim that the 1985 amendments were adopted for the specific purpose of excluding her from membership is without merit. Plaintiff did not obtain privileges at any of the outlying hospitals until 1987. Unless Health First's Board members could foretell the future, they would have no way of knowing that their actions would impact any particular individual. Additionally, I note that plaintiff was ineligible under both the original and amended version of the bylaws.

FN44. I emphasize that I am not dealing here with the conspiracy alleged by plaintiff. I already have determined that there was no conspiracy. Rather, I am looking at the fundamental structure of the HMO itself.

FN45. Defendants merely assert that plaintiff has failed to present evidence establishing the relevant geographic market. It is undisputed that over 80% of Health Options subscribers live within the greater Pensacola area. In addition, over 80% of Baptist's and Sacred Heart's patients reside in this geographic area.

FN46. As discussed above, the product dimension of the relevant market is "determined by the availability of substitutes to which consumers can turn in response to price increases and other existing or potential producer's ability to expand output." *L.A. Draper, supra,* 735 F.2d at 423.

FN47. In a PPO, members are permitted to choose any physician or treatment facility they please. The insurer then reimburses the provider for a fixed amount per service or for a fixed percentage of the fee for the service. The provider then bills the subscriber for any outstanding balance. Many PPOs also have a deductible that the subscriber must pay out of his own pocket before he is eligible for reimbursement.

N.D.Fla.,1993.
Williamson v. Sacred Heart Hosp. of Pensacola
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 41
Not Reported in F.Supp., 1993 WL 543002 (N.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

• 3:89cv30084 (Docket) (Mar. 29, 1989)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.