Westlaw.

161 F.3d 3                                                                                                                                                                 Page 1
161 F.3d 3, 1998 WL 610648 (C.A.4 (Va.)), 1998-2 Trade Cases P 72,247
**(Cite as: 161 F.3d 3)**

Briefs and Other Related Documents

NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
SUPERMARKET OF MARLINTON, INCORPORATED, Plaintiff-Appellant,
v.
VALLEY RICH DAIRY; Flav-o-rich, Incorporated; The Valley Of Virginia Cooperative Milk Producers Association, Defendants-Appellees,
andMEADOW GOLD DAIRIES, INCORPORATED; Borden, Incorporated, Defendants.
John MILES, formerly doing business as Central Market; Ruth C. Miles, formerly doing business as Central Market, Plaintiffs-Appellants,
v.
VALLEY RICH DAIRY; Flav-o-rich, Incorporated; The Valley Of Virginia Cooperative Milk Producers Association, Defendants-Appellees,
andMEADOW GOLD DAIRIES, INCORPORATED; Borden, Incorporated, Defendants.
**Nos. 97-2314, 97-2315.**

Argued: May 7, 1998.
Decided: Aug. 27, 1998.

Appeals from the United States District Court for the Western District of Virginia, at Roanoke. Jackson L. Kiser, Senior District Judge. (CA-93-968-R, CA-96-407-R)

ARGUED: Charles Leonard Egan, FORT & SCHLEFER, L.L.P., Washington, D.C., for Appellants. Michael Francis Urbanski, WOODS, ROGERS & HAZLEGROVE, P.L.C., Roanoke, Virginia, for Appellees.
ON BRIEF: William C. Buckhold, FORT & SCHLEFER, L.L.P., Washington, D.C., for Appellants. Francis H. Casola, WOODS, ROGERS & HAZLEGROVE, P.L.C., Roanoke, Virginia; William H. Cleaveland, RIDER, THOMAS, CLEAVELAND, FERRIS & EAKIN, P.C., Roanoke, Virginia, for Appellees.

Before MICHAEL and MOTZ, Circuit Judges, and TRAXLER, United States District Judge for the District of South Carolina, sitting by designation.

OPINION
PER CURIAM.
**\*1** Supermarket of Marlinton, Inc. ("Marlinton") and the owners of Central Market ("Central Market") filed class actions against several large dairy companies, seeking treble damages for alleged violations of federal antitrust laws. Specifically, the grocery stores claimed that the dairy companies conspired to suppress competition by fixing, raising, and maintaining the price of milk at artificially high levels in violation of the Sherman Act. *See* 15 U.S.C.A. § 1 (West 1997). Marlinton and Central Market appeal the district court's order granting summary judgment to the dairy companies on the ground that they failed to produce sufficient evidence of injury in fact, and, therefore, lacked antitrust standing. We affirm.

I.

Marlinton and Central Market are two grocery stores located in southeastern West Virginia and southwestern Virginia, respectively. They instituted these private antitrust actions in the wake of a 1992 Department of Justice investigation into the milk industry, which led to the indictment of Valley Rich Dairy ("Valley Rich"), Meadow Gold Dairies, Inc. ("Meadow Gold"), Borden, Inc. ("Borden"), and three Meadow Gold officials on charges that they had rigged school milk bids. The dairy companies pled guilty while the Meadow Gold officials proceeded to trial.

During the trial of the Meadow Gold officials, Paul French ("French"), the former General Manager of Valley Rich, testified under a grant of use immunity that he had engaged in various pricefixing activities with officials from Meadow Gold, a competitor in portions of Virginia and West Virginia. More specifically, French testified about meetings in which he and the Meadow Gold officials conspired to fix school milk bids and wholesale milk prices. He stated that these meetings were in person, prearranged, and conducted at locations away from his office. French further testified that he filled out his expense

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

accounts in such a manner as to conceal these meetings. The trial resulted in a hung jury and the Government did not reprosecute the case. French's testimony, however, became the basis for the present actions against the dairies.

