

198 F.3d 246 Page 1
198 F.3d 246, 1999 WL 1045098 (C.A.6 (Tenn.)), 1999-2 Trade Cases P 72,712
**(Cite as: 198 F.3d 246)**

Briefs and Other Related Documents

NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
PARK AVENUE RADIOLOGY ASSOCIATES, P.C.; Dr. Ian F. Murray; and Dr. Daniel K. Westmoreland, Plaintiffs-Appellants,
v.
METHODIST HEALTH SYSTEMS, INC.; Health Choice, Inc.; Metrocare, Inc.; Memphis Radiological Professional Corp.; and Methodist Hospitals of Memphis, Defendants-Appellees.
**No. 98-5668.**

Nov. 10, 1999.

On Appeal from the United States District Court for the Western District of Tennessee.

Before RYAN, BATCHELDER, and CLAY, Circuit Judges. FN*

> FN* Honorable Alice M. Batchelder recused herself from this case after oral argument was heard.

CLAY, Circuit Judge.

**\*1** Plaintiffs, Dr. Ian Murray, Dr. Daniel Westmorland and their radiology business, Park Avenue Radiology Associates, P.C., appeal from the judgment dismissing Plaintiffs' claim for lack of antitrust standing, in this antitrust action brought against Defendants, Health Choice, Inc., Metrocare, Inc., Methodist Hospitals of Memphis, its parent corporation Methodist Health Systems, Inc., and Memphis Radiological Professional Corporation. For the reasons set forth below, we AFFIRM the judgment of the district court.

BACKGROUND

Plaintiffs provide outpatient radiology services for patients referred to them by primary care physicians in and around Shelby County, Tennessee. Plaintiffs directly compete with Memphis Radiological Professional Corporation ("Memphis") for physician referrals. Memphis is the exclusive provider of radiology services at five hospitals in Shelby County, collectively called the "Methodist Hospitals." All five Methodist Hospitals are owned by Methodist Hospitals of Memphis ("Methodist of Memphis"), a subsidiary of Methodist Health Systems ("Methodist Health" hereinafter referred to collectively with Methodist of Memphis as "Methodist"). A sixth hospital, Crittenden Memorial Hospital in West Memphis, Arkansas, is also affiliated with Methodist.

The physicians with staff privileges at Methodist Hospitals or Crittenden Memorial are members of Metrocare, Inc., a company which negotiates with third-party payors of managed health care programs on behalf of its member physicians. Along with Methodist Health, Metrocare is a member of Health Choice, Inc., which operates a preferred provider organization ("PPO"). Plaintiffs allege that Health Choice contracts with third-party payors -employers, insurance companies, and the like - to make Methodist Health's hospital services and Meterocare's physician services available at discounted rates to hundreds of thousands of beneficiaries in the relevant market group. Plaintiffs also allege that before Metrocare entered into a contract with Health Choice, its physicians referred patients to Plaintiffs, as well as to Memphis for radiology services, but after it entered into the Health Choice contract, Metrocare stopped making referrals to Plaintiffs inasmuch as Health Choice physicians are required to send all Health Choice enrollees, as well as those patients who are not members of Health Choice, to Memphis.

In October of 1992, Plaintiffs filed suit against Defendants alleging that based on their defined relevant market, Defendants' contractual agreements violated § 1 of the Sherman Act, 15 U.S.C. § 1, because the contractual agreements amounted to a group boycott, and exclusive dealing arrangement, a tying arrangement and price fixing. Plaintiffs also alleged a § 2 violation of the Sherman Act, 15 U.S.C. § 2, claiming that the Health Choice defendants possess or conspired to possess monopoly power in the relevant market. Finally, Plaintiffs alleged several state law claims. Defendants filed motions to dismiss or for summary judgment, and the district court - while denying Plaintiffs' Rule 56(f) request for discovery - granted summary judgment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:05-cv-01096-MHT-TFM     Document 28-6     Filed 03/24/2006     Page 2 of 6

198 F.3d 246                                                                                                                            Page 2
198 F.3d 246, 1999 WL 1045098 (C.A.6 (Tenn.)), 1999-2 Trade Cases  P 72,712
**(Cite as: 198 F.3d 246)**

against Plaintiffs on all counts. Plaintiffs appealed the district court's order to this Court and, in January of 1995, this Court reversed the district court's decision. See Park Ave. Radiology Assoc. v. Methodist Health Sys., Inc., No. 93-6458, 1995 WL 16844 (6 th Cir. Jan. 17, 1996) (*per curiam* unpublished table decision). The Court also found the district court abused its discretion when it denied Plaintiffs' Rule 56(f) motion, and remanded the case. *Id.*

