Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases  P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

United States District Court, S.D. New York.
PEPSICO, INC., Plaintiff,
v.
THE COCA-COLA COMPANY, INC., Defendant.
**No. 98 CIV. 3282(LAP).**

Aug. 27, 1998.

Richard M. Steuer, Esq., Michael Malina, Esq., Randolph S. Sherman, Esq., Michael A. Rogoff, Esq., Robert Grass, Esq., Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, Gerard W. Casey, Esq., Pamela C. McGuire, Esq., Pepsico, Inc., Somers, for Plaintiff.
Jonathan M. Jacobson, Esq., Daniel F. McInnis, Esq., Anthony W. Swisher, Esq., Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York, Michael C. Russ, Esq., Jeffrey S. Cashdan, Esq., King & Spalding, Atlanta, GA, Abbot B. Lipsky, Jr., Esq., James M. Koelemay, Jr., Esq. , Kenneth L. Glazer, Esq., Joel M. Neuman, Esq., The Coca-Cola Company, Atlanta, GA, for Defendant.

OPINION AND ORDER
PRESKA, District J.
**\*1** Plaintiff PepsiCo, Inc. ("PepsiCo") has sued defendant The Coca-Cola Company, Inc. ("Coca-Cola"), alleging that Coca-Cola has violated section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing and attempting to monopolize a segment of the fountain-dispensed soft drink industry. Coca-Cola moves to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons that follow, Coca-Cola's motion is denied.

BACKGROUND

The facts alleged in the complaint are as follows. PepsiCo complains of Coca-Cola's behavior in a market described as "sales of fountain-dispensed soft drinks distributed through foodservice distributors throughout the United States." Complaint ¶ 9. This market allegedly consists of "an increasing number of restaurant chains, movie theater chains and other 'on-premise' accounts" that purchase "most of their supplies, including fountain soft drink products, through foodservice distributors." *Id.* ¶ 7.

Foodservice distributors are "independent companies that distribute a broad variety of food products, paper products and other supplies, including fountain-dispensed soft drinks, in consolidated deliveries to restaurant chains, movie theater chains and other customers." *Id.* ¶ 2. These distributors carry thousands of items and supply all of a customer's needs at once, using consolidated single-truck deliveries and consolidated bookkeeping. *Id.* ¶ 8.

Because foodservice distributors offer a form of one-stop shopping, their customers take delivery of all of the customer's supplies from only one distributor at each of the customer's locations. *Id.* ¶ 2. Foodservice distributors' customers "generally make it a practice not to purchase these supplies through any other means." *Id.* Furthermore, for "logistical and economic reasons, these accounts make it a practice to have only a single foodservice distributor supply any given outlet, and it is common for a single foodservice distributor to supply either an entire chain or groups of outlets within a chain." *Id.* As a result, "for each location in each such chain there is only one foodservice distributor through which a supplier" can have its product distributed. *Id.* ¶ 7.

According to PepsiCo, the accounts in question have no viable alternatives to fountain-dispensed soft drinks distributed through foodservice distributors. As an initial matter, soft drinks sold in bottles and cans are not adequate substitutes for fountain products. Indeed, virtually all of the soft drink volume of these accounts is in fountain-dispensed products (which provide considerably greater profits than drinks sold in bottles and cans), and the cost of switching a fountain business to bottles and cans would be prohibitive. *Id.* ¶ 8.

Other modes of delivery also fail to present an adequate alternative to distribution through foodservice distributors. According to PepsiCo, "customers of foodservice distributors generally refuse to be supplied by any other means once they have begun receiving supplies through such distributors, because changing from their established distribution and accounting practices to other methods of distribution, or even switching distributors, would cause them to incur severely adverse economic and logistical consequences." *Id.*

Case 2:05-cv-01096-MHT-TFM    Document 28-7    Filed 03/24/2006    Page 2 of 14

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

As described in the complaint, the distribution "superhighway" formed by the growth of independent foodservice distributors has become "the lifeblood of competitive efficiency in the restaurant business, movie theater business and other businesses that depend upon delivery through foodservice distributors in order to remain logistically efficient." *Id.*

**\*2** PepsiCo alleges that Coca-Cola "dominates" the market described above, *see* Complaint ¶ ¶ 9, 33, 36, and that "virtually every major foodservice distributor in America today" has an agreement with Coca-Cola to distribute Coca-Cola fountain products. *Id.* ¶ 16. Coca-Cola is alleged to control over 90% of that market and to possess the power to control prices and exclude competition in the market. *Id.* ¶ 9.

PepsiCo alleges that the parties' past business practices explain Coca-Cola's dominance in, and PepsiCo's absence from, this market. Although PepsiCo itself markets fountain-dispensed soft drinks, for two reasons "it historically has been less successful than Coca-Cola in penetrating the relevant market." *Id.* ¶ 10. First, the fountain products that PepsiCo sold to its "on-premise" accounts were distribued exclusively through PepsiCo local bottlers, while Coca-Cola's sales were made through various types of national, regional and local fountain distributors. *Id.* ¶ 11. As a result, when foodservice distributors "began to take over" distribution of supplies to restaurant chains, movie theater chains and other "on-premise" accounts, Coca-Cola was able to designate the foodservice distributors as Coca-Cola fountain distributors as well, "thereby facilitating sales to the growing number of customers that had begun to receive their supplies only through such distributors." *Id.* ¶ 11. In contrast, PepsiCo's arrangements with its local bottlers prevented it from selling its products through foodservice distributors, and PepsiCo lost the opportunity to capitalize on the emergence of foodservice distribution. *Id.* ¶ 11.

PepsiCo attributes its disadvantage as well to its acquisition in the 1970's and 1980's of restaurant chains which featured PepsiCo products. Coca-Cola capitalized on PepsiCo's restaurant ownership by "convincing other restaurant chains that PepsiCo had become their competitor and therefore they should spurn Pepsi and support Coke." *Id.*

In 1997, PepsiCo changed its business strategy. It negotiated new arrangements with its bottlers, thereby allowing it to distribute fountain-dispensed soft drinks through foodservice distributors rather than local bottlers. PepsiCo also divested itself of its restaurant chains "so that it could no longer be portrayed as a competitor of the other chains." *Id.* ¶ 13. As a result of these moves, PepsiCo "emerged in 1997 as a significantly more potent competitive threat to Coca-Cola's dominance" in the alleged market. *Id.* ¶ 14. Rid of its self-imposed constraints, PepsiCo increased its efforts to sell and market its fountain products; to this end, PepsiCo approached restaurant chains, movie theater chains and other customers with "highly competitive proposals, offering to sell to them through foodservice distributors for less money than Coca-Cola." *See id.*

According to the complaint, Coca-Cola viewed PepsiCo's emergence as a threat to Coca-Cola's market dominance. Coca-Cola thus embarked on a "strategy to use its market power to perpetuate its monopoly by threatening foodservice distributors with the loss of Coke if they dare to carry Pepsi for their customers who want Pepsi, and by cutting off any distributors that decide to carry Pepsi anyway, making examples of them." *Id.* ¶ 15. PepsiCo maintains that Coca-Cola's strategy "threatens to freeze PepsiCo out of the market and leave customers that require delivery through foodservice distributors with no alternative to Coke." *Id.*

**\*3** According to the complaint, to carry out its strategy Coca-Cola relied on the terms of its contracts with foodservice distributors. Those contracts allegedly contain an express condition prohibiting the distributor from handling PepsiCo soft drink products. *Id.* ¶ 17. While those agreements historically contained such a condition, Coca-Cola rarely enforced it and even had acquiesced when some foodservice distributors refused to agree to the provision. *Id.* As soon as PepsiCo "became a serious competitive threat," however, Coca-Cola began to enforce the condition actively. *Id.* ¶ 20. Coca-Cola allegedly cut off foodservice distributors that began to distribute PepsiCo products and threatened to cut off those that showed an interest in carrying PepsiCo products. *Id.* ¶ ¶ 20-26.

