

Not Reported in F.Supp.
Not Reported in F.Supp., 1988 WL 142119 (W.D.Mo.), 1988-2 Trade Cases P 68,323
**(Cite as: Not Reported in F.Supp.)**

Page 1

United States District Court, W.D. Missouri.
John REDMOND and Ann Redmond, d/b/a Passport Bookstore, Plaintiffs,
v.
MISSOURI WESTERN STATE COLLEGE, Defendant.
**84-6139-CV-SJ-6.**

Nov. 2, 1988.

MEMORANDUM AND ORDER

SACHS, District Judge.

**\*1** The parties and the court have been struggling fitfully with legal issues presented by defendant's practice of issuing vouchers to scholarship students, usable only for books and paper products (school supplies) sold by the college bookstore. [FN1] Plaintiffs, owners of a competing bookstore, assert in Count I of the amended complaint that there has been an attempt at monopolization, in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2. In Count II they allege violations of Missouri antitrust laws. Defendant's motions for summary judgment on Count I and to dismiss Count II will be sustained.

I.

The court acknowledges some difficulty with this case, although the facts seem not to be in material controversy. The voucher practice, though presumably profitable to defendant, appears to "serve hardly any purpose beyond the suppression of competition." *Standard Oil Company v. United States,* 337 U.S. 293, 305 (1949). Plaintiffs do not allege a conspiracy or agreement, in violation of § 1 of the Act, in that defendant is acting unilaterally. The elements of monopolization or attempted monopolization cannot be satisfied, however, unless (arguably) there is an artificial classification limiting the market to products sold to scholarship students. [FN2]

Plaintiffs and defendant compete in selling books and related products to students in the St. Joseph area, and in particular those attending Western Missouri State College. The range of competition is by no means limited to scholarship students. Plaintiffs contend that the practice complained of relates to some 700 scholarship students out of a student body of some 4,000. Thus the restricted group, even assuming total success, would account for no more than about 17% of the market. A practice so narrowed cannot, under existing law, be treated as an unlawful attempt to monopolize. *International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.,* 812 F.2d 786, 792-3 (2d Cir. 1987) (17% market share "not sufficiently significant to give rise to a dangerous probability" that defendant "would monopolize the market even when its anticompetitive conduct is taken into account"); *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1368-9 (5th Cir. 1976) (attempted monopolization not chargeable to defendant acquiring 20% of the market); *Robert's Waikiki U-Drive v. Rudget Rent-a-Car,* 491 F.Supp. 1199, 1219 (D. Haw. 1980) ("fly-drive" arrangement steering passengers on airlines does not create dangerous probability of a successful monopolization where market share is 20-25%), *affirmed without challenge* to this aspect of district court ruling, 732 F.2d 1403, 1406 (9th Cir. 1984). [FN3] In fact, the court understands plaintiffs assert they are able to prosper competitively with defendant, insofar as the total student market is concerned, in that defendant's pricing pattern discourages student purchases. There is no dangerous probability of a college textbook monopoly in St. Joseph.

**\*2** The court does not find that the plaintiffs develop any theory supporting a market definition that would confine itself to scholarship students. Where a lock-in theory of *product* use can be established, some cases accept a narrowed view of the market allegedly being monopolized. *See General Business Systems v. North American Philips Corp.,* 699 F.2d 965, 972-5 (9th Cir. 1983). Antitrust plaintiffs cannot, however, artificially define a market so as to cover only the practice complained of; this would be circular or at least result-oriented reasoning. 699 F.2d at 975. Any restrictive practice that has economic likelihood of success could be outlawed, if the relevant market is narrowed to the group affected by the practice. The absence of citations showing successful monopolization claims from issuance of vouchers, or scrip, or use of other customer steering devices, shows that § 2 of the Sherman Act has not been interpreted to allow such narrow market definitions as to prohibit conduct like that at bar. [FN4]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1988 WL 142119 (W.D.Mo.), 1988-2 Trade Cases P 68,323
**(Cite as: Not Reported in F.Supp.)**

An attempt to define the relevant market in terms of a certain class of prospective purchasers runs contrary to the classic tests used in a monopolization case. "As a prerequisite to recovery" under a monopolization theory a "plaintiff must properly delineate the relevant market, which is comprised of a geographic and product market." *Morton Buildings of Nebraska Inc. v. Morton Buildings Inc.,* 531 F.2d 910, 918 (8th Cir. 1976). Classes of prospective purchasers are not separated, and it seems unprecedented to allow a claim that a defendant has monopolized a class of customers as distinguished from a product or service. This limitation on market definition apparently goes back to the Supreme Court opinion in *Standard Oil Company v. United States,* 221 F.2d 1, 61 (1911), where it was said that "the manifest purpose of the statute has both a geographical and a distributive significance, that is it includes any portion of the United States and any one of the classes of things forming a part of interstate or foreign commerce." Only "classes of things" can be monopolized, under this definition, not certain groups of customers.

The parties have cited the *Fortner* litigation. *United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610 (1977). In that controversy it was alleged that the steel company had engaged in a tying arrangement forbidden by § 1 of the Sherman Act and there were incidental allegations of monopolization. The Supreme Court summarily ruled for the defendant on the monopolization issue. 429 U.S. at 612, n. 1. Defendant did not have a large market share or dominant market share for prefabricated homes. But if plaintiff had been permitted to limit its market definition to the tying arrangement itself (for example, purchasers of prefabricated homes having credit arrangements with defendant), the monopolization result would obviously have been different. The failure of the claim in Fortner, although not extensively discussed by the Supreme Court, supports my conclusion that plaintiffs are unsoundly limiting the market definition to fit the monopoly claim.

\*3 Summary judgment will be entered in favor of defendant on Count I.

## II.

Count II is based on Missouri law which essentially mirrors federal law. Section 416.031, RSMo. Defendant would doubtless be entitled to summary judgment on this count, also, if such a motion had been filed. The renewed motion to dismiss Count II will be granted under both the Eleventh Amendment and (on reconsideration) preemption under 15 U.S.C. § 34 and 35(a). *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89 (1984).

Summary judgment is GRANTED in favor of defendant under Count I, and defendant's motion to dismiss is GRANTED as to Count II. SO ORDERED.

> FN1. Plaintiffs also complain about withholding information, rent-free space and the like without showing that an antitrust violation is involved.
>
> FN2. Even with such a limitation, the court would have difficulty finding a violation in that (1) the vouchers are redeemable in cash, a process that takes approximately one week, and (2) price competition remains effective for scholarship students who have some savings, or can borrow from family, for example, or obtain temporary credit from plaintiffs. The voucher system thus appears to work some inconvenience, but does not necessarily lock scholarship students into purchases from defendant, certainly not at any profit margin defendant seeks to impose. Such ability to manipulate prices would be the ordinary earmark of monopoly power.
>
> FN3. It is recognized that the 17% of the market referred to here assumes that defendant gets all the voucher business and no other business from students. The record fails to show the actual shares in the textbook market, and plaintiffs do not base their claim on that percentage.
>
> FN4. Recognizing that plaintiffs' case does have intrinsic appeal regardless of the precedents, it seems that there would be a possibility of relief before the Federal Trade Commission, on a claim of unfairness in defendant's method of competition. 15 U.S.C. § 45.

W.D.Mo.,1988.
Redmond v. Missouri Western State College
Not Reported in F.Supp., 1988 WL 142119 (W.D.Mo.), 1988-2 Trade Cases P 68,323

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1988 WL 142119 (W.D.Mo.), 1988-2 Trade Cases  P 68,323
**(Cite as: Not Reported in F.Supp.)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.