**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **PRECISION CPAP, INC.;** | ) |
| **MEDICAL PLACE, INC.;** | ) |
| **PHASE III VANS, INC. d/b/a** | ) |
| **EAST MEDICAL EQUIPMENT** | ) |
| **AND SUPPLY; and MED-EX,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION NO.:** |
| | )       **2:05-cv-1096** |
| **JACKSON HOSPITAL;** | ) |
| **MED-SOUTH, INC.; JMS** | ) |
| **HEALTH SERVICES, L.L.C. d/b/a** | ) |
| **JACKSON MED-SOUTH HOME** | ) |
| **HEALTH, L.L.C.; BAPTIST** | ) |
| **HEALTH, INC.; AMERICAN** | ) |
| **HOME PATIENT, INC.;** | ) |
| **BAPTIST VENTURES-** | ) |
| **AMERICAN HOME PATIENT,** | ) |
| | ) |
| **Defendants.** | ) |

**OPPOSITION TO MOTION TO DISMISS
FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

### A.    Facts Alleged In Complaint

This is an antitrust case in which the basic allegations are that Jackson Hospital and

Baptist Hospital combined with MedSouth, Inc. and American Home Patient respectively, to

operate durable medical equipment ("DME") businesses. The joint venture DME businesses are

Jackson-MedSouth DME, L.L.C. ("Jackson-MedSouth"), and Baptist Ventures-American

Homepatient ("Baptist/American DME") (First Amended Complaint "FAC", ¶ 12).

The operative allegations of the Complaint are that Jackson Hospital entered into a joint

venture with Med-South, Inc., a DME company, and Baptist Hospital entered into a joint venture

with Baptist Ventures American Homepatient to form Jackson-MedSouth and Baptist/American DME. The joint venture DME companies are sometimes referred to herein as "captive DME companies." (FAC, ¶¶ 11, 12).

Durable medical equipment is the provision of medical devices needed for care in the homes of patients, largely after discharge from the hospital (First Amended Complaint, "F1AC", ¶ 3) The equipment is usually leased, but sometimes sold, and includes items such as wheelchairs, hospital beds, oxygen, walkers, respiratory therapeutic devices and services, and other durable medical devises (FAC, ¶ 3). A large portion of DME business comes from patients who have been recently discharged from a hospital. The market actors are aware of this district and large portion of the business, and treat that subset of business in a particular fashion by focusing marketing efforts on hospital patients and staff in an attempt to gain the business (FAC, ¶ 17). In fact, patients must be prescribed durable medical equipment from a physician, and the orders must come through the hospital. As such, there is a specific method or chain of distribution through which DME is dispensed, that is recognized by all parties (FAC, ¶¶ 16, 21, 24-31).

One particular way this market was treated was that, before entry into the market of the captive DME companies, Plaintiffs and other DME companies worked with hospital case workers and staff in assisting patients with their DME needs (FAC, ¶ 19). Also, if hospital patients did not have a preference for DME services, the patients were referred by hospital staff to the various DME providers in the market area of a rotational system (FAC, ¶ 20).

The market, defined as the market for the rental and sale of durable medical equipment to patients discharged from Jackson Hospital, Baptist Medical Center, and Baptist Medical Center East in Montgomery and Prattville, Alabama (FAC, ¶ 17), changed dramatically in the late 1990's (FAC, ¶ 22). In the late 1990's, the captive DME joint ventures were established (FAC, ¶ 22). Part and parcel of these joint venture agreements was an agreement that the hospitals would restrict access to hospital patients, and instruct hospital staff to refer or funnel all DME referrals

to the captive DME companies (FAC, ¶ 24). The economic incentive for this agreement and subsequent behavior is obvious. The captive DME companies got an exclusive market, and the hospitals enjoyed a financial stake in the profitability of their joint ventures that had exclusive access to the market (FAC, ¶ 25). In this way, the captive DME companies were able to expand their business, not by greater efficiency or business acumen, but by combining with the hospitals to foreclose competition in the market for durable medical equipment needed by patients discharged from the hospitals (FAC, ¶¶ 24-31). It is this combination and monopolization that has lead to the filing of this action.

### B.    The Legal Causes of Action

The above-referenced facts give rise to claims brought pursuant to sections 1 and 2 of the Sherman Antitrust Act, and Sections 4 and 16 of the Clayton Act. The Sherman Act prohibits contracts or combinations "in restraint of trade or commerce among the several states . . ." and acts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states . . ." 15 U.S.C. §§ 1, 2. From these relatively brief statutory prohibitions has grown a number of recognized iterations of claims, which are included in this action: Coercive Reciprocity; Concerted Refusal to Deal; Monopolization; Attempted Monopolization; Conspiracy to Monopolize; and Conspiracy to Monopolize (under the essential facilities doctrine). Plaintiffs have plead a *prima facie* case under each of these theories, and Defendants' Motion to Dismiss is due to be denied.

### 1.    Coercive Reciprocity.

A claim of coercive reciprocity, like a tying arrangement claim, is premised on "the practice of using economic leverage in one market coercively to secure competitive advantage in another." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1360 (Fed. Cir. 1999 (Ala.)). In this case, Defendants use their economic leverage in the market for hospital services to obtain a competitive advantage over Plaintiffs in the market for the sale and rental of DME (FAC, ¶¶ 13,

16, 17). Such an arrangement is a *per se* violation of the antitrust laws, which means that no proof of monopoly power in a particular market, the focus of much of Defendants' argument is necessary in making out such a claim. *Id.*, *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 425 (5th Cir. 1978); see also *Betaseed v. U & I, Inc.*, 681 F.2d 1203, 1216 (9th Cir. 1982).

The requisites for this claim under the Sherman Act have been plead. The FAC states that the hospital defendants have used their power in the market for acute care hospital services to coerce patients into using the captive DME companies to fill their DME needs (FAC, ¶¶ 13, 16, 36-38). More specifically, the FAC states the hospitals are the primary sources of hospital care such that their share of that market rises to monopoly power (FAC, ¶ 13). The FAC goes on to show how the hospitals and captive DME companies have an arrangement whereby the market for DME sales to those customers is foreclosed. The FAC states:

> Part and parcel of the joint venture between the hospitals and their captive DME companies referenced above was that the hospitals and their captive DME companies would combine to restrict access to the market for durable medical equipment sales and rentals to patients discharged from hospitals' agreement that they would instruct case workers and staff only to steer patients to captive DME companies, and to deny Plaintiffs access to the hospital staff and patients. The rotational system referenced herein was ceased, and Plaintiffs were no longer allowed to market to the hospital staff and patients. Moreover, hospital staff continues to steer patients needing DME to the captive DME companies. In essence, since Plaintiffs and other DME providers have been denied access, and the hospitals have informed patients that the captive DME companies can meet their needs, the patients in the market, with very few exceptions, know of only one choice for durable medical equipment—the captive DME companies. This strongly has worked because now the captive DMEs have such market share that they can cut services and/or raise prices without any corresponding drop in usage or revenues.

(FAC, ¶ 24) There is no question that the hospitals have used their monopoly power in this particular channel of distribution, i.e., patients who have been treated at their hospitals, to steer patients to their captive DMEs, and to foreclose any other competitors from accessing that market (FAC, ¶¶ 24, 36-38). That is coercive reciprocity proscribed by the Sherman Act.

4

## 2.    **A Claim For Concerted Refusal To Deal Has Been Made.**

Count II of the Complaint states a claim for concerted refusal to deal.  "Certain agreements, including concerted refusals to deal . . . have generally long been held to be per se unreasonable and always illegal."  *Orval Sheppard Real Estate Co., Inc. v. Valinda Freed & Assoc.*, 608 F. Supp. 354, 358 (M.D. Ala. 1985), citing *U.S. v. General Motors Corp.*, 86 S.Ct. 1327, 1330-31 (1966).  In *Orval Sheppard*, this Court correctly noted that a business, in this case a real estate agency, has a right to partner with whatever other businesses it chooses "provided its refusal stems from independent decision, and not from some agreement, tacit or otherwise." *Orval Sheppard*, 608 F. Supp. at 357.  In this case, it is alleged that the actions of the hospitals in referring patients only to their captive DMEs and excluding Plaintiffs and other DME companies from the market, results not from any independent business reason benefiting the hospitals, but because there is an agreement between the hospitals and their captive DMEs that referrals will only be made to the captive DMEs, thereby increasing the profitability of the DME companies, which the hospitals have a stake in. (FAC, ¶ 24).  Such is the very definition of a concerted refusal to deal.

### 3.    **Monopolization.**

A monopolization claim rests upon two elements: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth and development as a consequence of superior product, business acumen, or historic accident.  *U. S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  The FAC alleges that the captive DMEs have monopoly power, in terms of market share, in the market for DME sales and rentals for patients discharged from their respective hospitals.  The allegation is that this monopoly was acquired, and is maintained, not because of any particular business practice of the captive DMEs, but because of the agreement between the captive DMEs and the

hospitals that all referrals will come to the captive DMEs (FAC, ¶¶ 24-25, 49). This states a monopolization claim.

### 4. Attempted Monopolization.

An attempted monopolization claim is properly plead where the plaintiff alleges that the defendant(s): (1) engaged in predatory conduct; (2) intended to monopolize; (3) with a dangerous probability of success. *Spectrum Sports, Inc. v. McQuillan*, 113 S. Ct. 884, 890-91 (1993). These elements have been plead.

"A firm that attempts to exclude competitors on some basis other than efficiency has engaged in predatory conduct." *Gould v. Sacred Heart Hosp. of Pensacola*, 1998 WL 1017208 (N.D. Fla. 1998), citing *Aspen Skiing Company v. Aspen Highlands Skiing Corp.*, 105 S.Ct. 2847, 2859 (1985). It is alleged in the FAC that the hospitals, in conjunction with their captive DMEs, have excluded Plaintiffs, not because of any efficiency, but because the two can profit, the captive DMEs directly, and the hospitals indirectly, from all referrals going to the captive DME providers (FAC, ¶¶ 24 quoted above; see also FAC, ¶¶ 25, 27, 29, 56, 57).

