IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

PRECISION CPAP, INC.;          )
MEDICAL PLACE, INC.; PHASE     )
III VANS, INC. d/b/a EAST      )
MEDICAL EQUIPMENT AND          )
EQUIPMENT AND SUPPLY; and      )
MED-EX,                        )
                               )
     Plaintiffs,               )
                               )     CIVIL ACTION NO.
     v.                        )     2:05cv1096-MHT
                               )         (WO)
JACKSON HOSPITAL; MED-SOUTH    )
INC.; JMS HEALTH SERVICES,     )
LLC, d/b/a JACKSON MED-        )
SOUTH HOME HEALTH, LLC,;       )
BAPTIST HEALTH, INC.;          )
BAPTIST VENTURES-AMERICAN      )
HOME PATIENT;                  )
                               )
     Defendants.               )


OPINION

The plaintiffs, which are in the durable medical

equipment (DME) business, bring this private antitrust

suit against the defendants, which are hospitals,

corporations, and affiliates, claiming violations of §§ 1

and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2,

as privately enforced through §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, as well as violations of Alabama state antitrust law, 1975 Ala. Code § 6-5-60. The plaintiffs are as follows:  Precision CPAP, Inc.; Medical Place, Inc.; Phase III Vans, Inc., d/b/a/ East Medical Equipment and Supply; and Med-Ex.  The defendants are as follows:  Jackson Hospital; Med-South, Inc.; JMS Health Services, L.L.C., d/b/a Jackson Med-South Home Health, L.L.C.; Baptist Health, Inc.; American Home Patient, Inc.; and Baptist Ventures-American Home Patient.  Specifically, the plaintiffs allege that the defendants have illegally excluded them from the DME market.  Jurisdiction over the plaintiffs' federal claims is proper pursuant to 28 U.S.C. §§ 1331 (federal question) and 15 U.S.C. § 4 (antitrust); supplemental jurisdiction over the state claims is proper under 28 U.S.C. § 1367.

Now before the court is the defendants' motion to dismiss the plaintiffs' first amended complaint.  Fed. R.

Civ. P. 12(b)(6).  For the reasons that follow, the motion will be granted.

## I. MOTION-TO-DISMISS STANDARD

In considering a defendant's motion to dismiss, the court accepts the plaintiff's allegations as true, <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984), and construes the complaint in the plaintiff's favor, <u>Duke v. Cleland</u>, 5 F.3d 1399, 1402 (11th Cir. 1993).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974). To survive a dismissal motion, a complaint need not contain "detailed factual allegations," <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007), but rather "only enough facts to state a claim to relief that is plausible on its face," <u>id</u>. at 570.

The relevant facts as alleged by the plaintiffs are as follows. The plaintiffs are corporations engaged or formerly engaged in the business of providing DME (including beds, walkers, wheelchairs, and oxygen tanks) for the home-health care of patients in and around Montgomery, Alabama. The vast majority of the plaintiffs' business results from the sale or lease of DME to patients who have been discharged from local hospitals and prescribed DME by their physicians.

Defendant Jackson Hospital, in Montgomery, and defendant Baptist Health, which operates two hospitals in Montgomery as well as a hospital in nearby Prattville, Alabama, are the primary source of hospital services for a majority of Montgomery-area residents. Until the late 1990s, the plaintiffs focused their DME marketing efforts on the staff at these hospitals and on patients awaiting discharge. When patients did not choose a DME provider, they were assigned to a provider on a rotating basis.

In the late 1990s, Jackson Hospital and Baptist Health each decided to enter the DME market. Jackson entered into a joint venture with defendant Med-South, Inc., a DME provider, to operate JMS Health Services. Similarly, Baptist Health entered into a joint venture with defendant American Home Patient, Inc., a DME provider, to operate Baptist Ventures-American Home Patient. Each joint venture created an in-house provider of DME for the patients at Jackson's and Baptist's respective hospitals.[1]

Once these joint ventures were formed, Jackson Hospital began referring its patients with DME needs to JMS, and the hospitals operated by Baptist Health began referring their patients with DME needs to Baptist Ventures. The hospitals ended their practice of assigning DME providers on a rotating basis to patients who do not choose a provider. Unless patients

---

1. The amended complaint does not allege that Jackson Hospital and Baptist Health cooperated in any way with each other, only that they both entered similar joint ventures with different DME providers.

specifically requested an outside DME provider, they were referred to the hospital's affiliated DME provider.

The plaintiffs allege that their referrals from hospitals have almost vanished and that they have suffered a loss of revenue as a result of the defendants' actions.   Plaintiff Med-Ex sold the assets of its business and alleges that the sale price of the assets was depressed as a result of the defendants' actions.

## III. FEDERAL CLAIMS

### A.  Antitrust Standing

As a threshold matter, the court must address whether the plaintiffs have standing to sue under the Sherman and Clayton Acts.  Section 4 of the Clayton Act defines the class of persons who may bring a private-damages action under antitrust laws.  It states:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district of the United States in the district in which the defendant resides or is found or has

> an agent, without respect to the amount
> in controversy, and shall recover
> threefold the damages by him sustained,
> and the cost of suit, including a
> reasonable attorney's fee."