In 1993, Marlinton filed a class action [FN1] against Meadow Gold, Borden, Valley Rich, Flav-O-Rich, Inc. ("Flav-O-Rich"), and Valley of Virginia Co-Operative Milk Producers Association ("Valley of Virginia"), [FN2] alleging that between 1984 and 1987 the dairies had conspired to fix the price of milk sold in the wholesale market where Marlinton conducted business. The district court granted the dairies' motion for summary judgment on the ground that the applicable statute of limitations barred Marlinton's claim. [FN3] We reversed that ruling in *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,* [FN4] holding that the district court had employed an incorrect standard for the tolling of the statute of limitations under the fraudulent concealment doctrine. In addition, we recognized that on remand the district court would have to resolve the question of whether Marlinton had antitrust standing, an issue that the parties had not yet fully briefed. [FN5] In April 1996, Marlinton's attorney filed an identical suit on behalf of John and Ruth Miles, who owned and operated Central Market during the period of the alleged conspiracy. The district court consolidated these cases for discovery purposes. Thereafter, in April 1997, the grocery stores deposed French, who by then claimed to have a poor recollection of his price-fixing discussions with Meadow Gold officials. However, French did testify that his discussions with Meadow Gold officials had "no application" when: (1) Valley Rich faced competition from a third dairy competitor; (2) one of Valley Rich's partners, such as Flav-O-Rich, controlled the account; (3) there was guaranteed pricing; (4) the milk was sold to a customer under a private label; or (5) the milk was purchased from a distributor to whom Valley Rich sold milk.

> FN1. Marlinton purported to represent a class of similarly situated commercial milk purchasers in western Virginia and a portion of southeastern West Virginia.
>
> FN2. During the relevant period, Flav-O-Rich and Valley of Virginia were joint venture partners of Valley Rich.
>
> FN3. See *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,* 874 F.Supp. 721 (W.D.Va.1994).
>
> FN4. 71 F.3d 119 (4th Cir.1995).
>
> FN5. On remand, the dairies renewed their motion for summary judgment, arguing that the action was both time-barred and that Marlinton lacked antitrust standing to bring suit because it could not prove that it purchased a price-fixed product from any of the dairies during the relevant period. The district court denied that motion.

**\*2** Two developments relevant to this appeal occurred after French's deposition. First, the district court approved a classwide settlement between the grocery stores and Meadow Gold and Borden in the amount of $100,000. Therefore, in the present appeal, Valley Rich, Flav-O-Rich, and Valley of Virginia are the only defendants remaining in the case. Second, the non-settling dairies once again moved for summary judgment, arguing that the grocery stores lacked antitrust standing because the grocery stores could not prove that they were injured by the price-fixing conspiracy. Although Marlinton and Central Market could show that a price-fixing conspiracy existed in the general geographic areas where they conducted business, the district court held they could not demonstrate that the products they purchased from the dairies were a subject of that conspiracy, *i.e.,* Marlinton and Central Market failed to produce sufficient evidence of injury in fact. Therefore, the district court found that Marlinton and Central Market lacked antitrust standing, and granted the dairies' motion for summary judgment. This appeal followed.

II.

We review the district court's grant of summary judgment *de novo.* [FN6] Although permissible inferences from the underlying facts are to be drawn in the light most favorable to the non-moving party, we have noted that, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." [FN7] Section 4 of the Clayton Act (" § 4"), which authorizes private actions for treble damages, provides in pertinent part that, "*any* person who shall be injured in his business or property by reason of *anything* forbidden in the antitrust laws may sue...." [FN8] The Supreme Court has recognized that "[a] literal reading of the statute is broad enough to encompass every harm that can be attributed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

directly or indirectly to the consequences of an antitrust violation." [FN9] For this reason, "[t]he federal courts ... have not interpreted section 4 as expansively as its literal language suggests." [FN10] Rather, "[t]he voluminous case law on [antitrust] standing to sue under section four reflects an effort by the federal courts to narrow the scope of the broad statutory language so as to prevent unfair and oppressive results." [FN11] "Judicial limitation of the § 4 remedy ... has proven to be less than an empirical judicial science." [FN12] "The Supreme Court, along with the lower federal courts, has long struggled to develop a precise test to determine whether a particular plaintiff is the proper party to bring an antitrust suit under section 4 of the Clayton Act; in truth, '[t]he issue of antitrust standing has become somewhat confused.' " [FN13]