**\*2** Upon remand, Plaintiffs filed a second amended complaint challenging Defendants' allegedly anticompetitive referral policies. First, the amended complaint alleged that Defendants coerce Metrocare physicians into referring Health Choice patients to Methodist - and thus to Memphis - for radiology services, despite contracts that would allow Health Choice beneficiaries to use Plaintiffs' radiology services. Second, the complaint alleged that Defendants coerce Metrocare physicians into referring not only Health Choice enrollees to Methodist and Memphis; they also coerce those doctors into steering a large percentage of patients who are not enrolled with Health Choice, but with other competing plans - plans for which Plaintiffs are a provider - to Methodist and Memphis. Plaintiffs alleged that the effect of Defendants' arrangement is twofold: (1) Health Choice enrollees who may have chosen Plaintiffs are precluded from doing so; and (2) non-Health Choice participants whose plan options include Plaintiffs are also precluded from choosing Plaintiffs.

Plaintiffs also challenged Defendants' market allocation in its second amended complaint, noting that Doctors Murray and Westmoreland provided radiology services at Crittenden Memorial Hospital, which had affiliated with Methodist in 1995. Although Crittenden's affiliation with Methodist enabled Murray and Westmoreland to serve Health Choice patients at Crittenden, Plaintiffs were completely prevented from receiving any referrals in Shelby County, despite Murray and Westmoreland's participation in Health Choice at Crittenden.

The amended complaint also charged Defendants with several violations of § § 1 and 2 of the Sherman Act. Counts One through Six specifically dealt with the § 1 violations and claimed that Defendants' referral practices 1) constituted a group boycott; 2) were an unlawful exclusive dealing arrangement between the Defendants and the Metrocare physicians; 3 & 4) unlawfully tied, in two respects, radiology services to non-radiology services the physicians provide; 5) unreasonably restrained trade and competition in the market for radiology services; and 6) reflected a *per se* unlawful geographic market allocation of competitors, in view of Murray and Westmoreland's inability to service Health Choice enrollees in Shelby County, Tennessee.

In Counts Seven through Nine, Plaintiffs brought claims under § 2 of the Sherman Act, alleging specifically that Defendants had monopolized, attempted to monopolize, and conspired to monopolize the market for radiology services. Count Ten of the complaint stated a common law claim for tortious interference with business relationships. Plaintiffs sought treble damages under §  4 of the Clayton Act, 15 U.S.C. §  15, and injunctive relief under §  16 of the Clayton Act, 15 U.S.C. §  26.

Defendants filed a motion to dismiss Plaintiffs' amended complaint under Fed.R.Civ.P. 12(b)(6). The district court granted Defendants' motion, and dismissed Plaintiffs' action for lack of antitrust standing, finding that Plaintiffs failed to allege an antitrust injury and that, moreover, Plaintiffs were not an "efficient enforcer of the antitrust laws." Because the district court found that Plaintiffs lacked standing to pursue their federal antitrust claims, the court declined to exercise supplemental jurisdiction over the remaining pendant state-law claims. Plaintiffs filed this timely appeal.

ANALYSIS

**\*3** This Court reviews a district court's decision to dismiss a lawsuit for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) de novo. See Cline v. Rogers, 87 F.3d 176, 179 (6th Cir.), cert. denied, 1147 S.Ct. 510 (1996). In conducting its review, the Court must construe the complaint in the light most favorable to the plaintiff, accept as true all of the plaintiff's well-pleaded factual allegations, and determine whether plaintiff can prove no set of facts supporting his claims which would entitle him to relief. *See id.* (citing In re DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir.1993)).

In *HyPoint Tech., Inc. v. Hewlett-Packard Co.,* this Court succinctly described antitrust standing as follows:
Antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws. *The requirement of antitrust standing ensures*

Case 2:05-cv-01096-MHT-TFM    Document 28-6    Filed 03/24/2006    Page 3 of 6

198 F.3d 246                                                                  Page 3
198 F.3d 246, 1999 WL 1045098 (C.A.6 (Tenn.)), 1999-2 Trade Cases P 72,712
**(Cite as: 198 F.3d 246)**

*that antitrust litigants use the laws to prevent anticompetitive action and makes certain that they will not be able to recover under the antitrust laws when the action challenged would tend to promote competition in the economic sense.* Antitrust laws reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect.