PepsiCo maintains that Coca-Cola's tactics lock foodservice distributors into Coca-Cola, depriving those distributors of the ability to distribute competing brands to their customers. In particular, because of Coca-Cola's
huge share of the relevant market, its particular dominance of fountain-dispensed cola (which restaurants, theaters and other accounts must have), and the fact that foodservice distributors must carry Coke products in order to fill orders from their other

Case 2:05-cv-01096-MHT-TFM    Document 28-7    Filed 03/24/2006    Page 3 of 14

Not Reported in F.Supp.2d                                                                                     Page 3
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases  P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

customers who sell Coke, such a threat is overwhelmingly powerful and coercive, and reflects Coca-Cola's single-minded determination to hold on to its monopoly.

*Id.* ¶ 25. As a consequence, restaurant chains, theater chains and other customers of foodservice distributors "remain locked into Coca-Cola as their supplier without the real ability to entertain a competitive bid from PepsiCo." *Id.* ¶ 11. Because their distributors will only deliver Coca-Cola products, establishments that wish to serve PepsiCo products are forced to remain with Coca-Cola products and are prevented from putting their requirements out for fair and open competitive bids. *Id.* ¶ 27. This absence of price competition is alleged to affect the consumers who are customers of these establishments and deprives PepsiCo of opportunities to compete on the merits for the business of the customers that require delivery through foodservice distributors. *Id.* ¶ ¶ 27-28.

## DISCUSSION

Coca-Cola moves to dismiss, under Fed.R.Civ.P. 12(b)(6), on the ground that PepsiCo's complaint fails to state a claim upon which relief may be granted. "A dismissal is warranted under Rule 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 62-63 (2d Cir.1997). Under this standard, the question is not "whether a plaintiff will or might ultimately prevail on [its] claim, but whether [it] is entitled to offer evidence in support of the allegations in the complaint." *Id.* at 62. As explained by the Supreme Court, and recently reiterated by the Court of Appeals, "it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (quoted in *Hamilton College,* 128 F.3d at 62). To this end, I must "accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton College,* 128 F.3d at 63 (citing *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976)). This "generous approach to pleading applies in the antitrust context," and courts should recall that "where the proof of the alleged antitrust violation is largely in the hands of the defendants, dismissals prior to giving the plaintiff an opportunity for discovery should be granted

sparingly." *Id.*

## I. SECTION 2 OF THE SHERMAN ACT

**\*4** PepsiCo alleges that Coca-Cola is guilty of actual or attempted unlawful monopolization of the relevant market in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. To state a monopolization claim under section 2, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Clorox Co. v. Sterling Winthrop, Inc.,* 117 F.3d 50, 61 (2d Cir.1997). To state an attempted monopolization claim, a plaintiff must establish "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890, 122 L.Ed.2d 247 (1993); *Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 99-100 (2d Cir.1998).

According to Coca-Cola, PepsiCo's complaint must be dismissed because it fails, as a matter of law, to allege either (1) a valid relevant market or (2) prohibited anticompetitive conduct. These contentions are discussed in turn below.

## II. FAILURE TO ALLEGE A VALID RELEVANT MARKET

It is "a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 268 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). This is so because "[w]ithout a definition of that market, there is no way to measure [a defendant's] ability to lessen or destroy competition." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *see Morgenstern v. Wilson,* 29 F.3d 1291, 1296 (8th Cir.1994) ("An actual monopolization claim often succeeds or fails strictly on the definition of the product or geographic market."), *cert. denied,* 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995). Accordingly, PepsiCo's first task is to plead a relevant market. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 4
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases  P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

*Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 840 (2d Cir.1980); *Theatre Party Assocs., Inc. v. Shubert Org., Inc.,* 695 F.Supp. 150, 153 (S.D.N.Y.1988).

A. *Defining a Relevant Product Market*

For antitrust purposes a relevant market has both a product dimension and a geographic dimension. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962); *T. Harris Young & Assoc. v. Marquette Elec. Inc.,* 931 F.2d 816, 823 (11th Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991). Coca-Cola does not contest PepsiCo's allegation that the relevant geographic market in this case consists of sales "throughout the United States." This dispute thus focuses on whether PepsiCo has alleged a valid and relevant product market.

**\*5** As the Supreme Court has explained, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1523; *Hayden Pub. Co., Inc. v. Cox Broadcasting Corp.,* 730 F.2d 64, 70-71 (2d Cir.1984). Defining the relevant product market requires consideration of "cross-elasticity of demand" between products, which measures "the extent to which consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak v. Image Technical Servs.,* 504 U.S. 451, 469, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992). If customers are able to substitute one product or service in response to a nontrivial increase in the price of another, these products or services must fall within the same product market. *F.T.C. v. R.R. Donnelly & Sons Co.,* 1990-2 Trade Cas. (CCH) ¶ 69,239, at 64,854 (D.D.C.1990) (citing *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 400, 76 S.Ct. 994, 1010, 100 L.Ed. 1264 (1956)). As explained by the Court of Appeals, " '[d]efining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability-actual or potential-to take significant amounts of business away from each other.' " *Hayden,* 730 F.2d at 71 (quoting *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1063 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978)).

At play in this case is the principle that within a broad product market there may exist "well-defined submarkets ... which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524 (citing *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 593-95, 57 S.Ct. 872, 877 (1957)). The boundaries of so-called "submarkets" may be established by reference to such "practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.; see F.T.C. v. Cardinal Health, Inc.,* Nos. Civ. A. 98-595, Civ. A. 98-596, 1998 WL 433784, at \*12 (D.D.C. July 31, 1998); *F.T.C. v. Staples, Inc.,* 970 F.Supp. 1066, 1075 (D.D.C.1997).