Once predatory conduct is established, the other two elements of an attempted monopolization claim follow. Unfair or predatory conduct "may be sufficient to prove the necessary intent to monopolize. . ." *Spectrum Sports, Inc.*, 113 S. Ct. at 892 (1993). In this case, the exclusionary practices were established, and continue for the sole purpose of maintaining the monopoly on DME services with the Captive DMEs. Not only has there been a showing of a strong probability of success due to the very nature of the conduct involved, but the market is already monopolized by the captive DMEs such that the elements of an attempted monopolization claim have been plead.

### 5. Conspiracy To Monopolize.

To plead a claim for conspiracy to monopolize, a plaintiff must plead: (1) concerted action entered into with the intent of achieving a monopoly; and (2) the commission of at least an overt act in furtherance of the conspiracy. *Seagood Trading Corp. v. Jericho*, 924 F.2d 1555,

1576 (11th Cir. 1991). As stated above, the same allegations that make up the predatory conduct in the case, the agreement to restrict referrals to the captive DMEs to further the hospitals' and the captive DMEs' joint financial interests, show concerted actions with an intent of achieving a monopoly (FAC, ¶¶ 24-25). The overt acts are similarly well plead. The FAC states that part and parcel of the joint venture agreements giving life to the captive DME companies was that the hospitals would restrict access to the market for DME referrals out of the hospitals, and would instruct staff to only steer patients to the captive DME companies. The FAC goes on to state that, "Defendants began directing and/or assigning such patients to their captive DME companies, and excluding Plaintiffs from the market of DME business sold to hospital patients discharged from the hospitals." (FAC, ¶ 26). In paragraphs 27-31 of the FAC, specific examples of memoranda and communications aimed at excluding Plaintiffs from the market are alleged.

### 6.    Claim Under The Essential Facilities Doctrine.

Count Six of the FAC states a cause of action pursuant to Section 2 of the Sherman Act under the essential facilities doctrine. The essential facilities doctrine requires the plaintiff to prove: (1) control of the essential facility by monopolist; (2) a competitor's inability to practicably or reasonably duplicate the essential facility; (3) denial of the use of the facility to competitors; and (4) feasibility of providing the facility to a competitor. *MCI Communication v. AT&T*, 708 F.2d 1081 (7th Cir.1983). The doctrine "imposes upon a firm controlling an essential facility--that is, a facility that cannot be reasonably duplicated and to which access is necessary if one wishes to compete--the obligation to make that facility available to competitors on nondiscriminatory terms." *Fishman v. Estate of Wirth*, 807 F.2d 520, 537 (7th Cir. 1986).

In this case, it has been alleged that the hospital, at least in terms of the referral of DME providers, is controlled by the hospital companies. There is no question that the DME providers cannot reasonably or practicably operate their own hospitals, and such is plead (FAC, ¶ 70). It has similarly been alleged that Plaintiffs are denied use or access to the facility. Lastly, it has been alleged that, prior to the entrance of the Jackson DMEs into the market, Plaintiffs, and the

market of the DME providers, did have access to the market for getting these services to be provided to patients discharged from the hospitals (FAC, ¶¶ 16, 20, 21). As such, history shows that it is feasible to provide Plaintiffs and other DME providers access to the hospitals, satisfying the fourth element of a claim under the essential facilities doctrine. As such, a claim for monopolization under the essentials facilities doctrine has been alleged.

## II. ARGUMENT

### A.     There Are Three Cases Involving Hospital/DME Combinations that are Directly On Point, And Have Been Decided In Favor of the Plaintiffs.

Defendants have cited numerous authorities from within and without the 11th Circuit in their papers. However, it was only after Plaintiffs' Response to Defendants' original Motion to Dismiss was filed that Defendants even mentioned *Advanced Health Care Services, Inc. v. Radford Community Hospital*, 910 F.2d 139 (4th Cir. 1990); *M&M Medical Supply Svcs., Inc. v. Pleasant Valley Hospital*, 981 F.2d 160 (4th Cir. 1993), and the 11th Circuit case *Key Enterprises of Delaware, Inc. v. Venice Hospital*, 919 F.2d 1550, vacated 979 F.2d 806 (11th Cir. 1990).[1] The facts in these cases mirror the facts alleged in the present action. In all of these cases, DME companies filed antitrust actions against hospitals and the DME companies. The allegations in the cases were that the captive DME received the majority of its business from the hospitals at

---

[1] Plaintiffs' counsel is aware that the 11th Circuit panel decision in *Key Enterprises* was vacated. However, the opinion was vacated only under the most peculiar circumstances. In *Key Enterprises*, a DME company brought an antitrust action against a hospital and its captive DME company on antitrust grounds. The case was tried, resulting in a substantial verdict for the plaintiff. The district court granted the defendant's motion for summary judgment notwithstanding the verdict. *Key Enterprises v. Venice Hosp.*, 703 F. Supp. 1513 (M. D. Fla. 1989). The 11th Circuit reversed the ruling and reinstated the jury verdict. The defendants filed a petition for *en banc* rehearing, which was granted. However, in the interim, the case was settled, and request was made to vacate the panel decision. The 11th Circuit ultimately vacated the panel decision because the settlement mooted the case. This case is cited herein as persuasive authority for how the 11th Circuit has viewed many of the same issues raised in this action.

issue, and that the joint venture DME received a monopolists percentage of all DME referrals from the hospital. These are the same allegations that are made in the case at bar.

The *Key Enterprise* case, which was tried, is consistent with two other Circuit Court opinions in which the merits of DME providers' antitrust claims against hospitals and captive DME providers were considered. *Advanced Health Care Services, Inc.*, and *M&M Medical Supplies and Services, Inc., supra*. In these three cases, the Courts allowed antitrust claims against hospitals and their jointly owned DME ventures to go forward, (one was an affirmance of a jury verdict, on summary judgment, and the third on a motion to dismiss). The facts in this case are functionally identical to the facts in those cases, and this case should similarly be allowed to go forward.

### B. Legal Standard

Defendants have brought a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Of course, the standard for such a motion is that all factual inferences to be drawn from the Complaint are made in favor of Plaintiffs, and the complaint should only be dismissed with prejudice if it appears beyond a doubt that the pleader can assert no set of facts which would entitle it to relief. *St. Joseph's Hosp. Corp. v. Hosp. Corp. of Am.*, 795 F.2d 948, 953 (11th Cir. 1986). The Defendants' burden in this case is particularly high where "dismissals are disfavored in fact-intensive antitrust cases." *Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communication, Inc.*, 376 F.2d 1065, 1070 (11th Cir. 2004), citing *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 944-45 (11th Cir. 1983). Lastly, Defendants make several arguments concerning the relevant product market in this case. "The definition of the relevant market is a question nearly dependent upon the special characteristics of the industry involved." *National Bancard Corp. v. Visa, U.S.A.*, 779, F.2d 592, 604 (11th Cir. 1986), quoting *Salmeyer v. Coca Cola Co.*, 515 F.2d 835, 839 (5th Cir. 1975). As a question of fact, a motion to dismiss on the issue rarely appropriate.

Plaintiffs contend, that the FAC is sufficiently specific in its allegations, and sets forth claims under each cause of action alleged. However, if there is some pleading defect such that a more carefully drafted Complaint might state a claim upon which relief can be granted, the Courts have held that a district court should give a plaintiff an opportunity to amend the Complaint instead of dismissing it. *Friedlander v. Nims*, 755 F.2d 810, 817 (11th Cir. 1985). As such, if this Court finds some technical defect in the FAC, or some other curable defect, Plaintiff certainly can and will cure such defect if directed to do so.

## C.   Defendants' Argument Concerning "Combining" Market Share to Show Monopoly Power Misunderstands Allegations of the Complaint.

Confronted with the three factually similar hospital controlled DME cases referenced above, Defendants attempt to distinguish the cases on the basis that in those cases, there was only one hospital in the community served, and in this case there are three hospitals. However, because the submarkets alleged in this case are defined by the contours of this particular method of distribution of DME, distribution of DME to patients discharged from each hospital, this is a difference without distinction.

Defendants' chart as to the two markets at issue in the case on p. 12 of their brief accurately depicts the submarkets at issue. They are: (1) the market for the sale and rental of durable medical equipment to hospital patients discharged from Jackson Hospital (Jack Med-South Captive DME in Montgomery and Prattville, Alabama); and (2) the market for the sale and rental of durable medical equipment to hospital patients discharged from Baptist and Baptist Medical Center East Hospitals (Baptist Health America Home Patient Captive DME in Montgomery and Prattville, Alabama).

In their Motion to Dismiss the original Complaint in this matter, Defendants denied the existence of legally recognizable submarkets. Defendants now, however, recognize the existence of properly defined submarkets (Defendants' Brief, p. 24).

[W]ithin this broad market, well-defined submarkets may exist which, in

10

> Themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*U. S. Anchor Mtg., Inc. v. Rule Industries, Inc.* 7 F.3d 986, 995 (11th Cir. 1993), citing *Brown Shoe Co. v. United States*, 82 S. Ct. 1502, 1523 (1962).

The FAC alleges that a great deal of DME business comes form patients who have been discharged from hospitals, and have been prescribed durable medical equipment by their physician (FAC, ¶ 16). Indeed, the facts are that the provisions of DME services to those patients must be by a prescription from a physician who, of course, is at the hospital (FAC, ¶016), and then the hospital staff makes the referral to the DME providers (FAC, ¶¶ 20-21). Indeed, the very nature of the business creates a mandated, specific channel of distinction through which DME is provided to this significant segment of the market. The FAC alleges that the market is boundaried by a distinct method of distribution to a distinct segment of customers. The FAC goes on to allege that the market actors within this chain of distribution, and that DME providers have traditionally focused their marketing efforts accordingly (FAC, ¶¶ 16, 17, 26-28). More specifically, the FAC states, "The market actors are aware of this submarket of business, and treat it accordingly by focusing market efforts on patients and staff in an attempt to gain market share, particularly targeting staff who will ultimately arrange DME services. (FAC, ¶ 17). The FAC similarly recognizes a unique line of vendors that the DME companies must market to. That is, hospital staff arranges for DME services. As such, they are the vendors with whom DME providers must work with to market their services.

What exists in this case is a particular method of distribution. That is, the methods of distribution whereby hospital patients are prescribed DME while in the hospital, and whose DME needs are arranged through staff at the hospital. This specific distribution system operates as a submarket. The courts have recognized that "All forms of distribution must, at some level, compete with one another, however, 'the mere fact that a firm may be termed a competitor in the

overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.'" *Fed. Trade Comm. v. Cardinal Health, Inc.*, 42 F. Supp. 2d 34, 46 (D.D.C. 1998), quoting *F.T.C. v. Staples, Inc.* 970 F. Supp. 1066, 1075-76 (D.D.C. 1997).