15 U.S.C. § 5. Despite this language, which could conceivably "encompass every harm that can be attributed directly to the consequences of an antitrust violation," Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 529 (1983), the courts have interpreted this statute more narrowly. In considering whether a party has standing to bring suit under the antitrust laws, a court should first determine "whether the plaintiff suffered 'antitrust injury.'" Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1449 (11th Cir. 1991). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Specifically, "[t]he injury should reflect the anticompetitive effects either of the violation or of

anticompetitive acts made possible by the violation."
_Id_. Second, "the court should determine whether the
plaintiff is an efficient enforcer of the antitrust
laws." _Todorov_, 921 F.2d at 1449. This requires an
examination of factors including:

> "1) the existence of a causal connection
> between the antitrust violation and the
> alleged injury; 2) the nature of
> plaintiff's alleged injury; 3) the
> directness or indirectness of the
> asserted injury and the related inquiry
> of whether the damages are speculative;
> 4) the potential for duplicative
> recovery or complex apportionment of
> damages; and, finally, 5) the existence
> of a more direct victim of the alleged
> anticompetitive conduct."

_Austin v. Blue Cross & Blue Shield of Alabama_, 903 F.2d
1385, 1388 (11th Cir. 1990). To determine antitrust
standing, "a court must review the allegations contained
in the complaint." _Id_. at 1387.

The plaintiffs allege that the hospitals and their
captive DME providers combined to restrict access to the
market for DME sales and rentals to patients discharged
from their hospitals. Specifically, the hospitals ceased

8

the rotational assignment of patients to the plaintiffs and other DME providers; denied the plaintiffs access to the hospital staff and patients; and instructed case workers on staff to refer patients to the captive DME providers. The plaintiffs allege that, as a result, in most cases patients know of only one choice of DME provider. According to the plaintiffs, this has led to an increase in the captive DME providers' market power to the point where they can cut services and raise prices without any corresponding drop in usage or revenues.

The defendants contend that the plaintiffs' allegations are insufficient to establish antitrust standing. In particular, the defendants argue that the plaintiffs lack antitrust standing because they are unable to show that prices have actually risen for DME not covered by Medicare or that the quality has eroded for DME covered by Medicare. According to the defendants, the plaintiffs did not suffer an antitrust

injury and, even if they had, the plaintiffs would not be the most efficient enforcers of the antitrust laws.

1.  Antitrust Injury

The defendants rely on the reasoning in Todorov to support their contention that the plaintiffs did not suffer an antitrust injury.  There, the Eleventh Circuit Court of Appeals held that a doctor lacked antitrust standing to sue a hospital for failure to grant privileges in the radiology department.

Todorov was a practicing neurologist who relied on CT scans to diagnose his patients.  Todorov, 921 F.2d at 1442.  He referred many of his patients to DCH Healthcare Authority for the procedure.  DCH would receive a fee from patients' insurance companies for the CT scan, even though Todorov usually examined the film himself.  To obtain some of the profits from the procedure, Todorov applied for privileges at DCH to administer and officially interpret CT scans.  DCH, however, denied his

application. Todorov brought suit against defendants for conspiracy under Section 1 of the Sherman Act and monopolization under Section 2 of the Sherman Act. Specifically, he alleged that radiologists controlled the market and were reaping supercompetitive profits.

The court held that Todorov's alleged injury was not the "type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." Id. at 1453. Todorov "applied for privileges in the radiology department so that he could reap the profits that the radiologists received" from the inflated prices that patients were charged. Id. at 1452. Thus, his primary objective in bringing suit was to benefit from supercompetitive prices rather than create competition for consumers. This was not a cognizable antitrust injury because "[t]he antitrust laws were not enacted to permit one person to profit from the anticompetitive behavior of another person." Id. at 1454.

Contrary to the defendants' contention, this case is distinguishable from <u>Todorov</u>. Whereas Todorov failed to allege any injury to competition from DCH's denial of access to radiologist privileges, the plaintiffs' allegations in this case, that the hospitals were channeling patient choice to their captive DME providers, are sufficient to show the necessary injury to competition. <u>See</u> <u>Advanced Health-Care Servs, Inc. v. Radford Cmty Hosp.</u>, 910 F.2d 139, 149 (4th Cir. 1990).

In addition, the failure of the plaintiffs to allege an actual increase in prices or an actual deterioration in the quality of DME does not defeat the claim of an antitrust injury. In making a determination of whether a plaintiff has alleged antitrust injury, "a court must consider the effect on competition and not simply the effect on the ultimate consumer." <u>Key Enterprise of Delaware, Inc. v. Venice Hospital</u>, 919 F.2d 1550, 1559 (11th Cir. 1990), <u>vacated as moot en banc</u>, 9 F.3d 893

(11th Cir. 1993).[2]  If the allegations of the plaintiffs

are proven true, competition has been injured because

competing DME vendors no longer have access to the

discharged-hospital patients who require DME.

Finally, this court disagrees with the defendants'

contention that the plaintiffs, through this action, seek

only to increase their profits and therefore have not

alleged a cognizable antitrust injury.  Unlike Todorov,

the plaintiffs' damages in this case are not premised on

their ability to profit while patients "paid an

artificially inflated price."  Todorov, 921 F.2d at 1454.

Instead, the plaintiffs seek to ameliorate the potential

for an increase in price and erosion in the quality of

DME by reintroducing competition into the DME market for

discharged-hospital patients.  While an increase in the

---

2.  The defendants correctly assert that Key
Enterprises has no precedential authority since it was
vacated on mootness grounds.  However, a court can find
the reasoning in vacated cases to be of persuasive value.
See e.g., United States v. Johnson, 399 F.3d 1297, 1298
n.1 (2005) (concluding that a vacated opinion can have
persuasive value).

plaintiffs' profit will be a likely byproduct of a successful suit, it does not come at the continued detriment of consumers and competition.