FN6. See *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994).

FN7. *Thompson Everett, Inc. v. National Cable Adver., L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995) (citation omitted).

FN8. 15 U.S.C.A. § 15(a) (West 1997) (emphasis added).

FN9. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 529, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

FN10. *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1448 (11th Cir.1991).

FN11. *Midwest Communications, Inc. v. Minnesota Twins, Inc.,* 779 F.2d 444, 450 (8th Cir.1985).

FN12. *Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1081 (6th Cir.1983).

FN13. *Todorov,* 921 F.2d at 1449 (footnote omitted) (quoting *Local Beauty Supply, Inc. v. Lamaur, Inc.,* 787 F.2d 1197, 1201 (7th Cir.1986)). In *Associated General,* 459 U.S. at 535-36, the Supreme Court likened the struggle of federal judges to fashion a precise test to determine antitrust standing to "the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause.' "

Although federal courts have not developed a single precise test for determining antitrust standing, they have gradually begun to conduct § 4 analysis in a uniform manner. [FN14] In particular, courts have recognized that an antitrust standing analysis should begin by examining the plaintiff's alleged injury. As the Eighth Circuit has noted, in determining "whether a plaintiff has standing to sue under the antitrust laws, the threshold inquiry must focus on the plaintiff's alleged injury. This inquiry is potentially dispositive: if there is no showing of injury ... the plaintiff does not have a claim cognizable under the antitrust laws." [FN15] Indeed, we have noted that injury is the "crux" of every private antitrust action. [FN16] This threshold showing of injury, sometimes labeled injury in fact, [FN17] is satisfied if the plaintiff can produce sufficient evidence of an injury "proximately caused by the defendants' conduct." [FN18] However, the Supreme Court has held that the showing of an injury causally linked to a defendant's alleged illegal conduct, by itself, is insufficient to maintain an action for treble damages. [FN19] Rather, in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* [FN20] the Court held that an antitrust plaintiff must show that the alleged injury is an "antitrust injury," which it defined as:

FN14. See *Sports Racing Serv., Inc. v. Sports Car Club of Am., Inc.,* 131 F.3d 874, 882 (10th Cir.1997) (stating that "[t]o maintain standing to bring an antitrust claim under § 4 ... a plaintiff must show (1) an 'antitrust injury;' and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws"); *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir.1997) (antitrust standing exists only if plaintiff shows: (1) injury in fact; (2) antitrust injury; and (3) proper plaintiff status, "which assures that other parties are not better situated to bring suit"); *Barton & Pittinos, Inc. v. Smithkline Beecham Corp.,* 118 F.3d 178, 182 (3d Cir.1997) (explaining that antitrust standing requires a showing of antitrust injury and proper plaintiff status); *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 596-97 (7th Cir.1995) ("[i]n order to maintain an antitrust action, plaintiffs must establish that they (1) have suffered an antitrust injury and (2) are proper plaintiffs to maintain an antitrust action....");

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Balaklaw v. Lovell,* 14 F.3d 793, 797 n. 9 (2d Cir.1994) (noting that courts have developed a two-pronged test for determining antitrust standing: (1) whether the plaintiff suffered an antitrust injury; and (2) an analysis of other factors "largely relating to the directness and identifiability of the plaintiff's injury"); *Todorov,* 921 F.2d at 1449 (prescribing a twopronged test for determining antitrust standing: (1) whether the plaintiff has suffered an antitrust injury; and (2) whether the plaintiff is an "efficient enforcer" of the antitrust laws); *Adams v. Pan Am. World Airways, Inc.,* 828 F.2d 24, 26 (D.C.Cir.1987) (stating that the plaintiff must show: (1) antitrust injury; and (2) proper plaintiff status).