949 F.2d 874, 877 (6th Cir.1991) (emphasis added). In Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079 (6th Cir.1983), this Court summarized the test for antitrust standing as set forth by the Supreme Court in Associated General Contractors of California v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897 (1983), by enunciating the following five-factor inquiry.(1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

Southaven Land Co., Inc., 715 F.2d at 1085 (citing Associated Gen. Contractors, 459 U.S. at 537-44. 103 S Ct at 908-13); see Re/Max Int'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1022 (6th Cir.1999).

Here, as found by the district court, Plaintiffs have failed to allege that they have antitrust standing so as to survive Defendants' motion to dismiss. Under the first *Southaven* factor, the causal connection between the non Health Choice patients - the group of patients for which Plaintiffs take particularly exception - being referred improperly to Memphis and Plaintiffs decrease in patients, is tenuous If, as Plaintiffs allege, they provide a superior product for a more competitive price, the non-Health Choice patient, either by direction of their own third-party provider or at their own economic directive, will seek Plaintiffs' services.

**\*4** Next, under the second *Southaven* factor, Plaintiffs have failed to sufficiently allege that they suffered an antitrust injury caused by Defendants' alleged anticompetitive conduct. The "antitrust injury" requirement was first explained by the Supreme Court in Brunswick Corp. v. Pueblo Bowl-O-Matic, Inc., 429 U.S. 477 (1977), where the Court found that plaintiffs seeking to recover damages in a private action against a violator of antitrust laws must demonstrate more than that they are in a worse position than they would have been had the violator not committed the antitrust conduct. Specifically, the Court stated that private antitrust plaintiffs must

prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Id.* at 489 (citation omitted). Antitrust injury is necessary to sustain such a cause of action because the "antitrust laws ... were enacted for 'the protection of competition not competitors.' " *Id.* (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)).

The district court found that Plaintiffs failed to allege antitrust injury as a matter of law inasmuch as, reduced to its essence, plaintiffs' complaint challenges the fundamental structure of the modern PPO, in that requiring in-plan referrals for plan patients is one of the primary means by which a PPO is able to fulfill its promise of increased patient volume for the preferred providers. The district court therefore concluded that when Plaintiffs asked the court to declare Health Choice's inplan referral requirement an antitrust violation, they asked the court to remove the primary bargaining tool by which PPOs are able to reduce health care providers' prices and, as a result, consumers would therefore *suffer* if Plaintiffs were to prevail in this litigation, which is contrary to the purpose of antitrust laws. Relying upon several cases from various circuit courts which found that doctors who were denied staff privileges at a hospital lacked antitrust standing to sue, the district court found the case at hand indistinguishable in that here Plaintiffs - two doctors - were denied staff privileges at a hospital and consequently denied membership in the PPO comprised of staff doctors at that hospital. [FN1]

> FN1. *See, e.g.,* Balaklaw v. Lovell, 14 F.3d 793, 801-02 (2d Cir.1994) (holding that anesthesiologist lacked antitrust standing to challenge exclusive contract awarded to

Case 2:05-cv-01096-MHT-TFM    Document 28-6    Filed 03/24/2006    Page 4 of 6

198 F.3d 246                                                                                                                           Page 4
198 F.3d 246, 1999 WL 1045098 (C.A.6 (Tenn.)), 1999-2 Trade Cases P 72,712
**(Cite as: 198 F.3d 246)**

competing group of anesthesiologists); *Oksanen v. Page Mem'l Hosp.,* 945 F.2d 696, 709 (4th Cir.1991) (holding that physician whose privileges were revoked did not establish antitrust injury); *Barry v. Blue Cross of Cal.,* 805 F.2d 866, 871 (9th Cir.1986).