Ultimately, a "submarket" definition turns on the same inquiry as a "market" definition-"whether the products in a proposed submarket are reasonably interchangeable in use or production with products in the broader market." ABA Antitrust Section, Antitrust Law Developments 521 (4th ed.1997). At bottom, then, "the same proof which establishes the existence of a relevant product market also shows (or fails ... to show) the existence of a product submarket." *H.J., Inc. v. International Tel. & Tel. Corp.,* 867 F.2d 1531, 1540 (8th Cir.1989); *AD/SAT v. Associated Press,* 920 F.Supp. 1287, 1296 n. 6 (S.D.N.Y.1996) (observing that "[t]he required analysis does not change whether a particular product market is deemed a market or a submarket," agreeing with commentators that "submarket" term draws no meaningful distinction and restricting itself to use of the term "market"); *Staples,* 970 F.Supp. at 1080 n. 11 (noting that use of term "submarket" may be confusing and observing that "[w]hatever term is used-market, submarket, relevant product market-the analysis is the same"). As Professor Areeda counseled, "speaking of submarkets is both superfluous and confusing in an antitrust case," and "nothing would be lost by deleting the word 'submarket' from the antitrust lexicon." IIA Antitrust Law ¶ 533e, at 170, 173. Heeding this advice, where possible this Opinion will speak only of relevant "markets".

**\*6** Also crucial here is the principle that to define a relevant product market one must look at how *consumers* view the products in question. *See Westman Commission Co. v. Hobart Int'l, Inc.,* 796 F.2d 1216, 1220 (10th Cir.1986) ("Any definition of a line of commerce which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful." (quoting *United States v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 5
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases  P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

*Bethlehem Steel Corp.,* 168 F.Supp. 576, 592 (S.D.N.Y.1958)); *Cardinal Health,* 1998 WL 433784, at *11 ("[T]he relevant market consists of all of the products that the Defendant's customers view as substitutes to those supplied by the Defendants.").

The market definition inquiry set out in *Cardinal Health,* which involved a potential merger of pharmaceutical wholesalers, is apt here. In deciding whether wholesale distribution services constituted a market distinct from other distribution methods, Judge Sporkin focused on customers' decisions:
Thus, in this case, if enough customers view other forms of prescription drug delivery methods as acceptable substitutes to the services provided by the Defendants, then the relevant market should include these alternative methods. On the other hand, if customers do not view the other methods of distribution as viable substitutes, then the relevant product market should be limited to wholesalers' services.

1998 WL 433784, at *11. Judge Sporkin also reflected that "[i]t is imperative that the Court, in determining the relevant market, take into account the economic and commercial realities of the pharmaceutical industry." *Id.* at 12. Similarly, market definition in this case must account for the "economic and commercial realities" of the beverage industry, but on this motion to dismiss such consideration must be limited to how those realities are alleged in the complaint.

B. *The Standard for Evaluating Market Definition on a Motion to Dismiss*

As the above cases might suggest, market definition is most often a factual inquiry. See *Hayden,* 730 F.2d at 70 n. 8 (noting that " 'a pronouncement as to market definition is not one of law, but of fact' " (quoting *Jennings Oil Co. v. Mobil Oil Corp.,* 539 F.Supp. 1349, 1352 (S.D.N.Y.1982))); *International Audiotext Network, Inc. v. American Tel. & Tel. Co.,* 893 F.Supp. 1207, 1214 (S.D.N.Y.1994) ("Market definition ... is generally ultimately a question of fact which 'can be determined only after a factual inquiry into the "commercial realities" faced by consumers.' " (quoting *Eastman Kodak,* 504 U.S. at 482, 112 S.Ct. at 2090)), *aff'd,* 62 F.3d 69 (2d Cir.1995). Motions to dismiss in this context thus may be granted only if the alleged market makes "no economic sense under any set of facts." *National Communications Ass'n v. American Tel. & Tel. Co.,* 808 F.Supp. 1131, 1134 (S.D.N.Y.1992) (quoting *Theatre Party,* 695 F.Supp. at 154); *Envirosource, Inc. v. Horsehead Resource Dev. Co.,* 1997-2 Trade Cas. (CCH) ¶ 71,944, at 80,608 (S.D.N.Y.1997) ("Extensive analyses of reasonable interchangeability and cross elasticity of demand ... are not required at the pleading stage."); *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.,* 795 F.Supp. 639, 647 (S.D.N.Y.1992) (deeming market definition-based 12(b)(6) dismissal proper only where proposed market definition is "patently implausible solely on the basis of the four corners" of the complaint). Absent an inherently implausible market allegation, the question must be resolved on the facts and economic realities of the case. *See, e.g., R.R. Donnelly,* 1990-2 Trade Cas. ¶ 69,239, at 64,854 (rejecting market definition where evidence showed that technological developments in relevant fields rendered once-viable market allegation implausible).

C. *PepsiCo's Alleged Market*

**\*7** As explained above, PepsiCo defines the relevant market as "sales of fountain-dispensed soft drinks distributed through independent foodservice distributors throughout the United States." Complaint ¶ 6. In alleging this market, PepsiCo contends, and for the purposes of the motion Coca-Cola accepts, that the relevant sales are to the restaurants, movie theaters, or other establishments that purchase fountain-dispensed soft drinks for later sale to individual consumers, not sales to the diners, moviegoers, or other customers who patronize those retail establishments and actually drink the soft drinks. The market PepsiCo alleges consists of an "increasing number" of these restaurants, theater operators, and other "on-premise" accounts who "generally make it a practice" to purchase the supplies exclusively through foodservice distributors. *Id.* PepsiCo thus alleges that the relevant market consists not of the sale of all soft drinks, or even of all fountain-dispensed soft drinks, but only of sales of fountain-dispensed soft drinks distributed through foodservice distributors. In this way, PepsiCo alleges that within the broader market for fountain-dispensed soft drinks, there exists a separate distinct market (or submarket) for fountain-dispensed soft drinks distributed through foodservice distributors. The boundaries of PepsiCo's proposed product market are thus defined by this particular method of distribution. As one would expect, Coca-Cola takes issue with this market definition.

D. *Coca-Cola's Arguments*

Case 2:05-cv-01096-MHT-TFM    Document 28-7    Filed 03/24/2006    Page 6 of 14

Not Reported in F.Supp.2d                                                                                                   Page 6
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

1. *A Market Cannot Be Limited to Sales Through a Single Group of Distributors*

At the outset I must address Coca-Cola's argument that "as a matter of law, a market cannot be limited to sales through a single group of distributors." Memorandum of Defendant The Coca-Cola Company in Support of Its Motion to Dismiss ("Coca-Cola Mem.") at 12. This statement is incorrect-numerous courts have defined product markets by reference to a channel of distribution. *See e.g .,* Cardinal Health, 1998 WL 433784, at *13 (holding that wholesale distribution of pharmaceutical products to customers who demanded such distribution was a relevant market, even though products so delivered were identical to those delivered through other modes of distribution); Staples, 970 F.Supp. at 1080 (holding that sales of consumable office supplies through office supply superstores constituted relevant market, even though the office supplies sold in those outlets were physically identical to those sold elsewhere; relying on "compelling pricing evidence" which demonstrated that customers of office superstores did not turn to non-superstore outlets when faced with price increases in the superstore market); Columbia Broadcasting Sys., Inc. v. FTC, 414 F.2d 974, 978-79 (7th Cir.1969), *cert. denied,* 397 U.S. 907, 90 S.Ct. 903, 25 L.Ed.2d 88 (1970) (phonograph records sold through record clubs comprised relevant market even though records delivered by clubs were identical to those sold in record stores and other outlets); Henry v. Chloride, Inc., 809 F.2d 1334, 1343 (8th Cir.1987) (sales of automobile batteries through route salespersons distinct from sales of such batteries through retail stores even though "the batteries sold by route salespersons are not different in character, creation or use from those sold from a warehouse or store"); Ansell Inc. v.. Schmid Lab., Inc., 757 F.Supp. 467, 471-75 (D.N.J.1991) (holding that sales of condoms "to retail distributors does constitute an 'economically significant submarket' " even though manufacturers "may sell their products through a number of different channels of distribution").