Plaintiffs do not attempt to "combine" the two streams of distribution flowing out of the hospitals to show market share in the overall DME market. The two submarkets are separate and distinct. What the FAC describes is a particular channel of distribution for durable medical equipment. That is, the channel of distribution whereby patients are discharged from the hospital with DME needs, and those needs are filled by working through hospital staff that must make a referral to patients who are in the hospital without access to any other choice of distribution. In *Greyhound Computer Corp., Inc. v. IBM*, 559 F.2d 488 (9th Cir. 1977), the question was whether a market could be defined as the market for the lease of computer systems as opposed to the market for the sale leasing of general purpose computers for commercial application. This submarket definition contained a limitation not only predicated on a particular customer (commercial application), but also upon a particular method of distribution (a lease as opposed to the sale of a computer) the Court held:

> No rule of law or economic principle bars application of Section 2 of the Sherman Act to one of the several alternative means of distributing a product. The statute prohibits monopolization of "any part" of interstate or foreign commerce. Accordingly, the Sherman Act an other antitrust statutes have been applied to protect competition in one of alternate channels of distribution.

*Greyhound Computer Corp.*, 5459 F.2f 488.

In this case, the FAC alleges a factual basis upon which the market is defined. That is, a specific method of sales and distribution to a distinct market of customers that the industry has traditionally marketed to in a particular fashion. Such a submarket is not uncommon. In *Eastern Dental Corp. v. Isaac Masel Co.*, 502 F. Supp. 1354 (D.C. Pa. 1980), a submarket based upon a particular method of reaching customers was recognized. In *Eastern Dental*, the plaintiff was a distributor of orthodontic appliances. The plaintiff brought an antitrust claim against a manufacturer of dental appliances who would no longer supply its products to the distributor

because the distributor began competing with the manufacturer in a different line of dental appliances. The plaintiff defined the market as the market for wholesale distribution facebows (which is a particular orthodontic appliance). The Court, citing *Brown Shoe*, specifically confirmed that a submarket may exist, and may be defined by recognition of the submarket as a separate economic entity with distinct customers, and specialized vendors. The Court then recognized that, "A method of product distribution can be considered a relevant submarket for antitrust purposes." *Eastern Dental*, 502 F. Supp. at 1360, citing *Greyhound Computer*, *supra*, and *Coleman Motor Co. v. Chrysler Corp.*, 525 F. 2d 1338, 1348-49 (3d Cir. 1975).

In *Eastern Dental*, the Court recognized that, while other chains of distribution were possible, the defendant was the only manufacturer that sold facebows through wholesale distributors. The Court found recognition within the industry of this particular method of sale to be indicia of a submarket, and denied summary judgment because the contour of such a market is a fact question. Similarly, the FAC pleads that there is industry recognition of the particular method of selling DME, through the hospitals. Not only is there recognition of this submarket, but as a practical matter, it is the only way this particular product can meet these particular customers. Physicians must prescribe DME, and a referral must be made through a hospital. As such, a proper submarket of the sales and lease of durable medical equipment to patients discharged from hospitals is a properly defined submarket.

On page 24 of this Brief, there is string cite of cases wherein a particular chain or method of distribution was recognized as a relevant product submarket for antitrust purposes. In those cases, entities that sold the relevant product through a recognized chain of distribution were not "combined" to make up the requisite market share compared to the market for the product as a whole. Rather, the Courts recognized those channels as discreet submarkets that the plaintiffs, while having theoretically alternative means to sell their product, were unlawfully excluded from. For example, in *Ansell Inc. v. Schmidt Laboratories, Inc.*, 757 F. Supp. 467 (D.N.J. 467). The relevant market was the retail distribution of condoms. In performing its analysis, the Court

did not consider each retailer through which product was to be distributed and compare the defendant's volume of business through that retailer to the entire market for condoms.  Rather, retail distribution was to be considered as a whole, and the market shares of the parties considered on that basis.  Similarly, Plaintiffs in this case do not seek to "combine" two markets, but define the market as a particular chain of distribution from which Plaintiffs are foreclosed.  It is not necessary to allege a conspiracy amongst those foreclosing each particularized chain of distribution in this case (the two hospitals) to allege that Plaintiffs have been foreclosed from competing in the market for DME services to patients discharged from the hospital any more than it was necessary to prove conspiracy amongst the several retailers in the retail condom market, or the computer lease market in *Greyhound Computer, supra*.

Defendants' "combined market" argument ignores the realities that each captive DME enjoys a monopoly on those patients that must come through its attached hospitals' distribution system.  Even the captive DMEs treat these markets as separate economic entities in making sure they get referrals therefrom rather than competing in the market for DME services at large.  Defendants' "combined market" argument is a classic example of using a legal principle out of context.  This is particularly ill suited in the antitrust arena where, "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."  *Eastman Kodak v. Image Technical Svcs.*, 112 S. Ct. 2072, 2082 (1992).

**D.  Plaintiffs Have Standing**

The question of standing was litigated in *Key Enterprises*.  In that case, the defendants made the same arguments raised by Defendants herein, that absent a showing that price would be affected, no standing exists.  The Court rejected the argument, stating:

> As we discussed above, the channeling of patient choice is sufficient to show injury to consumers.  The antitrust laws do not require the consumer to suffer some form of monetary damage before a defendant's anticompetitive conduct is actionable.  *See Aspen Skiing*, 105 S.Ct. At 2859-60 (consumers injured by not having easy access to all four mountains.  *See also Association of*

*General Contractors of Cal. v. California St. Council of Carpenters*, 459 U. S. 519, 103 S.Ct. 897, 903 74 L.Ed.2d 723 (1983). ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect."). Injury to competition may be shown even though injury to the consumer is practically nonexistent. *Cf. Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973) (electric utility that dominates transmission of power in most of it service area may not use that "dominance to foreclose potential entrants into the retail area from obtaining electric power from outside sources of supply"); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986) ("The antitrust laws are concerned with the competitive *process*, and their application does not depend in each particular case upon the ultimate demonstrable consumer effect.") (emphasis added).

\* \* \*

Thus, a court must consider the effect on competition and not simply the effect of on the ultimate consumer. In the DME industry, because of the regulated nature of Medicare and Medicaid reimbursements, the primary means of competition is quality and service. The defendants here have knowingly and purposefully set in place a scheme which insulates the unknowing patient from learning of these nuances. Competition has been injured because there is no effective means by which competing DME vendors can reach those patients who require DME when they are discharged from the hospital. The Supreme Court has aptly stated:

A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare. . . . Absent some countervailing procompetitive virtue-such as, for example, the creation of efficiencies in the operation of a market or provision of goods and services, such an agreement *limiting consumer choice by limiting the "ordinary give and take of the market place," cannot be sustained. . . . Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986).

*Key Enterprises*, 919 F.2d at 1559-60. Plaintiffs' counsel cannot articulate the law any more eloquently than the 11th Circuit has.

15

In addition to the *Key Enterprises* opinion citing Supreme Court precedent holding that protecting  a market driven by service levels, not necessarily price, constitutes antitrust injury, and hence standing,  the Court in *M&M Medical Supplies*, specifically referencing *Advanced Health Care* stated, "In a case that also charges hospital-DME monopolization, we recently held that if the plaintiff can prove that the DME now provided to patients in the relevant areas is inferior in quality and/or more expensive than [the plaintiffs'], it will have shown harm to competitors, short-term sacrifices by the hospitals, and adverse affects on merits competition that injure DME consumers, all as a result of the hospital's entry into the DME markets." *M&M Medical Supplies*, 981 F.2d at 166.  The same allegations have been made here.  The FAC states that "a lack of competition will eventually, and has already begun to, erode the services offered by the companies, and the quality of goods offered."  (FAC, ¶ 31).  Similarly, this case is due to go forward.

Defendants' argument concerning standing in their original Motion to Dismiss was that no standing existed in this action because there was no allegation that the practices complained of lead to increased prices.  Of course, there is an allegation concerning increased prices, nonetheless, this argument having been rebutted, Defendants now argue that these plaintiffs are not situated such that they will be efficient enforcers of the antitrust laws.

The 11th Circuit, citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 97 S.Ct. 690 (1977) has defined antitrust injury as the type for which the antitrust statutes were intended to prevent "'and that flows from that which makes the Defendants' acts unlawful."  "It requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation, increasing the likelihood that public and private enforcement of the antitrust laws will further same goal of increased competition." *Todorov v. DCH Healthcare Authority*, 921 F.2d  1438, 1449-50 (11th Cir. 1991).  In this case, the allegations are that the captive DME companies have foreclosed competition within the market, which injures consumers, and more specifically forecloses Plaintiffs from competing within the market, which

injures consumers. Plaintiffs' interests are identically aligned with those of consumers in general. That is, opening the market to competition.

The Supreme Court in *Associated General Contracting co. v. Col. State Council of Carpenters*, 103 S. Ct. 897 (1983) articulated several factors for determining whether a particular plaintiff is an efficient enforcer of the antitrust statutes. Those factors are whether the plaintiff is a consumer or competitor in the market; the directness of the injury to the plaintiff, and whether the plaintiff is a member of "an identifiable class of persons whose self interest would normally motivate them to vindicate the public interest in antitrust enforcement. . ." *Associated General Contractors*, 103 S. Ct. at 910-911.

Plaintiffs' interests align exactly with the interest of consumers. Both have an interest in a competitive market for the sale of durable medical equipment to patients released from the hospitals. Second, Plaintiffs are within the class of persons who have a self interest that would motivate them to enforce the antitrust laws. Essentially, without a competitive market, both consumers and Plaintiffs lose. Plaintiffs are foreclosed from a market, and consumers will be faced with a market without any viable substitutes. This is exactly the alignment of interests typically found in an antitrust case and is why, typically, antitrust plaintiffs are either consumers or competitors in the market, of course, Plaintiffs in this case are competitors in the market.