## 2. Efficient Enforcer of the Antitrust Laws

The second issue that must be addressed to determine the plaintiffs' antitrust standing is whether they would be "efficient enforcer[s] of the antitrust laws." Todorov, 921 F.2d at 1449. As stated, there is a non-exhaustive list of five factors that should be assessed in determining whether a plaintiff is an efficient enforcer of the antitrust laws. The defendants, without addressing any particular factor, contend that the plaintiffs would not be efficient enforcers of the antitrust laws. The court will address each of the factors in turn.

The first factor this court must address is "the existence of a causal connection between the antitrust violation and the alleged injury." Austin, 903 F.2d at

1388. In this case, the plaintiffs allege that violations of the Sherman Act have caused a loss of business and create the potential for an increase in price and an erosion in the quality of DME. This court finds that the allegations are sufficient to show a causal connection between the asserted antitrust violation and the alleged injury. <u>See</u> 2A Phillip E. Areeda et al., <u>Antitrust Law</u> ¶ 338 (hereinafter, "Areeda") ("It is ... enough that the antitrust violation contributes significantly to the plaintiff's injury, even if other factors amounted in the aggregate to a more substantial cause.").

According to the second factor, this court must look to "the nature of plaintiff's alleged injury," <u>Austin</u>, 903 F.2d at 1388, "including the status of the plaintiff as consumer or competitor in the relevant market," <u>Potters Medical Ctr. v. City Hosp. Ass'n</u>, 800 F.2d 568, 575 (6th Cir. 1986), to determine whether plaintiff is an efficient enforcer of the antitrust laws. The plaintiffs

in the instant case are clearly competitors in the relevant market as they allegedly lost profits as a result of the defendants' exclusionary practices. Therefore, this second factor supports a finding of antitrust standing.

The third through fifth factors raise more difficult issues. In a case that is most analogous to the present case and that addresses these three factors, <u>Park Ave. Radiology Assocs., P.C. v. Methodist</u>, 198 F.3d 246, 1999 WL 1045098 (6th Cir. 1999) (table),[3] plaintiffs, providers

---

3. <u>Park Avenue</u>, although unpublished, obviously still can have persuasive value. Based on the similarities between <u>Park Avenue</u> and the present case, this court will look to the Sixth Circuit's treatment of the antitrust standing issue (particularly the issue of whether the plaintiffs were efficient enforcers of the antitrust law) as a guide to resolution of the question of standing in this case. To support their argument that there was antitrust standing, the plaintiffs looked to two cases that addressed whether a competitor DME provider had antitrust standing to bring suit. <u>See Key Enterprises</u>, 919 F.2d at 1559-60; <u>Advanced Health-Care Services, Inc. v. Radford Community Hospital</u>, 910 F.2d 139, 149 (4th Cir. 1990). However, in neither of the cases did the court address the second prong of the antitrust-standing determination: whether the plaintiff would be an efficient enforcer of the antitrust laws. (continued...)

16

of outpatient-radiologist services for patients referred to them by primary-care physicians, appealed from a dismissal of their claims for lack of antitrust standing. The physicians with staff privileges at the Methodist Hospitals were members of Metrocare, Inc., a company that negotiated with third-party payors of managed health care programs on behalf of its member physicians.  Metrocare was a member of Health Choice, Inc., which operated a preferred-provider organization.  Plaintiffs alleged that Health Choice contracted with employers and insurance companies to make Methodist Health's hospital services and Metrocare physician services available at a discounted rate to beneficiaries in the relevant groups. After entering into the contract, Metrocare stopped making referrals of patients to plaintiffs.  This

---

3.  (...continued)
Todorov, which was decided after these two cases, requires that this court look to whether plaintiffs would be efficient enforcers of the antitrust laws in order to determine whether they have antitrust standing. Therefore, this court will look to Park Avenue because it provides more relevant guidance on this issue.

resulted in a loss of business to the plaintiffs.

Addressing the third factor ("the directness or indirectness of the asserted injury and the related inquiry of whether the damages are speculative," Austin, 903 F.2d at 1388), the Park Avenue court held that the injury to plaintiff radiologists was indirect because "their claimed lost profits [were] derivative of the alleged harm inflicted on third parties--the health care consumers and their third-party providers," that is, insurance companies and employers. Park Avenue, 1999 WL 1045089, at *5-*6. The court also held that the damages were speculative because the number of lost referrals was difficult to measure. Id. at *6.

Analogously, in the instant case, the injury of lost profits to the plaintiffs is indirect and derivative of the alleged harm inflicted on the discharged patients. In addition, the damages are speculative because it would be difficult for the plaintiffs to measure the number of lost referrals resulting from the hospitals' allegedly

exclusionary conduct. This factor therefore weighs against affording the plaintiffs antitrust standing.

Addressing the fourth factor, the Park Avenue court explained that "the potential for duplicative recovery or complex apportionment of damages exist if Plaintiffs were allowed to go forward inasmuch as the parties directly harmed would also have a cause of action." Id, at *7. Here, in the instant case, if the plaintiffs were allowed to go forward with the suit, there is a risk of duplicative recovery because the patients that are directly harmed by the exclusionary conduct could also bring suits against the hospitals and the captive DME providers. In addition, if plaintiffs were awarded damages, this court would face the difficult prospect of identifying damages and apportioning them among directly victimized patients and the indirectly affected plaintiffs. See Associated General, 459 U.S. at 545. This factor therefore weighs against affording the plaintiffs antitrust standing.