FN15. *Midwest Communications,* 779 F.2d at 450 (footnote omitted). *See also Amarel v. Connell,* 102 F.3d 1494, 1507 (9th Cir.1997) (stating that "the nature of the plaintiff's alleged injury is of 'tremendous significance' in determining whether a plaintiff has antitrust standing") (quoting *Bhan v. NME Hosp., Inc.,* 772 F.2d 1467, 1470 n. 3 (9th Cir.1985)); 2 Phillip E. Areeda & Hebert Hovenkamp, *Antitrust Law* ¶ 363a, at 219 (rev. ed.1995) (stating that "all courts demand a showing of injury-infact 'caused' by an antitrust violation").

FN16. *See Windham v. American Brands, Inc.,* 565 F.2d 59, 66 (4th Cir.1977).

FN17. *See* Areeda & Hovenkamp,*supra,* ¶ 360e, at 201 (stating that "we usually speak of 'causation' or 'injury-in-fact' when focusing on the presence or absence of actual injury caused by an alleged antitrust violation").

We recognize that a majority of courts begin their antitrust standing analysis by determining whether a plaintiff has suffered an "antitrust injury." We see no substantive difference between those courts which look first to whether the plaintiff has produced sufficient evidence of injury in fact and those which begin by examining whether the plaintiff has suffered an "antitrust injury." "The key point is that a plaintiff is generally denied relief unless he proves each element[for standing]. The Supreme Court has made this clear in requiring a plaintiff to establish both proximately caused injury-in- fact and antitrust injury as 'essential' elements of the plaintiff's case." *Id.,*¶ 360e, at 200 (citing *Associated General,* 459 U.S. at 539, 542-44; *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478-79, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)).

We do note, however, that there is a distinction between the two concepts. On several occasions, the Supreme Court has declined to "equate injury in fact with antitrust injury ... [for] not every loss stemming from a[n] [antitrust] violation counts as antitrust injury." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 339 n. 8, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (noting that the Court declined to adopt such an approach in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), and *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)). *See also* Areeda & Hovenkamp, *supra,* ¶ 360e, at 201 n. 53 (stating that "injury-in-fact is never defined to include antitrust injury").

FN18. *Doctor's Hosp.,* 123 F.3d at 305. *See also* Areeda & Hovenkamp, *supra,* ¶ 360e, at 201 (stating that "[c]ausation, or injury-in-fact, requires a showing that the injury of which the plaintiff complains actually resulted from those acts of the defendant that violated the antitrust laws"); M. Sean Royall, *Disaggregation of Antitrust Damages,* 65 Antitrust L.J. 311, 315 (1997) (noting that "in order to establish the fact of injury, an antitrust plaintiff must demonstrate that it suffered 'some damage' as a causal result of the defendant's violation") (footnote omitted).

As courts and commentators have observed, antitrust standing involves more than the constitutional standing requirement of "case or controversy." "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated General,* 459 U.S. at 535 n. 31; *see also Todorov,* 921 F.2d at 1448 (stating that antitrust standing involves more than the constitutional "case or controversy" requirement).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN19. See Brunswick, 429 U.S. at 489.