One such case upon which the district court relied is *Leak v. Grant Medical Center,* 893 F.Supp. 757 (S.D.Ohio 1995), *aff'd,* 103 F.3d 129 (6th Cir.1996) (affirming for the reasons set forth in the district court's decision), *cert. denied* 117 S.Ct. 2408 (1997). In *Leak,* the plaintiff physician specializing in pain medicine sued when he was denied medical staff privileges at the defendant hospital. *Id.* at 759. The district court found that the plaintiff lacked antitrust standing to sue inasmuch as he had staff privileges at two other area hospitals and was therefore able to fully compete with other doctors offering pain-related medical services in the area, and accordingly failed to allege antitrust injury *Id.* at 763. The *Leak* court further found that even though some patients' managed care insurance plans may effectively limit them to services offered at the defendant hospital, this did not alter its conclusion. *Id.* The court reasoned that as follows:

**\*5** If plaintiffs' practice of pain medicine is, as Dr. Leak avers, truly more cost effective than traditional pain management used by anesthesiologists, then both the hospitals at which plaintiffs have privileges and plaintiffs have a competitive advantage over the defendant anesthesiologists. If pain medicine is more cost-effective than traditional pain management, then in an open and competitive marketplace managed care insurance plans should eventually be more inclined to designate those hospitals at which pain medicine is practiced. In these circumstances, the Court concludes that plaintiffs have failed to allege, or adduce evidence of, the kind of injury that antitrust laws were designed to protect.

*Id.* (citations and footnotes omitted).

The district court in the case at hand found that, likewise, Plaintiffs should enjoy a competitive advantage if what they allege is true. On appeal, Plaintiffs claim that the district court's holding and reasoning was short-sighted in that the court failed to consider the "non-Health Choice" patients who were being referred to Defendants. Plaintiffs claim that while it may be true that Health Choice patients are part of the PPO system, non-Health Choice patients are not and these patients are suffering because they, too, are being referred to Defendants and away from Plaintiffs who offer a better product at a more competitive price. We disagree.

Whether the patients are members of the Health Choice PPO, or whether they are members of some other third-party provider for which Plaintiffs are participants, the fact remains that if Plaintiffs are providing a superior and more cost efficient product as they allege, then the third-party providers for which the non-Health Choice members are participants will direct their members to Plaintiffs, and those patients who may not have any third party coverage will do the same in a competitive market. This is particularly true in today's health care industry where third party providers are acutely aware of costs associated with physician's services, which is precisely the reason behind the advent of PPOs and HMOs (Health Maintenance Organizations). The competition between Plaintiffs and Defendants for members and the related services will ultimately keep costs down *See Leak,* 893 F.Supp. at 963-64 (citing *Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc.,* 725 F.Supp. 669, 673 (N.D.N.Y.1989) (recognizing that the selective nature of managed care insurance plans is pro-competitive and reduces health care costs); *see also Valley Prods. Co., Inc. v. Landmark, a Div. of Hospitality Franchise Sys., Inc.,* 128 F.3d 398 (6th Cir.1997); *Axis v. Micafil, Inc.,* 870 F.2d 1105 (6th Cir.1989). Plaintiffs are competitors in this action, not consumers and, accordingly, Plaintiffs have failed to sufficiently allege antitrust injury.

Under the third *Southaven* factor, whether the injury was direct or indirect, Plaintiffs' claim fails. Plaintiffs in this case have alleged only indirect harm inasmuch as their claimed lost profits are derivative of the alleged harm inflicted on the third parties - the healthcare consumers and their third-party providers, if any. In *Associated General Contractors,* two unions brought suit against an association of building and construction contractors who entered into contracts with nonunion subcontractors, claiming that as a result of these contracts, some general contractors, the union contractors, and the unions were harmed. 459 U.S. at 540-41. The Court noted that according to the plaintiffs' complaint, the defendants "applied coercion against certain landowners and other contracting parties in order to cause them to divert business from certain union contractors to nonunion contractors. As a result, the Union's complaint alleges, the Union suffered unspecified injuries in its 'business activities." *Id.* The Court concluded that such injuries were only an indirect result of whatever harm may have been

Case 2:05-cv-01096-MHT-TFM   Document 28-6   Filed 03/24/2006   Page 5 of 6

198 F.3d 246                                                                                                                Page 5
198 F.3d 246, 1999 WL 1045098 (C.A.6 (Tenn.)), 1999-2 Trade Cases P 72,712
**(Cite as: 198 F.3d 246)**

suffered by "certain" construction contractors and subcontractors. *Id.*

**\*6** Similarly, in this case, the parties directly harmed due to the alleged violations are the healthcare consumers - both Health Choice members and nonmembers - and their third-party providers. Although Plaintiffs may ultimately suffer from a loss of patients and profits, their lost profits are derivative of the alleged harmed inflicted on the third parties, the harm is not sufficiently causally related to the violation, and their damages are speculative in that the number of lost referrals is not easy to measure. *See Associated Gen. Contractors,* 459 U.S. at 451-52; *see also Southaven Land,* 715 F.2d at 1085; *compare ReMax Int'l, Inc.,* 173 F.3d at 1023.