**\*8** The point was expressly made in Greyhound Computer Corp., Inc. v. International Business Mach. Corp., 559 F.2d 488, 494 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978), where IBM argued that leasing general purpose computers did not constitute a submarket "economically distinct from others in which such computers are made available to users," such as sales, time-sharing and contracting with service bureaus. *Id.* at 494. In upholding the jury's finding that leasing of computers did constitute a separate submarket, the court noted:

No rule of law or economic principle bars application of section 2 of the Sherman Act to one of several alternative means of distributing a product. The statute prohibits monopolization of 'any part' of interstate or foreign commerce. Accordingly, the Sherman Act and other antitrust statutes have been applied to protect competition in one of alternate channels of distribution.

*Id.*

Accordingly, it is appropriate to limit a market to a discrete channel of distribution so long as it is shown, using established market-definition criteria, that enough customers do not view other methods of distribution as viable substitutes to the distribution method in question. *See* Cardinal Health, 1998 WL 433784, at *11. PepsiCo's allegations on this score are more than adequate.

PepsiCo's complaint expressly alleges that there are no viable substitutes to fountain-dispensed soft drinks distributed through independent foodservice distributors. *See, e.g.,* Complaint ¶ 8 (alleging that neither sales of soft drinks in bottles and cans nor sales of fountain-dispensed soft drinks through alternative means of distribution are viable alternatives to foodservice distribution of fountain-dispensed soft drinks). According to the complaint, distribution through foodservice distributors constitutes "the lifeblood of competitive efficiency" among the delineated restaurants, theaters, and other customers who must take delivery in this fashion in order to "remain logistically efficient." *Id.* ¶ 8. Indeed, "because customers of foodservice distributors maintain a tightly integrated relationship with their distributors, relying on the distributor for virtually all of their supplies, it is far more difficult for them to switch distributors than to switch brands of soft drinks." *Id.* ¶ 24. Accordingly, even though PepsiCo has made "highly competitive proposals" to customers of foodservice distributors, *id.* ¶ 14, those customers "remain locked into Coca-Cola as their supplier without the real ability to entertain a competitive bid from PepsiCo." *Id.* ¶ 27. PepsiCo has adequately alleged a market with reference to cross-elasticity of demand and a lack of reasonable interchangeability within the meaning of the distribution channel cases cited above.

Nonetheless, Coca-Cola argues that it is inappropriate

Case 2:05-cv-01096-MHT-TFM     Document 28-7     Filed 03/24/2006     Page 7 of 14

Not Reported in F.Supp.2d                                                                  Page 7
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

to define the relevant product market in this way, because there is no difference in the products that the parties manufacture. Viewing PepsiCo's proposed market definition as a "submarket" within a broader soft-drink market, Coca-Cola argues that "there can be no relevant submarket without some differences in the products" the parties sell. In support Coca-Cola cites T. Harris, 931 F.2d 816, where a supplier of EKG paper alleged that its competitor monopolized the market in EKG paper sold to "hospitals with more than 200 beds." Id. at 825. Although recognizing that "a relevant product market can be limited to a portion of customers," the court cautioned that such a limitation must be "based on a distinction in the product sold to those customers." Id. at 823. The court rejected plaintiffs' purported distinction, finding after discovery that the paper sold to hospitals with more than 200 beds was identical to the paper sold to all other hospitals. Coca-Cola seizes on the court's holding, observing that "[t]he product that Coca-Cola and PepsiCo supply-soft drinks-is *identical* irrespective of the form of distribution that is used." *See* Reply Brief of Defendant The Coca-Cola Company in Support of Its Motion to Dismiss ("Coca-Cola Reply Mem.") at 11. Coca-Cola maintains that this fact is fatal to PepsiCo's claim.

**\*9** Although *T. Harris* is not dispositive for Coca-Cola, it highlights a crucial aspect of PepsiCo's claim: under PepsiCo's purported market definition, there *is* a distinction among the products in question-PepsiCo has alleged that the relevant product market is not the market for soft-drinks, or fountain-dispensed soft drinks, but rather the market for "fountain-dispensed soft drinks *distributed through foodservice distributors*." This product-fountain-dispensed soft drinks distributed through foodservice distributors-is alleged to be something distinct from "fountain-dispensed soft drinks" distributed through any other means. Indeed, the complaint posits that the buyers in question have real efficiency-based reasons to take delivery of all of their supplies, including fountain syrup, from foodservice distributors; the complaint maintains that for these customers delivery through other means simply will not do. The *T. Harris* plaintiff made no showing to this effect. FN1 Further, PepsiCo alleges that a soft drink manufacturer that can offer its product delivered through the preferred-indeed required-channel of distribution offers something markedly different than does a soft drink manufacturer that can only offer delivery of its product through alternate, but disfavored, methods of distribution.

FN1. Further, as another court in this Circuit has observed, *T. Harris* was decided "not on law, but on facts." *See* Sunshine Cellular v. Vanguard Cellular Sys., Inc., 810 F.Supp. 486, 494 (S.D.N.Y.1992). Its consideration of the economic realities of the marketplace before it thus provide limited guidance on this motion under Rule 12(b)(6).

Coca-Cola contends generally that PepsiCo has merely selected one group of customers and called it a market. Coca-Cola posits that "just as Coca-Cola could not define a market made up of [fast-food restaurants owned by a PepsiCo subsidiary] and then accuse PepsiCo of monopolizing the sale of soft drinks within that market, PepsiCo cannot make out a monopolization case focused entirely on a segment of the selling opportunities in which Coca-Cola has achieved substantial success." Coca-Cola Reply Mem. at 7.