The two cases Defendants rely upon for their proposition that these parties lack antitrust standing are inapposite. In *Spanish Broadcasting Systems of Florida, Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065 (11th Cir. 2004), the issue was certain practices of a competitor within the market for Spanish programming broadcast rights. The allegations of the Complaint were that a competitor in the market had "leveraged its relationship with Clear Channel (the antitrust defendant) to obtain preferential treatment from auditors and investors, discourages analysts and investors from dealing with SBS, misrepresented the state of SBS's finances in order to adversely affect SBS's stock price, and engaged in a bidding war with SBS over a Los Angeles radio station." *Id.*, at 1076.

17

The complaint in the *Spanish Broadcasting Systems* case concerned actions taken by a competitor in the market. These allegations did not state antitrust claims because they did not "specifically address how these practices have harmed competition. As the Supreme Court has stated, the antitrust laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Spanish Broadcasting Systems*, 376 F.3d at 1076, quoting *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corporation*, 113 S. Ct. 2578, 2589 (1993). This is far different from the allegations in this case. In this case, the allegations are that Defendants have combined to stifle all competition within the market, not just to injure Plaintiffs.

The FAC goes on to outline how the market has been harmed

> For example, in the case of Jackson-MedSouth, hospital staff was Specifically directed to refer all hospital patients to Jackson-MedSouth. In a July 7, 2003 memo, hospital staff was informed that, "Only if the Patient chooses another company, or it is an emergency should the patient be referred to another company. The economic incentive for Jackson to take this action is obvious, and the above-referenced memo confirms the purpose of these actions. The memo state, "Please keep this in mind. CPAPs we outsource affect our bottom line in the long run . . . remember, we are only hurting ourselves if we don't send to JMS when possible. Similar measures were taken by Baptist Health to ensure that discharged hospital patients were directed to its captive DME suppliers.

> Following the entry by Defendants into the DME market, Defendants have combined, contracted and/or conspired to create a monopoly and foreclose all vendors of DME from competing in the market for the provisions of durable medical equipment to discharged hospital patients leaving Baptist Health and Jackson Hospital facilities. Baptist East personnel have told Plaintiffs that they have an "obligation" to refer all patients only to Baptist/America Homepatient DME. A representative for East Medical was specifically told this when the representative was attempting to market the company's services to hospital personnel responsible for managing DME referrals. Other plaintiffs have experienced very similar rebukes in their attempt to market within the hospitals.

> Following the entry by Defendants into the DME market, Defendants have engaged in a pattern of communications and actions foreclosing competition

within the relevant market. That is, foreclosing competition for the business of discharged hospital patients from Baptist Medical Center, Baptist Medical Center East, and Jackson Hospital. In cases where the DME services are not covered by Medicare, the monopolistic practices of Defendants have foreclosed competition, and will lead to higher prices.

In the case where Medicare pays for equipment, a lack of competition will eventually, and has already begun to erode the services offered by the companies and the quality of the good offered. Because there is no competition, the services offered to consumers of durable medical equipment will continue to erode.

Following the entry by Defendants into the DME market, and as a result of the Improper conduct related above, Plaintiffs have suffered a loss of revenue, as their referrals from hospital patients have almost vanished. In the case of Med-Ex, not only did the company lose revenues, but the sale price of the business was depressed.

(FAC, ¶¶ 27-31). These are specific allegations relating how the market has been effected, and explaining how the natural incentive to bring this action by Plaintiffs coincides with the interests of consumers in having a competitive market.

The *Todorov* case is no more helpful to Defendants. In *Todorov*, a non-radiologist sought hospital privileges to perform CT head scan interpretation at a hospital that had before only before granted such privileges to radiologists. The allegation was not that the hospital had conspired with one radiologist or one radiological group to foreclose competition, and have all patients referred to an entity in which the hospital had an interest. The allegation was that Dr. Todorov was denied access to an already competitive market. In this way, Dr. Todorov's complaint was not that the activities of the hospital and radiologists created a market devoid of competition, the allegation was that he, a particular competitor, was damaged. Because antitrust laws focus on damages to competition, not competitors, Dr. Todorov's claims were dismissed on summary judgment. As stated above, the allegations in this case is not that there is a competitive market for which Plaintiffs are foreclosed, the allegations is that the agreement between the hospitals and their captive DME companies have foreclosed competition of any sort within the relevant market.

In *Todorov*, the Court went through a lengthy analysis explaining why Dr. Todorov's interest were not aligned with consumers.  The Court assumed that the charges of radiologists, who controlled the market for CT scans, were artificially inflated.  The Court reasoned that Dr. Todorov simply wanted to reap the benefits of the these inflated prices.  Thus, Dr. Todorov only sought to increase his profits by participating in a super-competitive market.  The Court stated:

> This scenario reveals several things.  First, if Dr. Todorov were granted privileges, he would reap the radiologists' supercompetitive price and thus some profit in the short run.  Second, if competition ensued, consumers—the patients who purchase the CT scans of the head—would benefit because of the lower prices brought about by the competition.  Finally, Dr. Todorov eventually would either be driven from the market or reach some agreement with the radiologists to fix prices.  By conspiring this way, Dr. Todorov would reduce the chance that he would be driven from the market by competition and he could share the supercompetitive revenue, or some portion of it, with the radiologists; this or course, would not benefit consumers.

*Todorov*, 921 F.2d at 1453.

In this case, Plaintiffs claim that their entrance into the market would create competition, and serve lower prices and/or raise the level of services.  The interest Plaintiffs have in this case is not to enter into a market to maintain super competitive prices, but to enter into a market to create competition and the benefits that competition brings to consumers.  Plaintiffs interests are perfectly aligned with consumers in this case, and Plaintiffs are efficient enforcers of the antitrust laws.

The unreported decision in *Park Avenue Radiology Associates, PC v. Methodist Health Systems, Inc.*, 198 F. 3d 246 (6th Cir. 1999) is also distinguishable.  In that case, radiologists filed an antitrust action based upon the contention that contractual arrangements between a hospital and a Preferred Provider Organization ("PPO") to which those with staff privileges of the hospital belonged.  The thrust of the Complaint was that radiologists unaffiliated with either of the defendants did not get referrals from physicians with the PPO because all PPO physicians were required to send patients to other physician within the PPO.  The Court held that the

radiologists lacked standing, after applying the *Associated General Contractors* factors, *supra*, because there was no causal connection between the interests of the physicians in receiving referrals and "the non Health Choice patients--the group of patients for which Plaintiffs take particular exception." *Id.* at *3.   In other words, the contractual arrangement by which the patients within the PPO were referred assumedly benefited those patients within the PPO by lowering health costs and insurance premiums, and the Court found no immediate, concrete way that non-PPO patients would benefit by patients within the network being referred to non-network radiologists.   In contrast, the causal connection between Plaintiff and the market in this case is direct.   At present, there is no real competition for the provision of DME services to patients discharged from the hospitals.   This action seeks entry into that market for Plaintiffs which will lead to lower prices and increased service.   This is the classic alignment of interest in an antitrust case.

The *Park Avenue Radiology* case cited by Defendants cites *Potters Medical Center v. City Hosp. Assoc.*, 800 F.2d 568 (6th Cir. 1986) as an example of a case in  the medical context where antitrust standing was found. In *Potters*, a small hospital brought a claim that a large hospital in the community had a monopoly by refusing to grant staff privileges to physicians who also had staff privileges at the smaller hospital, and otherwise taking actions to discourage physicians from obtaining staff privileges at the small hospital.

The Court found standing under the factors stated above where the restrictive activity was focused on physicians who were the source of patients for the hospital.   The Court held that, "If. . . patients can only be admitted by a doctor with staff privileges, then lost admissions and revenues could be a direct result of a policy which seeks to limit the number of doctors with privileges at Potters." *Potters*, 800 F.2d at 576.   The situation in the present case is even more direct.   The FAC alleges that the acts of Defendants have restricted the ability of Plaintiff to enter the market for patients directly, which <u>directly</u> leads to lost business and revenues.   Also, the allegation is that the market for DME services is directly affected, injuring that market and the

consumers in it. Again, this is the classic alignment of interests upon which antitrust standing traditionally rests.

Lastly, in an attempt to distinguish the *M&M Medical* and *Advance Health Care* cases, which rest on very similar basis, Defendants attempt to argue that the Fourth Circuit standard for antitrust standing differs from the Eleventh Circuit. This is just no so. First, Plaintiffs rely upon the U. S. Supreme Court factors in determining standard articulated in *Associated General Contractors*, and enumerated in *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983), which is cited in the Sixth Circuit cases Defendant relies upon for the proper standard as to standing. Indeed, the *Advanced Health Care Services* Court cites *Brunswick Corp.*, which is cited by the Eleventh Circuit, and uses the same language Defendants do in their brief concerning antitrust standings, "As with other causes of action, a claim advanced under § 5 of the *Clayton Act* must allege injury to competition, not just to a competitor." *Advanced Health Care*, 910 F. 2d at 139. There simply is not a second, lessened standing formulation in the Fourth Circuit, and none of the cases with virtually identical factual predicates have been found wanting on the basis of standing.

**E.    A Proper Product Market Has Been Defined**

**1.    A Submarket Alleging A Market Defined In Part By A Specific And Recognized Particular Chain Of Distribution Has Been Properly Alleged.**

The relevant product market or submarket in this case is the market for the rental and sale of durable medical equipment to patients discharged from Jackson Hospital, Baptist Medical Center, and Baptist Medical Center East in Montgomery and Prattville, Alabama.[2] While a relevant product market, defined in terms of product and geography is "the area of effective competition," *Brown Shoe Co. v. United States*, 82 S. Ct. 1502, 1523, (1962), the law is that

---

2 There is no special antitrust pleading rule. *Twonbly v. Bell Atlantic Corp.*, 425 F.3d 999, 108 (2nd Cir. 2005) ("We have consistently rejected the argument, put forward by successive generations of lawyers representing clients defending against civil antitrust claims that antitrust Complaints merit a more rigorous pleading standard . . . it is quite clear that the federal rules contain no special exceptions for antitrust cases.).

within a broad market, "there may also exist well-defined submarkets which, in themselves, constitute markets for antitrust purposes."  *Storer Cable Communications, Inc., v. City of Montgomery*, 826 F. Supp. 1338, 1350 (M. D. Ala. 1993), vacated 866 F. Supp. 1376 (1993), citing *Brown Shoe, supra.*

Defendants argue that a proper market definition consists of only two components–product and geography.  However, defining a relevant submarket is in no way limited to those two factors.