Addressing the fifth and final factor ("the existence of a more direct victim of the alleged anticompetitive conduct," Austin, 903 F.2d at 1388), the Park Avenue court identified the healthcare consumers and third-party insurers as the direct victims of the alleged antitrust violations. Id. at *6-*7. Similarly, in this case, the patients are the direct victims of the allegedly exclusionary conduct that limits their choice of DME providers and could have the potential of increasing the price and eroding the quality of DME.

Thus, three of the five factors identified in Austin (including the indirectness of the asserted injury and the speculative nature of the damages; the potential for duplicative recovery or complex apportionment of damages; and the existence of a more direct victim of the anticompetitive conduct) weigh against judicial enforcement of the plaintiffs' antitrust claim. However, as discussed above, the factors identified in Austin should not be considered exhaustive.

Prominent antitrust commentators Phillip Areeda and Herbert Hovenkamp have identified additional factors that are relevant to this case. These commentators argue that competitor antitrust standing serves antitrust policy when "(a) the rival is in a position to detect a violation earlier than consumers are; or (b) the rival's injury is large, while the injuries of individual consumers are likely to be very small or the consumers have collective action problems making their suit cumbersome or less likely." 2A Areeda ¶ 348.

Addressing first whether the plaintiffs are in a position to detect a violation earlier than the patients, the plaintiffs allege that patients rarely have a preferred DME provider. As a result, the system of hospital-staff referral to the captive DME providers combined with the denial to competing DME providers of access to hospitals to market their services results in a situation in which patients, "with very few exceptions, know of only one choice for durable medical equipment."

Plaintiffs' First Amended Complaint, at ¶ 24 (doc. no. 21).  Without knowledge of alternatives, patients will not be able to detect the evidence of an antitrust violation, including higher prices and an erosion in the quality of services.

The <u>Park Avenue</u> court addressed a similar issue and explained that the role of third-party payors (employers and insurance companies) was an important element not addressed in the radiologists' argument that they were the most efficient enforcers of antitrust law.  In particular, the court surmised that, "if Plaintiffs are providing a superior and more cost efficient product as they allege, then the third-party providers ... will direct their members to Plaintiffs, and those patients who may not have any third party coverage will do the same in a competitive market."  <u>Park Avenue</u>, 1999 WL 1045098, at *5.

For those covered by insurance, such as Medicare, the holding in <u>Park Avenue</u> is persuasive that the third-party

payor would be as well positioned as rivals to detect an antitrust violation. However, for those not covered by insurance, it is not clear how the method of detection identified in Park Avenue would operate. In cases involving uninsured patients who do not have knowledge of DME prior to their entry into the hospital and to whom non-captive DME providers are unable to market their services in the hospital, there is no third-party payor to direct patients to the most cost-efficient DME provider. Thus, uninsured patients are poorly positioned relative to rival DME providers to detect an antitrust violation.

In addition, even if the captive DME providers ultimately raised the prices or allowed their services to erode, the harm to individual patients is likely to be very small in comparison to the plaintiffs' loss of profits resulting from the defendants' anticompetitive conduct. As a result, the likelihood that patients will

bring suit to ameliorate the allegedly anticompetitive conduct is minimal.

While it is a close call, this court finds that the plaintiffs are efficient enforcers of the antitrust law. The plaintiffs are much better positioned than consumers to detect an antitrust violation earlier.  In addition, consumers would suffer from collective-action problems in bringing a suit because of the relatively small injury experienced by individual consumers by the rise in price or decline in the quality of DME.

On the basis of the finding that the plaintiffs are efficient enforcers of the antitrust laws combined with the finding above that the plaintiffs have demonstrated antitrust injury, this court concludes that the plaintiffs have antitrust standing to sue for damages under the Sherman and Clayton Acts.  This court now addresses whether the plaintiffs have stated claims under §§ 1 and 2 of the Sherman Act for which relief can be granted.

## B.   Sherman Act § 1

Under § 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.[4] "Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,'" the Supreme Court "has long recognized that Congress intended to outlaw only unreasonable restraints." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).   The plaintiffs bring a claim of coercive reciprocity and concerted refusal to deal under § 1 of the Sherman Act.

---

4.   Although the Sherman Act itself does not provide a private right of action, the Clayton Act permits private parties to seek damages or injunctive relief for antitrust violations.   15 U.S.C. §§ 15, 26.

1. Coercive Reciprocity

Count I of the plaintiffs' amended complaint alleges restraint of trade in violation of § 1 of the Sherman Act; more specifically, the plaintiffs allege that the defendants have engaged in an illegal restraint of trade by contracting, combining, or conspiring to use their control of hospital services to coerce patients into buying or renting DME from their joint-venture affiliates. The plaintiffs term their claim "coercive reciprocity," or "the practice of using economic leverage in one market coercively to secure competitive advantage in another." Plaintiff's Opposition to Motion to Dismiss (doc. no. 33) at 3 (citing Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1360 (Fed. Cir. 1999)).

Courts have recognized that reciprocal dealing can constitute an illegal restraint of trade under § 1. Typically, reciprocal dealing involves two parties who "face each other as both buyer and seller. One party offers to buy the other party's goods, but only if the

second party buys other goods from the first party."
Spartan Grain & Mill Co. v. Ayers, 581 F.2d 419, 424 (5th
Cir. 1978).[5]

Reciprocal dealing is not, by itself, illegal.
Spartan Grain & Mill, 581 F.2d at 423.   Rather,
reciprocal-dealing arrangements illegally restrain trade
only when they are coercive--that is, only when a
defendant uses its market power, or leverage, over one
product to induce the purchase or sale of a second
product, a transaction that would not otherwise take
place in a competitive market.  "In each case one side of
a transaction has special power in the market place.  It
uses this power to force those with whom it deals to make
concessions in another market."  Spartan Grain & Mill,
581 F.2d at 425.