FN20. 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

***3** injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause." [FN21] The purpose of such a requirement is two-fold: "It ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws ... and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief." [FN22] We recently applied *Brunswick* 's "antitrust injury" requirement in *Thompson Everett, Inc. v. National Cable Advertising, L.P.,* [FN23] and concluded that the plaintiff, "if injured at all, had not been injured by anything forbidden by the antitrust laws." [FN24] If a would-be antitrust claimant produces sufficient evidence of "antitrust injury," the standing analysis continues. In *Cargill, Inc. v. Monfort, Inc.,* [FN25] the Supreme Court stated that, "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons." [FN26] Identifying who is a "proper plaintiff" under § 4 involves an analysis of "other factors in addition to antitrust injury." [FN27] These factors help determine whether a plaintiff is an efficient enforcer of the antitrust laws, and helps "exclude as plaintiffs those whose suits might 'undermine[ ] the effectiveness of treble-damages suits.' " [FN28]

FN21. Brunswick, 429 U.S. at 489 (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 124, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)).

FN22. Atlantic Richfield, 495 U.S. at 342 (discussing purpose of the "antitrust injury" requirement).

FN23. 57 F.3d 1317 (4th Cir.1995).

FN24. See Thompson Everett, 57 F.3d at 1320. In *Thompson Everett,* we stated that, "[a] private person may not ... recover damages simply by establishing that his injury was causally linked to an illegal presence in the market. Rather, the damages sought must flow from *that conduct* which is proscribed by the antitrust laws." *Id.* at 1325 (citations and internal quotation marks omitted).

FN25. 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

FN26. Cargill, 479 U.S. at 110 n. 5.

FN27. Id. at 111 n. 6 (citing Associated General, 459 U.S. at 544-45;Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)).

FN28. Adams, 828 F.2d at 26 (quoting Associated General, 459 U.S. at 545).

In *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* [FN29] we identified certain factors, enunciated by the Supreme Court in *Blue Shield of Virginia v. McCready* [FN30] and *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* [FN31] which are "designed in combination to put principled limits on the literally unbounded reach of the threefold damage remedy authorized by § 4 of the Clayton Act." [FN32] These factors, which are to be assessed on a case-by-case basis, include:

FN29. 828 F.2d 211 (4th Cir.1987).

FN30. 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).

FN31. 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

FN32. Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211, 219 (4th Cir.1987).

the risk of duplicative recovery by multiple antitrust claimants; the extent to which the claim is based upon speculative, abstract, or impractical measures of damages; the causal connection between the alleged violation and the harm suffered; and the relationship of the injury alleged to the forms of injury about which Congress was concerned when it created a private remedy. [FN33]

FN33. *Id.* (citations omitted).

In the instant case, the district court determined that Marlinton and Central Market lacked antitrust standing because they failed to produce sufficient evidence that they purchased products affected by the alleged price-fixing conspiracy, *i.e.,* they failed to produce sufficient evidence of injury in fact. Based on the following, we affirm. [FN34]

> FN34. Because we agree that Marlinton and Central Market have failed to satisfy the threshold requirement of demonstrating injury in fact, we need not address whether they produced sufficient evidence of "antitrust injury" and whether they are considered "proper plaintiffs" under § 4.

III.

**\*4** Marlinton and Central Market base their claims entirely upon French's testimony. They contend that French's testimony demonstrates that between 1984 and 1987 Valley Rich and Meadow Gold agreed on joint responses to changes in the regulated cost of raw milk in the geographic areas where the grocery stores conducted business, in violation of the Sherman Act. *See* 15 U.S.C.A. § 1. [FN35]

> FN35. Section 1 of the Sherman Act provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C.A. § 1 (West 1997).

In support of their argument, the grocery stores point specifically to the agreement that whenever there was a significant change in the price of raw milk, French and Meadow Gold officials would meet to decide on the timing and amount of published price changes of key items, such as gallons, half-gallons, quarts, and pints of milk. Marlinton and Central Market claim that they purchased milk affected by these price changes. Therefore, the injury they assert is the increase in prices that they and others paid over the price that would have been charged in a competitive market.

A.