We are not persuaded otherwise by Plaintiffs' reliance upon this Court's decision in *Potters Medical Center v. City Hosp. Assoc.,* 800 F.2d 568 (6th Cir.1986). Plaintiffs contend that the district court's holding in this case is contrary to *Potters;* however, we disagree with Plaintiff and find *Potters* distinguishable. Potters was a small hospital which brought an antitrust action against a larger hospital alleging that the defendant larger hospital had, among other things, refused to grant staff privileges to doctors with privileges at Potters and pressured doctors not to seek privileges at Potters. *Id.* at 575. Potters brought Sherman Act claims against the defendant hospital claiming as damages lost admissions and revenues. *Id.* The district court concluded that Potters lacked antitrust standing because the only competition directly restrained was between doctors; however, this Court reversed the district court. *Id.* In doing so, the Court specifically noted that the parties actually competed for physicians, not patients, inasmuch as the more physicians that a hospital had on staff, the more admissions it would receive. *Id.* In this context, the Court stated, the parties were in direct competition for scarce resources - physicians - and that it was not unreasonable to assume that doctors, if they felt compelled to choose between Potters and the much larger defendant hospital, would likely opt for the latter. *Id.* The Court concluded that, under these facts, it was conceivable that the defendant hospital sought to restrict physicians' staff privileges in order to foreclose competition from Potters in the hospital inpatient services market. *Id.* The Court then found that, under the *Southaven* factor of directness of the injury, the district court erred in finding that Potters was not the party directly injured. *Id.* at 576. The Court reasoned that if, as the defendant hospital stated, patients could only be admitted by a doctor with staff privileges, then lost admissions and revenue could be a direct result of a policy which seeks to limit the number of doctors with privileges at Potters. *Id.*

However, in the instant case, unlike the hospitals in *Potters,* it is the health care *patient* - both Health Choice and non-Health Choice - who is the party most directly injured by the alleged harm. The *Potters* Court never considered patients - or "consumers" if you will - as being the party directly injured. We agree with the district court that a more analogous case to be applied here is *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438 (11th Cir.1991). There, under analogous facts, the Court of Appeals for the Eleventh Circuit found that the plaintiff, a radiologist, lacked antitrust standing to sue inasmuch as he did not allege an antitrust injury, and was not an efficient enforcer of the antitrust laws. *Id.* at 1450-52. Focusing on the directness of the injury asserted, the Eleventh Circuit stated as follows

**\*7** Dr Todorov is simply looking to increase his profits, like any competitor. As such, Dr Todorov is a particularly poor representative of the patients; indeed, his interests in this case are so at odds with the patients' interests that it is unlikely that he would have standing under article III of the Constitution to present their claims. Dr. Todorov is thus no champion for the cause of consumers. If the radiologists or DCH are acting anti-competitively ... then the *patients,* their insurers or the government, all of whom are interested in ensuring that consumers pay a competitive price, may bring an action to enjoin such practice.

*Id.* at 1455 (emphasis added). Likewise, in the case at hand, the injury is directed to the patients, or third-party insurers as the case may be, as opposed to Plaintiffs. *See id.*

Next, under the fourth and fifth *Southaven* factors, as noted above, the direct victims, if any, are the healthcare consumers - both Health Choice and non-Health Choice - as well as their third-party providers who may not be receiving the best service for the best price. As such, the potential for duplicative recovery or complex apportionment of damages exists if Plaintiffs were allowed to go forward inasmuch as the parties directly harmed would also have a cause of action.

CONCLUSION

In summary, considering Plaintiffs antitrust claim under the *Southaven* factors, they have failed to

198 F.3d 246                                                                                                                Page 6
198 F.3d 246, 1999 WL 1045098 (C.A.6 (Tenn.)), 1999-2 Trade Cases  P 72,712
**(Cite as: 198 F.3d 246)**

allege antitrust standing. We therefore AFFIRM the judgment of the district court dismissing Plaintiffs' claim.

C.A.6 (Tenn.),1999.
Park Avenue Radiology Associates, P.C. v. Methodist Health Systems, Inc.
198 F.3d 246, 1999 WL 1045098 (C.A.6 (Tenn.)), 1999-2 Trade Cases  P 72,712

Briefs and Other Related Documents (Back to top)

• 98-5668 (Docket) (May. 20, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.