In this vein, Coca-Cola relies on *Redmond v. Missouri Western State College,* 1988-2 Trade Cas. ¶ 68,323, at 59,843 (W.D.Mo.1988). There, a private college-textbook bookstore claimed that the college-owned bookstore unlawfully monopolized a market for the sale of college textbooks to scholarship students by issuing vouchers to the students usable only for books in the college-owned bookstore. The court rejected plaintiff's attempt to "define the relevant market in terms of a certain class of prospective purchasers," noting that to do so would run "contrary to the classic tests used in a monopolization case." *Id.* The court observed that "it seems unprecedented to allow a claim that a defendant has monopolized a class of customers as distinguished from a product or service." *Id.* The *Redmond* court noted, and Coca-Cola relies upon, the proposition that a plaintiff cannot artificially define a market so as to cover only the practice complained of; to do so would, as described by the *Redmond* court, be an example of "circular or at least result-oriented reasoning." *Id.*

*Redmond* is distinguishable. Here, the complaint alleges that market realities force the end users in question to make their purchases exclusively through foodservice distributors. Thus, at least at the pleading stage, it is economic reality, not reference to "the practice complained of," that delineates the boundaries of the alleged market. Further, the books at issue in *Redmond* were identical whether delivered by the plaintiff or the defendant; as noted above, PepsiCo argues that the character and value of the product actually manufactured by the parties-fountain

Case 2:05-cv-01096-MHT-TFM    Document 28-7    Filed 03/24/2006    Page 8 of 14

Not Reported in F.Supp.2d                                                                                              Page 8
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

syrup used to create fountain-dispensed soft drinks- changes in the eyes of buyers by virtue of the manner in which it is delivered. Because foodservice distributors satisfy all of their customers' supply needs at once, offering consolidated delivery and accounting systems, their customers buy supplies through them to the exclusion of all other methods of distribution. *See, e.g., Staples,* 970 F.Supp. at 1080; *Cardinal Health,* 1998 WL 433784, at *11. Thus, a manufacturer offering to sell its product through a foodservice distributor is offering something different from a manufacturer offering to sell the same product through other means of distribution. The cluster of products and services offered by independent foodservice distributors selling fountain syrup is alleged to constitute a different product, for antitrust purposes, than fountain syrup sold through other methods of distribution. *See, e.g., Staples,* 970 F.Supp. at 1080; *Cardinal Health,* 1998 WL 433784, at *15.

***10** Finally, the *Redmond* scholarship students had the option of exchanging their vouchers for cash and then using that cash to purchase books elsewhere; the class of customers alleged to have no alternative to textbooks in the college-owned store in actuality were free to purchase their books from other distributors. Here, in contrast, PepsiCo alleges that buyers who take delivery through foodservice distributors are unable to switch to any product/distribution combination other than fountain-dispensed soft drinks distributed through foodservice distributors. If, as alleged, Coca-Cola has monopoly power in the market for distribution of fountain syrup within the distinct cluster of products and services offered by foodservice distributors, Coca-Cola would have the ability to restrict output, raise prices, and exclude competition in that market to the detriment of its rivals and buyers in the market.

PepsiCo has not, as suggested at argument, merely "drawn a circle around" certain customers and called those customers a market. To the contrary, PepsiCo has alleged a market using criteria traditionally considered in antitrust cases and has alleged that Coca-Cola has monopolized or attempted to monopolize that market. The market alleged indeed contains a disproportionately high number of Coca-Cola purchasers; but those purchasers are alleged to be distinct, not because they buy Coca-Cola, but because market forces dictate that they purchase their fountain syrup only through foodservice distributors, and those foodservice distributors offer only Coca-Cola.

Coca-Cola also relies on *Queen City Pizza v. Domino's Pizza, Inc.,* 124 F.3d 430 (3d Cir.1997), *cert. denied,* 523 U.S. 1059, 118 S.Ct. 1385, 140 L.Ed.2d 645 (1998), to argue that a market cannot be defined by reference to the purchasing restrictions of a distinct class of customers. There, Domino's pizza franchisees, bound under the terms of their franchise agreements to purchase Domino's-approved supplies and distribution services, claimed that Domino's had monopolized the market for the supplies and services "used in the operation of Domino's stores." *Id.* at 437. The district court granted the defendant's Rule 12(b)(6) motion to dismiss for failure to allege a valid relevant market, and the Third Circuit affirmed. The court of appeals observed that the supplies available from other pizza suppliers and used by other pizza companies differed from Domino's approved supplies in but one particular: only the latter could be used by Domino's franchisees without precipitating a breach of the franchise contract. Because "the test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes,' " the inquiry properly focused not on the contractual restrictions of one class of consumers but rather on the decisions of all consumers purchasing the commodity for the same purpose. *Id.* at 438. The court rejected the notion that a market may be defined by reference to a particular consumer's contractual restraints, affirming the district court's conclusion that the relevant economic power in the antitrust context must flow from the market, not from private contractual relations. *Id.* at 435; *see also* IIA Phillip E. Areeda et al., Antitrust Law ¶ 510b, at 111 (Supp.1998) (discussing *Queen City* holding and noting that "the existence of even an unconscionable contract does not create a relevant market for antitrust purposes").

***11** In contrast to the *Queen City* plaintiffs, however, PepsiCo alleges a market based on consumer demand, not on contractual restrictions. As noted above, PepsiCo has alleged that "logistical efficiency" considerations compel an increasing number of purchasers to take delivery of supplies exclusively through foodservice distributors and that such customers will not switch away from that method of distribution once they have chosen it because to do so would result in "severely adverse economic and logistical consequences." Complaint ¶ 8. Again, as alleged, economic forces, not contractual restraints, dictate the boundaries of the market defined in the complaint, and *Queen City* is thus distinguishable. *See* IIA Antitrust Law ¶ 510b, at 112 (noting importance of distinguishing between "lock-

Case 2:05-cv-01096-MHT-TFM    Document 28-7    Filed 03/24/2006    Page 9 of 14

Not Reported in F.Supp.2d                                                                                                              Page 9
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases  P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

in" imposed by a contract and that imposed by market forces).

The above cases demonstrate that market definition is a particularly fact-based inquiry. Thus it is not surprising that courts granting 12(b)(6) motions for failure to allege a proper market generally have dismissed only those complaints that failed to explain how the product in question was not reasonably interchangeable with other similar products. *See e.g., Rohlfing v. Manor Care, Inc., 172 F.R.D. 330, 347 (N.D.Ill.1997)* (dismissing complaint where alleged market "improperly excludes interchangeable substitutes"); *Deep-South Pepsi-Cola Bottling Co. v. PepsiCo, Inc ., 1989-1 Trade Cas. (CCH) ¶ 68,560 (S.D.N.Y.1989)* (granting 12(b)(6) dismissal where plaintiff failed "to set out a theoretically rational explanation to support its proposed relevant product market"; plaintiff "failed to allege why Pepsi-Cola franchises are not interchangeable with franchises for the distribution of other soft drinks"); *Theatre Party, 695 F.Supp. at 153* (dismissing complaint after concluding that plaintiff alleging a market limited only to the defendant-supplier's own product had "narrowly defined the market in an attempt to conform the alleged market to the facts of the present case"). Here, the complaint addresses and explains the basis for the market, and on this score is more than sufficient to withstand a motion to dismiss.