> The boundaries of so-called "submarkets" may be established by reference to such "practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, and distinct prices, sensitivity to price changes, and specialized vendors.  *Id.; see F.T.C. v. Cardinal Health, Inc.*, Nos. Civ. A. 98-595, Civ. A. 98-596, 1998 WL 433784, at *12 (D.D.C. July 31, 1998); *F.T.C. v. Staples, Inc.* 970 F. Supp. 1066, 1075 (D.D.C. 1997).

> * * *

> Ultimately, a "submarket" definition turns on the same inquiry as a "market" definition–"whether the products in a proposed submarket are reasonably interchangeable in use or production with products in the broader market."  ABA Antitrust Section Antitrust Law Developments 521 (4th ed. 1997).  At bottom, then, "the same proof market also shows (or fails . . . to show) the existence of a product submarket."  *H. J., Inc. v. International Tel. & Tel. Corp.*, 867 F.2d 1531, 1540 (8th Cir. 1989); *AD/SAT v. Associated Press*, 920 F. Supp. 1287, 1296 n. 6 (S.D.N.Y. 1996) (observing that "[t]he required analysis does not change whether a particular product market is deemed a market or a "submarket" term draws no meaningful distinction and restricting itself to use of the term "market").

*Pepsico*, 1988 WL 547088 at *5.  This Court in *Storer Cable Communications*, relied upon the same formulation of an antitrust submarket, citing its original source in *Brown* Shoe, 82 S.Ct. at 1524.

Defendants essentially argue that, as a matter of law, a market cannot be limited to sales through a single group of distributors. This is incorrect. Numerous courts have defined produce markets by reference to a channel of distribution. *See e. g. , Cardinal Health*, 1998 WL 433784, at *13 (holding that wholesale distribution of pharmaceutical products to customers who demanded such distribution was a relevant market, even though products so delivered were identical to those delivered through other modes of distribution); *Staples* 970 F. Supp. at 1080 (holding that sales of consumable office supplies through office supply superstores constituted relevant market , even though the office supplies sold in those outlets were physically identical to those sold elsewhere; relying on "compelling pricing evidence" which demonstrated that customers of office superstores did not turn to non-superstore outlets when faced with price increases in the superstore market); *Columbia Broadcasting Sys., Inc. v. FTC*, 414 F.2d 974, 978-79 (7th Cir. 1969), *cert. denied*, 397 U.S. 907, 90 S. Ct. 903, 25 L.Ed.2d 88 (1970) (phonograph records sold through record clubs comprised relevant market even though records delivered by clubs were identical to those sold in record stores and other outlets); *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1343 (8th Cir. 1987) (sales of automobile batteries through route salespersons distinct from sales of such batteries through retail stores even though "the batteries sold by route salespersons are not different in character, creation or use from those sold from a warehouse or store"); *Ansell Inc. v. Schmidt Lab., Inc.* 757 F.Supp[. 467, 471-75 (D.N.J.. 1991) (holding that sales of condoms "to retail distributors does constitute an 'economically significant submarket'" even though manufacturers "may sell their products through a number of different channels of distribution"). This submarket defined in terms of durable medical equipment leased to patients discharged from the hospital is nothing but a definition of sales through a particular distribution channel. As such, it is a validly defined market.

In response to the submarket alleged in this case, Defendants argue that the *Pepsico* case stands for the proposition that a submarket cannot exist unless, from a consumer's point of view, there are no viable substitutes for the product at issue. Defendants' Brief states, "There is no

allegation here that, 'from a consumers' point of view, there are no viable substitutes for the rental or sale of DME in the hospital setting.  In fact, Plaintiffs' entire case is based on their allegations that they are the substitute." (Defendants' Brief, p. 25).  The problem with this argument is that market or submarket definition is not determined based upon whether, from a consumer's' point of view" there are viable substitutes for the product at issue.  The market is defined as whether, from a consumer's view, there are viable substitutes <u>for the method of distribution</u> of the product.

The analysis of "viable substitutes" in *Pepsico* could not have been whether any consumer would have viewed Pepsi as a viable alternative to Coke.  That is self evident.  The "viable substitute analysis" was whether there was a viable substitute for a producer of fountain dispensed soft drinks to the "sales of fountain dispensed soft drinks distributed through independent food service distributors."  *Pepsico*, 1998 WL 547088 at * 8.  Translated, the question in this case is not whether Plaintiffs have products that are viable substitutes for the products sold and leased by Defendants. The question is whether there is a viable substitute for the method of distribution of DME products to discharged patients through hospital staff or physician orders.  Such that this method of distribution constitutes a separate submarket. This is primarily a fact question that has been properly alleged.  However, the ultimate answer is that there is no viable substitute for this method of distribution.  Hospital patients are in no position to "shop" for DME services, and the physicians' orders are made and given to hospital staff to carry out.  Simply put, the method of distribution for durable medical equipment to discharged hospital patients through hospital staff is a separate economic entity bounded by the particular circumstances of patients being discharged from hospitals needing DME services. *See e.g., Graphics Products Distributors v. ITSK*, 77 F.2d 1560, 1569 (11th Cir. 1983) (relevant product market a question of fact).

In *Pepsico*, the question was not whether the ultimate customers viewed Pepsi products as a viable substitute for Coke products.  The question was whether consumers recognized other

methods of distribution for interchangeable products. The Court stated, "On the other hand, if customers do not view the other methods of distribution or viable substitutes, then the relevant product market should be limited to wholesalers' services." *Pepsico*, 1998 WL 547088 at \*6. In the present case, it is clear that there is no substitute for the distribution of DME to hospital patients other than through hospital staff, who must make a referral for DME to be provided. This too, is a fact driven question which is not to be decided on a motion to dismiss. *See, PepsiCo, supra*, citing *Cardinal Health*, *supra* ("Accordingly, it is appropriate to limit a market to a discreet channel of distribution so long as it is shown, using established market driven criteria, that enough customers do not view other methods of distribution as viable substitutes to the distribution method in question.")

The other case argued by Defendants in this section of their Brief, a district court opinion out of the Western District of Missouri, *Redmond v. Missouri Western State College*, 1988 WL 142119 (W. D. Mo. 1988) similarly misses the point. In that case, the plaintiff was an independent bookstore that objected to the practice of the defendant university giving graduate students vouchers for the purchase of books and supplies at the university-owned bookstore. In that case, the limitation in the market was based on a class of consumers, and not on a method of or chain of distribution as alleged in this case.

The holding in this case, like the holding in *T. Harris Young & Associates, Inc. v. Marquette Electronics*, 931 F.2d 816 (11th Cir. 1991) is that product market cannot be limited to a particular group of purchasers unless there is some aspect of the product that distinguishes it as fir for only those purchasers. *T Harris Young*, 931 F,.2d at 824. This logically follows in that if a market is to be defined by a class of customers, there must be some "outer boundary" which defines the customers, or else there is simply no limit to the market. Plaintiffs, however, do not define the market in terms of customers, but in terms of a particular method of distribution. As stated *supra*, this is a common and accepted method of defining a submarket.

## 2. **The Product Is Adequately Identified**

The FAC in this case lays out the product at issue (durable medical equipment, defined as "medical devices needed for car in the homes of patients after discharge from the hospital . . . such as hospital beds, walkers, wheelchairs, oxygen . . . respiratory therapeutic services") (FAC, ¶ 3). Defendants' primary concern as to the relevant product is that "the Complaint does not allow Defendants to know whether Plaintiffs are concerned with the 'DME market' the 'DME leasing market' or the 'home health care' market or some subset thereof." (Defendants' Memorandum, pp. 13-14). As stated above, the product is defined as "durable medical equipment." That term is defined in paragraph 3 of the FAC as "medical devices needed for care in the home of patients after discharge from the hospital." (FAC, ¶ 3). Not only is the product defined, but examples are given –"hospital beds, walkers, wheelchairs, oxygen, and other durable medical devices . . . [including] respiratory therapeutic services." *Id.* This general description of the items is all that is done in *M&M Medical Supplies*, *Advanced Health-Care*, and *Key Enterprises*. In those cases, durable medical equipment has no more specific definition. The definition in this case goes beyond that which is acceptable. Each piece of DME equipment is not listed, nor is each piece its own separate market. Such fragmentation is not required where there is a cluster of goods or services typically sold together and the actors in that market typically cluster those services. *See, U. S. Grinnell Corp.*, S. Ct. 1698, 1705 (1966), *Manufacturing Research Corp. v. Greenlee Tool Corp.*, 693 F. 2d 1037, 1043 (11th Cir. 1982).

### F. **The Market Is Defined Such That Monopoly Power Is Present.**

"The relevant product market is the 'part of trade or commerce' that the defendant is allegedly attempting to monopolize." *Lockheed Martin Corp. v. Boeing Company*, 314 F. Supp.2d 1198, 1224 (M.D. Fla. 2004), citing, 15 U.S.C. §2 and *United States v. Grinnell Corp.*, 86 S. Ct. 1698 (1966). The boundaries of the case are determined by the boundaries of market. All purchasers and suppliers within those boundaries make up the market for the product unless there is evidence that the market is narrower because of other considerations. *Id.* The FAC

clearly alleges that in the submarket Defendants have a virtual lock on the business by excluding Plaintiffs and other DME providers.  Defendants' assertion that DME rentals come form other sources is simply irrelevant in a market defined by the distribution network which is patient referrals generated from hospital discharges.3

Defendants may assert that this definition is inadequate because of a glut of suppliers, or because consumers are not limited to suppliers within the geographical boundaries defined. However, "The definition of the relevant market is essentially a factual question."  *U. S. Anchor Mfg. v. Rule Industries, Inc.*, 7 F.3d 986, 994 (11th Cir. 1993).  Because of the fact intensive nature of market definition, "Dismissals are exceedingly disfavored in antitrust cases because of their fact-intensive nature."  *Lockheed Martin*, 314 F. Supp. 2d at 1225, citing *Covad Communications Co. v. BellSouth Corp.*, 799 F.3d 1272, 1279 (11th Cir. 2002).