---

5.   In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th
Cir. 1981) (en banc), the Eleventh Circuit Court of
Appeals adopted as binding precedent all of the decisions
of the former Fifth Circuit handed down prior to the
close of business on September 30, 1981.

Here, the plaintiffs allege that the defendant hospitals use their market power over hospital services to coerce patients into dealing exclusively with the hospitals' respective affiliated DME provider. That is, patients who receive hospital services at Jackson Hospital are coerced into buying or renting DME from JMS, and patients who receive hospital services at Baptist hospitals are coerced into buying or renting DME from Baptist Ventures, even though those patients would buy or rent from the plaintiffs in a competitive market.

As support for their argument, the plaintiffs rely on the holding in the vacated Eleventh Circuit opinion, <u>Key Enterprise</u>. In that case, the defendant hospital pressured home-health-care nurses to refer patients to the hospital's DME provider. 919 F.2d at 1561-63. The home-health-care nurses were not employees of the hospital and relied on access to patients to remain in business. The court determined that the act of the hospital constituted coercive reciprocity as it involved

a buyer (the hospital) conditioning the purchase of services from the sellers (home-health-care nurses) on the sellers' marketing of the buyers' service.

Here, the plaintiffs argue that the defendants "coerce, pressure, or otherwise unduly influence the patients, doctors, nursing homes and home health care agents to select or recommend only the captive DME companies to the exclusion of Plaintiffs." Plaintiff's First Amended Complaint, at ¶ 37 (doc. no. 21). The only factual allegation that the plaintiffs make to support this conclusory statement is that the hospitals have instructed "case workers and staff to steer patients to the captive DME companies." Id. at ¶ 24. This factual allegation is not sufficient to support a coercive-reciprocity claim. See Twombly, 550 U.S. at 570 (requiring at the pleading stage factual allegations that plausibly suggest a violation of the antitrust laws). Unlike the independent home-health-care nurses in Key Enterprise who felt that their access to the hospital was

conditioned on patient referrals to the DME provider, the plaintiffs in this case make no allegations that the hospitals similarly coerced hospital staff or case workers into referring the hospital's DME providers to patients; in particular, there is no allegation that the hospital staff's continued employment, pay, or benefits at the hospital or access to the hospital were in any way conditioned on them referring patients to their hospital's DME providers. Moreover and perhaps most importantly, there is nothing the complaint to suggest that the hospitals and their staff otherwise had a buyer-seller or other comparable commercial relationship. <u>See</u> <u>Spartan Grain & Mill</u>, 581 F.2d at 423 ("A reciprocal dealing arrangement exists when two parties face each other as both buyer and seller."). In the absence of any such factual allegations in the complaint of coercion arising out of a buyer-seller relationship or something comparable, the plaintiffs' coercive-reciprocity claim

fails to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6).

2. Concerted Refusal to Deal

Count II of the amended complaint alleges that the defendants have acted in concert in refusing to deal with the plaintiffs by failing to provide access to the discharged patients in violation of § 1 of the Sherman Act. The plaintiffs in their brief opposing the dismissal motion have clarified that it is the concerted actions of the hospitals and their respective captive DME providers that is at issue; they do not allege that the four hospitals engaged in any illegal concerted actions among themselves.

The plaintiffs have made sufficient allegations of agreements between the three hospitals and their captive DME provider to state a claim that they were acting in concert. However, the more difficult question is whether the allegation in the complaint that the hospitals and

31

captive DME providers refused to deal with the plaintiffs states a claim under § 1 of the Sherman Act for which relief can be granted. This court concludes that it does not.

The plaintiffs allege that the hospitals unilaterally ceased the DME rotational assignment that existed prior to the entry into the market of their DME providers. In addition, the plaintiffs allege that, since the hospitals entered into the joint ventures, they have refused to provide the plaintiffs with access to the hospitals so that they can market their DME. The plaintiffs contend that these acts constituted a refusal to deal in violation of the Sherman Act.

The plaintiffs rely on two Supreme Court cases to support their refusal-to-deal claim. In <u>Lorain Journal Co. v. United States</u>, 342 U.S. 143 (1951), the Court held that a newspaper publisher that enjoyed a substantial monopoly in the mass dissemination of news and advertising in Lorain, Ohio, engaged in unlawful

exclusionary conduct when it refused to accept any local advertisements from any entity that advertised on a radio station run by the Elyria-Lorain Broadcasting Company. As a result, numerous advertisers refrained from advertising on the radio. The Court explained that the newspaper publisher's actions "not only reduced the number of customers available to [the radio station] in the field of local Lorain advertising and strengthened the Journal's monopoly in that field, but more significantly tended to destroy and eliminate [the radio station] altogether." Id. at 149.

The newspaper publisher argued that it had a right "to select its customers and to refuse to accept advertisement from whomever it pleases." Id. at 155. The Court agreed that there was such a right, but explained that the right was not unqualified. In particular, the Court explained that the publisher could not exercise that right in a manner contrary to the

Sherman Act.  Id.  The Court therefore held that the publisher's action violated the Sherman Act.

In the second case cited by the plaintiffs, Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985), the Court added greater specificity to the refusal-to-deal standard.  In Aspen Skiing, two ski companies, Ski Co. (which operated three ski mountains) and Highland (which operated a fourth ski mountain), offered an all-Aspen ski ticket, in which customers could ski on any of the four mountains.  The revenues from sales were divided between the companies based on usage of the mountains.  This arrangement lasted for 15 years, when Ski Co. proposed a fixed-revenue-sharing arrangement that it knew Highland would not accept.  As expected, Highland rejected the offer.  Ski Co. discontinued the all-Aspen ski ticket and instead offered ski tickets limited to the three mountains that it operated.