Central Market claims to have direct evidence that beginning in December 1986 it purchased milk affected by the alleged price-fixing conspiracy. On September 1, 1986, the regulated cost of raw milk in the relevant portions of southern West Virginia and southwestern Virginia rose $.60 per hundred weight. French testified that he and a Meadow Gold official agreed on a joint response to this increase. At the time of this joint response, Central Market was served by Alexander, Inc. ("Alexander"), one of Valley Rich's distributors. Central Market does not contend that Alexander was a party to this pricefixing agreement, and indeed, French stated in his deposition that his price-fixing discussions with Meadow Gold officials had "no application" when an independent distributor, such as Alexander, controlled the pricing.

However, on December 12, 1986, Valley Rich acquired Alexander, and as a result, Central Market began purchasing milk directly from Valley Rich. Because the regulated cost of raw milk did not change again until 1987, Central Market claims that the milk it began purchasing from Valley Rich in December 1986 was affected by the alleged price-fixing conspiracy. We disagree.

As an initial matter, we will assume for purposes of our analysis that the alleged conspiracy existed through 1987, as Marlinton and Central Market contend. We note, however, that the district court determined that the latest evidence of price-fixing was a discussion between French and a Meadow Gold official concerning the September 1, 1986 regulated price increase of raw milk, and that there was no evidence "of any collusion in prices in 1987." [FN36] Additionally, in analyzing Central Market's claim, the district court found that the evidence was "suggestive of the absence, not presence, of collusion between Valley Rich and Meadow Gold" [FN37] because the price Central Market paid for milk did not change when Valley Rich acquired Alexander.

> FN36. J.A. 354 n.4.
>
> FN37. J.A. 353.

We are mindful that, in order to prevail, "a private plaintiff must establish both that (1) he has standing *and* (2) the defendant has violated the antitrust laws. Once it appears, whether early or late in the litigation, that either requirement is lacking, the suit must be dismissed." [FN38] In the instant case, if there is no evidence that the alleged conspiracy continued to exist in December 1986, then in reality Central

Market's claim fails on its merits. [FN39] However, we limit our discussion to antitrust standing, and in so doing, we will "assume the existence of a violation and then [determine] whether the ... standing elements are shown." [FN40] Applying this test, even assuming the alleged conspiracy existed through 1987, we find that Central Market has not produced sufficient evidence that it purchased price-fixed products.

>   FN38. Areeda & Hovenkamp, *supra,* ¶ 360f, at 202.
>
>   FN39. *See Todorov,* 921 F.2d at 1459 (stating that "[b]ecause we find no conspiracy, [the plaintiff's] section 1 claim must fail").
>   Commentators have stated that, "[a]n increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred." Areeda & Hovenkamp, *supra,*¶ 360f, at 203. *But see Levine v. Central Fla. Med. Affiliates, Inc.* 72 F.3d 1538, 1545 (11th Cir.) (agreeing with Areeda & Hovenkamp and deciding antitrust case on merits rather than standing), *cert. denied,* 519 U.S. 820, 117 S.Ct. 75, 136 L.Ed.2d 34 (1996); *Sicor Ltd. v. Cetus Corp.,* 51 F.3d 848, 855 n. 10 (9th Cir.1995) (deciding not to reach appellants' standing contention because there was no proof of injury to competition); *Todorov,* 921 F.2d at 1455 (addressing the merits of a § 1 claim even though the plaintiff lacked antitrust standing); *McCormack v. NCAA,* 845 F.2d 1338, 1343 (5th Cir.1988) (assuming standing and addressing antitrust claim on its merits).
>
>   FN40. Areeda & Hovenkamp, *supra,* ¶ 360f, at 204.

*5 As noted, Marlinton and Central Market allege that Valley Rich and Meadow Gold agreed on *joint responses* to changes in the regulated cost of raw milk. Such joint responses would have resulted in joint increases or decreases in the dairies' milk prices. However, the pricing data for Central Market during the period it was allegedly injured demonstrates that Valley Rich's and Meadow Gold's prices to Central Market were not mutual. When Valley Rich acquired Alexander's account in December 1986, Valley Rich continued to charge Central Market the same prices as had Alexander. These prices were substantially lower than Meadow Gold's during this time. In addition, while Valley Rich did not change its gallon price for milk sold to Central Market until July 1987, Meadow Gold changed Central Market's gallon price two times during this same period.