While not compelling on a motion to dismiss, Coca-Cola's arguments highlight the difficulties PepsiCo may encounter in proving the existence of the market it has alleged in the complaint. Indeed, numerous cases have rejected purported market definitions, some of which were similar to that proposed here, after evidence culled during discovery demonstrated that the plaintiff had excluded reasonably interchangeable products or services from its proposed market definition. *See e.g., Thurman v. Pay 'N Pak Stores, Inc., 875 F.2d 1369 (9th Cir.1989)* (rejecting proposed submarket based on one-stop shopping where evidence failed to support plaintiff's purported market); *Westman, 796 F.2d 1216* (rejecting proposed market limited to one-stop shopping distributors of goods where evidence in record failed to establish inelastic demand between defendant's products and similar products offered by competing brands); *see also R.R. Donnelly,* 1990 Trade Cas. at ¶ 64,852 (denying motion for a preliminary injunction after five days of evidentiary hearings because plaintiff was unable to prove the contours of the product market that it had alleged); *T. Harris, 931 F.2d 816* (rejecting alleged market because record failed to support finding that products included in alleged market differed from those sold to different class of customers).

**\*12** Here, if the facts adduced during discovery demonstrate that customers purchasing fountain-dispensed soft drinks view other methods of fountain-dispensed soft drink delivery as acceptable substitutes to delivery through foodservice distributors, then the market alleged should include those alternative methods, and Coca-Cola may be entitled to summary judgment at that time. But for the moment our attention is limited to the complaint, and the allegations contained therein must be taken as true. Those allegations expressly state that an "increasing number" of customers do not view the other distribution methods as viable substitutes. As such the market alleged in the complaint is properly limited to fountain-dispensed soft drinks distributed through foodservice distributors.

2. *Even if the Purported Market Exists, It is Irrelevant to This Claim*

Conceding that a market may, in certain circumstances, be defined by reference to a distribution channel, Coca-Cola argues that even if such a market exists here, it is irrelevant to PepsiCo's claim. In particular, Coca-Cola points out that PepsiCo alleges it has been foreclosed from competition. Therefore, Coca-Cola maintains, citing *Tampa Electric Co. V. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)*, that foreclosure must be measured within the context of a market which "includes the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations." Coca-Cola Reply Brief at 4 (citing IIA Antitrust Law ¶ 570b, at 278 (rev. ed.1995)). To this end, Coca-Cola asserts that foreclosure should be "measured in a market including the total output of the sellers who would be included in the market for assessing a horizontal merger between the merging seller [*i.e.,* Coca-Cola] and any allegedly foreclosed rival [*i .e.,* Pepsi]." Coca-Cola Mem. at 13. Coca-Cola maintains that whatever amount of sales might be attributed to the buyers PepsiCo delineates in its alleged market, such a distinct class of customers is meaningless unless considered in the context of the entire market in which PepsiCo and Coca-Cola, both soft drink manufacturers, compete generally. I disagree.

A " 'market' for antitrust purposes is the one relevant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:05-cv-01096-MHT-TFM    Document 28-7    Filed 03/24/2006    Page 10 of 14

Not Reported in F.Supp.2d                                                                                                Page 10
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases  P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

to the particular legal issue at hand." IIA Antitrust Law ¶ 533, at 167. With this in mind it is helpful to examine the nature of the claim PepsiCo asserts. Here, PepsiCo asserts monopoly claims under section 2 of the Sherman Act. That Act prohibits unlawful monopolies because monopoly power allows the monopolist to control a market by excluding competition, restricting output, and raising prices, all without losing customers. *See Grinnell Corp.,* 384 U.S. at 571, 86 S.Ct. at 1704; *Hamilton College,* 128 F.3d at 67 (explaining that ability to "restrict output and raise prices" without losing customers is "precisely the vice of a monopoly"). The essence of product market definition in a monopoly case, therefore, is determining whether there exists a group of buyers which is unable, because of market forces, to switch to an alternative product or service in the face of a monopolist's price increase.[FN2]

> [FN2.] Courts have also considered "supply substitutability," or cross-elasticity of supply, *i.e.,* "the ability of firms in a given line of commerce to turn their productive facilities toward the production of commodities in another line because of similarities in technology between them." *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1271 (9th Cir.1975). While the parties have not focused on this potential factor, I note that the effect, if any, of supply substitutability on market definition can be determined after discovery.

**\*13** An example by Professor Areeda, advanced in his attempt to discourage use of the term "submarket," *see supra,* demonstrates that identifying the relevant market turns on identifying the harm to be avoided. Presume a glass maker selling containers for food, medicine, *etc.;* presume also that some of the buyers can readily substitute cans or other packages, but others find substitution more difficult. In explaining how to define the market properly in such a case, Professor Areeda noted that "while the glass firms might be able to charge the latter higher prices than others, the more vulnerable customers are not a 'submarket,' " but rather are properly deemed a relevant product market in their own right. IIA Antitrust Law ¶ 533e, at 170. The following F.T.C. discussion makes the point even more clearly:
[I]f in fact price could be raised above competitive levels for the glass containers sold in these end-use segments, those segments would be proper topics of antitrust concern not because they are submarkets, but because they would be relevant product markets in their own right. *At least in theory, each end-use segment could stand as a grouping of sales for which a hypothetical monopolist might be able to impose a significant price increase.*

In re Owens-Illinois, Inc., 115 F.T.C. 14 (1992) (emphasis added).

Here, the complaint alleges a distinct "end-use segment" comprised of those fountain-dispensed soft drink purchasers who can take delivery *only* through foodservice distributors. For these customers nothing else will do; in Professor Areeda's words, they find substitution "more difficult" than do other purchasers of fountain syrup. If a monopolist-in this case Coca-Cola-can charge these customers more than it charges others, these "more vulnerable" customers constitute a separate product market, and that market is directly relevant to a case complaining about the monopolist's anticompetitive behavior.

As noted above, Coca-Cola suggests that the proper market definition inquiry in a case between manufacturers would be the same as that undertaken in evaluating a horizontal merger between those parties. Exploring this suggestion, I note that in evaluating a horizontal merger between sellers, it is appropriate to consider not only the effect of the merger across a market defined by the full range of those companies' selling opportunities, but also to explore the merger's effects within smaller, distinct markets for "unique" items that the merging entities offer. As the Supreme Court put it in *Brown Shoe,* "[b]ecause § 7 of the Clayton Act prohibits any merger which may substantially lessen competition 'in any line of commerce', it is necessary to examine the effect of a merger in each economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition." *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524. Indeed, as then-Judge Bork observed, "[t]hat view of submarket analysis is also mandated by the purpose of antitrust laws: the promotion of consumer welfare." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 218 (D.C.Cir.1986) (Bork, J.), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987); *see also United States v. Household Fin. Corp.,* 602 F.2d 1255 (7th Cir.1979) (noting that "in determining the effect of competition in mergers of one type of institution, it is the effect in any area of unique services that must be considered" (citing *United States v. Phillipsburg Nat'l Bank,* 399 U.S. 350, 360-61, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970))), *cert.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:05-cv-01096-MHT-TFM    Document 28-7    Filed 03/24/2006    Page 11 of 14

Not Reported in F.Supp.2d                                                                                                      Page 11
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

*denied,* 444 U.S. 1044 (1980).