In order to make out a monopolization claim, a plaintiff must establish: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as consequence of superior product, business acumen, or historic accident."  *U. S. v. Grinnell Corp.*, 384 U. S. 563, 570-71 (1966).  The element of monopoly power "is the power to control prices in or exclude competition from the relevant market."  *Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004).  The allegations of the Complaint are that a significant portion

---

3 Defendants cited *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 994 F. Supp. 133 (E. D. N.Y 1998) for the proposition that courts had rejected market definitions in DME cases stemming from a single hospital.  The is not what the case says.  In fact, the *Continental Orthopedic* case says that "Upon review of the other two cases [*Advanced Health-Care* and *M&M Medical Supplies*], the Court finds that each case demonstrates that a single hospital **could** be found to have market or monopoly power in its market and therefore, foreclosure of the plaintiff from the portion of durable medical equipment market represented by referrals from that single hospital constituted a substantial foreclosure form the market of all durable medical equipment purchasers."  *Continental Orthopedic Appliances*, 904 F. Supp. at 141.  Similarly, *Delaware Health Care, Inc. v. Med Holding Co.*, 957 F. Supp. 5325, 538 (D. Del. 1997) aff'd without opinion, 141 F.3d 1153 (3d Cir. 1998) does not help Defendants on this point.  The Court did not reject a market definition with a supper (hospital) component, it merely held that the plaintiffs "just has not put enough information into the record to support its geographic market definition."  *Delaware Health Care, Inc.*, 957 F. Supp at 546.

of the DME market in Montgomery and Prattville, Alabama emanates from the hospitals, and that this is a well accepted distinct market. If Defendants are able to effectively exclude plaintiffs from the market, they will be able to control prices and the ability to provide service in the DME market. The question is not whether DME customers can practically seek alternative sources of the product form a multitude of suppliers. The question is whether hospitals and their captive DMEs can and do control such a portion of the DME market that they have the ability to foreclose competition or effectively set prices because competition has been foreclosed for a significant portion of the market.

The relevant question, in terms of whether a proper geographic market has been plead, is not the number of providers from which a consumer may choose, but whether a party possesses sufficient market share, i.e., monopoly power, to control prices or exclude competition. "Market power is the measure of a firm's ability to raise prices above competitive levels without losing profits from decreased sales." *Service Trends, Inc. v. Siemens Medical Systems, Inc.*, 870 F. Supp. 1042, 1052, n.4 (N. D. Ga. 1994). *Grinnell, supra* at 1704 (The existence of monopoly power can be inferred from a firm's dominant share of the market).

In this case, Plaintiffs have alleged that Defendants' market share is above that threshold such that it can control service levels and prices (FAC, ¶ 24). "The existence of monopoly power can be inferred from a firm's dominant share of the market." *Id.* It has been alleged that Defendants share of the defined market is such that it can control prices and service levels without a drop in usage or sales (FAC, ¶ 24). While this obviously will be a disputed fact, it is not ripe for determination at the motion to dismiss stage.

### G. In Addition To Proper Market Definition, And Monopoly Power Having Been Alleged, Proper Claims For The Remaining Elements Of Plaintiffs Monopolization Claims Have Been Plead.

As stated above, after the relevant market is established, a § 2 monopolization claim requires the showing of monopoly power in that market, and willful acquisition or maintenance

of that owe as approval to legitimate business growth. *U. S. Grinnell Corp., Supra.* To establish a claim for attempted monopolization, a showing of: (1) an intent to bring about a monopoly; and (2) a dangerous possibility of success must be plead. *Norton Tire Co. V. Tire Kingdom*, 858 F. 2d 1533, 1535 (11th Cir. 1988). As argued above, it clear that whether a party has sufficient monopoly power, defined in terms of market share, is a question of fact.

Defendants argue that Counts III and V of the Complaint (§ 2 monopolization and attempted monopolization) should be dismissed because they allege collective action by Defendants, as opposed to unilateral action by a defendant. This argument is refuted by *Copperweld Corp. v. Independence Tube Corp.*, 104 S. Ct. 2731, 2740 (1984). The *Copperweld* case states:

> Section 2 of the Sherman Act provides in pertinent part:
>
> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several state, or with foreign nations, shall be deemed guilty of a felony.
>
> By making a conspiracy to monopolize unlawful, §2 does reach both concerted and unilateral behavior. The point remains, however, that purely unilateral conduct is illegal only under §2 and not under §1. Monopoly without conspiracy is unlawful under §2, but restraint of trade without a conspiracy or combination is not unlawful under §1.

*Copperweld*, 104 S. Ct. at 2740. Citing the plain language of the statue, the *Copperweld* decision directly contradicts Defendants' proposition that the §2 claims made in Counts III and V may only be made based upon unilateral action. The plain language of the statute creates liability for both unilateral and concerted actions, and *Copperweld* echoes this language. Counts III and V of the Complaints (Counts III and IV of the FAC) allege conduct by "Defendants"

meaning both in concert, and unilaterally, as allowed under §2, have violated §2 of the Sherman Act. Defendants' argument on this point simply misunderstands the statute.

Lastly, Defendants argue that Plaintiffs have not properly plead a dangerous probability of success as to monopoly because Plaintiffs have not alleged that Defendants either possess or are close to possessing monopoly power within the relevant market. The FAC clearly alleges just that. Paragraph 24 of the FAC alleges that Defendants, through their conspiracy, have pushed the market share of the captive DMEs to such a level that they can cut services or raise prices without fear of a corresponding drop in sales (FAC, ¶ 24). As stated above, market share is the principal measure of monopoly power. The test of monopoly power, the ability to raise prices/lower service without economic reprisal, *Levine v. Cent. Fla. Medical Affiliates, Inc.*, 72 F.3d 1538 (11th Cir. 1996) is exactly what is plead in paragraph 24 of the FAC. Whether that threshold can actually be met will undoubtedly be a factual contention in the case, but it is not the subject of determination on a motion to dismiss.

H. **Defendants Are Liable Under the Essential Facilities Doctrine.**

Count VI of the FAC states a cause of action pursuant to Section 2 of the Sherman Act under the essential facilities doctrine. The allegations are that the hospitals use their monopoly power over the provision of acute care hospital services to further a monopoly through their joint venture in the retail of DME to discharged patients (FAC, ¶¶ 68-73). Such use of monopoly power, either alone or in concert, creates liability under the essential facilities doctrine.

The essential facilities doctrine requires a plaintiff to prove: (1) control of the essential facility by a monopolist; (2) a competitor's inability practicably or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competition; and (4) the feasibility

of providing the facility to competitors. *MCI Communications v. A.T. & T*, 708 F.2d 1081 (7th Cir. 1132-33), citing *Otter Tail Power Co. v. U.S.*, 93 S. Ct. 1022 (1973). The doctrine "imposes upon firm controlling an essential facility–that is, a facility that cannot reasonably be duplicated and to which access is necessary if one wishes to compete –the obligation to make that facility available to competitors on nondiscriminatory terms." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir. 1986).

These elements are extant in the present case as they were in *Advanced Health-Care Services, Inc.*. In that case, the Court stated the following:

> Here, the plaintiff alleges that the defendants' market power over the provision of acute care hospital services is being used to further a monopoly in the retail of DME to discharged patients. AHCS contends that all DME dealers were equally able to market their services to patients, physicians, and discharge personnel before the hospitals entered into exclusive contracts with Medserv. The plaintiffs alleges that now the hospitals will not give it access to their patients. This has resulted in AHCS's inability to compete in the DME market and has ultimately given Medserv complete control over the price and quality of DME services in the areas surrounding Twin County and Giles. AHCS argues that access to patients is an essential facility that cannot be duplicated and that the hospitals could feasibly return to their prior practice of providing this facility to AHCS and other DME providers.
>
> These allegations on their face address all of the elements of a claim under the essential facilities doctrine established buy *MCI* and the relevant Supreme Court precedent.
>
> * * *
>
> As noted above, AHCS has alleged that Twin City and Giles, who control access to the alleged essential facility, now have a financial stake in the sale of DME by Medserv to their discharged patients. Whether this connection alone is enough to make the hospitals competitors of AHCS and whether access to hospital patients is actually an essential facility to entry into the relevant market are factual issues that cannot be resolved on a motion to dismiss. *Compare Fishman v. Estate of Wirtz*, 807 F.2d 520, 539-40 (7th Cir. 1986) (upholding liability under the essential facilities doctrine where the owner of a stadium in competition with the

> plaintiff to purchase basketball team refused to lease the stadium to the other bidder), *with Ferguson v. Greater Pocatello Chamber of Commerce*, 848 F.2d 976, 983 (9th cir. 1988) (no liability under essential facilities doctrine because minidome owner was not a competitor of prospective trade show producer).
>
> Therefore, we reverse the district court's refusal to allow amendment of the plaintiff's complaint in the Twin County and Giles cases to add claims for denial of access to an essential facility.

*Advanced Health Care*, 960 F.2d at 150-51. Just as the facts in *Advanced Health Care* presented a fact question, they present a fact question in the case at bar as to Count VI of the Complaint.

The *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986) case cited by Defendants is easily distinguishable. In that case, the plaintiff's complaint was that a competitor's sales force would not refer it business. First, the complaint in this case is not that the captive DME companies will not refer Plaintiffs business, it is that the owners of the essential facility, the hospital, which is not a competitor, will not allow Plaintiffs access to a market that must emanate from that essential facility, i.e., the hospital. Plaintiffs seek no free ride on anyone's sales force, they simply seek access to a market closed by agreement between Defendants.

## I.  Plaintiffs' Claims Of Coercive Reciprocity Create Per Se Liability

Without regard to establishing the requisite market share in the relevant product market, Defendants concede that conduct constituting coercive reciprocity is a *per se* violation of antitrust law if a Defendant has sufficient economic power with respect to the tying (hospital) product appreciably restrain free competition in the tied product (durable medical equipment). (Memorandum in support of original Motion to Dismiss p. 12); *Spartan Grain and Mill Co. v. Ayers.*, 581 F.2d 419, 425 (5th Cir. 1978). Once a plaintiff has established a *prima facie* case of a

*per se* violation, no specific snowing of anti-competitive effect is necessary. *Betaseed, Inc. v. U and I, Inc.*, 681 F.2d 1203, 1216 (9th Cir. 1982).