In addition to the discontinuance of the all-Aspen ski ticket, Ski Co. also refused to sell any lift tickets

to Highland either at the tour operator's discount or at retail. Id. at 593. Highlands then developed the "Adventure Pack," which consisted of a three-day ski pass at Highlands and three vouchers equal to the price of a daily lift ticket at a Ski Co. mountain. Ski Co. refused to accept the vouchers. Unable to offer a package that included access to the Ski Co. mountains, Highlands' share of the market for downhill skiing services declined dramatically.

The Court reiterated that "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." Id. at 601. A firm's refusal to deal is unlawful "[i]f [it] has been attempting to exclude rivals on some basis other than efficiency." Id. at 605 (internal quotation marks omitted). The Court identified two indicators that Ski Co. was attempting to exclude rivals on a basis other than efficiency. First, Ski Co. "elected to make an important change in a pattern of distribution that had

originated in a competitive market and had persisted for several years." Id. at 603. Such a change was contrary to consumer demand, as "skiers demonstrably preferred four mountains to three." Id. at 606. Second, Ski Co. decided to forgo daily ticket sales from vouchers obtained by Skiers contained in Highlands' Adventure Pack. From this conduct, it was proper to infer that "Ski Co. elected to forgo these short-run benefits because it was more interested in reducing competition in the Aspen market over the long run by harming its smaller competitors." Id. at 608.

In the present case, the plaintiffs, relying on the reasoning in Aspen Skiing, argue that the defendants can point to no increased efficiency resulting from refusing to deal with the plaintiffs. However, the plaintiffs ignore the subsequent modification of the refusal-to-deal standard in Verizon Communications, Inc. v. Trinko, 540 U.S. 398 (2004), where the Court broadened the right of firms to refuse to deal with rivals.

In <u>Trinko</u>, the Court explained that "[c]ompelling ... firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficially activities." <u>Id</u>. at 407-08. The Court was concerned about the fact that "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing--a role for which they are ill suited." <u>Id</u>. at 408. Therefore, the Court held that, "as a general matter, the Sherman Act does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom it will deal." <u>Id</u>. (citation and internal quotation marks omitted). The Court explained that only under certain circumstances will a refusal to deal with rivals constitute an antitrust violation under the Sherman Act.

The Court identified <u>Aspen Skiing</u> as being "at or near the outer boundary of [antitrust] liability." <u>Id.</u> at 409. This <u>Aspen Skiing</u> exception applies only if: "(a) the defendant engaged in a prior course of dealing with its rival; <u>and</u> (b) the unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." <u>Id.</u> (emphasis added).

In the present case, there allegedly was a prior course of dealing between the plaintiffs and defendant hospitals as demonstrated by the rotational system. However, the unilateral termination of a voluntary course of dealing by the hospitals in this case does not suggest a willingness to forsake short-term profits. The hospitals terminated the course of dealing after entering into a joint venture with their respective DME providers, and there is nothing in the plaintiffs' complaint, outside of conclusory allegations, plausibly suggesting

that the decision to cease the rotational system and exclude competitor DME providers from access to the hospital was for any purpose other than increasing both the short-term and long-term profits of their DME providers.  This case is thus distinguishable from <u>Aspen Skiing</u> in which Ski Co. decided to forgo short-term profits in the form of redeeamable vouchers provided by its competitor.

In light of the clear direction from the Supreme Court not to extend the refusal-to-deal exception beyond <u>Aspen Skiing</u>, the plaintiffs' concerted-refusal-to-deal claim fails to state a claim upon which relief can be granted.  <u>See</u> Fed. R. Civ. P. 12(b)(6).

### C.   Sherman Act § 2

The plaintiffs assert four claims under § 2 of the Sherman Act.  Under § 2, it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the

trade or commerce among the several States."  15 U.S.C. § 2.  Section 2 "covers behavior by a single business as well as coordinated action taken by several businesses." Spanish Broad. Sys. of Florida, Inc. v. Clear Channel Communications, Inc., 376 F.3d 1065, 1074 (11th Cir. 2004).  A violation of § 2 "requires harm to competition that must occur within a relevant ... market, with a specific set of geographical boundaries and a narrow delineation of the products at issue."  Id.  Therefore, this court must first identify the relevant market in this case.

1.  Relevant Market

A relevant market consists of both a product market and a geographic market.  Brown Shoe Co. v. United States, 370 U.S. 294, 324 (1962).  The parties agree that the geographic market is Montgomery and Prattville, Alabama.  The dispute concerns the definition of the product market.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc., 931 F.2d 816, 824 (11th Cir. 1991). Within broader product markets, "well-defined submarkets may exist which, in themselves constitute product markets for antitrust purposes." Id. The boundaries of a submarket are determined by "examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id.

The plaintiffs allege that the relevant product market in this case includes two submarkets that consist of the sale and rental of DME for patients discharged from Jackson Hospital and the Baptist Health hospitals,

41

respectively. The defendants contend that the plaintiffs' definition of the relevant market is implausible and the market should instead be understood more broadly to consist of the sale and rental of DME to all outlets in the geographic market.

Based on an examination of the practical indicia for determining a relevant market, the court finds that the plaintiffs have identified the relevant product submarket as the rental and sale of DME in hospitals. However, the plaintiffs' argument that the submarket is disaggregated as between the two sets of hospitals, such that two product submarkets exist within the one geographic market, lacks merit.