Even when there were changes in the regulated cost of raw milk, which the grocery stores contend was the "triggering event" for price increases, "the movement in milk prices charged by Valley Rich and Meadow Gold to Central Market [was] anything but mutual." [FN41] For example, when the regulated cost of raw milk increased effective January 1, 1987, Meadow Gold's gallon price to Central Market increased four cents, while Valley Rich's price did not increase. Similarly, when Meadow Gold, in response to a May 1987 regulated raw milk change, lowered its price on half-gallons and quarts, Valley Rich's prices remained unchanged.

>   FN41. J.A. 353.

As the Supreme Court has stated, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." [FN42] In light of the pricing data, we cannot agree with Central Market's contention that it has produced sufficient evidence that could support an inference that it was injured by its purchases of milk from Valley Rich. Because Central Market has not produced sufficient evidence that it purchased products that were affected by the alleged pricefixing conspiracy, it has failed to satisfy the threshold requirement of demonstrating injury in fact, and therefore, lacks antitrust standing.

>   FN42. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

B.

Both Marlinton and Central Market make the additional argument that they have established a circumstantial evidentiary basis to infer that they were injured by their purchases from Meadow Gold throughout the 1984-87 conspiracy period. Specifically, Marlinton and Central Market contend that French's testimony supports the existence of a general conspiracy whose effect must flow through the pricing system of the two dairies. We disagree.

In his deposition testimony in this case, which focused upon wholesale price fixing by the dairies,

French specifically testified that his discussions had "no application" when: (1) Valley Rich faced competition from a third dairy competitor; (2) one of Valley Rich's partners controlled the account; (3) there was guaranteed pricing; (4) the milk was sold to a customer under a private label; or (5) the milk was purchased from a distributor to whom Valley Rich sold milk. When asked specifically about Marlinton and Central Market, French testified that: (1) his discussions had "no application" to Marlinton because a third dairy, Broughton's Foods, was present in the market during the relevant period and set Marlinton's prices; and (2) his discussions had "no application" to Central Market because Alexander, an independent distributor, controlled Central Market's prices.

**\*6** French's deposition testimony is significant for several reasons. First, it reveals the narrow scope of his price-fixing discussions and the fact that the alleged conspiracy did not have the all-encompassing effects which the grocery stores urge. Second, French's deposition was the first time that he testified in great detail as to the alleged conspiracy to fix prices in the wholesale market, as opposed to the school milk market at issue in the previous criminal proceedings. Finally, French's deposition statements are consistent with his trial testimony that "all bets were off" when a third party competitor was involved.

To reiterate the Supreme Court's instruction-"antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." FN43 Because French's testimony is the grocery stores' only evidence indicating how Meadow Gold handled its pricing, we believe that Marlinton and Central Market have failed to establish a circumstantial evidentiary basis to infer that they were injured by their purchases from Meadow Gold.

FN43. *Matsushita Elec.,* 475 U.S. at 588.

IV.

Based upon the foregoing, we hold that Marlinton and Central Market have failed to produce sufficient evidence that the products they purchased were affected by the alleged price-fixing conspiracy.

As such, they have failed to satisfy the threshold requirement of demonstrating injury in fact, and therefore, lack antitrust standing. Accordingly, the district court's grant of summary judgment in favor of the dairy companies is affirmed.

*AFFIRMED*

C.A.4 (Va.),1998.
Supermarket of Marlinton, Inc. v. Valley Rich Dairy
161 F.3d 3, 1998 WL 610648 (C.A.4 (Va.)), 1998-2 Trade Cases P 72,247

Briefs and Other Related Documents (Back to top)

• 97-2315 (Docket) (Sep. 30, 1997)
• 97-2314 (Docket) (Sep. 29, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.