***14** Indeed, in *Owens-Illinois, supra,* which involved a proposed merger of glass container manufacturers, the F.T.C. looked not only at the market for the broadest range of the companies' selling opportunities, but also examined the effect within distinct "end-user segments" that might be vulnerable to price increases imposed by a hypothetical monopolist. The Commission found that certain classes of customers put the glass containers to different end uses, with varying abilities to substitute away from the product in the event of price increases. The Commission concluded that so long as an "end-user segment within the larger grouping meets the same economic standard which defines a market, the end-use segment may properly be analyzed as a product market in its own right." *Owens-Illinois,* 115 F.T.C. at 16. Accordingly, here, where the complaint alleges an end-use segment that "meets the same economic standard which defines a market," it is appropriate to consider that segment a market.

3. *Coca-Cola Cannot Monopolize a Market in Which It Does Not Participate*

Coca-Cola also argues that PepsiCo's allegations indicate that the proper market here is really the market for foodservice distribution services, not any type of market for fountain syrup. Coca-Cola argues that PepsiCo's market definition is thus inappropriate in a claim against Coca-Cola because Coca-Cola is not a foodservice distributor.

To support the proposition that an entity may not be said to monopolize a market in which it does not participate, Coca-Cola points to *Official Airline Guides, Inc. v. FTC,* 630 F.2d 920 (2d Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981). There, the petitioner published an airline guide which provided detailed information on flight connections and fares. The guide, described as the "bible" of the industry, was the "standard reference for airline ticket offices, travel agents, businesses, and the public generally" and was the "primary market tool of ... virtually every (air) carrier ... in the United States." *Id.* at 921-22. The publisher's concededly arbitrary listing policy was found to handicap commuter carriers attempting to compete against certificated carriers. The Court of Appeals held that the publisher, not itself an air carrier, had no duty under the Federal Trade Commission Act "not to discriminate unjustifiably between certificated air carriers and commuter airlines so as to place the latter at a significant competitive disadvantage." *Id.* at 921.

In so holding, the Court of Appeals noted at the outset that the guide publisher had no "purpose to create or maintain a monopoly" in the relevant market, which was defined as the airline industry. *Id.* at 925. The court concluded that the guide publisher, "though possibly a monopolist in the airline schedule publishing industry, admittedly had no anticompetitive motive or intent with respect to the airline industry and is engaged in a different line of commerce from that of the air carriers." *Id.* at 926.

***15** Here, in contrast, the complaint clearly alleges that Coca-Cola has acted with "anticompetitive motive or intent with respect" to the downstream distribution of its product, that is to say, in the market for fountain-dispensed soft drinks distributed through foodservice distributors. In particular, by virtue of its agreements with foodservice distributors and in carrying out its actual and threatened refusals to deal, Coca-Cola is alleged to have exhibited anticompetitive conduct in a market for its product as delivered through a particular method of distribution that a number of customers must have in order to remain efficient. It is alleged to have done so to the detriment of both retail customers and ultimate consumers, as well as to the detriment of PepsiCo, which is foreclosed from reaching the buyers in this market. Moreover, in contrast to *Official Airline Guide,* both PepsiCo and Coca-Cola compete with one another in the market alleged.

Coca-Cola also relies on *Interface Group, Inc. v. Massachusetts Port Authority,* 816 F.2d 9 (1st Cir.1987), but that case is distinguishable as well. There, the defendant was a municipal authority which possessed a monopoly over an airport's facilities. The plaintiff, an air carrier, was denied access to the ground facility of its choice and claimed that defendant had denied plaintiff access to an "essential facility" in violation of section 2 of the Sherman Act. The court rejected the claim, because it was "difficult to see how denying a facility to one who, like [plaintiff], is not an actual or potential competitor could enhance or reinforce the monopolist's market power." *Id.* at 12. Here in contrast, Coca-Cola's alleged refusals to deal clearly could "enhance or reinforce" Coca-Cola's market power in the market for the sale of its product to those customers who must take delivery through independent foodservice distributors.

The lingering question, however, is whether it makes sense to charge Coca-Cola, a soft-drink

Case 2:05-cv-01096-MHT-TFM     Document 28-7     Filed 03/24/2006     Page 12 of 14

Not Reported in F.Supp.2d                                                                                                Page 12
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

manufacturer, with monopolizing a product market defined by reference to both the product Coca-Cola manufactures, fountain syrup, and the independent, value-added method of distribution through which that syrup is delivered. As PepsiCo alleges it, this case involves one market with two components: the market for (1) fountain-dispensed soft drinks (2) distributed through foodservice distributors. As Coca-Cola would have it, this case involves two distinct markets: (1) a market for fountain-dispensed soft drinks (in which PepsiCo and Coca-Cola compete) and (2) a market for foodservice distribution services (in which neither PepsiCo nor Coca-Cola participate or compete). Coca-Cola maintains that the market PepsiCo has alleged is at most a distribution-specific market; thus, because Coca-Cola does not participate or operate in any distribution business, a claim that it monopolizes such a market makes no sense. According to Coca-Cola, it may be accused of monopolizing only a market for the "thing" it produces, which in this case is the fountain syrup used to make fountain-dispensed soft drinks.

**\*16** But PepsiCo does more than allege a market for distribution services and it has not alleged that Coca-Cola monopolizes the foodservice distribution industry generally. Rather, PepsiCo alleges that Coca-Cola has monopolized the market for fountain-dispensed soft drinks *as distributed through* foodservice distributors. According to the allegations in the complaint, consumers view fountain syrup distributed within this cluster of products and services to be different from fountain-dispensed soft drinks distributed through other means. According to the complaint, therefore, the relevant product is neither fountain-dispensed soft drinks alone nor foodservice distribution services alone, but rather a distinct product created by the combination of fountain-dispensed soft drinks and distribution through foodservice distributors. So understood, Coca-Cola has a hand in making this combined product-it manufactures the fountain syrup and secures delivery of that syrup through a distinct channel of distribution that the complaint describes as the "lifeblood of competitive efficiency in the restaurant business, movie theater business and other businesses that depend upon delivery through foodservice distributors in order to remain logistically efficient." Complaint ¶ 8. In this way Coca-Cola creates a product that is unique in the purchasing eyes of an increasing number of restaurants, movie theaters, and other "on-premise" accounts. Moreover, the complaint alleges that by virtue of its actual and threatened refusals to deal Coca-Cola has acted with anticompetitive purpose and intent in this market. Thus, while the complaint does not allege that Coca-Cola is a direct participant in the downstream foodservice distribution market, *i.e* ., it does not compete horizontally with foodservice distributors, the complaint does allege Coca-Cola's purposeful participation in the distribution of its product and in that regard trumps, at the pleading stage, any attempt by Coca-Cola to disclaim participation in the market alleged in the complaint.

### III. FAILURE TO ALLEGE ANTICOMPETITIVE CONDUCT

PepsiCo alleges that Coca-Cola is unlawfully exercising its monopoly power by refusing to deal and threatening to refuse to deal with foodservice distributors that carry or desire to carry Pepsi. Coca-Cola properly notes that even where a defendant has monopoly power, a plaintiff's claims of actual or attempted monopolization require proof of anticompetitive conduct as an essential element of the claim. *See Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. at 890; *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991).