Coercive reciprocity refers to the practice of using economic leverage in one market to coercively secure competitive advantage in another. *Id.* The use of monopoly power, however lawfully acquired, to foreclose competition, is unlawful. *U. S. v. Griffith*, 68 S. Ct. 941, 945 (1948). In the present case, there is no question that Jackson and Baptist hospitals have monopoly power over hospital services within the relevant submarkets flowing from their hospitals. An allegation that the hospitals have used those powers to foreclose competition in the DME market has been made. It is alleged in the Complaint that the hospital defendants have exclusive control over the method of distribution for DME to patients discharged from acute care hospitals and, accordingly, have the power to unduly influence . . . selection or recommendation of durable medical equipment vendors (FAC, ¶ 13, 36). In this way, Defendants have used their monopoly power in the market of hospital services to gain a competitive advantage in the DME market. This exact claim was the subject of a large section of the *Key Enterprises*, opinion, in which the Court opined, "Since we find that the arrangement between defendants and the home health agencies has sufficient elements of a reciprocal arrangement, we analyze the evidence VCA presented to support its claim under the law governing such arrangements. *Key Enterprises*, 919 F.2d at 1562.

The question becomes whether the acts alleged in the Complaint are sufficiently "coercive" to qualify for *per se* treatment. The Complaint alleges that hospital staff was directed to refer all hospital patients needing sleep lab services to Jackson-MedSouth (FAC, ¶¶ 26-30). Moreover, as to Baptist, Plaintiffs have been told that they have an "obligation" to refer patients only to Baptist/American Homepatient DME (FAC, ¶29). In either case, such activity rises to

the level needed to prevail on a coercive reciprocity claim even when it is far less than "bludgeoning or coercion". *Federal Trade Commission v. Consolidated Foods Corp.*, 85 S. Ct. 1220, 1222 (1965). The *Key Enterprise* Court noted that the term "coercion" is a proxy for "leverage", and that, "Leverage is loosely defined as a supplier's power to induce his customer for one product to buy a second product from him that would not otherwise be purchased solely on the merit of that second product." *Id.* citing 5 P. Areeda & Turner, *Antitrust Law* § 1134a, p. 202 (1980). In this case, as in *Key Enterprises*, the arrangement at the outset of the joint venture whereby trade in the durable medical equipment market is monopolized as part of this joint venture arrangement is a reciprocal agreement restraining trade prohibited by all of the Sherman Act.

Defendants argue that Plaintiffs' claims of coercive reciprocity is untenable because "'Plaintiffs claim only that <u>hospital personnel</u> have said they 'have an obligation' to refer patients only to [Baptist-AHP]', FAC, ¶ 29, but any claim of coercive reciprocity agreement (or other conspiracy) between a hospital and its employees fails as a matter of law because an agreement between a company and its employees cannot constitute a violation of Section 1." (Defendants' Brief, p. 37). (emphasis in original). Apparently the integration of the entities is so complete in the minds of Defendants that it is not realized that the captive DME companies are separate entities, and the communications referred to reference the agreement, not between hospital and employees, but between hospital and captive DME.

## J. A Conspiracy Is Alleged

The allegations of a conspiracy between the hospitals and their captive DMEs are far greater than generalized allegations. The original Complaint alleged that, prior to the entry of the captive DMEs into the marketplace, Plaintiff DME providers were able to market themselves

to hospital staff and patients whose discharge was imminent." (FAC, ¶19). The FAC makes explicit what is implicit in the above-referenced statement, that "Plaintiffs are now denied access to hospital patients by hospital policy." (FAC, ¶ 19). The FAC goes on to state specific hospital policies regarding referrals to outside DME providers in paragraphs 21-30.[4]

Of course, "Even a successful antitrust plaintiff will seldom be able to offer direct evidence of a conspiracy and such evidence is not a requirement." *General Chemicals, Inc. v. Exxon Chemical Co.*, 625 F.2d 1231, 1233 (5th Cir. 1980). A plaintiff must only convince the Court that it is reasonable to infer the existence of a conspiracy from the facts shown. *Id.* In this case, the following facts are plead:

- Prior to the 1990's, Plaintiffs were able to market their products in the defendant hospitals (FAC, ¶19).

- Prior to that time, patients who had no preference were assigned a DME provider on a rotational basis. (FAC, ¶ 20).

- Baptist and Jackson hospital entered into a business arrangement wherein they became significant shareholders in DME businesses. (FAC, ¶ 23).

- There is direct evidence of directives from the hospital not to refer patients to other DMEs, and to refer all patients to captive DMEs. (FAC, ¶¶ 27, 29).

- Plaintiffs' referrals have almost vanished. (FAC, ¶ 32).

- Plaintiffs are no longer allowed to market to the hospitals (FAC, ¶ 24).

---

[4] Contrary to Defendants' argument, the FAC does not seek a return to a rotational system. The Complaint simply seeks a stop to the exclusionary practices outlined in the FAC, and any assignment done by the hospital, out of necessity due to lack of choice, to be done on a nondiscriminatory and nonpreferential basis (FAC, ¶¶ 39, 44, 51, 60, 67).

These are certainly facts from which one could infer that the defendant hospitals have conspired with the defendant captive DME companies to exclude Plaintiffs from the market for DME equipment through the referral of patients from the hospitals that represents a significant portion of the DME market so that the hospital, who has significant stake in the profitability of the Captive DME companies.

The memo goes on to state, "Please keep this in mind, CPAPs that we outsource affect our bottom line in the long run . . .remember, we are only hurting ourselves if we don't send to JMS whenever possible." (FAC, ¶ 27).   Moreover, the FAC recounts wherein Baptist East personnel stated that it was the company's "obligation" to refer patients only to Baptist American Homepatient DME (FAC, ¶ 29).      Not only are the sufficient facts from which one could infer agreement to exclude Plaintiffs from the relevant market by the hospitals and their captive DME companies, but the FAC specifically alleges an agreement to exclude Plaintiffs from the market, and action to do so pursuant to that agreement.   As for the specific actions, the FAC states that "Defendants have engaged in a pattern of communications and actions foreclosing competition within the relevant market area." (FAC, ¶ 30).

The FAC then goes on to give two specific examples of how Defendants have taken action to foreclose competition.   The FAC relates a Jackson-MedSouth memo that states, "Only if the patient chooses another company, or it is an emergency should the patient be referred to another company." (FAC, ¶ 27).

Finally, the FAC specifically alleges the agreement leading to these actions.   "Jackson Hospital has agreed with its captive DME, Jackson Med-South, that it will refer its patients needing DME services to Jackson-MedSouth, and Baptist and Baptist East have agreed with American Homepatient, Inc., that it will refer the patients DME services to Baptist/American Homepatient DME.   These agreements were made a part and parcel of the agreements to joint venture with the then existing DME companies, and as part of the consideration for the operation

of the captive DME companies." (FAC, ¶ 24).   These allegations are more than sufficiently specific to allege a conspiracy.

### K.  Plaintiffs Have Properly Alleged An Unreasonable Restraint of Trade

Plaintiffs have made claims under Section 1 of the Sherman Act that the activities of Defendants have restrained trade, and under Section 2, for monopolization, and attempted monopolization.  The claims require similar allegations.  A Section 1 Sherman Act claim must allege that the conduct of the defendant unreasonably restrains competition, *NCAA v. Board of Regents of University of Oklahoma*, 104 S. Ct. 2948, and a Section 2 claim requires a showing of anti-competitive affects in the relevant market, *American Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1579 (11th Cir. 1985).  Both of these showings have been made in this case.

### 1.  The Requisite Pleading Of A *Per Se* Unreasonable Restraint For A Section 1 Claim Has Been Made.

The Complaint states that Defendants have: (1) excluded them from the hospitals, thus preventing plaintiffs from marketing to soon-to-be discharged hospital patients (FAC, ¶¶ 24, 30); and have directed or assigned patients to the captive DMEs (FAC, ¶¶ 26-29).  The FAC alleges that the above-referenced exclusionary conduct "will eventually and has already began to erode the services offered by the companies and the quality of goods offered.  Because there is no competition, the services offered to consumers of durable medical equipment will continue to erode  (FAC, ¶ 31).  The FAC goes on to state that, as a result of the practices complained of, Plaintiffs have suffered a loss of revenues. (FAC, ¶ 32).

The law is that "certain agreements, including concerted refusals to deal . . . have generally long been held to be *per se* unreasonable and always illegal."  *Orval Sheppard Real Estate Co., Inc. v. Valinda Freed & Associates*, 608 F. Supp. 354, 358 (M.D. Ala. 1985), citing *United States v. General Motors Corp.*, 86 S. Ct. 1321, 1330-31 (1966).  The allegations are

clearly stated that the hospitals and their captive DME companies have entered into agreements whereby the hospital will only refer to the captive DME companies those patients requiring DME services.  This is the very definition of a concerted refusal to deal, which is *per se* an unreasonable restraint of trade. *Id.*

The type of concerted refusal to deal found to be *per se* an unreasonable restraint of trade in *U. S.  v. General Motors Corp.*, *supra*, is the functional equivalent of what is occurring in this case.  In the *General Motors* case, there was an agreement between General Motors and auto dealerships that no auto dealership would sell automobiles to "discount houses" which were automobile sales lots that operated independent of nay dealership agreement, and offered several different makes of automobiles.  The Court found that an agreement between a supplier and its retailers not to deal with a group of other automobile sellers was an agreed upon or "concerted" refusal to deal, and was thus *per se* an unreasonable restraint of trade.  The same sort of an agreement has been plead in this case.  In this case, it has been plead that the hospitals have agreed with their DME companies that they will not do any business, i.e., refer any patients, for the purpose of obtaining durable medical equipment.  This is a concerted refusal to deal with a distributor of durable medical equipment, which is part and parcel of the agreement establishing the captive DMEs, and is *per se* unreasonable.

### 2.    The Restraint Of Trade Is Unreasonable If The Rule of Reason Standard Is Applied.

Not only is the agreement by the hospitals with their captive DMEs that they will not deal with Plaintiffs *per se* unreasonable, but an application of the rule of reason, also used to show an unreasonable restraint of trade, and shows the product to unreasonably restrain competition. *Boczar v. Manatee Hospitals and Health Systems, Inc.*, 131 F. Supp. 1042, 1046 (M. D. Fla.

1990) (Two different methods of analysis are used to determine whether conduct is an unreasonable restraint of trade: the rule of reason and the *per se* rule).