The complaint alleges that the market is bounded by a distinct method of distribution to a distinct segment of customers. In particular, it is a method of distribution whereby hospital patients are prescribed DME while in the hospital, and those DME needs are arranged through staff at the hospital.

Several courts have found a method of distribution to be a relevant submarket for antitrust purposes. See e.g., Henry v. Chloride, 809 F.2d 1334, 1342 (8th Cir. 1087) (batteries sold by route salespersons are a distinct submarket from batteries sold from warehouses or stores); Greyhound Computer Corp., Inc. v. Int'l Bus. Mach. Corp., 559 F.2d 488, 494 (9th Cir. 1977) (lease of computers a distinct submarket from the sale of computers); Columbia Broad. Sys., Inc. v. F.T.C., 414 F.2d 974, 979 (7th Cir. 1969) (records sold through record clubs are a distinct submarket); F.T.C. v. Staples, Inc., 970 F.Supp. 1066, 1080 (D.D.C. 1997) (sale of consumable office supplies through office supply superstores a distinct submarket from the sale of consumable office supplies through other outlets); Eastern Dental Corp. v. Isaac Masel Co., Inc., 502 F.Supp. 1354, 1361 (E.D. Pa. 1980) (sale of facebows wholesale a distinct market from sale of facebows retail).

This court finds this case law persuasive and finds that the method of distribution of DME to hospital patients is the relevant product submarket for antitrust purposes. The indicia that the sale and rental of DME in hospitals constitute a relevant submarket include the plaintiffs' allegations that there is industry recognition that the sale and rental of DME to hospitals is a distinct market. In addition, the hospital DME providers service a distinct class of discharged patients, and there is allegedly less sensitivity of consumer demand to changes in the price or quality of the DME to discharged patients in hospitals.

However, the court cannot agree with the plaintiffs' suggestion that the sale and rental of DME in the two sets of hospitals represent two separate and distinct submarkets. The plaintiffs seek not only to define the submarket by the method of distribution, which as described above is recognized in the case law, but also on the basis of the position or location of the

consumers.  In particular, they argue that the two sets of hospitals constitute two separate submarkets because the hospitals have two separate sets of discharged patients that are referred to two different DME providers.  This court has not found any cases in which the relevant product market is defined on the basis of the position or location of consumers.

The one case cited by plaintiffs is inapposite.  The Ninth Circuit Court of Appeals in <u>Greyhound Computer Corp.</u> held that the leasing of computers constitutes a distinct submarket separate from other methods of distribution of computers, including the sale of computers.  559 F.2d at 494.  The court did address whether leases and sales served different customer needs; however, this was in the context of an examination of one of the indicia for determining the existence of a leasing submarket.  The court ultimately defined the submarket in terms of the leasing method of distribution, not in terms

of the class or group of consumers to whom computers were leased.

The only case that this court has been able to find that is somewhat analogous holds that submarkets cannot be defined in terms of the location or position of the consumers. In Rohlfing v. Manor Care, Inc., 172 F.R.D. 330 (N.D. Ill. 1997), the plaintiffs alleged that the relevant market consisted of "the sale of pharmaceutical products to residents of Manor Care nursing home facilities." Id. at 345. The court explained that "it is improper to define a market simply by identifying a group of customers who have purchased a given product; rather the market consists of the array of 'interchangeable' products that those consumers confronted when making their product selection, plus those products which could quickly be supplied as interchangeable alternatives." Id. The court recognized that it was particularly inappropriate to define the market on the basis of a particular set of consumers in

that case because Manor Care residents who are unhappy with the pharmaceutical service supplied by their nursing home could simply transfer to a different nursing home that does not utilize that service.  Id. at 346.

This court finds the reasoning in Rohlfing persuasive.  It is inappropriate to define the product submarket on the basis of a particular set of patients because the market is defined by the interchangeability of the use of the product itself, not the users of the product.  Patients in hospitals are in a sense a captured audience; nonetheless, if they are dissatisfied with the DME supplied by their hospital, they could either express their preference for an alternative DME provider to the hospital staff or transfer to another hospital that does not utilize that DME provider.  This ability of hospital patients to access DME from other sources demonstrates that the relevant market, at the very least, includes both of the DME providers that are involved in joint ventures with the respective sets of hospitals.

In sum, this court concludes that the relevant market for purposes of determining whether defendants have violated § 2 of the Sherman Act is the distribution of DME through hospitals in Montgomery and Prattville, Alabama.

2.  Shared Monopoly

On the basis of this definition of the relevant market, the court concludes that the plaintiffs' four asserted claims under § 2 of the Sherman Act should be dismissed.  As discussed above, in order to prove a violation of § 2 of the Sherman Act, the plaintiffs must demonstrate either that a single entity or multiple entities acting in concert engaged in monopolizing activity.  The plaintiffs have not alleged a violation of § 2 by a "single hospital" or concerted activity by the two hospital distributors of DME.