Coca-Cola argues that the conduct in which it is alleged to have engaged is not anticompetitive as a matter of law. In particular, Coca-Cola contends that PepsiCo's complaint is fatally flawed because it fails to allege that Coca-Cola's agreements with foodservice distributors are not terminable at will. For this proposition Coca-Cola cites a number of cases of "fairly recent vintage": *Paddock Publications, Inc. v. Chicago Tribune Co.,* 103 F.3d 42 (7th Cir.), *cert. denied,* 520 U.S. 1265, 117 S.Ct. 2435, 138 L.Ed.2d 196 (1997); *Omega Envt'l, Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1164 (9th Cir.1997), *pet. for cert. filed,* 66 U.S.L.W. 3750 (May 11, 1998); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 236-38 (1st Cir.1983).

**\*17** Each of these cases held that exclusive dealing arrangements that were terminable at will or of short duration were not barred by the antitrust laws because they left the relevant market up for grabs and because competitors were not foreclosed from the market but rather were encouraged to "compete for the contract." *See Paddock,* 103 F.3d at 45 (dismissing exclusive dealing claim brought under section 1 of the Sherman Act because, *inter alia,*

Not Reported in F.Supp.2d                                                                                                Page 13
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases  P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

"other firms that want to enter the market can do so by competing at intervals for these contracts"); Gilbarco, 127 F.3d at 1164 (finding, after trial, that exclusive dealing arrangements did not foreclose rivals from substantial portion of market because other modes of distribution were available and all relevant distributors were open to bids within one year or less); Barry Wright, 724 F.2d at 236-38 (affirming district court's rejection of claim that requirements contract was exclusionary after finding, on complete record, that multiple factors, including nature and duration of contract, suggested the agreements were not 'exclusionary').

Coca-Cola argues that in this case the ability of *all* distributors to switch to Coca-Cola's competitors' products at all times precludes a finding of exclusionary conduct as a matter of law. Coca-Cola points out that the complaint itself alleges that the reason distributors faced with threats do not carry Pepsi is because those distributors could not afford to stop distributing Coca-Cola in favor of Pepsi because those distributors have customers who want Coca-Cola. According to Coca-Cola, this reflects Coca-Cola's superior product and superior business strategy, not unlawful monopolistic activity.

PepsiCo points out, however, that this complaint does not assert that Coca-Cola has entered into anticompetitive exclusive dealing contracts. Rather, PepsiCo complains that Coca-Cola's actual and threatened refusals to deal represent anticompetitive monopolization or attempted monopolization of the relevant market. To this effect, PepsiCo relies predominantly upon Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), which held that a defendant-monopolist's refusal to deal with any advertiser that also dealt with an emerging competitor constituted a section 2 violation because it was a use of "monopoly to destroy threatened competition ." *Id.* at 143, 72 S.Ct. at 187 (recognizing the general right of a private business to select its customers, but holding that the exercise of that right for the purpose of monopolization violates the Sherman Act). This principle may be traced back to the Supreme Court's pronouncement generations ago that:
*In the absence of any purpose to create or maintain a monopoly,* the [Sherman Act] does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he may deal.

**\*18** United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). The principle has remained valid law. *See* Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 602, 105 S.Ct. 2847, 2857, 86 L.Ed.2d 467; Byars v. Bluff City News Co., 609 F.2d 843, 858 (6th Cir.1979) (observing that where "a monopolist refuses to deal with customers who deal with its rivals," such "behavior is inherently anticompetitive; *Lorain Journal* ... makes it clear that this is illegal ...."). As noted by Professors Areeda and Hovenkamp:Extraction of an agreement not to deal with any competitor-or the equivalent, refusing to deal with buyers who do-can be exclusionary and particularly damaging where the buyers cannot do without the seller's product or service. We see no convincing justification for a requirement that a customer not deal with a particular rival.

IIIA Phillip E. Areeda et al., Antitrust Law ¶ 768e6 (citing Lorain Journal, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162).

In this case, PepsiCo asserts that Coca-Cola has refused to deal and threatened to refuse to deal with independent foodservice distributors who wish to distribute Pepsi. This conduct might be unobjectionable had PepsiCo not alleged that Coca-Cola has acted with a "purpose to create or maintain a monopoly." But PepsiCo's complaint does allege that Coca-Cola possesses or is likely to possess monopoly power in the market for fountain-dispensed soft drinks delivered through these distributors and that Coca-Cola's actual and threatened refusals to deal have been undertaken with the "purpose to create or maintain" monopoly power in that market. The complaint also alleges that Coca-Cola's actions effectively foreclose PepsiCo from reaching any consumers in the relevant market. As such, PepsiCo's complaint states a section 2 claim, and Coca-Cola's motion to dismiss on the ground that PepsiCo has failed to allege anticompetitive conduct must be denied.

CONCLUSION

"Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." Eastman Kodak, 504 U.S. at 467-68, 112 S.Ct. at 2082. Taking the allegations in the complaint as true, I find that they describe an economically viable market relevant to the section 2 claims PepsiCo asserts. Thus, because it does not appear that PepsiCo "can prove no set of facts in support of [its] claim which would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 14
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases P 72,257
**(Cite as: Not Reported in F.Supp.2d)**

entitle [it] to relief," *see* Hamilton College, 128 F.3d at 62, Coca-Cola's motion to dismiss is denied. PepsiCo now must demonstrate, however, that "market realities" support the market it has alleged.

Counsel shall appear for an initial pre-trial conference in Courtroom 12A on Friday, October 2, 1998, at 10:00 a.m.

SO ORDERED:

S.D.N.Y.,1998.
Pepsico, Inc. v. Coca-Cola Co.
Not Reported in F.Supp.2d, 1998 WL 547088 (S.D.N.Y.), 1998-2 Trade Cases P 72,257

Briefs and Other Related Documents (Back to top)

• 1999 WL 33919644 (Trial Pleading) Defendant's Answers and Defenses to Plaintiff's Amended Complaint (Apr. 01, 1999)
• 1999 WL 33919643 (Trial Pleading) Amended Complaint (Mar. 02, 1999)
• 1998 WL 34311465 (Trial Pleading) Defendant's Answers and Defenses to Plaintiff's Complaint (Sep. 11, 1998)
• 1998 WL 34311464 (Trial Pleading) Reply Brief of Defendant the Coca-Cola Company in Support of Its Motion to Dismiss (Jun. 29, 1998)
• 1998 WL 34311501 (Trial Motion, Memorandum and Affidavit) Pepsico, Inc.'s Memorandum of Law in Opposition to Defendant's Motion to Dismiss (Jun. 29, 1998)
• 1998 WL 34311502 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant the Coca-Cola Company in Support of Its Motion to Dismiss (Jun. 29, 1998)
• 1998 WL 34311463 (Trial Pleading) Complaint (May. 07, 1998)
• 1:98cv03282 (Docket) (May. 07, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.