Under the rule of reason, it is necessary to plead that "the alleged restraint of trade tends or is reasonably calculated to prejudice the public." *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979), cited by *Boczar*, *supra*. The test has been alternatively formulated as a requirement that the plaintiff "must allege that the defendants conduct had an impact upon competition in his particular . . . profession, and not just upon his business." *Boczar*, *supra*, quoting *Feldman v. Jackson Memorial Hospital*, 571 F. Supp. 1000, 1008 (S. D. Fla. 1983), aff'd 752 F.2d 647 (11th Cir. 1983). The necessary facts have been plead in this case. It has been alleged that the conspiracy between the defendant hospitals are their captive DME companies has injured the public in that prices will rise, and the level of service and quality of goods had will decrease without competition among DME companies. Defendants have argued no legitimate business reason, i.e., efficiency, for excluding Plaintiffs from the market. As such, Plaintiffs have carried their burden to show that the combination and agreement between the defendant hospitals and their captive DME companies are an unreasonable restraint of trade.

**L.     Defendants' Argument That The Section 2 Claims Are To Be Dismissed Because Defendants Are Not Required to Cooperate With Plaintiffs Is Misplaced.**

Defendants argue that Plaintiffs' Section 2 claims are due to be dismissed because, in essence, they amount to a claim that Defendants are required to cooperate with Plaintiffs, and the law requires no such cooperation amongst competitors. This argument mischaracterizes Plaintiffs' claim, and distorts the holding of the cases establishing liability for exclusionary practices undertaken by firms possessing monopoly power in the relevant market.

To prevail on a monopolization claim, a plaintiff must show (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *United States v. Grinnell Corp.*, 86 S. Ct. 1698, 1702-04 (1966). There is no question that exclusion from the market has been alleged. The FAC alleges that there was and is an agreement in place between the hospitals and the captive DMEs to limit access to customers discharged from the hospital who need DME services, and who might otherwise be served by Plaintiffs. (FAC, ¶¶ 24, 26, 30).

Defendants argue that this agreement to exclude competitors from marketing to hospital patients is a legal exclusionary practice. After all, Defendants argue, a business should not be required to assist a competitor. Nowhere do Defendants cite the proper legal standard for distinguishing legal exclusions (unwillingness to cooperate) from improper or predator exclusion giving rise to a monopolization claim. "The key to distinguishing legal exclusion from improper, or predatory exclusion is whether the exclusion was based on superior efficiency." *Advanced Health Care Services*, 9109 F.2d at 147, citing *Aspen Skiing*, 105 S. Ct. 2857-58 ("Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended.").

In this case, Defendants point to no increased efficiency as the result of excluding Plaintiffs. Indeed, even if such were proposed by Defendants, whether the practice actually was one aimed at increasing efficiency, or whether the claim of increased efficiency is merely pretext is a fact question. The *Advanced Health Care Services* Court, a cases brought by a DME provider against a hospital and its captive DME company for excluding it form the market, the Court held that such an argument cannot support dismissal. The Court held as follows:

> If a refusal to deal with an individual competitor can give rise to antitrust liability in an appropriate case, it stands to reason that an agreement to exclude such a competitor could create liability as

41

well. Therefore, the question in this case is not whether the defendants have a duty to advertise on behalf of or refer patients to the plaintiff; rather, it is whether the purposeful exclusion of this competitor from gaining access to the hospital's patients constitutes the type of circumstances that can give rise to antitrust liability. *See Oahu Gas Serv. v. Pacific Resources, Inc.,* 838 /f,2d 360m 368 (9th Cir.) (a monopolist in some instances has "affirmative duties" under antitrust laws to aid its competitors), *cert. denied.* 488 U.S. 8709, 109 S. Ct. 180, 102 L.Ed.2d 149 (1988). Like the plaintiffs in *Aspen Skiing*, AHCS deserves an opportunity to develop a factual record that "support an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." 472. U.S. at 610, 105 S. Ct. at 2861.

*Advanced Health Care*, 910 F.3d at 148-149.

Not only are the facts plead in this case indistinguishable from those in the *Advanced Health Care* case (and in the *M&M Medical Supplies* and *Key Enterprises* cases), but the legal theory put forth as grounds for recovery is squarely within accepted antitrust law. The *Aspen Skiing Company* case relied heavily upon *Lorain Journal Co. v United States*, 72 S. Ct. 181 (1951). The Court in *Aspen Skiing* stated that, "In *Lorain Journal Co.*, we squarely held that this right was not unqualified." *Aspen Skiing*, 105 S. Ct. at 2857. In *Lorain Journal Co.*, the question was whether a small town's only local newspaper cold refuse to accept advertising from customers that also advertised on a new radio station in the town. "The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases." In holding that such a right is not absolute, the court held that, "The right claim by the publisher is neither absolute nor exempt from regulation. Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act." *Id.* Similarly, where Defendants' refusal to allow Plaintiffs access to a market is done with an intent to monopolize the DME market, it is subject to regulation and prohibition by the Sherman Act.

Not only is the claim in the mainstream, but one of the key factors relied upon in *Aspen Skiing*, and commented upon by *Trinko*, citied by Defendants, and *Covad Communications*, also quoted by Defendants, is present in the case at bar.  In *Aspen Skiing*, the Court cited as a factor in determining the exclusionary practice to be predatory as opposed to benign or legal that, "The nonprofit elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years."  *Aspen Skiing*, 105 S. Ct. at 2858. Defendants argue that *Trinko* and *Covad Communications Co. v. Bellsouth Corp.*, 374 F.3d 1044 (11th Cir. 2004) now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal to deal claims under *Aspen.  Covad*, 374 F.3d at 1049.

Whether this is the law or not, Plaintiffs have alleged just that.  In paragraph 26 of the FAC, Plaintiffs allege that the hospitals unilaterally ceased the rotational assignment of patients for durable medical equipment that had existed prior to the entry into the market of the captive DME companies.5  In *Trinko*, the Court relied upon the absence of an earlier course of dealing , stating, "Here, therefore, the defendants' prior conduct sheds no light upon the notification of  its refusal to deed upon whether its regulatory lapses were prompted not be competitive zeal but by anti-competitive malice."  *Id.*   In the present case, there was a prior history of rotational assignment in order to best serve the hospitals' patients. That rotational practice ended upon entry into the market of captive DMEs.  It certainly can be inferred that the ceasing of this practice occurred as the result of Defendants' wishes to exclude competition, rather than to compete with Plaintiffs.

---

5 Defendants' Brief, at p. 42, argues that "once each [hospital] became a competitor of the Plaintiffs, Jackson and Baptist acted as competitors (Defendants' Brief, p. 42).  The problem with this argument is that Jackson and Baptist never became competitors of Plaintiffs; they are hospitals, not DME companies. In essence, Defendants' Brief concedes that it was the very purpose of the hospital to foreclose competition.  This is by definition actionable predatory conduct.

### M.  Plaintiffs Has Stated A Claim For Injunctive Relief.

Defendants argue that Plaintiffs are not entitled to injunctive relief on the simple assertion that they have not stated any claim for relief under either the Sherman Act or the Clayton Act.  Plaintiffs have refuted each argument made by Defendants as to whether they have stated a claim, and have shown that they are entitled to relief under the antitrust statutes.

Plaintiffs have alleged that the conduct giving rise to liability is ongoing, and that the ongoing actions threaten serious and irreparable harm in the alleged market.  Defendants do no dispute that injunctive relief  is available to a successful antitrust claimant, such as provided for by the statutes themselves, 15 U.S.C. § 26 ("Any person, from, corporation, or association shall be entitled to sue for and have injunctive relief . . . against certain loss or violation of  the antitrust laws").  Because the Plaintiffs have alleged continuing  violation and continuing loss or threat of loss, the claims for injunctive relief are properly plead.

### N.    Plaintiffs State Law Claims Are Proper And This Court Properly Has Jurisdiction Over Them.

Defendants make no real argument concerning Plaintiffs claims for a violation of the Alabama Antitrust Act.   Plaintiffs merely state that federal law regarding monopolization governs Alabama Antitrust  actions.  *McCluney v. Zap Professional Photography, Inc.*, 663 So.2d 982, 926 (Ala. 1995).  Because Plaintiffs have stated claims under the Federal Antitrust Acts, they have stated claims under the Alabama Antitrust Act.   Similarly, this Court has jurisdiction over the state law claims under its supplemental jurisdiction, 28 U.S.C. §1367.  Where a federal court has proper jurisdiction over the case either on diversity of subject matter grounds, the Court has jurisdiction "over all other claims that are so related to claims in the action within such that they form part of the same case or controversy under Article 3 of the United States Constitution." 28 U.S.C. § 1367(a).  Where a federal court has original jurisdiction

over some claims in the case, the Court also has jurisdiction over state law claims so related to federal claim that the two claims "derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 86 S. Ct. 1130, 1138 (1966). There is no question that the same facts giving rise to liability under the federal antitrust laws also give rise to liability under the Alabama Antitrust Act. As such, federal jurisdiction attaches.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss First Amended Complaint is due to be denied in its entirety.

Respectfully,


s/Brian M. Clark
Brian M. Clark (ASB-5319-R78B)
*Attorney for Plaintiffs*


**OF COUNSEL:**

WIGGINS, CHILDS, QUINN
 & PANTAZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile:  (205) 254-1500
Email address: bclark@wcqp.com

**OF COUNSEL:**

DWAYNE L. BROWN
5926 Carmichael Road, Suite C
Montgomery, Alabama 36123-02058
Email address: dbrown@dbrownatty.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing via CMF Electronic Filing System and/or by U. S. Mail, properly addressed and postage prepaid upon the following:

James E. Williams, Esq.
Melton, Espy & Williams, P.C.
301 Adams Avenue
Montgomery, Alabama 36104

Glenn B. Rose, Esq.
Harwell, Howard, Hyne, Gabbert
 & Manner, P.C.
315 Deaderick Street, Suite 1800
Nashville, Tennessee 37238

Dennis R. Bailey
Ruston, Stakely, Johnston
 & Garrett, P.A.
184 Commerce Street
Montgomery, Alabama 36104

Mike Carlson
William Carlson & Associates, P.C.
Post Office Box 660955
Birmingham, Alabama 35266

Done this 21st day of April, 2006.


s/Brian M. Clark_____
Of Counsel