The relevant market consists of two hospital distributors of DME, Jackson Med-South and Baptist

Ventures-American Home Patient.[6]   Plaintiffs have not

alleged any agreement or concerted activity between the

two distributors.   The only allegation is that of

parallel conduct derived from the fact that the hospitals

entered into the joint ventures with their respective DME

providers during the same broadly defined time period

(the late 1990s).   The Supreme Court has clearly held,

that, "[w]hile a showing of parallel business behavior is

admissible circumstantial evidence from which the fact

finder may infer agreement, it falls short of

_____

6.   Because there are two hospital distributors in
the relevant market, this case is distinguishable from
the cases relied upon by that plaintiffs that involved
claims of monopolization of DME markets under § 2 of the
Sherman Act.    In Key Enterprise, the claim of
monopolization was brought against a single hospital,
with monopoly power in the relevant market, and its
affiliated DME supplier.   919 F.2d at 1552.   In Advanced
Health-Care Services, the claim of monopolization was
brought against three separate hospitals and their
affiliated DME suppliers in three different geographic
markets in which the hospitals had monopoly power.   910
F.2d at 141-43.   Finally, in M&M Medical Supplies and
Services, Inc., v. Pleasant Valley Hospital, Inc., the
claim of monopolization was brought against a single
hospital, with monopoly power in the relevant market, and
its affiliated DME supplier.   981 F.2d 160, 162 (4th Cir.
1993).

conclusively establishing agreement or itself constituting a Sherman Act offense." "While a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,' it falls short of 'conclusively establish[ing] agreement or ... itself constitut[ing] a Sherman Act offense.'" Twombly, 550 U.S. at 553 (quoting Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540-41 (1954)). Allegations of parallel conduct, without more, are not sufficient to survive a motion to dismiss. Twombly, 550 U.S. at 556-57.

The complaint vaguely alleges that defendants have engaged in a series of unlawful and wrongful activities and communications that constitute monopolization, attempted monopolization, and conspiracy to monopolize. In the absence of any allegations of concerted activity between the hospitals' two DME providers, the only theory that could possibly support these claims would be one based on shared monopoly.

Under a theory of shared monopoly, "a group of firms that collectively possess monopoly power can be found liable for joint monopolization." ABA Section of Antitrust Law, Antitrust Law Developments (5th ed. 2002), at 312. The former Fifth Circuit Court of Appeals, consistent with other courts that have addressed the issue, has rejected any claim of violation of § 2 of the Sherman Act predicated on a theory of shared monopoly. See American Tel. and Tel. Co. v. Delta Communications Corp., 579 F.2d 972 (5th Cir. 1978), adopting opinion, 408 F.Supp. 1075 (S.D. Miss. 1976) (rejecting a claim that networks constituting an oligopoly can violate § 2 of the Sherman Act and explaining that "[t]he Sherman Act neither mentions nor regulates oligopolies.");[7] see also Kramer v. Pollock-Krasner Foundation, 890 F.Supp. 250, 256 (S.D.N.Y. 1995) (rejecting a shared monopoly claim and explaining that "the offense of monopolization under Section 2 refers to market dominance by a 'single

---

7.    See supra note 5.

firm.'"); <u>Sun Dun, Inc. v. Coca-Cola Co.,</u> 740 F.Supp. 381, 391 (D. Md. 1990) ("An examination of the history of the Sherman Act reveals that Congress' concept of 'monopoly' did not include 'shared monopolies' or 'oligopolies' at all, but rather the complete domination of a market by a single economic entity."); <u>H.L. Hayden Co. v. Siemens Medical Systems, Inc.,</u> 672 F.Supp. 724, 741 (S.D.N.Y. 1987) ("Two competitors could conspire to oligopolize ... but it would not constitute an offense under a literal reading of section 2 [of the Sherman Act].");  <u>Consolidated Terminal Systems, Inc. v. ITT World Communications, Inc.,</u> 535 F.Supp. 225, 228-29 (S.D.N.Y. 1982) ("An oligopoly or a shared monopoly, does not in itself violate § 2 of the Sherman Act.").

Not only must the monopolization and attempted monopolization claim fail as a result of this court's rejection of a theory of shared monopoly, but so must any claim of conspiracy to monopolize.  The court in <u>Sun Dun,</u>

addressing a conspiracy to monopolize claim in a similar context, persuasively held that

> "[w]hen ... two or more competitors conspire to create a market environment in which competition and market entry is improperly restricted, but in which market power continues to be shared among these otherwise unrelated entities, ... there is no conspiracy to monopolize claim stated under Section 2, and the claim must therefore be dismissed."

740 F.Supp. at 392. In other words, a conspiracy to monopolize claim requires either actions by a single firm or concerted activity by multiple firms. Neither has been alleged in the complaint.

In sum, the plaintiffs' Count III claim of monopolization, Count IV claim of attempted monopolization, Count V claim of conspiracy to monopolize, and Count VI claim of conspiracy to monopolize based on the so-called essential facility doctrine all fail to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6). Each of these claims requires either allegations of concerted activity

or sufficient monopoly power by a single firm that are not set forth in the complaint.

## IV.   STATE CLAIMS

In Count VII, the plaintiffs assert violations of Alabama Antitrust Law.  They state that their state claims and their governing law are the same as their federal claims and their governing law.  See Ex parte Rice, 67 So.2d 825, 829 (1953) (per curiam) ("The federal statutes ... prescribe the terms of unlawful monopolies and restraints of trade as they should also be administered in Alabama."); see also Avery Freight Lines, Inc. v. Alabama Pub. Serv. Comm'n, 104 So.2d 705, 709 (1958) ("In construing the terms and provisions of Alabama statutes derived from federal statutes, such terms and provisions will usually be considered as having the meaning given by the federal courts.").  Therefore, the plaintiffs' state claims fail for the same reasons that their federal ones do.

## V. CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss will be granted on the plaintiffs' federal and state claims.

An appropriate judgment will be entered.

DONE, this the 8th day of March, 2010.

                    /s/ Myron H. Thompson
                UNITED STATES DISTRICT JUDGE